UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/14/2022
```

-------------------------------------------------------------------X
   :
MICHAEL COHEN,    :
   :
        Plaintiff,    :
   :        21-cv-10774 (LJL)
    -v-    :
   :        OPINION AND ORDER
UNITED STATES OF AMERICA, et al.,    :
   :
        Defendants.    :
   :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff Michael Cohen's complaint centers around allegations of serious violations of his constitutional rights by the United States government, then-President Donald J. Trump, then-Attorney General William Barr, and various officers within the Federal Bureau of Prisons. Cohen alleges—and another Court found with respect to certain of the defendants, *see infra*—that the defendants remanded him to prison because he wanted to publish a book critical of the then-President. He seeks redress for the violations of his constitutional rights through this damages action.

Cohen's complaint and the motions to dismiss now before this Court raise fundamental questions about the meaning and value of constitutional rights, the relationship between a citizen and the government, and the role of the federal courts in protecting those rights. The ability to publicly criticize even our most prominent politicians and leaders without fear of retaliation is a hallmark of American democracy; political speech is core First Amendment speech. "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270 (1941). And it is a further hallmark of American democracy that, where one's rights have been violated, one may seek to

vindicate those rights in the courts. In the oft-quoted words of Chief Justice John Marshall: "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Marbury v. Madison*, 1 Cranch 137, 163 (1803). The Court today must consider the limits of these hallmark principles.

## BACKGROUND

The following facts are drawn from the complaint and are taken as true for the purposes of this motion to dismiss.

Plaintiff Michael D. Cohen ("Cohen" or "Plaintiff") was formerly employed by individual defendant Donald J. Trump ("Trump") as his attorney and personal advisor for over a decade. Dkt. No. 3 ("Compl.") ¶ 48. In August and November of 2018, Cohen pleaded guilty to various crimes including lying to Congress and campaign finance violations; he was sentenced to thirty-six months of incarceration. *Id.* ¶¶ 4, 52–53. In May of 2019, he voluntarily surrendered for service of his sentence at FCI Otisville. *Id.* ¶ 54.

While incarcerated, Cohen began to work on a book about his association with Trump. *Id.* ¶ 55. The book chronicles the arc of his experiences with Trump and describes how, upon reflection, he came to the realization that his actions in furtherance of Trump's agenda ultimately led to his own downfall. *Id.* ¶ 56. Cohen publicly spoke about his forthcoming book in ways that made it clear that the book would be critical of and perhaps damaging to Trump; he publicly stated that his book would be unfavorable to Trump and would substantiate the descriptions he gave during his congressional testimony of Trump as "a cheat, a liar, a conman, [and] a racist," among other things. *Id.* ¶¶ 57, 59. The complaint also alleges that Cohen was privy to years of non-public behavior by Trump, which included witnessing anti-Semitic and racist remarks by him; that the book included quotes and documentary evidence of such behavior; and that Trump

was aware that Cohen was witness to many years of such behavior that, if made public, could damage Trump's reputation and his future political goals, including, at that time, his potential run for a second term as President in 2020. *Id.* ¶¶ 57–58, 60.

Cohen's incarceration in 2019 and the beginning of 2020 was uneventful. *Id.* ¶ 62. Upon completion of his sentence, Cohen was to be released from FCI Otisville on November 21, 2021. *Id.* ¶ 63. The onset of the COVID-19 pandemic, however, altered this. *Id.* ¶ 64. COVID-19 caused significant concerns for prison populations because the virus spreads easily within the close confines of a prison; this was particularly concerning for Cohen because he has various health comorbidities that make him highly susceptible to COVID-19 risks. *Id.* ¶¶ 64–65. Cohen petitioned the defendants for early release from FCI Otisville based on Congress's passage of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, and then-Attorney General Barr's memoranda of March 26, 2020 and April 3, 2020. *Id.* ¶ 66. Cohen submitted his request to officials from the Federal Bureau of Prisons ("FBOP") on March 31, 2020; the officials determined that Cohen should be released on furlough and then transferred to home confinement. *Id.* ¶¶ 67–68. The FBOP granted Cohen furlough approval on April 18, 2020; the furlough time period was from May 1, 2020 to May 31, 2020. *Id.* ¶ 69.

During that time period, while on furlough, Cohen made several public statements via Twitter regarding the imminent publication of his book about Trump, a number of which were accompanied by the hashtag #WillSpeakSoon. *Id.* ¶ 72. Cohen planned to release his book by late September of 2020. *Id.*

On July 9, 2020, in compliance with a directive by defendant Adam Pakula, a probation officer with U.S. Probation and Pretrial Services, Cohen reported to the U.S. Probation Office in downtown Manhattan, along with his attorney, in order to transition from furlough to home

confinement. *Id.* ¶ 73. They met with Pakula as well as defendant Enid Febus, a supervisory

probation officer. *Id.* Pakula and Febus gave Cohen a Federal Location Monitoring Program

Participant Agreement ("FLM"), which set forth conditions for Cohen's home confinement. *Id.*

¶ 74. In the first paragraph, it contained a broad provision prohibiting Cohen from engaging with

the media in any form, including books, and from posting on social media:

> No engagement of any kind with the media, including print, tv, film, books, or any
> other form of media/news. Prohibition from all social media platforms. No posting
> on social media and a requirement that you communicate with friends and family
> to exercise discretion in not posting on your behalf or posting information about
> you. The purpose is to avoid glamorizing or bringing publicity to your status as a
> sentenced inmate serving a custodial term in the community.

*Id.* ¶ 75. Cohen viewed this condition as an attempt to chill and restrain his First Amendment

rights; he also suspected that this condition was not a standard one in FLMs for those transferring

to home confinement, partially because he noted that the document was not in the standard FLM

form, contained grammatical and typographical errors, and was not identified with its federal

form designation. *Id.* ¶¶ 76–78. He and his attorney inquired why the paragraph was included in

the FLM, since it did not appear to be standard and would prohibit the publication of his book.

*Id.* ¶ 79. Febus replied—and Pakula agreed—that that this was the standard form used, and that

Cohen was not being treated differently than other prisoners.[1] *Id.* ¶¶ 80–81. Cohen and/or his

---

[1] The complaint alleges that "[i]n a July 22, 2020 signed declaration made under penalty of
perjury and submitted to the Court in *Cohen v. Barr et al, supra*, document number 23, defendant
Pakula admitted in great detail how he and defendant Febus lied to plaintiff." *Id.* ¶ 82. The
declaration, however—which is referred to and relied upon by the complaint and is thus
incorporated by reference, and which the Court can take judicial notice of the contents of as a
public record pursuant to Federal Rule of Evidence 201(b), *see Rothman v. Gregor*, 220 F.3d 81,
92 (2d Cir. 2000)—does not contain such a broad admission. Rather, Pakula states that he drew
the FLM agreement presented to Cohen from an agreement sent to him by a probation officer in
another district as an example of an FLM agreement used for high-profile inmates. Declaration
of Adam Pakula, *Cohen v. Barr et al.*, 1:20-cv-05614 (S.D.N.Y. July 22, 2020), ECF No. 23.
Taking Cohen's allegations as true—particularly, that Febus and Pakula told Cohen that this
was the standard form and that he was not being treated differently than other prisoners—
Pakula's declaration does indicate that the statements made to Cohen were not true, in that he

attorney asked whether it would be possible to adjust the language of the paragraph or remove it entirely; the parties agreed to table the question so that they could "run it up the chain of command," and continued with reviewing the rest of the FLM. *Id.* ¶¶ 84–86. Cohen was not asked at that time or at any other point in the meeting to sign the FLM agreement, nor did he refuse to sign the agreement, withhold consent to electronic monitoring, or refuse any other condition of home confinement. *Id.* ¶¶ 87–88.

After Cohen, his attorney, Pakula, and Febus finished reviewing the agreement, Pakula and Febus directed Cohen and his attorney to remain in the waiting area while they waited for a response from their supervisors about the first paragraph of the FLM. *Id.* ¶ 89. After waiting for about an hour and half—during which time Cohen's attorney checked in with Pakula and Febus to see if everything was alright, and was assured that everything was fine and that they were just waiting for a response from their supervisors—three United States marshals came to the waiting area and served Cohen's attorney with a remand ordered by defendant Patrick McFarland that stated that Cohen had failed to agree to the terms of FLM and was being remanded for that reason. *Id.* ¶¶ 90–91. Cohen was shackled, handcuffed, and remanded to prison. *Id.* ¶ 92. Cohen's attorney explained that the meeting had not concluded, that they were still waiting to hear back as to what, if anything, could be adjusted, that Cohen had not refused to agree to the terms of the FLM, and that Cohen was prepared to sign the FLM "as is." *Id.* ¶ 95. Pakula and Febus responded that it was "out of their hands," and that the proposed FLM was no longer on the table. *Id.* ¶ 96.

---

was, at least, being treated differently than lower-profile prisoners, and this was not the standard form used in such cases.

Cohen was transported to the Metropolitan Correctional Center ("MCC") in Manhattan and then transported back to FCI Otisville, where he was placed in a special segregated housing unit and then transferred to solitary confinement for sixteen days. *Id.* ¶¶ 98–100. While in solitary confinement, he spent all but thirty minutes of his day alone in a twelve by eight-foot cell with poor ventilation, no air conditioning, and temperatures frequently over one hundred degrees. *Id.* ¶¶ 101–102. These conditions caused health problems for Cohen; his blood pressure was elevated, resulting in severe headaches, shortness of breath, and anxiety, which required immediate medical attention. *Id.* ¶ 102. While incarcerated, Cohen was unable to proceed with drafting his book and was unable to make any public statements. *Id.* ¶ 103.

Cohen filed a habeas petition against Barr, Michael Carvajal, in his official capacity as Director of the FBOP, and James Petrucci, in his official capacity as Warden of FCI Otisville, challenging his incarceration on July 20, 2020, eleven days after having been remanded. On July 23, 2020, Judge Hellerstein issued an order granting Cohen's motion for a preliminary injunction directing these defendants to release Cohen to home confinement. *Id.* ¶ 108. Judge Hellerstein found that the defendants' "purpose in transferring Cohen from release on furlough and home confinement back to custody was retaliatory in response to Cohen desiring to exercise his First Amendment rights to publish a book critical of the President and to discuss the book on social media." *Cohen v. Barr*, 2020 WL 4250342, at *1 (S.D.N.Y. July 23, 2020). Cohen had spent two weeks either in the special segregated housing unit or in solitary confinement. Compl. ¶ 27.

Cohen filed the complaint in this case on December 17, 2021. *See generally id*. The complaint names as defendants: (i) the United States of America, (ii) former President Trump, (iii) former Attorney General Barr, (iv) Director of the FBOP Carvajal, (v) Administrator of the Residential Reentry Management Branch of the FBOP Jon Gustin, (vi) Residential Reentry

Manager of the FBOP McFarland, (vii) Warden of FCI Otisville Petrucci, (viii) Supervisory

Probation Officer Febus, (ix) Probation Officer Pakula, and (x) John and Jane Doe (1-10) agents,

servants, and employees of the United States.

The United States and the individual defendants with the exception of Trump filed a joint

motion to dismiss on March 31, 2022; Trump filed a separate motion to dismiss the same day.

Dkt. Nos. 39, 41. Cohen filed oppositions to the motions on May 27, 2022. Dkt. Nos. 59, 61.

The defendants filed replies on June 17, 2022. Dkt. Nos. 67, 68. The Court held oral argument

on the motions on August 2, 2022.

## DISCUSSION

Cohen's complaint asserts seven causes of action. Broadly, they can be grouped into two

categories. First, Cohen brings claims against all the individual defendants, including Trump, for

violations of his First, Fourth, and Eighth Amendment rights; the claims are brought under a

*Bivens* cause of action. *See* Compl. ¶¶ 139–142. Second, Cohen brings claims against the

United States for (i) retaliation; (ii) false arrest, false imprisonment, and abuse of authority and

process; (iii) negligent failure to protect; (iv) negligent infliction of emotional distress;

(v) intentional infliction of emotional distress; and (vi) negligent hiring, retention, training, and

supervision. *See* Compl. ¶¶ 111–138. These claims are all brought under the Federal Tort

Claims Act ("FTCA").

The Court turns first to the *Bivens* claims brought against all the individual defendants

and then considers the FTCA claims against the United States.

## I.    Cohen's *Bivens* Claims

The seventh cause of action in the complaint—the only one brought against the

individual defendants—is brought as a *Bivens* cause of action for violations of Cohen's First,

Fourth, and Eight Amendment rights, and alleges that defendants intentionally retaliated against

Cohen by remanding him to prison for exercising his right to free speech, in violation of his First Amendment rights; committed an unlawful seizure in so doing, in violation of his Fourth Amendment rights; and placed him in dangerous solitary confinement conditions, in violation of his Eighth Amendment rights. Compl. ¶¶ 139–142. All of the individual defendants move to dismiss this count. They do not dispute that Cohen's constitutional rights were violated and that he suffered injury as a result. They instead argue that the *Bivens* cause of action is not available for Cohen's claims. *See* Dkt. No. 40 at 20; Dkt. No. 42 at 10.

The Supreme Court has held that whether a *Bivens* cause of action is available is an "antecedent issue" to whether a plaintiff has alleged a violation of a clearly established constitutional right. *See Wood v. Moss*, 572 U.S. 744, 757 (2014); *see also Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017) ("The Court turns first to the *Bivens* question, which is 'antecedent' to the other questions presented." (quoting *Wood*, 572 U.S. at 757)). At this stage, therefore, the question before this Court is simple: Assuming, in the first instance, that Cohen has sufficiently alleged that federal officials violated his constitutional rights, is there a judicial mechanism through which he can vindicate those rights and seek to recover for the harm he suffered from those who harmed him? It is a question that, here, is strengthened by the fact that—with regard to Cohen's First Amendment claim—another court in this District has already found Cohen's constitutional rights *were* violated. The question thus becomes whether the Constitution and the courts afford Cohen a forum in which to seek relief for the injury he suffered as a result of that violation. It is a question that, in 1803—"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury," *Marbury*, 1 Cranch at 163—or in 1971—"Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty," *Bivens v. Six Unknown Named*

*Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 395 (1971)—likely would have been answered in the affirmative. His claim would have been entertained either in state or in federal court. It is a question to which the answer seems intuitive; what, after all, is the value of a right if one has no recourse when that right is violated? But it is also a question that the Supreme Court has unequivocally answered in the negative. The Court is bound by that ruling. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents.").

In 1971, in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, the Supreme Court squarely considered this question for the first time, in the Fourth Amendment context; as it put it, the question before the Court was "merely whether petitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts." 403 U.S. at 397. In *Bivens*, the petitioner, Webster Bivens, alleged that agents of the now-defunct Federal Bureau of Narcotics violated his Fourth Amendment rights by entering his apartment, searching it, and arresting him, all without a warrant and with unreasonable force. *Id.* at 389. The Court concluded that Bivens was entitled to redress his alleged constitutional injury through the mechanism of a damages suit against the federal officers. Justice Brennan, writing for the majority, noted: "That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition." *Id.* at 395. After looking to *Marbury*, the Court held that "petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment." *Id.* at 397.

After *Bivens*, the Supreme Court twice extended the implied cause of action to other constitutional rights: In *Davis v. Passman*, the Court expanded the *Bivens* action to sex discrimination under the due process clause of the Fifth Amendment, 442 U.S. 228 (1979), and in *Carlson v. Green*, the Court expanded the *Bivens* action to a violation of Eight Amendment rights in a federal prison, 446 U.S. 14 (1980). In each of these cases, the Court treated the expansion of *Bivens* as the straightforward application of settled law and settled constitutional principles.

In the era after *Bivens*, *Passman*, and *Carlson*, however, the Court's jurisprudence markedly shifted. By 2001, in *Correctional Services Corp. v. Malesko*, the Court recognized that it had "consistently refused to extend *Bivens* liability to any new context or new category of defendants." 534 U.S. 61, 68 (2001).

This shift has frequently been explained in context of the broader shift in the Court's approach towards implying damages remedies for statutory violations. *Bivens* was decided in an era in which the Court took an expansive view of the ability of the courts to fashion a remedy to persons injured as a result of a violation of a congressional statute. *See, e.g.*, *J. I. Case Co. v. Borak*, 377 U.S. 426 (1964) ("While this language makes no specific reference to a private right of action, among its chief purposes is 'the protection of investors,' which certainly implies the availability of judicial relief where necessary to achieve that result."). The Court later retreated from that view, instead believing that "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress," and that "[t]he judicial task" is not to give effect to the statute's purpose but rather "to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Indeed, this contextualization of

the Court's newfound hostility towards the *Bivens* cause of action has repeatedly been professed by the Court itself: "*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action—decreeing them to be 'implied' by the mere existence of a statutory or constitutional provision." *Malesko*, 534 U.S. at 75 (Scalia, J., concurring).

In *Ziglar v. Abbasi*, against the backdrop of the September 11 terrorist attacks, the Court again considered the availability—and continued force—of the *Bivens* cause of action. 137 S. Ct. 1843 (2017). The Court emphasized that *Bivens* and its progeny were part of an "*ancien regime*" in which "the Court followed a different approach to recognizing implied causes of action than it follows now." *Id.* at 1855. Under the new approach, "the Court adopted a far more cautious course before finding implied causes of action," and "clarified . . . that, when deciding whether to recognize an implied cause of action, the 'determinative' question is one of statutory intent." *Id.* at 1855–56. The *Ziglar* Court did recognize that "[t]he decision to recognize an implied cause of action under a statute involves somewhat different considerations than when the question is whether to recognize an implied cause of action to enforce a provision of the Constitution itself." *Id.* at 1856. The Court failed, however, to give significant meaning to that distinction, recounting that "the Court's expressed caution as to implied causes of actions under congressional statutes led to similar caution with respect to actions in the *Bivens* context, where the action is implied to enforce the Constitution itself." *Id.* Noting that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity," *id.* at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)), the Court clarified the somewhat piecemeal *Bivens* jurisprudence into a cohesive—and narrow—two-step test, which first asks "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court," meaning that it presents a new context, *id.* at 1859, and then asks if there are "special factors counselling hesitation in the absence of

affirmative action by Congress," in which case a court should decline to extend *Bivens*, *id.* at 1857.

*Hernandez v. Mesa*, the next significant *Bivens* case confronted by the Court, followed the reasoning and analysis of *Ziglar*. Again distinguishing *Bivens*, *Passman*, and *Carlson* as "the products of an era when the Court routinely inferred 'causes of action' that were 'not explicit' in the text of the provision that was allegedly violated," but from which the Court has now retreated as it "came to appreciate more fully the tension between this practice and the Constitution's separation of legislative and judicial power," the Court declined to extend a *Bivens* cause of action to a lawsuit brought under the Fourth Amendment by the family of Sergio Hernandez, a fifteen-year-old Mexican citizen who was shot and killed by a U.S. border patrol agent, allegedly without provocation. 140 S. Ct. 735, 741 (2020). The *Hernandez* Court applied the same "two-step inquiry" articulated in *Ziglar*, asking first "whether the request involves a claim that arises in a new context or involves a new category of defendants," with "new context" understood to mean any context that "is different in a meaningful way from previous *Bivens* cases decided by this Court," and then, if a claim arises in a new context, asking "whether there are any special factors that counsel hesitation about granting the extension." *Id.* at 743 (internal quotation marks and citations omitted).

Finally, and most recently, in *Egbert v. Boule*, the Supreme Court considered the availability of a *Bivens* cause of action for a First Amendment retaliation claim and a Fourth Amendment excessive force claim. Rejecting both claims, the Court stated that "our cases have made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." 142 S. Ct. 1793, 1800 (2022). The Court provided an even narrower test than that articulated in *Ziglar* and *Hernandez*—"[w]hile our cases describe two

steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 1803.

Explaining that test, the *Egbert* Court made clear that, effectively, it operates as a bar to a *Bivens* claim in all cases except, perhaps, those involving Fourth, Fifth and Eighth Amendment claims factually indistinguishable from *Bivens*, *Passman*, or *Carlson*. In an all-encompassing articulation of the special factors inquiry, the Court majority stated that "[e]ven in a particular case, a court likely cannot predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*. That uncertainty alone is a special factor that forecloses relief." *Id.* at 1804. And claims that paralleled *Bivens*, *Passman*, or *Carlson* exactly could also be foreclosed: "Even assuming the factual parallels [to *Passman*] are as close as Boule claims, *Passman* carries little weight because it predates our current approach to implied causes of action and diverges from the prevailing framework in three important ways." *Id.* at 1808. Departing from *Ziglar*'s assurance that "this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose," 137 S. Ct. at 1856, *Egbert* held that where a case is directly parallel to *Bivens*, *Passman*, or *Carlson*, even that is insufficient, because those cases do not align with the Court's current approach to *Bivens*; "a plaintiff cannot justify a *Bivens* extension based on 'parallel circumstances' with *Bivens*, *Passman*, or *Carlson* unless he also satisfies the 'analytic framework' prescribed by the last four decades of intervening case law," 142 S. Ct. at 1809. Concluding, the Court all but held that *no* case would ever be able to satisfy that analytic framework, because "if we were called to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution." *Id.* at 1809.

Applying those principles to the First Amendment claim before it, and in keeping with its sweeping rejection of *Bivens*, the *Egbert* Court went beyond merely holding that a damages cause of action should not be extended to the particular facts of the case before it; seemingly rejecting the fact-specific inquiry set forth in its prior *Bivens* jurisprudence, it categorically held that "there is no *Bivens* action for First Amendment retaliation." *Id.* at 1807.

That holding squarely forecloses Cohen's First Amendment retaliation claim here. And the Court's broader *Bivens* jurisprudence forecloses his Fourth Amendment claim as well; there is no question that it is factually distinct from the Fourth Amendment claim implied in *Bivens*. The federal officers at issue in *Bivens* were members of the Federal Bureau of Narcotics, while the federal officers named as individual defendants in Cohen's complaint are members of the Bureau of Prisons, in addition to the former President and former Attorney General. Under the Court's current jurisprudence, this distinction alone appears to be enough to create a new context because one of the oft-quoted examples of a "new context" is a case that involves a "new category of defendants." *Malesko*, 534 U.S. at 68; *see Egbert*, 142 S. Ct. at 1803; *Ziglar*, 137 S. Ct. at 1876. Nor were the Bureau of Prisons officers performing functions "in the common and recurrent sphere of law enforcement," as in *Bivens*, *see Ziglar*, 137 S. Ct. at 1857; rather, they were effectuating a remand of a federal prisoner who had already been sentenced to a term of incarceration.

Likewise, Cohen's Eighth Amendment claim arises in a new context. In *Carlson*, the Eighth Amendment claim centered on grossly inadequate medical care provided to an inmate during a severe asthma attack. 446 U.S. at 16 n.1. Cohen's Eighth Amendment claim centers on the conditions of his solitary confinement, which—although he claims "posed serious health risks"—did not result in him receiving inadequate medical care. Compl. ¶ 102. To the contrary,

the complaint states that the conditions resulted in Cohen's "blood pressure bec[oming] dangerously high resulting in severe headaches, shortness of breath, and anxiety requiring immediate medical attention," implying, if anything, that "immediate medical attention" was provided to him. *Id.* Cohen's claim asserts a somewhat different "mechanism of injury" (conditions of confinement as opposed to deliberate indifference to medical needs) and thus presents a new context under the Supreme Court's precedents. *Egbert*, 142 S. Ct. at 1805 (quoting *Ziglar*, 137 S. Ct. at 1859); *see, e.g.*, *Mammana v. Barben*, 856 F. App'x 411 (3d Cir. 2021) (mem.) (holding that Eight Amendment claim based on conditions of "confinement in a chilled room with constant lighting, no bedding, and only paper-like clothing" bore little resemblance to the facts in *Carlson*); *Schwarz v. Meinberg*, 761 F. App'x 732 (9th Cir. 2019) (mem.) (holding that Eighth Amendment claim based on unsanitary cell conditions presented a new context). While these contexts are undoubtedly similar, the Supreme Court has counseled that "even a modest extension [of *Bivens* liability] is still an extension." *Ziglar*, 137 S. Ct. at 1864.

Because Cohen's claims arise in a new context, the next question is whether there are "special factors" which the Supreme Court has stated indicate "that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed'" and thus further prevent the Court from recognizing a *Bivens* remedy. *Egbert*, 142 S. Ct. at 1803 (quoting *Ziglar*, 137 S. Ct. at 1858). The Supreme Court has stated that "[i]f there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy," *id.* (quoting *Hernandez*, 140 S. Ct. at 743), and where there are "alternative remedial structures in place, 'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action,'" *id.* at 1804

(quoting *Ziglar*, 137 S. Ct. at 1858).  It does not matter if those existing remedial structures "do not provide complete relief" or are "not as effective as an individual damages remedy."  *Id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 372, 388 (1983)).

In this case, defendants point to two remedial structures that they argue preclude this Court from recognizing a *Bivens* remedy for Cohen: (i) the FBOP's Administrative Remedy Program and (ii) a writ of habeas corpus.  Dkt. No. 40 at 27–29.  Cohen does not contest that he had these remedial structures available to him; to the contrary, he admits that he availed himself of the latter option.  *See* Oral Argument Tr. at 56 ("Again, one thing about the habeas relief.  My client was freed because of the habeas relief.  That stopped the bleeding, your Honor.").

While the Supreme Court has held that the FBOP's Administrative Remedy Program is an alternative remedial structure sufficient to preclude *Bivens* liability in prior cases, *see, e.g.*, *Malesko*, 534 U.S. at 74 (declining to find *Bivens* remedy where "[i]nmates in respondent's position [] have full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief and grievances filed through the BOP's Administrative Remedy Program"), this Court is reluctant to find—assuming that Cohen's allegations are true as it must at this stage—that Cohen could have successfully remedied the alleged constitutional violations in such a forum.  Cohen alleges in his complaint that senior FBOP officials, including the Director of the FBOP and the Warden of FCI Otisville, effectively acted at the behest of President Trump in committing the various Constitutional violations alleged.  *See, e.g.*, Compl. ¶ 39.  Yet, it is precisely these senior FBOP officials who exercise control over the Administrative Remedy Program:  Complaints are made to the Warden and are appealed to the General Counsel who appears to report up to the Director of the FBOP.[2]  If Cohen's allegations are thus proved, it

---

[2] *See* Administrative Remedy Program, FBOP (Jan. 6, 2014),

is hard to imagine that the same individuals who committed the constitutional violations against Cohen would, in any meaningful sense, provide a remedy for those violations.

Defendants' argument that Cohen had an alternative remedial structure through a writ of habeas corpus is more persuasive.  *See Ziglar*, 137 S. Ct. at 1865 ("And there might have been alternative remedies available here, for example, a writ of habeas corpus."); *Rodriguez v. Easter*, 2022 WL 356478, at *6 (D. Conn. Feb. 7, 2022) ("[C]ourts that have applied the *Ziglar* analysis to a claim of First Amendment retaliation by an inmate have noted the existing alternative remedial structures, including the BOP administrative grievance process and writ of habeas corpus.").  While the Supreme Court has left open the availability of habeas relief for federal prisoners challenging the conditions of their confinement (as Cohen does here), *see Ziglar*, 137 S. Ct. at 1862–63 ("[W]e have left open the question whether they might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *Bell v. Wolfish*, 441 U.S. 520, 527 (1979) (leaving "to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself"), the Second Circuit has held that prisoners in federal custody may seek habeas relief related to the conditions of their confinement under 28 U.S.C. § 2241, *see Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) ("This court has long interpreted § 2241 as applying to challenges to the execution of a federal sentence, 'including such matters as the administration of parole, . . . prison disciplinary actions, prison transfers, type of detention and

---

https://www.bop.gov/policy/progstat/1330_018.pdf; FBOP – Administrative Remedy Program, D.C. Corrections Information Counsel, https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/BOP%20Administrative%20Remedies%2011.15.17%20REVISED.pdf (last visited Nov. 11, 2022); Experienced Leadership, FBOP, https://www.bop.gov/about/agency/leadership.jsp (last visited Nov. 11, 2022).

prison conditions.'"); *Roba v. United States*, 604 F.2d 215, 219 (2d Cir. 1979) ("At that point petitioner's challenge to his transfer while seriously ill would be a challenge to the conditions of his confinement, for which habeas corpus relief under § 2241 would be available."); *Elleby v. Smith*, 2020 WL 2611921, at *2 (S.D.N.Y. May 22, 2020) ("[T]he Second Circuit has held that both habeas petitions, at least for prisoners in federal custody . . . may address conditions of confinement and seek the remedy of transfer (*e.g.*, to a different prison population or facility)."); *Ilina v. Zickefoose*, 591 F. Supp. 2d 145, 146–49 (D. Conn. 2008) (describing § 2241 as a "broad remedy available to federal prisoners challenging the conditions of their confinement"). That Cohen could successfully avail himself of habeas relief is borne out by the fact that he was able to do so in this case.

Cohen also likely could have sought relief through the right of federal courts to enjoin unconstitutional actions by state and federal officers. "Availability of federal equitable relief to remedy constitutional violations has been presumed by the courts," *Jensen v. Farrell Lines, Inc.*, 625 F.2d 379, 383 (2d Cir. 1980), and "it is established practice . . . to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)); *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 337 (2015) (Sotomayor, J., concurring) ("That parties may call upon the federal courts to enjoin unconstitutional government action is not subject to serious dispute."); *see also* Stephen I. Vladeck, *Douglas and the Fate of* Ex Parte Young, Yale L.J. (Forum) (Apr. 30, 2012) ("Whether or not *Ex parte Young* itself articulated this rule, it is now generally understood that injunctive relief for constitutional violations does not require a freestanding statutory cause of action (and instead arises under the relevant constitutional provision)."). As the Supreme Court stated in

*Armstrong*, the "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." 575 U.S. at 327. Thus, even if habeas relief were not available, a citizen imprisoned by the President to prevent him from expressing critical views of that President on the eve of an election is not without remedy. Cohen—and if there ever are any others similarly situated—could have sought an injunction for defendants' violations of the Constitution. *See Ojo v. United States*, 364 F. Supp. 3d 163, 174 (E.D.N.Y. 2019) (finding "there were alternative channels that plaintiff could have pursued" including "injunctive or declaratory relief to challenge and seek alterations to the BOP Policy affecting the provision of dental care."); *see also Malesko*, 534 U.S. at 74 ("And unlike the *Bivens* remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.").

It is worth noting that these alternative remedial structures are hardly adequate replacements for a suit for monetary damages. These alternative remedies would not compensate Cohen for or address the harms Cohen had already suffered prior to the issuance of the injunction. While Cohen would have been able to enjoin the defendants, as he did in this case, "a prospective injunction" does not "normally provide plaintiffs with redress for harms they have already suffered." *Ziglar*, 137 S. Ct. at 1879. Moreover, those avenues for prospective relief do not eliminate the deterrent effect that imprisonment (in solitary confinement) can have on all but the most intrepid. And, while *Bivens* is "concerned solely with deterring the unconstitutional acts of individual officers," *Egbert*, 142 S. Ct. at 1806 (quoting *Malesko*, 534 U.S. at 71), the injunctive relief that Cohen was awarded in his prior case in front of Judge Hellerstein does little to deter the unconstitutional acts of the defendants. An injunction is primarily focused on

stopping an unconstitutional violation from occurring on an ongoing basis. It does not seek to punish someone for what they have done and thus, in turn, deter that person from committing similar wrongs in the future. *See Sec. & Exch. Comm'n v. Stubos*, 2022 WL 6776741, at *10 (S.D.N.Y. Oct. 11, 2022) ("Injunctive remedies, as discussed, are tailored to deter future violations of law by that individual; not to punish the defendant and, through that punishment, send a message to those in the community not to do similar bad acts."). Nevertheless, the Supreme Court has instructed that it does not matter whether the existing remedies provide "complete relief" or appear inadequate. *Egbert*, 142 S. Ct. at 1804 (citation omitted). These difficult issues merit, and will no doubt receive, further consideration in the future, if not in this case.

As things currently stand, however, the Supreme Court's precedents squarely and unequivocally foreclose the *Bivens* claims here. None of the claims present a direct parallel to *Bivens*, *Passman*, or *Carlson*; even if one did, the *Egbert* Court has thrown into doubt the availability of the *Bivens* cause of action for any new claim, particularly where, as here, alternative remedial structures are in place.

As such, Cohen's *Bivens* claims must be dismissed. Before doing so, however, this Court pauses to reiterate the profound violence this holding does to Cohen's constitutional rights. Cohen's complaint alleges an egregious violation of constitutional rights by the executive branch—nothing short of the use of executive power to lock up the President's political enemies for speaking critically of him. The Supreme Court's precedents ensure that there is at best a partial remedy for the abuse of power and violation of rights against the perpetrators of those wrongs. And those precedents rest on a mistaken proposition—that the Court's reluctance to imply a damages remedy for *statutorily created* rights where Congress did not explicitly intend

for there to be such a remedy necessarily must extend to a reluctance to find such a remedy for *constitutionally guaranteed* rights.

As Justice Harlan articulated in *Bivens*, "[I]t must also be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities." 403 U.S. at 407 (Harlan, J., concurring). The notion that, for there to be any remedy for such a right, it must be explicitly provided for by one of the very branches of government from whom the right is designed to protect the individual is particularly insidious. And it does not logically follow from the Court's decisions in the statutory realm. The parallel to a jurisprudential shift towards looking to express congressional intent[3] in deciding whether to recognize an implied cause of action for a right conferred by Congress is emphatically not looking towards congressional intent in deciding whether to recognize an implied cause of action for a right conferred by the Constitution itself. Unlike statutory rights, constitutional rights do not stem from Congress; there is no reason why the remedies for such rights must then stem from Congress, and much reason to think that they need not.[4] This is the precise distinction that the Supreme Court recognized, but failed to give

---

[3] *See* Steven I. Vladeck, Bivens *Remedies and the Myth of the "Heady Days,"* 8 U. St. Thomas L.J. 513, 521–22 (2011) ("Whatever the merits of *Sandoval*'s approach, it is worth emphasizing that the crux of the dispute between the majority and the dissenters—and between more recent and older case law—boils down to methodological disagreements over statutory interpretation. There is simply no dispute today that congressional intent is dispositive when it comes to the existence of a private cause of action to enforce a federal statute . . . .").

[4] *See* George D. Brown, *Letting Statutory Tails Wag Constitutional Dogs—Have the* Bivens *Dissenters Prevailed?*, 64 Ind. L.J. 263, 265 (1989) ("One may agree with the Court's reservations about judicial lawmaking, its concern for the doctrine of separation of powers and its general views about the superior institutional competence of Congress. These positions . . . should not be determinative in the *Bivens* context. The basic question is availability of judicial relief for constitutional violations. In the recent cases the statutory tail comes to wag the constitutional dog. That is, the Court's emphasis on the statutory component of the remedial issues tends to obscure and downgrade their constitutional dimension. It is as if the whole problem involved only the judiciary's role in an article I legislative scheme. Yet the *Bivens*

meaning to, in *Ziglar*: "The decision to recognize an implied cause of action under a statute implies somewhat different considerations than when the question is whether to recognize an implied cause of action to enforce a provision of the Constitution itself." 137 S. Ct. at 1856. Rather, a proper inquiry—one parallel to that articulated in *Sandoval*, one still removed from the "heady days" where the Court looked to whether it believed a damages remedy *should* normatively be available for a particular right, and one that would honor the important distinction between rights conferred by a legislative majority and rights conferred by the Constitution—would look to whether the framers—in the language they used, the structure of the government they established, the limitations they intended to place on executive power, and the authority they gave to the federal courts—intended for there to be such a remedy.

There are powerful reasons to believe that, in many circumstances, the answer to that question will be yes,[5] reasons that are not easily brushed aside with the Supreme Court's rejection of *Marbury*'s promise—drawn from English common law, *see Marbury*, 1 Cranch at 163 (quoting Blackstone's commentaries)—that, if one's rights are violated by executive officials, the courts provide a legal remedy for that violation.

\* \* \*

---

doctrine deals with judicial enforcement of rights whose origin is outside of, and hierarchically superior to, any statute.").

[5] *See, e.g.*, Walter Dellinger, *Of Rights and Remedies: The Constitution as a Sword*, 85 Harv. L. Rev. 1532, 1542 (1972) ("Given a common law background in which courts created damage remedies as a matter of course, it is not unreasonable to presume that the judicial power would encompass such an undertaking on the part of the federal courts, unless there were some contrary indication that the judicial implementation of such a remedy was not to be a part of the article III judicial power. While with one exception prior to *Bivens*, the Court has never explicitly exercised the judicial power to create a damage remedy in a case arising under the Constitution, its power to do so would seem rather easily established.").

For the foregoing reasons, the complaint's claims against all the individual defendants, brought under the *Bivens* cause of action, are dismissed.[6]

## II.    Cohen's FTCA Claims

Cohen's remaining causes of action—all brought against the United States—are brought under the FTCA.  Cohen asserts claims for retaliation under New York common law; false arrest, false imprisonment, and abuse of authority and process under New York common law; negligent failure to protect under 18 U.S.C. § 4042; negligent infliction of emotional distress under New York common law; intentional infliction of emotional distress under New York common law; and negligent hiring, retention, training, and supervision under New York common law.  The United States moves to dismiss all of Cohen's FTCA claims.

"The United States, as sovereign, is immune from suit save as it consents to be sued, . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the

---

[6] Defendant Trump also moves to dismiss the claims against him for the independent reason that they are barred by presidential immunity.  Because the claims against Trump are dismissed along with the claims against the other individual defendants, the Court need not address his claimed immunity here.  Nonetheless, it is worth noting—and rejecting—Trump's argument that, effectively, a president may *never* be subject to a damages suit for violations of constitutional rights because "[i]t is blackletter law that a president is entitled to absolute immunity for acts taken within the scope of his official duties," Dkt. No. 42 at 1 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731 (1982)), and *Bivens* claims—if available at all—are available only for actions taken by the official "under color of his authority," *Bivens*, 403 U.S. at 389.  Trump reasons that "[s]ince a president is entitled to absolute immunity for 'acts within the outer perimeter of his official capacity,' it follows that a *Bivens* claim—which must arise from an act performed 'under color of his authority'—cannot be maintained against a [p]resident."  Dkt. No 42 at 3.  But the language of these two doctrines is not the same, and there is no reason to assume that the one wholly subsumes the other.  For an official's actions to be "under color of authority," "the conduct must be 'cloaked with official power and the official must purport to be acting under color of official right.'"  *Mueller v. Gallina*, 137 F. App'x 847, 850 (6th Cir. 2005) (mem.) (internal quotation marks omitted and alterations adopted) (quoting *Browning v. Clinton*, 292 F.3d 235, 250 (D.C. Cir. 2002)).  One could imagine a situation, for example, in which the President ordered Secret Service to kidnap his political opponent a few weeks before an election—asserting, all the while, that he was doing so in an exercise of executive authority.  Such an action could be taken under *color* of authority, while at the same time not legitimately within the president's official capacity, and thus not subject to presidential immunity.

suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (internal quotation marks omitted) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). "'The FTCA, 28 U.S.C. §§ 13469(b), 2401(b), and 2671–2680, constitutes a limited waiver by the United States of its sovereign immunity' and allows for tort suits against the United States under specified circumstances." *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007) (quoting *Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998)). "Under the FTCA, a private citizen may sue for injuries caused by 'the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Id.* (quoting 28 U.S.C. § 1346(b)). The FTCA waives sovereign immunity for claims that are:

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Id.* (quoting *FDIC v. Meyer*, 510 U.S. 471, 477 (1994)). The "source of substantive liability under the FTCA" is "law of the State." *FDIC*, 510 U.S. at 478.

Cohen's first FTCA claim is a claim for "retaliation," for "the exercising of his right to free speech," which he asserts is "a tort under the laws of the state of New York." In defending the claim in his opposition to the United States' motion to dismiss, however, Cohen makes it clear that the only substantive source of this claim is the First Amendment. *See* Dkt. No. 59 at 27 (concluding that "defendants did imprison Mr. Cohen for the lawful exercise of his First Amendment rights"); *see also id.* at 26 (first quoting *Lancaster v. Incorporated Village of Freeport*, 1 N.E.3d 302 (N.Y. 2013) (considering a First Amendment retaliation claim); then

24

quoting *People v. Oeser*, 721 N.Y.S.2d 147 (3d Dep't 2001) (not considering free speech claims at all); then quoting *People v. Bollander*, 558 N.Y.S.2d 795 (Sup. Ct. 1990) (considering whether fear of retaliatory prosecution for challenging a conviction implicates due process rights, which is inapposite to Cohen's claim, and not considering free speech claims at all); and then quoting *People v. Douglas*, 704 N.Y.S.2d 438, 439 (Sup. Ct. 1999) (noting that "retaliatory" motivation behind indictment "was particularly offensive and repugnant to the fair administration of law," and therefore dismissing an indictment).  That a handful of New York cases, one arising in the First Amendment context, mention the word "retaliation" does not demonstrate a freestanding New York common law tort claim for retaliation.  Rather, Cohen's claim is clearly predicated on the First Amendment.  "The FTCA 'has not waived the Government's sovereign immunity with respect to claims that its employees have committed constitutional torts' under the federal constitution." *Hernandez v. United States*, 939 F.3d 191, 205 (2d Cir. 2019) (alteration adopted) (quoting *Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994)).[7]  As such, Cohen's first cause of action against the United States for First Amendment retaliation is not cognizable under the FTCA and must be dismissed.

Cohen's second FTCA claim is for false arrest, false imprisonment, and abuse of authority and process under New York common law.  "False arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). "Under New York law, the elements of a false arrest and false imprisonment claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise

---

[7] In *Hernandez*, the Second Circuit also held that a FTCA claim could not be brought against a federal officer on the theory that his actions violated the New York State constitution.  939 F.3d at 205-06.

privileged.'" *Hernandez*, 939 F.3d at 199 (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016) (per curiam)). "For purposes of the privilege element of a false arrest and false imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause." *Id.* (internal quotation marks omitted) (quoting *De Lourdes Torres v. Jones*, 47 N.E.3d 747 (2016)). A claim for false imprisonment will only lie where the confinement does not stem from legal process. As the Supreme Court articulated:

> Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held *pursuant to such process*—when, for example, he is bound over by a magistrate or arraigned on charges. Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process.

*Wallace*, 549 U.S. at 389–90. "[T]he tort of false arrest does not permit recovery for 'confinement imposed pursuant to legal process.'" *Coakley v. Jaffe*, 72 F. Supp. 2d 362, 363 (S.D.N.Y. 1999) (quoting *Heck v. Humphrey*, 512 U.S. 477, 483 (1994)).

Cohen's false arrest and false imprisonment claim are based on the marshals' shackling him, handcuffing him, and remanding him to MCC and then to FCI Otisville, and his confinement there for sixteen days. The first three elements of a claim for false arrest and/or false imprisonment are not in contention; there is no doubt that defendants intended to confine Cohen, that Cohen was aware of his confinement, and that Cohen did not consent to his confinement. The fourth element, however, is plainly absent. The complaint alleges that Cohen was shackled, handcuffed, remanded, and confined during his thirty-six-month period of incarceration; although he was temporarily released on furlough with a planned transfer to home confinement, an inmate on furlough "[r]emains in the legal custody of the U.S. Attorney General, in service of a term of imprisonment." 28 C.F.R. § 570.38(b)(1). "Plaintiff's confinement was uncategorically privileged because he was a convicted felon serving his sentence." *McGowan v.*

*United States*, 94 F. Supp. 3d 382, 390 (E.D.N.Y. 2015). Just as a prisoner serving a term of incarceration in prison would not have a claim for false imprisonment for his transfer from one cell to another, or even from standard conditions to solitary confinement, Cohen does not have a claim for false imprisonment for his remand and confinement. Cohen's only response is that "it has already been adjudicated by the Honorable Alvin K. Hellerstein that plaintiff's incarceration was not 'privileged' and was a result of retaliatory conduct engaged in by defendants for the lawful exercise of his First Amendment rights." Dkt. No. 59 at 28. That argument does not hold water; Judge Hellerstein found that Cohen's remand was an unconstitutional retaliation for Cohen's exercise of his First Amendment rights, but it does not follow that the remand and his confinement—effectuated pursuant to a remand order for an inmate in federal custody—was the product of "the absence of legal process," *see Wallace*, 549 U.S. at 390. Rather, Cohen's complaint is not about the absence of legal process but for wrongs incurred while Cohen was subject to legal process and as a result of that process for which a claim of false imprisonment does not lie.

"To prove abuse of process, plaintiff must show that the defendant '(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'" *Hernandez*, 939 F.3d at 204 (quoting *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)). The United States argues that this claim, too, fails "[f]or similar reasons." Dkt. No. 40 at 12. They argue that the FBOP exercising its authority to determine where a prisoner serves a sentence of incarceration is not exercising "legal process"; no court order is required to effectuate its decisions. *See Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (citing *Mormon v. Baran*, 35 N.Y.S.2d 906, 909 (Sup. Ct. 1942) for the proposition

that "legal process means that a court issued the process, and the plaintiff will be penalized if he violates it"). In some sense, the government's argument appears troubling: Cohen cannot pursue a false imprisonment claim for his being shackled, handcuffed, remanded to prison, and confined because it was done pursuant to valid legal process in the form of his sentence from Judge Pauley, and thus "his confinement was legally permitted during the duration of his sentence," Dkt. No. 40 at 12, but Cohen also cannot pursue an abuse of process claim for being shackled, handcuffed, remanded to prison, and confined because that was not done pursuant to any legal process, *i.e.*, a court order. After all, as the unavailability of a false imprisonment claim reflects, Cohen's entire period of detention is pursuant to legal process; without his sentence, the Bureau of Prisons would not possess the authority to remand him to prison without a separate court order. But—as the only case Cohen cites recognizes—the tort of abuse of process lies in "*causing process to issue* lawfully but to accomplish some unjustified purpose." *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers' Ass'n*, 343 N.E.2d 278, 280 (N.Y. 1975). The "abuse" referenced by the tort is that "for maliciously abusing the process of the court," *i.e.*, it addresses those cases in which the process of the court "is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail, or retribution." *Id.* at 281, 283. Cohen does not allege that there was an abuse in the process of obtaining the court order pursuant to which he was confined. What he complains about is that the FBOP perverted its authority under already issued legal process, to accomplish goals for which that process was not originally intended. In short, since Cohen alleges no misconduct in connection with causing the process to issue, he does not properly allege a claim for abuse of process and his second cause of action must be dismissed.

Third, the government argues that Cohen's emotional distress claims—for negligent infliction of emotional distress and intentional infliction of emotional distress—relate to the same conduct as his false imprisonment and abuse of process claims, and therefore must fall with those claims. Dkt. No. 40 at 12 (first citing *Moore v. City of New York*, 219 F. Supp. 2d 335, 229 (E.D.N.Y. 2002) for the proposition that "[n]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort authority"; and then citing *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 395 n.3 (S.D.N.Y. 2008) for the proposition that "[t]o the extent a plaintiff is alleging an alternate theory of liability for false arrest, imprisonment and prosecution sounding in negligence, New York does not provide a cause of action under such a theory"). Cohen nowhere addresses this argument or defends the availability of his emotional distress claims if his false imprisonment and abuse of process claims are dismissed. Therefore, the Court deems the claims abandoned. *See, e.g.*, *Pincover v. J.P. Morgan Chase Bank, N.A.*, 2022 WL 864246, at *11 (S.D.N.Y. Mar. 22, 2022) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (internal quotation marks omitted) (first quoting *Williams v. Mirabal*, 2013 WL 174187, at *2 (S.D.N.Y. Jan 16, 2013)); and then quoting *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004))).

Finally, the United States moves to dismiss Cohen's remaining FTCA claims—for negligent failure to protect and negligent hiring, retention, training, and supervision—as barred by the FTCA's discretionary function exception, which provides that the Government is not liable for:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such

statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). "The exception covers only acts that are discretionary in nature, acts that 'involve an element of judgment or choice,' and 'it is the nature of the conduct, rather than the status of the actor that governs whether the exception applies.'" *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (citations omitted and alterations adopted) (first quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988); and then quoting *United States v. S.A. Empresa de Viavao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813 (1984)). "[E]ven 'assuming the challenged conduct involves an element of judgment,' it remains to be decided 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536). The exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Varig Airlines*, 467 U.S. at 808.

The Second Circuit has described a two-part test, termed the *Berkovitz-Gaubert* test, as "the framework for evaluating whether particular governmental conduct falls under the" discretionary function exception:

> According to the *Berkovitz-Gaubert* test, the [discretionary function exception] bars suit only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve "an element of judgment or choice" and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in "considerations of public policy" or susceptible to policy analysis.

*Coulthurst v. United States*, 214 F.3d 106, 109–10 (2d Cir. 2000).

The governmental conduct challenged in the two remaining causes of action is (1) "negligently operating and managing FCI Otisville," Compl. ¶ 123, presumably in placing

Cohen in solitary confinement in a space with poor ventilation, no air conditioning, and daily temperatures exceeding one-hundred degrees, *id.* ¶ 102; and (2) "negligence, carelessness, and recklessness . . . in failing to meet its duty of care to plaintiff in its screening, hiring, training, supervising, evaluating, managing, controlling, and retaining of defendants and other agents, servants, and employees of the United States," *id.* ¶ 137.  As to the second of these, even assuming that it is well-plead and not conclusory, it clearly falls within the discretionary function exception.  *See, e.g.*, *Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 387 (E.D.N.Y. 2009) ("[F]ederal courts have found such hiring, training, and supervision decisions generally fall within the exception."); *Li v. Aponte*, 2008 WL 4308127, at *8 (S.D.N.Y. Sept. 16, 2008) (holding that the plaintiff's "common law claims against the United States for negligent hiring, training and supervision are barred by the 'discretionary function' exception of the FTCA," and collecting cases for the proposition that "[p]ersonnel decisions of the United States generally fall within the discretionary function exception to the FTCA").  Cohen's negligent hiring, retention, training, and supervision claim therefore cannot proceed.

As to the first of this challenged conduct—the negligent operation and management of FCI Otisville—however, it is a closer call.  The Second Circuit has held that certain negligence claims related to prison management are not subject to the discretionary function exception.  *See Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000).  In *Coulthurst*, the plaintiff, who was a federal prisoner, was lifting weights in the prison exercise room and suffered an injury when a cable on a lateral pull down machine snapped.  *Id.* at 107.  He brought claims against the prison for "'negligence and carelessness' in that the defendant 'failed to diligently and periodically inspect the weight equipment, and the cable' and 'failed to replace the cable after undue wear and tear.'"  *Id.* at 108 (citation omitted).  The district court dismissed the claim as

barred by the discretionary function exception, and the Second Circuit vacated. *Id.* at 108, 111. In doing so, the Second Circuit distinguished between the type of negligence that is involved in designing deficient procedures or decisions about how frequently to inspect the exercise equipment, which involve "elements of judgment and choice" as well as "considerations of public policy," *id.* at 109, and thus would be subject to the discretionary function exception, and the type of negligence that results from an individual officer being carelessly inattentive or lazy in not checking on things, which does not involve elements of judgment and choice or considerations of governmental policy and would not be subject to the discretionary function exception, *id.* The Second Circuit found that the complaint was ambiguous as to which type of negligence was alleged, and therefore that the district court was wrong to dismiss the claim entirely as barred by the discretionary function exception. *Id.* at 109–10.

Cohen's allegations in his complaint are similarly ambiguous as to what type of negligence Cohen is alleging. While Cohen alleges generally that his negligent failure to protect claim is based on the United States' breach of its duty "in negligently operating and managing FCI Otisville," Compl. ¶ 123, it is not clear whether Cohen claims that the alleged "negligence" resulted from the policies and procedures governing FCI Otisville (which allowed for the unsafe conditions in Cohen's cell to occur perhaps due to concerns about costs or resource allocation) or from the carelessness of an individual guard in failing to check that the cell was well-ventilated, air conditioned, and a safe temperature.

To clarify this issue, the Court asked Cohen's counsel at oral argument which of these two theories (or both) he was alleging. Oral Argument Tr. 50. Cohen's counsel stated that he was only alleging that the "policies and procedures in place during COVID at Otisville were egregiously bad in that they, aside from deliberately indifferent, were just negligent in the

maintenance and upkeep." *Id.* at 50–51.  In other words, Cohen admitted that he was *not* asserting a negligent guard theory of liability.  Unfortunately for Cohen, this concession is fatal to his ability to assert this claim:  *Coulthurst* is clear that the designing of such policies and procedures regarding maintenance and upkeep of prisons are subject to the discretionary function exception and thus Cohen's claim of negligent failure to protect must be dismissed accordingly.

## CONCLUSION

The motions to dismiss are GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 38,[8] 39, 41.

SO ORDERED.

Dated: November 14, 2022
New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

[8] Defendants' request to stay discovery in this matter pending adjudication of their motions to dismiss, Dkt. No. 38 has already been addressed, Dkt. No. 66, and nonetheless should be denied as moot.