# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
## CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

**1. SEE NOTICE ON REVERSE**    **2. PLEASE TYPE OR PRINT**    **3. STAPLE ALL ADDITIONAL PAGES**

| Case Caption: | District Court or Agency: | Judge: |
|---|---|---|
| Cohen v. United States of America | S.D.N.Y. | Hon. Lewis J. Liman |

| | Date the Order or Judgment Appealed from was Entered on the Docket: | District Court Docket No.: |
|---|---|---|
| | 11/14/2022 | 1:21-cv-10774 |

| | Date the Notice of Appeal was Filed: | Is this a Cross Appeal? |
|---|---|---|
| | 01/10/2023 | ☐ Yes    ☑ No |

**Attorney(s) for Appellant(s):**
☑ Plaintiff
☐ Defendant

Counsel's Name:   Address:   Telephone No.:   Fax No.:   E-mail:

E. Danya Perry, Perry Guha LLP
1740 Broadway, 15th Floor, New York, NY 10019
(212) 399-8330
dperry@perryguha.com

**Attorney(s) for Appellee(s):**
☐ Plaintiff
☑ Defendant

Counsel's Name:   Address:   Telephone No.:   Fax No.:   E-mail:

Benjamin H. Torrance, United States Attorney's Office, Southern District of New York
86 Chambers Street, New York, NY 10007
(212) 637-2800
Benjamin.Torrance@usdoj.gov

| Has Transcript Been Prepared? | Approx. Number of Transcript Pages: | Number of Exhibits Appended to Transcript: | Has this matter been before this Circuit previously? ☐ Yes ☑ No |
|---|---|---|---|
| | | | If Yes, provide the following: |
| | | | Case Name: |
| | | | 2d Cir. Docket No.:    Reporter Citation: (i.e., F.3d or Fed. App.) |

*ADDENDUM "A":* COUNSEL MUST ATTACH TO THIS FORM: (1) A BRIEF, BUT NOT PERFUNCTORY, DESCRIPTION OF THE NATURE OF THE ACTION; (2) THE RESULT BELOW; (3) A COPY OF THE NOTICE OF APPEAL AND A CURRENT COPY OF THE LOWER COURT DOCKET SHEET; AND (4) A COPY OF ALL RELEVANT OPINIONS/ORDERS FORMING THE BASIS FOR THIS APPEAL, INCLUDING TRANSCRIPTS OF ORDERS ISSUED FROM THE BENCH OR IN CHAMBERS.

*ADDENDUM "B":* COUNSEL MUST ATTACH TO THIS FORM A LIST OF THE ISSUES PROPOSED TO BE RAISED ON APPEAL, AS WELL AS THE APPLICABLE APPELLATE STANDARD OF REVIEW FOR EACH PROPOSED ISSUE.

### PART A: JURISDICTION

| 1. Federal Jurisdiction | 2. Appellate Jurisdiction |
|---|---|
| ☑ U.S. a party    ☐ Diversity | ☑ Final Decision    ☐ Order Certified by District Judge (i.e., Fed. R. Civ. P. 54(b)) |
| ☐ Federal question (U.S. not a party)    ☐ Other (specify): | ☐ Interlocutory Decision Appealable As of Right    ☐ Other (specify): |

**IMPORTANT. COMPLETE AND SIGN REVERSE SIDE OF THIS FORM.**

**FORM C** (Rev. October 2016)

## PART B: DISTRICT COURT DISPOSITION (Check as many as apply)

**1. Stage of Proceedings**

- [✓] Pre-trial
- [ ] During trial
- [ ] After trial

**2. Type of Judgment/Order Appealed**

- [ ] Default judgment
- [ ] Dismissal/FRCP 12(b)(1) lack of subject matter juris.
- [ ] Dismissal/FRCP 12(b)(6) failure to state a claim
- [ ] Dismissal/28 U.S.C. § 1915(e)(2) frivolous complaint
- [ ] Dismissal/28 U.S.C. § 1915(e)(2) other dismissal
- [ ] Dismissal/other jurisdiction
- [✓] Dismissal/merit
- [✓] Judgment / Decision of the Court
- [ ] Summary judgment
- [ ] Declaratory judgment
- [ ] Jury verdict
- [ ] Judgment NOV
- [ ] Directed verdict
- [ ] Other (specify):

**3. Relief**

- [✓] Damages:
  - [ ] Sought: $ _____
  - [ ] Granted: $ _____
  - [ ] Denied: $ _____
- [ ] Injunctions:
  - [ ] Preliminary
  - [ ] Permanent
  - [ ] Denied

## PART C: NATURE OF SUIT (Check as many as apply)

**1. Federal Statutes**

- [ ] Antitrust
- [ ] Bankruptcy
- [ ] Banks/Banking
- [✓] Civil Rights
- [ ] Commerce
- [ ] Energy
- [ ] Commodities
- [ ] Other (specify): _____
- [ ] Communications
- [ ] Consumer Protection
- [ ] Copyright □ Patent
- [ ] Trademark
- [ ] Election
- [ ] Soc. Security
- [ ] Environmental
- [ ] Freedom of Information Act
- [ ] Immigration
- [ ] Labor
- [ ] OSHA
- [ ] Securities
- [ ] Tax

**2. Torts**

- [ ] Admiralty/ Maritime
- [ ] Assault / Defamation
- [ ] FELA
- [ ] Products Liability
- [✓] Other (Specify): FTCA

**3. Contracts**

- [ ] Admiralty/ Maritime
- [ ] Arbitration
- [ ] Commercial
- [ ] Employment
- [ ] Insurance
- [ ] Negotiable Instruments
- [ ] Other Specify

**4. Prisoner Petitions**

- [✓] Civil Rights
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Parole
- [ ] Vacate Sentence
- [ ] Other

**5. Other**

- [ ] Hague Int'l Child Custody Conv.
- [ ] Forfeiture/Penalty
- [ ] Real Property
- [ ] Treaty (specify): _____
- [ ] Other (specify): _____

**6. General**

- [ ] Arbitration
- [ ] Attorney Disqualification
- [ ] Class Action
- [ ] Counsel Fees
- [ ] Shareholder Derivative
- [ ] Transfer

**7. Will appeal raise constitutional issue(s)?**

- [✓] Yes
- [ ] No

Will appeal raise a matter of first impression?

- [ ] Yes
- [✓] No

---

1. Is any matter relative to this appeal still pending below? [ ] Yes, specify: _____ [✓] No

2. To your knowledge, is there any case presently pending or about to be brought before this Court or another court or administrative agency which:

   (A) Arises from substantially the same case or controversy as this appeal? [ ] Yes [✓] No

   (B) Involves an issue that is substantially similar or related to an issue in this appeal? [ ] Yes [✓] No

If yes, state whether □ "A," or □ "B," or □ both are applicable, and provide in the spaces below the following information on the *other* action(s):

| Case Name: | Docket No. | Citation: | Court or Agency: |
| --- | --- | --- | --- |
| Name of Appellant: | | | |

| Date: 01/23/2023 | Signature of Counsel of Record: |
| --- | --- |

## NOTICE TO COUNSEL

**Once you have filed your Notice of Appeal with the District Court or the Tax Court, you have only 14 days in which to complete the following important steps:**

1. Complete this Civil Appeal Pre-Argument Statement (Form C); serve it upon all parties, and file it with the Clerk of the Second Circuit in accordance with LR 25.1.
2. File the Court of Appeals Transcript Information/Civil Appeal Form (Form D) with the Clerk of the Second Circuit in accordance with LR 25.1.
3. Pay the $505 docketing fee to the United States District Court or the $500 docketing fee to the United States Tax Court unless you are authorized to prosecute the appeal without payment.

**PLEASE NOTE: IF YOU DO NOT COMPLY WITH THESE REQUIREMENTS WITHIN 14 DAYS, YOUR APPEAL WILL BE DISMISSED.** *SEE* LOCAL RULE 12.1.

**FORM C** (Rev. December 2016)

### ADDENDUM A

**1.** **A brief, but not perfunctory, description of the nature of the action**

Plaintiff-appellant is Michael D. Cohen.

Defendants-appellees are the United States of America; Donald J. Trump, former President of the United States; William Barr, former Attorney General of the United States; Michael Carvajal, former Director of the Bureau of Prisons; Jon Gustin, former Administrator of the Residential Reentry Management Branch of the Bureau of Prisons; Patrick McFarland, Residential Reentry Manager of the Federal Bureau of Prisons; James Petrucci, Warden of FCI Otisville; Enid Febus, Supervisory Probation Officer, United States Probation and Pretrial Services; Adam Pakula, Probation Officer, United States Probation and Pretrial Services; and John and Jane Does (1-10), agents, servants, and employees of the United States.

Mr. Cohen alleges that Defendants-appellees, at the direction of then-President Trump, unlawfully remanded him to prison, in deplorable and dangerous conditions, in retaliation for his plans to publish and speak about a book critical of the then-President.

On May 6, 2019, Mr. Cohen began serving a 36-month sentence at FCI Otisville. Following the onset of the COVID-19 pandemic in early 2020, the Bureau of Prisons determined that Mr. Cohen should be released on furlough and then transitioned to home confinement. On May 21, 2020, Mr. Cohen was released on

furlough. On July 9, 2020, he was scheduled to be transitioned from furlough to home confinement. However, Defendants demanded that Mr. Cohen agree to an apparently unique condition that Mr. Cohen not engage with the media in any form, including through books, social media, and television. After Mr. Cohen requested clarification of this condition in a meeting with Bureau of Prisons officials, he and his attorney were left alone for approximately one and a half hours, until Federal marshals remanded Mr. Cohen to prison, where he was kept in solitary confinement for sixteen days. The cell in which Defendants placed Mr. Cohen had poor ventilation, no air conditioning, broken windows, and temperatures frequently over one hundred degrees. Mr. Cohen filed a petition for *habeas corpus* on July 20, 2020. On July 23, 2020, U.S. District Judge Alvin Hellerstein ordered Mr. Cohen released to home confinement, finding that the government had retaliated against him in violation of his First Amendment rights.

On December 16, 2021, Mr. Cohen filed a complaint against Defendants, asserting a claim for violations of his First, Fourth, and Eighth Amendment rights against the individual Defendants pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and claims for retaliation, false arrest, false imprisonment, abuse of authority and process, negligent failure to protect, negligent and intentional infliction of emotional distress, and negligent

2

hiring, retention, training, and supervision against the United States pursuant to the Federal Tort Claims Act.

## 2. The result below

On November 14, 2022, following briefing and oral argument, Judge Lewis J. Liman of the U.S. District Court for the Southern District of New York granted the motions to dismiss filed by Mr. Trump and the United States and the remaining individual defendants, respectively. The following day, Judge Liman entered final judgment closing the case.

## 3. A copy of the notice of appeal and a current copy of the lower court docket sheet

A copy of the notice of appeal, dated January 10, 2023, is attached hereto as Exhibit 1. A current copy of the lower court docket sheet is attached hereto as Exhibit 2.

## 4. A copy of all relevant opinions/orders forming the basis for this appeal

Attached hereto as Exhibit 3 is a copy of the District Court's Opinion and Order granting Defendants' motions to dismiss, dated November 14, 2022 (ECF No. 76). A copy of a relevant transcript of proceedings in connection with Mr. Cohen's petition for habeas relief is attached hereto as Exhibit 4.

3

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL D. COHEN,

       *Plaintiff,*

    v.

UNITED STATES OF AMERICA, DONALD J. TRUMP, former President of the United States, WILLIAM BARR, former Attorney General of the United States, MICHAEL CARVAJAL, Director of the Bureau of Prisons, JON GUSTIN, Administrator of the Residential Reentry Management Branch of the Bureau of Prisons, PATRICK MCFARLAND, Residential Reentry Manager of the Federal Bureau of Prisons, JAMES PETRUCCI, Warden of FCI Otisville, ENID FEBUS, Supervisory Probation Officer of the United States Probation and Pretrial Services, ADAM PAKULA, Probation Officer of the United States Probation and Pretrial Services, and JOHN and JANE DOE (1-10) agents, servants, and employees of the United States

       *Defendants.*

Case No. 21-cv-10774 (LJL)

**NOTICE OF APPEAL**

---

NOTICE IS HEREBY GIVEN that Michael D. Cohen, Plaintiff in the above-titled action, hereby appeals to the United States Court of Appeals for the Second Circuit from the Judgment of the United States District Court for the Southern District of New York dismissing all counts of his Complaint entered in this action on November 14th, 2022 (ECF No. 76).

Dated: January 10, 2023
      New York, New York

Respectfully submitted,

*/s/ E. Danya Perry*
E. Danya Perry (No. 2839983)
PERRY GUHA LLP
1740 Broadway, 15th Floor
New York, New York 10019
Email: dperry@perryguha.com
Telephone: (212) 399-8340
Facsimile: (212) 399-8331

*Attorney for Plaintiff Michael D. Cohen*

**CERTIFICATE OF SERVICE**

     I, E. Danya Perry, certify that on January 10, 2023, I caused the foregoing Notice of Appeal

by Plaintiff Michael D. Cohen to be filed with the Clerk of the Court and served upon all counsel

of record via CM/ECF system.

Dated: January 10, 2023                        Respectfully submitted,
       New York, New York

                                          */s/ E. Danya Perry*
                                          E. Danya Perry

# EXHIBIT 2

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
### CIVIL DOCKET FOR CASE #: 1:21−cv−10774−LJL

Cohen v. United States of America et al
Assigned to: Judge Lewis J. Liman
Cause: 28:1331tt Fed. Question: Tort Action

Date Filed: 12/16/2021
Date Terminated: 11/15/2022
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Michael D. Cohen**  represented by  **E. Danya Perry**
Perry Guha LLP
1740 Broadway, 15th Floor
New York, NY 10019
212−399−8340
Fax: 212−399−8331
Email: dperry@perryguha.com
*ATTORNEY TO BE NOTICED*

**Jeffrey K. Levine**
Law Offices of Jeffrey K. Levine
340 West 57th Street
Suite 11e
New York, NY 10019
212−721−9600
Email: jl@nyadvocate.com
*ATTORNEY TO BE NOTICED*

**Andrew C. Laufer**
Law Office of Andrew C. Laufer, PLLC
264 West 40th Street
Suite 604
New York, NY 10018
212−422−1020
Email: alaufer@lauferlawgroup.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States of America**  represented by  **Allison Rovner**
United States Attorney's Office SDNY
86 Chambers St.
New York, NY 10007
(212)−637−2691
Fax: (212)−637−2750
Email: Allison.Rovner@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
DOJ−USAO
86 Chambers St
New York, NY 10007
917−754−4386
Email: alyssa.o'gallagher@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Donald J. Trump**
*former President of the United States*

represented by **Alina Habba**
Habba Madaio & Associates LLP
1430 US Highway 206
Suite 240
Bedminster, NJ 07921
908−869−1188
Email: ahabba@habbalaw.com
*ATTORNEY TO BE NOTICED*

**Michael T Madaio**
Habba Madaio & Associates LLP
1430 US Highway 206
Suite 240
Bedminster, NJ 07921
908−869−1188
Email: mmadaio@habbalaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**William Barr**
*former Attorney General of the United States*

represented by **Allison Rovner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael Carvajal**
*Director of the Bureau of Prisons*

represented by **Allison Rovner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jon Gustin**
*Administrator of the Residential Reentry Management Branch of the Bureau of Prisons*

represented by **Allison Rovner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Patrick Mcfarland**
*Residential Reentry Manager of the Federal Bureau of Prisons*

represented by **Allison Rovner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**James Petrucci**
*Warden of FCI Otisville*

represented by **Allison Rovner**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Enid Febus**                                    represented by   **Allison Rovner**
*Supervisory Probation Officer of the*                            (See above for address)
*United States Probation and Pretrial*                            *LEAD ATTORNEY*
*Services*                                                        *ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Adam Pakula**                                   represented by   **Allison Rovner**
*Probation Officer of the United States*                          (See above for address)
*Probation and Pretrial Services*                                 *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 12/16/2021 | 1 | **FILING ERROR − DEFICIENT PLEADING − FILED AGAINST PARTY ERROR −** COMPLAINT against All Defendants. (Filing Fee $ 402.00, Receipt Number ANYSDC−25479126)Document filed by Michael D. Cohen..(Laufer, Andrew) Modified on 12/17/2021 (jgo). (Entered: 12/16/2021) |
| 12/16/2021 | 2 | NOTICE OF APPEARANCE by Jeffrey K. Levine on behalf of Michael D. Cohen..(Levine, Jeffrey) (Entered: 12/16/2021) |
| 12/17/2021 |   | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Andrew C. Laufer to RE−FILE Document No. 1 Complaint,. The filing is deficient for the following reason(s): all of the parties listed on the pleading were not entered on CM/ECF; add party Jane Doe 1−10 with party text 'agents, servants, and employees of the United States; the All Defendant radio button was selected;. Re−file the pleading using the event type Complaint found under the event list Complaints and Other Initiating Documents − attach the correct signed PDF − select the individually named filer/filers − select the individually named party/parties the pleading is against. (jgo)** Modified on 12/17/2021 (jgo). (Entered: 12/17/2021) |
| 12/17/2021 |   | ***NOTICE TO ATTORNEY TO ELECTRONICALLY FILE CIVIL COVER SHEET. Notice to Attorney Andrew C. Laufer. Attorney must electronically file the Civil Cover Sheet. Use the event type Civil Cover Sheet found under the event list Other Documents. (jgo)** (Entered: 12/17/2021) |
| 12/17/2021 |   | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Andrew C. Laufer. The party information for the following party/parties has been modified: all defendants. The information for the party/parties has been modified for the following reason/reasons: party name was entered in all caps; party text was omitted;. (jgo)** (Entered: 12/17/2021) |
| 12/17/2021 |   | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above−entitled action is assigned to Judge Lewis J. Liman. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district−judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at |

| | | |
|---|---|---|
| | | https://nysd.uscourts.gov/rules/ecf−related−instructions..(jgo) (Entered: 12/17/2021) |
| 12/17/2021 | | Magistrate Judge Gabriel W. Gorenstein is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018−06/AO−3.pdf. (jgo) (Entered: 12/17/2021) |
| 12/17/2021 | | Case Designated ECF. (jgo) (Entered: 12/17/2021) |
| 12/17/2021 | 3 | COMPLAINT against William Barr, Michael Carvajal, Enid Febus, John Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, Donald J. Trump, United States of America. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 4 | **FILING ERROR − PDF ERROR −** CIVIL COVER SHEET filed..(Laufer, Andrew) Modified on 12/17/2021 (gp). (Entered: 12/17/2021) |
| 12/17/2021 | 5 | REQUEST FOR ISSUANCE OF SUMMONS as to United States of America, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 6 | REQUEST FOR ISSUANCE OF SUMMONS as to Donald J. Trump, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 7 | REQUEST FOR ISSUANCE OF SUMMONS as to William Barr, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 8 | REQUEST FOR ISSUANCE OF SUMMONS as to Michael Carvajal, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 9 | REQUEST FOR ISSUANCE OF SUMMONS as to Jon Gustin, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 10 | REQUEST FOR ISSUANCE OF SUMMONS as to Patrick McFarland, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 11 | REQUEST FOR ISSUANCE OF SUMMONS as to James Petrucci, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 12 | REQUEST FOR ISSUANCE OF SUMMONS as to Enid Febus, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 13 | REQUEST FOR ISSUANCE OF SUMMONS as to Adam Pakula, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Andrew Laufer. The party information for the following party/parties has been modified: John Gustin. The information for the party/parties has been modified for the following reason/reasons: party name contained a typographical error;. (gp)** (Entered: 12/17/2021) |
| 12/17/2021 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT CIVIL COVER SHEET. Notice to attorney Andrew Laufer to RE−FILE Document No. 4 Civil Cover Sheet. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the civil cover sheet is not correct (NATURE OF SUIT INFORMATION IS MISSING). Re−file the document using the event type Civil Cover Sheet found under the event list Other Documents and attach the correct PDF. Use civil cover sheet issued by S.D.N.Y. dated October 1, 2020. The S.D.N.Y. Civil Cover Sheet dated October 1, 2020 is located at http://nysd.uscourts.gov/file/forms/civil−cover−sheet.. (gp)** (Entered: 12/17/2021) |
| 12/17/2021 | 14 | ELECTRONIC SUMMONS ISSUED as to United States of America..(gp) (Entered: 12/17/2021) |

| | | |
|---|---|---|
| 12/17/2021 | 15 | ELECTRONIC SUMMONS ISSUED as to Donald J. Trump..(gp) (Entered: 12/17/2021) |
| 12/17/2021 | 16 | ELECTRONIC SUMMONS ISSUED as to William Barr..(gp) (Entered: 12/17/2021) |
| 12/17/2021 | 17 | ELECTRONIC SUMMONS ISSUED as to Michael Carvajal..(gp) (Entered: 12/17/2021) |
| 12/17/2021 | 18 | ELECTRONIC SUMMONS ISSUED as to Jon Gustin..(gp) (Entered: 12/17/2021) |
| 12/17/2021 | 19 | ELECTRONIC SUMMONS ISSUED as to Patrick Mcfarland..(gp) (Entered: 12/17/2021) |
| 12/17/2021 | 20 | ELECTRONIC SUMMONS ISSUED as to James Petrucci..(gp) (Entered: 12/17/2021) |
| 12/17/2021 | 21 | ELECTRONIC SUMMONS ISSUED as to Enid Febus..(gp) (Entered: 12/17/2021) |
| 12/17/2021 | 22 | ELECTRONIC SUMMONS ISSUED as to Adam Pakula..(gp) (Entered: 12/17/2021) |
| 12/20/2021 | 23 | CIVIL COVER SHEET filed..(Laufer, Andrew) (Entered: 12/20/2021) |
| 01/07/2022 | 24 | NOTICE OF INITIAL PRETRIAL CONFERENCE: Initial Conference set for 3/2/2022 at 11:00 AM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (Signed by Judge Lewis J. Liman on 1/7/2022) (va) (Entered: 01/07/2022) |
| 01/18/2022 | 25 | AFFIDAVIT OF SERVICE. United States of America served on 1/7/2022, answer due 1/28/2022. Service was accepted by Ostrich Gordon. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 01/18/2022) |
| 01/18/2022 | 26 | AFFIDAVIT OF SERVICE. Donald J. Trump served on 1/5/2022, answer due 1/26/2022. Service was accepted by Doorman − "John Doe". Service was made by MAIL. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 01/18/2022) |
| 01/18/2022 | 27 | AFFIDAVIT OF SERVICE. William Barr served on 12/30/2021, answer due 1/20/2022. Service was accepted by William Barr. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 01/18/2022) |
| 02/07/2022 | 28 | AFFIDAVIT OF SERVICE. Michael Carvajal served on 2/2/2022, answer due 2/23/2022. Service was accepted by Corinne Nastro. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 02/07/2022) |
| 02/07/2022 | 29 | AFFIDAVIT OF SERVICE. Jon Gustin served on 2/2/2022, answer due 2/23/2022. Service was accepted by Corinne Nastro. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 02/07/2022) |
| 02/07/2022 | 30 | AFFIDAVIT OF SERVICE. Patrick Mcfarland served on 2/2/2022, answer due 2/23/2022. Service was accepted by Corinne Nastro. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 02/07/2022) |
| 02/07/2022 | 31 | AFFIDAVIT OF SERVICE. James Petrucci served on 2/2/2022, answer due 2/23/2022. Service was accepted by Corinne Nastro. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 02/07/2022) |
| 02/07/2022 | 32 | AFFIDAVIT OF SERVICE. Enid Febus served on 1/17/2022, answer due 2/7/2022. Service was accepted by Enid Febus. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 02/07/2022) |
| 02/07/2022 | 33 | AFFIDAVIT OF SERVICE. Adam Pakula served on 2/3/2022, answer due 2/24/2022. Service was made by 20 Heron Drive, Marlboro, NJ 07746. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 02/07/2022) |
| 02/21/2022 | 34 | LETTER MOTION for Extension of Time *for defendants to respond to complaint and adjournment of initial conference with corresponding extension of time for pre−conference submission* addressed to Judge Lewis J. Liman from AUSA Allison Rovner dated February 21, 2022. Document filed by United States of America..(Rovner, Allison) (Entered: 02/21/2022) |
| 02/22/2022 | 35 | ORDER granting 34 Letter Motion for Extension of Time. The initial pretrial conference is adjourned to April 7, 2022 at 2:00P.M. in Courtroom 15C, 500 Pearl |

| | | |
|---|---|---|
| | | Street, New York, NY 10007 before Judge Lewis J. Liman. (HEREBY ORDERED by Judge Lewis J. Liman)(Text Only Order) (ra) (Entered: 02/22/2022) |
| 02/22/2022 | | Set/Reset Hearings: Initial Conference set for 4/7/2022 at 02:00 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 02/23/2022) |
| 03/29/2022 | 36 | NOTICE OF APPEARANCE by Alina Habba on behalf of Donald J. Trump..(Habba, Alina) (Entered: 03/29/2022) |
| 03/31/2022 | 37 | LETTER addressed to Judge Lewis J. Liman from Andrew C. Laufer dated 3/31/22 re: Discovery. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 03/31/2022) |
| 03/31/2022 | 38 | LETTER MOTION to Stay *Discovery* addressed to Judge Lewis J. Liman from AUSA Allison Rovner dated March 31, 2022. Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 03/31/2022) |
| 04/04/2022 | 39 | MOTION to Dismiss . Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 04/04/2022) |
| 04/04/2022 | 40 | MEMORANDUM OF LAW in Support re: 39 MOTION to Dismiss . . Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 04/04/2022) |
| 04/04/2022 | 41 | MOTION to Dismiss . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 04/04/2022) |
| 04/04/2022 | 42 | MEMORANDUM OF LAW in Support re: 41 MOTION to Dismiss . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 04/04/2022) |
| 04/04/2022 | 43 | DECLARATION of Alina Habba in Support re: 41 MOTION to Dismiss .. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit Complaint in the Matter of Robert S. Trump v. Mary L. Trump, et al, # 2 Exhibit Cease and Desist Letter).(Habba, Alina) (Entered: 04/04/2022) |
| 04/06/2022 | | ORDER: The Initial Pretrial Conference scheduled for April 7, 2022 at 2:00P.M. will be held in Courtroom 24B at the 500 Pearl Street Courthouse, and will no longer be held in Courtroom 15C. Instead, Courtroom 15C will be used as an overflow room if needed. (HEREBY ORDERED by Judge Lewis J. Liman) (Text Only Order) (mf) (Entered: 04/06/2022) |
| 04/06/2022 | 44 | NOTICE OF APPEARANCE by Alyssa O'Gallagher on behalf of William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(O'Gallagher, Alyssa) (Entered: 04/06/2022) |
| 04/07/2022 | 45 | NOTICE OF APPEARANCE by Michael T Madaio on behalf of Donald J. Trump..(Madaio, Michael) (Entered: 04/07/2022) |
| 04/07/2022 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Initial Pretrial Conference held on 4/7/2022. Jeffrey Levine (present by telephone) and Andrew Laufer present for Plaintiff. Allison Rovner and Alyssa O'Gallagher present for Defendants. Alina Habba and Michael Madaio present for Defendant, Donald J. Trump. Court reporter present. The Court ordered the exchange of initial disclosures by April 18, 2022. Plaintiff is permitted to serve interrogatories and document requests by May 12. 2022. Plaintiff's opposition briefs to motion to dismiss is due by May 27, 2022. Defendants' reply briefs due by June 17, 2022. (mf) (Entered: 04/18/2022) |
| 04/08/2022 | 46 | SUPPLEMENTAL LETTER addressed to Judge Lewis J. Liman from Jeffrey K. Levine dated 04/08/2022 re: Supplement to 04/07/22 Conference. Document filed by Michael D. Cohen..(Levine, Jeffrey) (Entered: 04/08/2022) |
| 04/09/2022 | 47 | SUPPLEMENTAL LETTER addressed to Judge Lewis J. Liman from Alina Habba, Esq. dated April 9, 2022 re: Response to Plaintiff's Supplemental Letter dated April 8, 2022. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 04/09/2022) |

| | | |
|---|---|---|
| 04/22/2022 | 48 | NOTICE of Request for Admission. Document filed by Michael D. Cohen. (Attachments: # 1 Exhibit Order − July 23, 2020 [ECF 30], # 2 Exhibit Stipulation and Order − July 30, 2020 [[ECF 36]).(Levine, Jeffrey) (Entered: 04/22/2022) |
| 04/26/2022 | 49 | TRANSCRIPT of Proceedings re: CONFERENCE held on 4/7/2022 before Judge Lewis J. Liman. Court Reporter/Transcriber: Andrew Walker, (212) 805−0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/17/2022. Redacted Transcript Deadline set for 5/27/2022. Release of Transcript Restriction set for 7/25/2022..(Moya, Goretti) (Entered: 04/26/2022) |
| 04/26/2022 | 50 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 4/7/22 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 04/26/2022) |
| 05/12/2022 | 51 | FIRST MOTION to Stay *Discovery*. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 05/12/2022) |
| 05/12/2022 | 52 | MEMORANDUM OF LAW in Support re: 51 FIRST MOTION to Stay *Discovery*. . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 05/12/2022) |
| 05/18/2022 | 53 | FIRST MOTION to Compel Donald J. Trump to produce discovery . Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 05/18/2022) |
| 05/18/2022 | 54 | MEMORANDUM OF LAW in Support re: 53 FIRST MOTION to Compel Donald J. Trump to produce discovery . . Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 05/18/2022) |
| 05/18/2022 | 55 | DECLARATION of Andrew C. Laufer in Support re: 53 FIRST MOTION to Compel Donald J. Trump to produce discovery .. Document filed by Michael D. Cohen. (Attachments: # 1 Exhibit Donald J. Trump's Initial Disclosures, # 2 Exhibit Order Granting Preliminary Injunction).(Laufer, Andrew) (Entered: 05/18/2022) |
| 05/23/2022 | 56 | MOTION to Stay *Discovery*. Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 05/23/2022) |
| 05/23/2022 | 57 | MEMORANDUM OF LAW in Support re: 56 MOTION to Stay *Discovery*. . Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America. (Attachments: # 1 Exhibit A (April 7, 2022 conference transcript), # 2 Exhibit B (Discovery Requests)).(Rovner, Allison) (Entered: 05/23/2022) |
| 05/25/2022 | 58 | MEMORANDUM OF LAW in Opposition re: 53 FIRST MOTION to Compel Donald J. Trump to produce discovery . . Document filed by Donald J. Trump. (Attachments: # 1 Affidavit Declaration of Michael Madaio).(Habba, Alina) (Entered: 05/25/2022) |
| 05/27/2022 | 59 | AFFIDAVIT of Andrew C. Laufer in Opposition re: 39 MOTION to Dismiss .. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 05/27/2022) |
| 05/27/2022 | 60 | DECLARATION of Andrew C. Laufer in Opposition re: 39 MOTION to Dismiss .. Document filed by Michael D. Cohen. (Attachments: # 1 Exhibit Decision of the Hon. Alvin K. Hellerstein, # 2 Exhibit United States Government Memorandum).(Laufer, Andrew) (Entered: 05/27/2022) |
| 05/27/2022 | 61 | AFFIRMATION of Andrew C. Laufer in Opposition re: 41 MOTION to Dismiss .. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 05/27/2022) |
| 05/27/2022 | 62 | DECLARATION of Andrew C. Laufer in Opposition re: 41 MOTION to Dismiss .. Document filed by Michael D. Cohen. (Attachments: # 1 Exhibit Decision of Hon. Alvin K. Hellerstein).(Laufer, Andrew) (Entered: 05/27/2022) |
| 05/31/2022 | 63 | AFFIRMATION of Andrew C. Laufer in Opposition re: 56 MOTION to Stay *Discovery*.. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: |

| | | |
|---|---|---|
| | | 05/31/2022) |
| 06/02/2022 | 64 | REPLY AFFIRMATION of Andrew C. Laufer in Support re: 53 FIRST MOTION to Compel Donald J. Trump to produce discovery .. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 06/02/2022) |
| 06/02/2022 | 65 | REPLY MEMORANDUM OF LAW in Support re: 56 MOTION to Stay *Discovery*. . Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 06/02/2022) |
| 06/16/2022 | 66 | MEMORANDUM AND ORDER granting 51 Motion to Stay re: 51 FIRST MOTION to Stay *Discovery*., 53 FIRST MOTION to Compel Donald J. Trump to produce discovery ., 56 MOTION to Stay *Discovery*. ; denying 53 Motion to Compel; granting 56 Motion to Stay re: 51 FIRST MOTION to Stay *Discovery*., 53 FIRST MOTION to Compel Donald J. Trump to produce discovery ., 56 MOTION to Stay *Discovery*. The motion to compel a response to discovery is DENIED. The motions for a stay of discovery pending a decision on the motions to dismiss are GRANTED. The Court will set a discovery schedule if the complaint survives the motions in whole or in part. The Clerk of Court is respectfully directed to close Dkt. Nos. 51, 53, 56. (Signed by Judge Lewis J. Liman on 6/16/2022) (rro) (Entered: 06/16/2022) |
| 06/17/2022 | 67 | REPLY MEMORANDUM OF LAW in Support re: 39 MOTION to Dismiss . . Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 06/17/2022) |
| 06/17/2022 | 68 | REPLY MEMORANDUM OF LAW in Support re: 41 MOTION to Dismiss . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 06/17/2022) |
| 06/21/2022 | 69 | LETTER addressed to Judge Lewis J. Liman from Andrew C. Laufer dated 06/21/2022 re: Cohen v. United States of America, et al 21 cv 10774 (LJL) (GWG). Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 06/21/2022) |
| 06/24/2022 | | ORDER: The Court will hear oral argument on the pending motions to dismiss on July 7, 2022 at 4:00PM. The hearing will be held in–person and parties are to appear in Courtroom 15C at the 500 Pearl Street Courthouse. (HEREBY ORDERED by Judge Lewis J. Liman) (Text Only Order) (mf) (Entered: 06/24/2022) |
| 06/24/2022 | | Set/Reset Hearings: Oral Argument set for 7/7/2022 at 04:00 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 06/24/2022) |
| 06/24/2022 | 70 | MEMO ENDORSEMENT on re: 69 Letter filed by Michael D. Cohen. ENDORSEMENT: The Court will receive the letter as a supplement to the opposition to the motion to dismiss. No further briefing may be filed absent leave of the Court. SO ORDERED. (Signed by Judge Lewis J. Liman on 6/24/2022) (vfr) (Entered: 06/24/2022) |
| 06/27/2022 | | ORDER: The Oral Argument on the pending motions to dismiss previously set for July 7, 2022 is RESCHEDULED to July 6, 2022 at 4:00PM in Courtroom 15C at the 500 Pearl Street Courthouse. (HEREBY ORDERED by Judge Lewis J. Liman) (Text Only Order) (mf) (Entered: 06/27/2022) |
| 06/27/2022 | | Set/Reset Hearings: Oral Argument set for 7/6/2022 at 04:00 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 06/27/2022) |
| 06/27/2022 | 71 | LETTER addressed to Judge Lewis J. Liman from Andrew C. Laufer dated 6/27/2022 re: Adjournment. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 06/27/2022) |
| 06/28/2022 | 72 | ORDER granting 71 Letter from Andrew C. Laufer dated 6/27/2022 re: Adjournment filed by Michael D. Cohen. The Oral Argument on the pending motions to dismiss is RESCHEDULED to July 11, 2022 at 2:30PM in Courtroom 15C at the 500 Pearl Street Courthouse. (HEREBY ORDERED by Judge Lewis J. Liman) (Text Only Order) (mf) (Entered: 06/28/2022) |

| | | |
|---|---|---|
| 06/28/2022 | | Set/Reset Hearings: Oral Argument set for 7/11/2022 at 02:30 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 06/28/2022) |
| 07/01/2022 | 73 | LETTER addressed to Judge Lewis J. Liman from AUSA Allison Rovner dated July 1, 2022 re: request to divide oral argument between AUSAs representing Moving Defendants. Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 07/01/2022) |
| 07/08/2022 | | ORDER: Due to a scheduling conflict, the Oral Argument previously set for July 11, 2022 is RESCHEDULED to July 18, 2022 at 4:30PM in Courtroom 15C at the 500 Pearl Street Courthouse. (HEREBY ORDERED by Judge Lewis J. Liman) (Text Only Order) (mf) (Entered: 07/08/2022) |
| 07/08/2022 | | Set/Reset Hearings: Oral Argument set for 7/18/2022 at 04:30 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 07/08/2022) |
| 07/11/2022 | 74 | LETTER MOTION to Adjourn Conference *(oral argument on pending motions to dismiss)* addressed to Judge Lewis J. Liman from AUSA Allison Rovner dated July 11, 2022. Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 07/11/2022) |
| 07/14/2022 | 75 | ORDER granting 74 Letter Motion to Adjourn Conference. The Oral Argument on the pending motions to dismiss is RESCHEDULED to August 2, 2022 at 4:30PM in Courtroom 15C at the 500 Pearl Street Courthouse. (Oral Argument set for 8/2/2022 at 04:30 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman.) (HEREBY ORDERED by Judge Lewis J. Liman)(Text Only Order) (mf) (Entered: 07/14/2022) |
| 08/02/2022 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Oral Argument held on 8/2/2022 re: 39 MOTION to Dismiss filed by William Barr, James Petrucci, Enid Febus, Michael Carvajal, Patrick Mcfarland, Jon Gustin, United States of America, Adam Pakula, and 41 MOTION to Dismiss filed by Donald J. Trump. Jeffrey Levine and Andrew Laufer present for Plaintiff. Allison Rovner and Alyssa O'Gallagher present for Defendants. Alina Habba and Michael Madaio present for Defendant, Donald J. Trump. Court reporter present. The Court heard argument from all parties regarding Defendants' pending motions to dismiss. The Court takes the matter under advisement, decision reserved by the Court. Defendants' directed to order a copy of the transcript on an expedited basis and to split cost between Defendants. (mf) (Entered: 08/11/2022) |
| 11/14/2022 | 76 | OPINION AND ORDER re: 39 MOTION to Dismiss . filed by William Barr, James Petrucci, Enid Febus, Michael Carvajal, Patrick Mcfarland, Jon Gustin, United States of America, Adam Pakula, 38 LETTER MOTION to Stay *Discovery* addressed to Judge Lewis J. Liman from AUSA Allison Rovner dated March 31, 2022. filed by William Barr, James Petrucci, Enid Febus, Michael Carvajal, Patrick Mcfarland, Jon Gustin, United States of America, Adam Pakula, 41 MOTION to Dismiss . filed by Donald J. Trump. The motions to dismiss are GRANTED. The Clerk of Court is respectfully directed to close Dkt. Nos. 38, 39, 41. SO ORDERED. (Signed by Judge Lewis J. Liman on 11/14/2022) (tg) Transmission to Orders and Judgments Clerk for processing. (Entered: 11/14/2022) |
| 11/15/2022 | 77 | CLERK'S JUDGMENT re: 76 Opinion & Order. in favor of United States of America, Adam Pakula, Donald J. Trump, Enid Febus, James Petrucci, Jon Gustin, Michael Carvajal, Patrick Mcfarland, William Barr against Michael D. Cohen. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion & Order dated November 14, 2022, Defendants' motions to dismiss are GRANTED; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 11/15/2022) (nd) (Entered: 11/15/2022) |
| 01/10/2023 | 78 | NOTICE OF APPEARANCE by E. Danya Perry on behalf of Michael D. Cohen..(Perry, E. Danya) (Entered: 01/10/2023) |

| 01/10/2023 | 79 | NOTICE OF APPEAL from 77 Clerk's Judgment,, 76 Memorandum & Opinion,,,. Document filed by Michael D. Cohen. Filing fee $ 505.00, receipt number BNYSDC−27181891. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Perry, E. Danya) Modified on 1/10/2023 (nd). (Entered: 01/10/2023) |
| 01/10/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 79 Notice of Appeal,..(nd) (Entered: 01/10/2023) |
| 01/10/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 79 Notice of Appeal, filed by Michael D. Cohen were transmitted to the U.S. Court of Appeals..(nd) (Entered: 01/10/2023) |

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                :

MICHAEL COHEN,                           :

                Plaintiff,           :

                                  :

        -v-                    :

                                  :

UNITED STATES OF AMERICA, et al.,   :

                                  :

               Defendants.      :

                                  :

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/14/2022

21-cv-10774 (LJL)

<u>OPINION AND ORDER</u>

LEWIS J. LIMAN, United States District Judge:

       Plaintiff Michael Cohen's complaint centers around allegations of serious violations of his constitutional rights by the United States government, then-President Donald J. Trump, then-Attorney General William Barr, and various officers within the Federal Bureau of Prisons. Cohen alleges—and another Court found with respect to certain of the defendants, *see infra*—that the defendants remanded him to prison because he wanted to publish a book critical of the then-President. He seeks redress for the violations of his constitutional rights through this damages action.

       Cohen's complaint and the motions to dismiss now before this Court raise fundamental questions about the meaning and value of constitutional rights, the relationship between a citizen and the government, and the role of the federal courts in protecting those rights. The ability to publicly criticize even our most prominent politicians and leaders without fear of retaliation is a hallmark of American democracy; political speech is core First Amendment speech. "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270 (1941). And it is a further hallmark of American democracy that, where one's rights have been violated, one may seek to

vindicate those rights in the courts.  In the oft-quoted words of Chief Justice John Marshall:

"The government of the United States has been emphatically termed a government of laws, and

not of men.  It will certainly cease to deserve this high appellation, if the laws furnish no remedy

for the violation of a vested legal right."  *Marbury v. Madison*, 1 Cranch 137, 163 (1803).  The

Court today must consider the limits of these hallmark principles.

## BACKGROUND

The following facts are drawn from the complaint and are taken as true for the purposes

of this motion to dismiss.

Plaintiff Michael D. Cohen ("Cohen" or "Plaintiff") was formerly employed by

individual defendant Donald J. Trump ("Trump") as his attorney and personal advisor for over a

decade.  Dkt. No. 3 ("Compl.") ¶ 48.  In August and November of 2018, Cohen pleaded guilty to

various crimes including lying to Congress and campaign finance violations; he was sentenced to

thirty-six months of incarceration.  *Id.* ¶¶ 4, 52–53.  In May of 2019, he voluntarily surrendered

for service of his sentence at FCI Otisville.  *Id.* ¶ 54.

While incarcerated, Cohen began to work on a book about his association with Trump.

*Id.* ¶ 55.  The book chronicles the arc of his experiences with Trump and describes how, upon

reflection, he came to the realization that his actions in furtherance of Trump's agenda ultimately

led to his own downfall.  *Id.* ¶ 56.  Cohen publicly spoke about his forthcoming book in ways

that made it clear that the book would be critical of and perhaps damaging to Trump; he publicly

stated that his book would be unfavorable to Trump and would substantiate the descriptions he

gave during his congressional testimony of Trump as "a cheat, a liar, a conman, [and] a racist,"

among other things.  *Id.* ¶¶ 57, 59.  The complaint also alleges that Cohen was privy to years of

non-public behavior by Trump, which included witnessing anti-Semitic and racist remarks by

him; that the book included quotes and documentary evidence of such behavior; and that Trump

was aware that Cohen was witness to many years of such behavior that, if made public, could damage Trump's reputation and his future political goals, including, at that time, his potential run for a second term as President in 2020. *Id.* ¶¶ 57–58, 60.

Cohen's incarceration in 2019 and the beginning of 2020 was uneventful. *Id.* ¶ 62. Upon completion of his sentence, Cohen was to be released from FCI Otisville on November 21, 2021. *Id.* ¶ 63. The onset of the COVID-19 pandemic, however, altered this. *Id.* ¶ 64. COVID-19 caused significant concerns for prison populations because the virus spreads easily within the close confines of a prison; this was particularly concerning for Cohen because he has various health comorbidities that make him highly susceptible to COVID-19 risks. *Id.* ¶¶ 64–65. Cohen petitioned the defendants for early release from FCI Otisville based on Congress's passage of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, and then-Attorney General Barr's memoranda of March 26, 2020 and April 3, 2020. *Id.* ¶ 66. Cohen submitted his request to officials from the Federal Bureau of Prisons ("FBOP") on March 31, 2020; the officials determined that Cohen should be released on furlough and then transferred to home confinement. *Id.* ¶¶ 67–68. The FBOP granted Cohen furlough approval on April 18, 2020; the furlough time period was from May 1, 2020 to May 31, 2020. *Id.* ¶ 69.

During that time period, while on furlough, Cohen made several public statements via Twitter regarding the imminent publication of his book about Trump, a number of which were accompanied by the hashtag #WillSpeakSoon. *Id.* ¶ 72. Cohen planned to release his book by late September of 2020. *Id.*

On July 9, 2020, in compliance with a directive by defendant Adam Pakula, a probation officer with U.S. Probation and Pretrial Services, Cohen reported to the U.S. Probation Office in downtown Manhattan, along with his attorney, in order to transition from furlough to home

confinement. *Id.* ¶ 73. They met with Pakula as well as defendant Enid Febus, a supervisory probation officer. *Id.* Pakula and Febus gave Cohen a Federal Location Monitoring Program Participant Agreement ("FLM"), which set forth conditions for Cohen's home confinement. *Id.* ¶ 74. In the first paragraph, it contained a broad provision prohibiting Cohen from engaging with the media in any form, including books, and from posting on social media:

> No engagement of any kind with the media, including print, tv, film, books, or any other form of media/news. Prohibition from all social media platforms. No posting on social media and a requirement that you communicate with friends and family to exercise discretion in not posting on your behalf or posting information about you. The purpose is to avoid glamorizing or bringing publicity to your status as a sentenced inmate serving a custodial term in the community.

*Id.* ¶ 75. Cohen viewed this condition as an attempt to chill and restrain his First Amendment rights; he also suspected that this condition was not a standard one in FLMs for those transferring to home confinement, partially because he noted that the document was not in the standard FLM form, contained grammatical and typographical errors, and was not identified with its federal form designation. *Id.* ¶¶ 76–78. He and his attorney inquired why the paragraph was included in the FLM, since it did not appear to be standard and would prohibit the publication of his book. *Id.* ¶ 79. Febus replied—and Pakula agreed—that that this was the standard form used, and that Cohen was not being treated differently than other prisoners.[1] *Id.* ¶¶ 80–81. Cohen and/or his

---

[1] The complaint alleges that "[i]n a July 22, 2020 signed declaration made under penalty of perjury and submitted to the Court in *Cohen v. Barr et al, supra*, document number 23, defendant Pakula admitted in great detail how he and defendant Febus lied to plaintiff." *Id.* ¶ 82. The declaration, however—which is referred to and relied upon by the complaint and is thus incorporated by reference, and which the Court can take judicial notice of the contents of as a public record pursuant to Federal Rule of Evidence 201(b), *see Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000)—does not contain such a broad admission. Rather, Pakula states that he drew the FLM agreement presented to Cohen from an agreement sent to him by a probation officer in another district as an example of an FLM agreement used for high-profile inmates. Declaration of Adam Pakula, *Cohen v. Barr et al.*, 1:20-cv-05614 (S.D.N.Y. July 22, 2020), ECF No. 23. Taking Cohen's allegations here as true—particularly, that Febus and Pakula told Cohen that this was the standard form and that he was not being treated differently than other prisoners—Pakula's declaration does indicate that the statements made to Cohen were not true, in that he

attorney asked whether it would be possible to adjust the language of the paragraph or remove it entirely; the parties agreed to table the question so that they could "run it up the chain of command," and continued with reviewing the rest of the FLM. *Id.* ¶¶ 84–86. Cohen was not asked at that time or at any other point in the meeting to sign the FLM agreement, nor did he refuse to sign the agreement, withhold consent to electronic monitoring, or refuse any other condition of home confinement. *Id.* ¶¶ 87–88.

After Cohen, his attorney, Pakula, and Febus finished reviewing the agreement, Pakula and Febus directed Cohen and his attorney to remain in the waiting area while they waited for a response from their supervisors about the first paragraph of the FLM. *Id.* ¶ 89. After waiting for about an hour and half—during which time Cohen's attorney checked in with Pakula and Febus to see if everything was alright, and was assured that everything was fine and that they were just waiting for a response from their supervisors—three United States marshals came to the waiting area and served Cohen's attorney with a remand ordered by defendant Patrick McFarland that stated that Cohen had failed to agree to the terms of FLM and was being remanded for that reason. *Id.* ¶¶ 90–91. Cohen was shackled, handcuffed, and remanded to prison. *Id.* ¶ 92. Cohen's attorney explained that the meeting had not concluded, that they were still waiting to hear back as to what, if anything, could be adjusted, that Cohen had not refused to agree to the terms of the FLM, and that Cohen was prepared to sign the FLM "as is." *Id.* ¶ 95. Pakula and Febus responded that it was "out of their hands," and that the proposed FLM was no longer on the table. *Id.* ¶ 96.

---

was, at least, being treated differently than lower-profile prisoners, and this was not the standard form used in such cases.

Cohen was transported to the Metropolitan Correctional Center ("MCC") in Manhattan and then transported back to FCI Otisville, where he was placed in a special segregated housing unit and then transferred to solitary confinement for sixteen days. *Id.* ¶¶ 98–100. While in solitary confinement, he spent all but thirty minutes of his day alone in a twelve by eight-foot cell with poor ventilation, no air conditioning, and temperatures frequently over one hundred degrees. *Id.* ¶¶ 101–102. These conditions caused health problems for Cohen; his blood pressure was elevated, resulting in severe headaches, shortness of breath, and anxiety, which required immediate medical attention. *Id.* ¶ 102. While incarcerated, Cohen was unable to proceed with drafting his book and was unable to make any public statements. *Id.* ¶ 103.

Cohen filed a habeas petition against Barr, Michael Carvajal, in his official capacity as Director of the FBOP, and James Petrucci, in his official capacity as Warden of FCI Otisville, challenging his incarceration on July 20, 2020, eleven days after having been remanded. On July 23, 2020, Judge Hellerstein issued an order granting Cohen's motion for a preliminary injunction directing these defendants to release Cohen to home confinement. *Id.* ¶ 108. Judge Hellerstein found that the defendants' "purpose in transferring Cohen from release on furlough and home confinement back to custody was retaliatory in response to Cohen desiring to exercise his First Amendment rights to publish a book critical of the President and to discuss the book on social media." *Cohen v. Barr*, 2020 WL 4250342, at *1 (S.D.N.Y. July 23, 2020). Cohen had spent two weeks either in the special segregated housing unit or in solitary confinement. Compl. ¶ 27.

Cohen filed the complaint in this case on December 17, 2021. *See generally id*. The complaint names as defendants: (i) the United States of America, (ii) former President Trump, (iii) former Attorney General Barr, (iv) Director of the FBOP Carvajal, (v) Administrator of the Residential Reentry Management Branch of the FBOP Jon Gustin, (vi) Residential Reentry

Manager of the FBOP McFarland, (vii) Warden of FCI Otisville Petrucci, (viii) Supervisory

Probation Officer Febus, (ix) Probation Officer Pakula, and (x) John and Jane Doe (1-10) agents,

servants, and employees of the United States.

The United States and the individual defendants with the exception of Trump filed a joint

motion to dismiss on March 31, 2022; Trump filed a separate motion to dismiss the same day.

Dkt. Nos. 39, 41. Cohen filed oppositions to the motions on May 27, 2022. Dkt. Nos. 59, 61.

The defendants filed replies on June 17, 2022. Dkt. Nos. 67, 68. The Court held oral argument

on the motions on August 2, 2022.

## DISCUSSION

Cohen's complaint asserts seven causes of action. Broadly, they can be grouped into two

categories. First, Cohen brings claims against all the individual defendants, including Trump, for

violations of his First, Fourth, and Eighth Amendment rights; the claims are brought under a

*Bivens* cause of action. *See* Compl. ¶¶ 139–142. Second, Cohen brings claims against the

United States for (i) retaliation; (ii) false arrest, false imprisonment, and abuse of authority and

process; (iii) negligent failure to protect; (iv) negligent infliction of emotional distress;

(v) intentional infliction of emotional distress; and (vi) negligent hiring, retention, training, and

supervision. *See* Compl. ¶¶ 111–138. These claims are all brought under the Federal Tort

Claims Act ("FTCA").

The Court turns first to the *Bivens* claims brought against all the individual defendants

and then considers the FTCA claims against the United States.

## I. Cohen's *Bivens* Claims

The seventh cause of action in the complaint—the only one brought against the

individual defendants—is brought as a *Bivens* cause of action for violations of Cohen's First,

Fourth, and Eight Amendment rights, and alleges that defendants intentionally retaliated against

Cohen by remanding him to prison for exercising his right to free speech, in violation of his First Amendment rights; committed an unlawful seizure in so doing, in violation of his Fourth Amendment rights; and placed him in dangerous solitary confinement conditions, in violation of his Eighth Amendment rights.  Compl. ¶¶ 139–142.  All of the individual defendants move to dismiss this count.  They do not dispute that Cohen's constitutional rights were violated and that he suffered injury as a result.  They instead argue that the *Bivens* cause of action is not available for Cohen's claims.  *See* Dkt. No. 40 at 20; Dkt. No. 42 at 10.

The Supreme Court has held that whether a *Bivens* cause of action is available is an "antecedent issue" to whether a plaintiff has alleged a violation of a clearly established constitutional right.  *See Wood v. Moss*, 572 U.S. 744, 757 (2014); *see also Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017) ("The Court turns first to the *Bivens* question, which is 'antecedent' to the other questions presented." (quoting *Wood*, 572 U.S. at 757)).  At this stage, therefore, the question before this Court is simple:  Assuming, in the first instance, that Cohen has sufficiently alleged that federal officials violated his constitutional rights, is there a judicial mechanism through which he can vindicate those rights and seek to recover for the harm he suffered from those who harmed him?  It is a question that, here, is strengthened by the fact that—with regard to Cohen's First Amendment claim—another court in this District has already found Cohen's constitutional rights *were* violated.  The question thus becomes whether the Constitution and the courts afford Cohen a forum in which to seek relief for the injury he suffered as a result of that violation.  It is a question that, in 1803—"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury," *Marbury*, 1 Cranch at 163—or in 1971—"Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty," *Bivens v. Six Unknown Named*

*Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 395 (1971)—likely would have been answered in the affirmative. His claim would have been entertained either in state or in federal court. It is a question to which the answer seems intuitive; what, after all, is the value of a right if one has no recourse when that right is violated? But it is also a question that the Supreme Court has unequivocally answered in the negative. The Court is bound by that ruling. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents.").

In 1971, in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, the Supreme Court squarely considered this question for the first time, in the Fourth Amendment context; as it put it, the question before the Court was "merely whether petitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts." 403 U.S. at 397. In *Bivens*, the petitioner, Webster Bivens, alleged that agents of the now-defunct Federal Bureau of Narcotics violated his Fourth Amendment rights by entering his apartment, searching it, and arresting him, all without a warrant and with unreasonable force. *Id.* at 389. The Court concluded that Bivens was entitled to redress his alleged constitutional injury through the mechanism of a damages suit against the federal officers. Justice Brennan, writing for the majority, noted: "That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition." *Id.* at 395. After looking to *Marbury*, the Court held that "petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment." *Id.* at 397.

After *Bivens*, the Supreme Court twice extended the implied cause of action to other constitutional rights:  In *Davis v. Passman*, the Court expanded the *Bivens* action to sex discrimination under the due process clause of the Fifth Amendment, 442 U.S. 228 (1979), and in *Carlson v. Green*, the Court expanded the *Bivens* action to a violation of Eight Amendment rights in a federal prison, 446 U.S. 14 (1980).  In each of these cases, the Court treated the expansion of *Bivens* as the straightforward application of settled law and settled constitutional principles.

In the era after *Bivens*, *Passman*, and *Carlson*, however, the Court's jurisprudence markedly shifted.  By 2001, in *Correctional Services Corp. v. Malesko*, the Court recognized that it had "consistently refused to extend *Bivens* liability to any new context or new category of defendants."  534 U.S. 61, 68 (2001).

This shift has frequently been explained in context of the broader shift in the Court's approach towards implying damages remedies for statutory violations.  *Bivens* was decided in an era in which the Court took an expansive view of the ability of the courts to fashion a remedy to persons injured as a result of a violation of a congressional statute.  *See, e.g.*, *J. I. Case Co. v. Borak*, 377 U.S. 426 (1964) ("While this language makes no specific reference to a private right of action, among its chief purposes is 'the protection of investors,' which certainly implies the availability of judicial relief where necessary to achieve that result.").  The Court later retreated from that view, instead believing that "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress," and that "[t]he judicial task" is not to give effect to the statute's purpose but rather "to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  Indeed, this contextualization of

10

the Court's newfound hostility towards the *Bivens* cause of action has repeatedly been professed by the Court itself: "*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action—decreeing them to be 'implied' by the mere existence of a statutory or constitutional provision." *Malesko*, 534 U.S. at 75 (Scalia, J., concurring).

In *Ziglar v. Abbasi*, against the backdrop of the September 11 terrorist attacks, the Court again considered the availability—and continued force—of the *Bivens* cause of action. 137 S. Ct. 1843 (2017). The Court emphasized that *Bivens* and its progeny were part of an "*ancien regime*" in which "the Court followed a different approach to recognizing implied causes of action than it follows now." *Id.* at 1855. Under the new approach, "the Court adopted a far more cautious course before finding implied causes of action," and "clarified . . . that, when deciding whether to recognize an implied cause of action, the 'determinative' question is one of statutory intent." *Id.* at 1855–56. The *Ziglar* Court did recognize that "[t]he decision to recognize an implied cause of action under a statute involves somewhat different considerations than when the question is whether to recognize an implied cause of action to enforce a provision of the Constitution itself." *Id.* at 1856. The Court failed, however, to give significant meaning to that distinction, recounting that "the Court's expressed caution as to implied causes of actions under congressional statutes led to similar caution with respect to actions in the *Bivens* context, where the action is implied to enforce the Constitution itself." *Id.* Noting that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity," *id.* at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)), the Court clarified the somewhat piecemeal *Bivens* jurisprudence into a cohesive—and narrow—two-step test, which first asks "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court," meaning that it presents a new context, *id.* at 1859, and then asks if there are "special factors counselling hesitation in the absence of

affirmative action by Congress," in which case a court should decline to extend *Bivens*, *id.* at 1857.

*Hernandez v. Mesa*, the next significant *Bivens* case confronted by the Court, followed the reasoning and analysis of *Ziglar*. Again distinguishing *Bivens*, *Passman*, and *Carlson* as "the products of an era when the Court routinely inferred 'causes of action' that were 'not explicit' in the text of the provision that was allegedly violated," but from which the Court has now retreated as it "came to appreciate more fully the tension between this practice and the Constitution's separation of legislative and judicial power," the Court declined to extend a *Bivens* cause of action to a lawsuit brought under the Fourth Amendment by the family of Sergio Hernandez, a fifteen-year-old Mexican citizen who was shot and killed by a U.S. border patrol agent, allegedly without provocation. 140 S. Ct. 735, 741 (2020). The *Hernandez* Court applied the same "two-step inquiry" articulated in *Ziglar*, asking first "whether the request involves a claim that arises in a new context or involves a new category of defendants," with "new context" understood to mean any context that "is different in a meaningful way from previous *Bivens* cases decided by this Court," and then, if a claim arises in a new context, asking "whether there are any special factors that counsel hesitation about granting the extension." *Id.* at 743 (internal quotation marks and citations omitted).

Finally, and most recently, in *Egbert v. Boule*, the Supreme Court considered the availability of a *Bivens* cause of action for a First Amendment retaliation claim and a Fourth Amendment excessive force claim. Rejecting both claims, the Court stated that "our cases have made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." 142 S. Ct. 1793, 1800 (2022). The Court provided an even narrower test than that articulated in *Ziglar* and *Hernandez*—"[w]hile our cases describe two

steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 1803.

Explaining that test, the *Egbert* Court made clear that, effectively, it operates as a bar to a *Bivens* claim in all cases except, perhaps, those involving Fourth, Fifth and Eighth Amendment claims factually indistinguishable from *Bivens*, *Passman*, or *Carlson*. In an all-encompassing articulation of the special factors inquiry, the Court majority stated that "[e]ven in a particular case, a court likely cannot predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*. That uncertainty alone is a special factor that forecloses relief." *Id.* at 1804. And claims that paralleled *Bivens*, *Passman*, or *Carlson* exactly could also be foreclosed: "Even assuming the factual parallels [to *Passman*] are as close as Boule claims, *Passman* carries little weight because it predates our current approach to implied causes of action and diverges from the prevailing framework in three important ways." *Id.* at 1808. Departing from *Ziglar*'s assurance that "this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose," 137 S. Ct. at 1856, *Egbert* held that where a case is directly parallel to *Bivens*, *Passman*, or *Carlson*, even that is insufficient, because those cases do not align with the Court's current approach to *Bivens*; "a plaintiff cannot justify a *Bivens* extension based on 'parallel circumstances' with *Bivens*, *Passman*, or *Carlson* unless he also satisfies the 'analytic framework' prescribed by the last four decades of intervening case law," 142 S. Ct. at 1809. Concluding, the Court all but held that *no* case would ever be able to satisfy that analytic framework, because "if we were called to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution." *Id.* at 1809.

Applying those principles to the First Amendment claim before it, and in keeping with its sweeping rejection of *Bivens*, the *Egbert* Court went beyond merely holding that a damages cause of action should not be extended to the particular facts of the case before it; seemingly rejecting the fact-specific inquiry set forth in its prior *Bivens* jurisprudence, it categorically held that "there is no *Bivens* action for First Amendment retaliation." *Id.* at 1807.

That holding squarely forecloses Cohen's First Amendment retaliation claim here. And the Court's broader *Bivens* jurisprudence forecloses his Fourth Amendment claim as well; there is no question that it is factually distinct from the Fourth Amendment claim implied in *Bivens*. The federal officers at issue in *Bivens* were members of the Federal Bureau of Narcotics, while the federal officers named as individual defendants in Cohen's complaint are members of the Bureau of Prisons, in addition to the former President and former Attorney General. Under the Court's current jurisprudence, this distinction alone appears to be enough to create a new context because one of the oft-quoted examples of a "new context" is a case that involves a "new category of defendants." *Malesko*, 534 U.S. at 68; *see Egbert*, 142 S. Ct. at 1803; *Ziglar*, 137 S. Ct. at 1876. Nor were the Bureau of Prisons officers performing functions "in the common and recurrent sphere of law enforcement," as in *Bivens*, *see Ziglar*, 137 S. Ct. at 1857; rather, they were effectuating a remand of a federal prisoner who had already been sentenced to a term of incarceration.

Likewise, Cohen's Eighth Amendment claim arises in a new context. In *Carlson*, the Eighth Amendment claim centered on grossly inadequate medical care provided to an inmate during a severe asthma attack. 446 U.S. at 16 n.1. Cohen's Eighth Amendment claim centers on the conditions of his solitary confinement, which—although he claims "posed serious health risks"—did not result in him receiving inadequate medical care. Compl. ¶ 102. To the contrary,

the complaint states that the conditions resulted in Cohen's "blood pressure bec[oming] dangerously high resulting in severe headaches, shortness of breath, and anxiety requiring immediate medical attention," implying, if anything, that "immediate medical attention" was provided to him. *Id.* Cohen's claim asserts a somewhat different "mechanism of injury" (conditions of confinement as opposed to deliberate indifference to medical needs) and thus presents a new context under the Supreme Court's precedents. *Egbert*, 142 S. Ct. at 1805 (quoting *Ziglar*, 137 S. Ct. at 1859); *see, e.g.*, *Mammana v. Barben*, 856 F. App'x 411 (3d Cir. 2021) (mem.) (holding that Eight Amendment claim based on conditions of "confinement in a chilled room with constant lighting, no bedding, and only paper-like clothing" bore little resemblance to the facts in *Carlson*); *Schwarz v. Meinberg*, 761 F. App'x 732 (9th Cir. 2019) (mem.) (holding that Eighth Amendment claim based on unsanitary cell conditions presented a new context). While these contexts are undoubtedly similar, the Supreme Court has counseled that "even a modest extension [of *Bivens* liability] is still an extension." *Ziglar*, 137 S. Ct. at 1864.

Because Cohen's claims arise in a new context, the next question is whether there are "special factors" which the Supreme Court has stated indicate "that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed'" and thus further prevent the Court from recognizing a *Bivens* remedy. *Egbert*, 142 S. Ct. at 1803 (quoting *Ziglar*, 137 S. Ct. at 1858). The Supreme Court has stated that "[i]f there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy," *id.* (quoting *Hernandez*, 140 S. Ct. at 743), and where there are "alternative remedial structures in place, 'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action,'" *id.* at 1804

(quoting *Ziglar*, 137 S. Ct. at 1858). It does not matter if those existing remedial structures "do not provide complete relief" or are "not as effective as an individual damages remedy." *Id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 372, 388 (1983)).

In this case, defendants point to two remedial structures that they argue preclude this Court from recognizing a *Bivens* remedy for Cohen: (i) the FBOP's Administrative Remedy Program and (ii) a writ of habeas corpus. Dkt. No. 40 at 27–29. Cohen does not contest that he had these remedial structures available to him; to the contrary, he admits that he availed himself of the latter option. *See* Oral Argument Tr. at 56 ("Again, one thing about the habeas relief. My client was freed because of the habeas relief. That stopped the bleeding, your Honor.").

While the Supreme Court has held that the FBOP's Administrative Remedy Program is an alternative remedial structure sufficient to preclude *Bivens* liability in prior cases, *see, e.g.*, *Malesko*, 534 U.S. at 74 (declining to find *Bivens* remedy where "[i]nmates in respondent's position [] have full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief and grievances filed through the BOP's Administrative Remedy Program"), this Court is reluctant to find—assuming that Cohen's allegations are true as it must at this stage—that Cohen could have successfully remedied the alleged constitutional violations in such a forum. Cohen alleges in his complaint that senior FBOP officials, including the Director of the FBOP and the Warden of FCI Otisville, effectively acted at the behest of President Trump in committing the various Constitutional violations alleged. *See, e.g.*, Compl. ¶ 39. Yet, it is precisely these senior FBOP officials who exercise control over the Administrative Remedy Program: Complaints are made to the Warden and are appealed to the General Counsel who appears to report up to the Director of the FBOP.[2] If Cohen's allegations are thus proved, it

---

[2] *See* Administrative Remedy Program, FBOP (Jan. 6, 2014),

is hard to imagine that the same individuals who committed the constitutional violations against Cohen would, in any meaningful sense, provide a remedy for those violations.

Defendants' argument that Cohen had an alternative remedial structure through a writ of habeas corpus is more persuasive. *See Ziglar*, 137 S. Ct. at 1865 ("And there might have been alternative remedies available here, for example, a writ of habeas corpus."); *Rodriguez v. Easter*, 2022 WL 356478, at *6 (D. Conn. Feb. 7, 2022) ("[C]ourts that have applied the *Ziglar* analysis to a claim of First Amendment retaliation by an inmate have noted the existing alternative remedial structures, including the BOP administrative grievance process and writ of habeas corpus."). While the Supreme Court has left open the availability of habeas relief for federal prisoners challenging the conditions of their confinement (as Cohen does here), *see Ziglar*, 137 S. Ct. at 1862–63 ("[W]e have left open the question whether they might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *Bell v. Wolfish*, 441 U.S. 520, 527 (1979) (leaving "to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself"), the Second Circuit has held that prisoners in federal custody may seek habeas relief related to the conditions of their confinement under 28 U.S.C. § 2241, *see Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) ("This court has long interpreted § 2241 as applying to challenges to the execution of a federal sentence, 'including such matters as the administration of parole, . . . prison disciplinary actions, prison transfers, type of detention and

---

https://www.bop.gov/policy/progstat/1330_018.pdf; FBOP – Administrative Remedy Program, D.C. Corrections Information Counsel, https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/BOP%20Administrativ e%20Remedies%2011.15.17%20REVISED.pdf (last visited Nov. 11, 2022); Experienced Leadership, FBOP, https://www.bop.gov/about/agency/leadership.jsp (last visited Nov. 11, 2022).

prison conditions.'"); *Roba v. United States*, 604 F.2d 215, 219 (2d Cir. 1979) ("At that point petitioner's challenge to his transfer while seriously ill would be a challenge to the conditions of his confinement, for which habeas corpus relief under § 2241 would be available."); *Elleby v. Smith*, 2020 WL 2611921, at *2 (S.D.N.Y. May 22, 2020) ("[T]he Second Circuit has held that both habeas petitions, at least for prisoners in federal custody . . . may address conditions of confinement and seek the remedy of transfer (*e.g.*, to a different prison population or facility)."); *Ilina v. Zickefoose*, 591 F. Supp. 2d 145, 146–49 (D. Conn. 2008) (describing § 2241 as a "broad remedy available to federal prisoners challenging the conditions of their confinement"). That Cohen could successfully avail himself of habeas relief is borne out by the fact that he was able to do so in this case.

Cohen also likely could have sought relief through the right of federal courts to enjoin unconstitutional actions by state and federal officers. "Availability of federal equitable relief to remedy constitutional violations has been presumed by the courts," *Jensen v. Farrell Lines, Inc.*, 625 F.2d 379, 383 (2d Cir. 1980), and "it is established practice . . . to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)); *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 337 (2015) (Sotomayor, J., concurring) ("That parties may call upon the federal courts to enjoin unconstitutional government action is not subject to serious dispute."); *see also* Stephen I. Vladeck, *Douglas and the Fate of* Ex Parte Young, Yale L.J. (Forum) (Apr. 30, 2012) ("Whether or not *Ex parte Young* itself articulated this rule, it is now generally understood that injunctive relief for constitutional violations does not require a freestanding statutory cause of action (and instead arises under the relevant constitutional provision)."). As the Supreme Court stated in

*Armstrong*, the "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."  575 U.S. at 327.  Thus, even if habeas relief were not available, a citizen imprisoned by the President to prevent him from expressing critical views of that President on the eve of an election is not without remedy.  Cohen—and if there ever are any others similarly situated—could have sought an injunction for defendants' violations of the Constitution.  *See Ojo v. United States*, 364 F. Supp. 3d 163, 174 (E.D.N.Y. 2019) (finding "there were alternative channels that plaintiff could have pursued" including "injunctive or declaratory relief to challenge and seek alterations to the BOP Policy affecting the provision of dental care."); *see also Malesko*, 534 U.S. at 74 ("And unlike the *Bivens* remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.").

It is worth noting that these alternative remedial structures are hardly adequate replacements for a suit for monetary damages.  These alternative remedies would not compensate Cohen for or address the harms Cohen had already suffered prior to the issuance of the injunction.  While Cohen would have been able to enjoin the defendants, as he did in this case, "a prospective injunction" does not "normally provide plaintiffs with redress for harms they have already suffered."  *Ziglar*, 137 S. Ct. at 1879.  Moreover, those avenues for prospective relief do not eliminate the deterrent effect that imprisonment (in solitary confinement) can have on all but the most intrepid.  And, while *Bivens* is "concerned solely with deterring the unconstitutional acts of individual officers," *Egbert*, 142 S. Ct. at 1806 (quoting *Malesko*, 534 U.S. at 71), the injunctive relief that Cohen was awarded in his prior case in front of Judge Hellerstein does little to deter the unconstitutional acts of the defendants.  An injunction is primarily focused on

stopping an unconstitutional violation from occurring on an ongoing basis. It does not seek to

punish someone for what they have done and thus, in turn, deter that person from committing

similar wrongs in the future. *See Sec. & Exch. Comm'n v. Stubos*, 2022 WL 6776741, at *10

(S.D.N.Y. Oct. 11, 2022) ("Injunctive remedies, as discussed, are tailored to deter future

violations of law by that individual; not to punish the defendant and, through that punishment,

send a message to those in the community not to do similar bad acts."). Nevertheless, the

Supreme Court has instructed that it does not matter whether the existing remedies provide

"complete relief" or appear inadequate. *Egbert*, 142 S. Ct. at 1804 (citation omitted). These

difficult issues merit, and will no doubt receive, further consideration in the future, if not in this

case.

     As things currently stand, however, the Supreme Court's precedents squarely and

unequivocally foreclose the *Bivens* claims here. None of the claims present a direct parallel to

*Bivens*, *Passman*, or *Carlson*; even if one did, the *Egbert* Court has thrown into doubt the

availability of the *Bivens* cause of action for any new claim, particularly where, as here,

alternative remedial structures are in place.

     As such, Cohen's *Bivens* claims must be dismissed. Before doing so, however, this Court

pauses to reiterate the profound violence this holding does to Cohen's constitutional rights.

Cohen's complaint alleges an egregious violation of constitutional rights by the executive

branch—nothing short of the use of executive power to lock up the President's political enemies

for speaking critically of him. The Supreme Court's precedents ensure that there is at best a

partial remedy for the abuse of power and violation of rights against the perpetrators of those

wrongs. And those precedents rest on a mistaken proposition—that the Court's reluctance to

imply a damages remedy for *statutorily created* rights where Congress did not explicitly intend

for there to be such a remedy necessarily must extend to a reluctance to find such a remedy for *constitutionally guaranteed* rights.

As Justice Harlan articulated in *Bivens*, "[I]t must also be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities." 403 U.S. at 407 (Harlan, J., concurring). The notion that, for there to be any remedy for such a right, it must be explicitly provided for by one of the very branches of government from whom the right is designed to protect the individual is particularly insidious. And it does not logically follow from the Court's decisions in the statutory realm. The parallel to a jurisprudential shift towards looking to express congressional intent[3] in deciding whether to recognize an implied cause of action for a right conferred by Congress is emphatically not looking towards congressional intent in deciding whether to recognize an implied cause of action for a right conferred by the Constitution itself. Unlike statutory rights, constitutional rights do not stem from Congress; there is no reason why the remedies for such rights must then stem from Congress, and much reason to think that they need not.[4] This is the precise distinction that the Supreme Court recognized, but failed to give

---

[3] *See* Steven I. Vladeck, Bivens *Remedies and the Myth of the "Heady Days,"* 8 U. St. Thomas L.J. 513, 521–22 (2011) ("Whatever the merits of *Sandoval*'s approach, it is worth emphasizing that the crux of the dispute between the majority and the dissenters—and between more recent and older case law—boils down to methodological disagreements over statutory interpretation. There is simply no dispute today that congressional intent is dispositive when it comes to the existence of a private cause of action to enforce a federal statute . . . .").

[4] *See* George D. Brown, *Letting Statutory Tails Wag Constitutional Dogs—Have the* Bivens *Dissenters Prevailed?*, 64 Ind. L.J. 263, 265 (1989) ("One may agree with the Court's reservations about judicial lawmaking, its concern for the doctrine of separation of powers and its general views about the superior institutional competence of Congress. These positions . . . should not be determinative in the *Bivens* context. The basic question is availability of judicial relief for constitutional violations. In the recent cases the statutory tail comes to wag the constitutional dog. That is, the Court's emphasis on the statutory component of the remedial issues tends to obscure and downgrade their constitutional dimension. It is as if the whole problem involved only the judiciary's role in an article I legislative scheme. Yet the *Bivens*

21

meaning to, in *Ziglar*: "The decision to recognize an implied cause of action under a statute implies somewhat different considerations than when the question is whether to recognize an implied cause of action to enforce a provision of the Constitution itself." 137 S. Ct. at 1856. Rather, a proper inquiry—one parallel to that articulated in *Sandoval*, one still removed from the "heady days" where the Court looked to whether it believed a damages remedy *should* normatively be available for a particular right, and one that would honor the important distinction between rights conferred by a legislative majority and rights conferred by the Constitution—would look to whether the framers—in the language they used, the structure of the government they established, the limitations they intended to place on executive power, and the authority they gave to the federal courts—intended for there to be such a remedy.

There are powerful reasons to believe that, in many circumstances, the answer to that question will be yes,[5] reasons that are not easily brushed aside with the Supreme Court's rejection of *Marbury*'s promise—drawn from English common law, *see Marbury*, 1 Cranch at 163 (quoting Blackstone's commentaries)—that, if one's rights are violated by executive officials, the courts provide a legal remedy for that violation.

\* \* \*

---

doctrine deals with judicial enforcement of rights whose origin is outside of, and hierarchically superior to, any statute.").

[5] *See, e.g.*, Walter Dellinger, *Of Rights and Remedies: The Constitution as a Sword*, 85 Harv. L. Rev. 1532, 1542 (1972) ("Given a common law background in which courts created damage remedies as a matter of course, it is not unreasonable to presume that the judicial power would encompass such an undertaking on the part of the federal courts, unless there were some contrary indication that the judicial implementation of such a remedy was not to be a part of the article III judicial power. While with one exception prior to *Bivens*, the Court has never explicitly exercised the judicial power to create a damage remedy in a case arising under the Constitution, its power to do so would seem rather easily established.").

For the foregoing reasons, the complaint's claims against all the individual defendants, brought under the *Bivens* cause of action, are dismissed.[6]

## II. Cohen's FTCA Claims

Cohen's remaining causes of action—all brought against the United States—are brought under the FTCA. Cohen asserts claims for retaliation under New York common law; false arrest, false imprisonment, and abuse of authority and process under New York common law; negligent failure to protect under 18 U.S.C. § 4042; negligent infliction of emotional distress under New York common law; intentional infliction of emotional distress under New York common law; and negligent hiring, retention, training, and supervision under New York common law. The United States moves to dismiss all of Cohen's FTCA claims.

"The United States, as sovereign, is immune from suit save as it consents to be sued, . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the

---

[6] Defendant Trump also moves to dismiss the claims against him for the independent reason that they are barred by presidential immunity. Because the claims against Trump are dismissed along with the claims against the other individual defendants, the Court need not address his claimed immunity here. Nonetheless, it is worth noting—and rejecting—Trump's argument that, effectively, a president may *never* be subject to a damages suit for violations of constitutional rights because "[i]t is blackletter law that a president is entitled to absolute immunity for acts taken within the scope of his official duties," Dkt. No. 42 at 1 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731 (1982)), and *Bivens* claims—if available at all—are available only for actions taken by the official "under color of his authority," *Bivens*, 403 U.S. at 389. Trump reasons that "[s]ince a president is entitled to absolute immunity for 'acts within the outer perimeter of his official capacity,' it follows that a *Bivens* claim—which must arise from an act performed 'under color of his authority'—cannot be maintained against a [p]resident." Dkt. No 42 at 3. But the language of these two doctrines is not the same, and there is no reason to assume that the one wholly subsumes the other. For an official's actions to be "under color of authority," "the conduct must be 'cloaked with official power and the official must purport to be acting under color of official right.'" *Mueller v. Gallina*, 137 F. App'x 847, 850 (6th Cir. 2005) (mem.) (internal quotation marks omitted and alterations adopted) (quoting *Browning v. Clinton*, 292 F.3d 235, 250 (D.C. Cir. 2002)). One could imagine a situation, for example, in which the President ordered Secret Service to kidnap his political opponent a few weeks before an election—asserting, all the while, that he was doing so in an exercise of executive authority. Such an action could be taken under *color* of authority, while at the same time not legitimately within the president's official capacity, and thus not subject to presidential immunity.

suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (internal quotation marks omitted)

(quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). "'The FTCA, 28 U.S.C.

§§ 13469(b), 2401(b), and 2671–2680, constitutes a limited waiver by the United States of its

sovereign immunity' and allows for tort suits against the United States under specified

circumstances." *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007) (quoting *Millares*

*Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998)). "Under the FTCA, a

private citizen may sue for injuries caused by 'the negligent or wrongful act or omission of any

employee of the Government while acting within the scope of his office or employment, under

circumstances where the United States, if a private person, would be liable to the claimant in

accordance with the law of the place where the act or omission occurred.'" *Id.* (quoting 28

U.S.C. § 1346(b)). The FTCA waives sovereign immunity for claims that are:

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of
> property, or personal injury or death [4] caused by the negligent or wrongful act or
> omission of any employee of the Government [5] while acting within the scope of
> his office or employment, [6] under circumstances where the United States, if a
> private person, would be liable to the claimant in accordance with the law of the
> place where the act or omission occurred.

*Id.* (quoting *FDIC v. Meyer*, 510 U.S. 471, 477 (1994)). The "source of substantive liability

under the FTCA" is "law of the State." *FDIC*, 510 U.S. at 478.

Cohen's first FTCA claim is a claim for "retaliation," for "the exercising of his right to

free speech," which he asserts is "a tort under the laws of the state of New York." In defending

the claim in his opposition to the United States' motion to dismiss, however, Cohen makes it

clear that the only substantive source of this claim is the First Amendment. *See* Dkt. No. 59 at

27 (concluding that "defendants did imprison Mr. Cohen for the lawful exercise of his First

Amendment rights"); *see also id.* at 26 (first quoting *Lancaster v. Incorporated Village of*

*Freeport*, 1 N.E.3d 302 (N.Y. 2013) (considering a First Amendment retaliation claim); then

quoting *People v. Oeser*, 721 N.Y.S.2d 147 (3d Dep't 2001) (not considering free speech claims at all); then quoting *People v. Bollander*, 558 N.Y.S.2d 795 (Sup. Ct. 1990) (considering whether fear of retaliatory prosecution for challenging a conviction implicates due process rights, which is inapposite to Cohen's claim, and not considering free speech claims at all); and then quoting *People v. Douglas*, 704 N.Y.S.2d 438, 439 (Sup. Ct. 1999) (noting that "retaliatory" motivation behind indictment "was particularly offensive and repugnant to the fair administration of law," and therefore dismissing an indictment). That a handful of New York cases, one arising in the First Amendment context, mention the word "retaliation" does not demonstrate a freestanding New York common law tort claim for retaliation. Rather, Cohen's claim is clearly predicated on the First Amendment. "The FTCA 'has not waived the Government's sovereign immunity with respect to claims that its employees have committed constitutional torts' under the federal constitution." *Hernandez v. United States*, 939 F.3d 191, 205 (2d Cir. 2019) (alteration adopted) (quoting *Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994)).[7] As such, Cohen's first cause of action against the United States for First Amendment retaliation is not cognizable under the FTCA and must be dismissed.

Cohen's second FTCA claim is for false arrest, false imprisonment, and abuse of authority and process under New York common law. "False arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). "Under New York law, the elements of a false arrest and false imprisonment claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise

---

[7] In *Hernandez*, the Second Circuit also held that a FTCA claim could not be brought against a federal officer on the theory that his actions violated the New York State constitution. 939 F.3d at 205-06.

privileged.'" *Hernandez*, 939 F.3d at 199 (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016) (per curiam)). "For purposes of the privilege element of a false arrest and false imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause." *Id.* (internal quotation marks omitted) (quoting *De Lourdes Torres v. Jones*, 47 N.E.3d 747 (2016)). A claim for false imprisonment will only lie where the confinement does not stem from legal process. As the Supreme Court articulated:

> Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held *pursuant to such process*—when, for example, he is bound over by a magistrate or arraigned on charges. Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process.

*Wallace*, 549 U.S. at 389–90. "[T]he tort of false arrest does not permit recovery for 'confinement imposed pursuant to legal process.'" *Coakley v. Jaffe*, 72 F. Supp. 2d 362, 363 (S.D.N.Y. 1999) (quoting *Heck v. Humphrey*, 512 U.S. 477, 483 (1994)).

Cohen's false arrest and false imprisonment claim are based on the marshals' shackling him, handcuffing him, and remanding him to MCC and then to FCI Otisville, and his confinement there for sixteen days. The first three elements of a claim for false arrest and/or false imprisonment are not in contention; there is no doubt that defendants intended to confine Cohen, that Cohen was aware of his confinement, and that Cohen did not consent to his confinement. The fourth element, however, is plainly absent. The complaint alleges that Cohen was shackled, handcuffed, remanded, and confined during his thirty-six-month period of incarceration; although he was temporarily released on furlough with a planned transfer to home confinement, an inmate on furlough "[r]emains in the legal custody of the U.S. Attorney General, in service of a term of imprisonment." 28 C.F.R. § 570.38(b)(1). "Plaintiff's confinement was uncategorically privileged because he was a convicted felon serving his sentence." *McGowan v.*

*United States*, 94 F. Supp. 3d 382, 390 (E.D.N.Y. 2015). Just as a prisoner serving a term of incarceration in prison would not have a claim for false imprisonment for his transfer from one cell to another, or even from standard conditions to solitary confinement, Cohen does not have a claim for false imprisonment for his remand and confinement. Cohen's only response is that "it has already been adjudicated by the Honorable Alvin K. Hellerstein that plaintiff's incarceration was not 'privileged' and was a result of retaliatory conduct engaged in by defendants for the lawful exercise of his First Amendment rights." Dkt. No. 59 at 28. That argument does not hold water; Judge Hellerstein found that Cohen's remand was an unconstitutional retaliation for Cohen's exercise of his First Amendment rights, but it does not follow that the remand and his confinement—effectuated pursuant to a remand order for an inmate in federal custody—was the product of "the absence of legal process," *see Wallace*, 549 U.S. at 390. Rather, Cohen's complaint is not about the absence of legal process but for wrongs incurred while Cohen was subject to legal process and as a result of that process for which a claim of false imprisonment does not lie.

"To prove abuse of process, plaintiff must show that the defendant '(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'" *Hernandez*, 939 F.3d at 204 (quoting *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)). The United States argues that this claim, too, fails "[f]or similar reasons." Dkt. No. 40 at 12. They argue that the FBOP exercising its authority to determine where a prisoner serves a sentence of incarceration is not exercising "legal process"; no court order is required to effectuate its decisions. *See Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (citing *Mormon v. Baran*, 35 N.Y.S.2d 906, 909 (Sup. Ct. 1942) for the proposition

that "legal process means that a court issued the process, and the plaintiff will be penalized if he violates it"). In some sense, the government's argument appears troubling: Cohen cannot pursue a false imprisonment claim for his being shackled, handcuffed, remanded to prison, and confined because it was done pursuant to valid legal process in the form of his sentence from Judge Pauley, and thus "his confinement was legally permitted during the duration of his sentence," Dkt. No. 40 at 12, but Cohen also cannot pursue an abuse of process claim for being shackled, handcuffed, remanded to prison, and confined because that was not done pursuant to any legal process, *i.e.*, a court order. After all, as the unavailability of a false imprisonment claim reflects, Cohen's entire period of detention is pursuant to legal process; without his sentence, the Bureau of Prisons would not possess the authority to remand him to prison without a separate court order. But—as the only case Cohen cites recognizes—the tort of abuse of process lies in "*causing process to issue* lawfully but to accomplish some unjustified purpose." *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers' Ass'n*, 343 N.E.2d 278, 280 (N.Y. 1975). The "abuse" referenced by the tort is that "for maliciously abusing the process of the court," *i.e.*, it addresses those cases in which the process of the court "is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail, or retribution." *Id.* at 281, 283. Cohen does not allege that there was an abuse in the process of obtaining the court order pursuant to which he was confined. What he complains about is that the FBOP perverted its authority under already issued legal process, to accomplish goals for which that process was not originally intended. In short, since Cohen alleges no misconduct in connection with causing the process to issue, he does not properly allege a claim for abuse of process and his second cause of action must be dismissed.

Third, the government argues that Cohen's emotional distress claims—for negligent infliction of emotional distress and intentional infliction of emotional distress—relate to the same conduct as his false imprisonment and abuse of process claims, and therefore must fall with those claims. Dkt. No. 40 at 12 (first citing *Moore v. City of New York*, 219 F. Supp. 2d 335, 229 (E.D.N.Y. 2002) for the proposition that "[n]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort authority"; and then citing *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 395 n.3 (S.D.N.Y. 2008) for the proposition that "[t]o the extent a plaintiff is alleging an alternate theory of liability for false arrest, imprisonment and prosecution sounding in negligence, New York does not provide a cause of action under such a theory"). Cohen nowhere addresses this argument or defends the availability of his emotional distress claims if his false imprisonment and abuse of process claims are dismissed. Therefore, the Court deems the claims abandoned. *See, e.g.*, *Pincover v. J.P. Morgan Chase Bank, N.A.*, 2022 WL 864246, at *11 (S.D.N.Y. Mar. 22, 2022) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (internal quotation marks omitted) (first quoting *Williams v. Mirabal*, 2013 WL 174187, at *2 (S.D.N.Y. Jan 16, 2013)); and then quoting *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004))).

Finally, the United States moves to dismiss Cohen's remaining FTCA claims—for negligent failure to protect and negligent hiring, retention, training, and supervision—as barred by the FTCA's discretionary function exception, which provides that the Government is not liable for:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such

statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). "The exception covers only acts that are discretionary in nature, acts that 'involve an element of judgment or choice,' and 'it is the nature of the conduct, rather than the status of the actor that governs whether the exception applies.'" *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (citations omitted and alterations adopted) (first quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988); and then quoting *United States v. S.A. Empresa de Viavao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813 (1984)). "[E]ven 'assuming the challenged conduct involves an element of judgment,' it remains to be decided 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536). The exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Varig Airlines*, 467 U.S. at 808.

The Second Circuit has described a two-part test, termed the *Berkovitz-Gaubert* test, as "the framework for evaluating whether particular governmental conduct falls under the" discretionary function exception:

> According to the *Berkovitz-Gaubert* test, the [discretionary function exception] bars suit only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve "an element of judgment or choice" and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in "considerations of public policy" or susceptible to policy analysis.

*Coulthurst v. United States*, 214 F.3d 106, 109–10 (2d Cir. 2000).

The governmental conduct challenged in the two remaining causes of action is (1) "negligently operating and managing FCI Otisville," Compl. ¶ 123, presumably in placing

Cohen in solitary confinement in a space with poor ventilation, no air conditioning, and daily temperatures exceeding one-hundred degrees, *id.* ¶ 102; and (2) "negligence, carelessness, and recklessness . . . in failing to meet its duty of care to plaintiff in its screening, hiring, training, supervising, evaluating, managing, controlling, and retaining of defendants and other agents, servants, and employees of the United States," *id.* ¶ 137. As to the second of these, even assuming that it is well-plead and not conclusory, it clearly falls within the discretionary function exception. *See, e.g.*, *Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 387 (E.D.N.Y. 2009) ("[F]ederal courts have found such hiring, training, and supervision decisions generally fall within the exception."); *Li v. Aponte*, 2008 WL 4308127, at *8 (S.D.N.Y. Sept. 16, 2008) (holding that the plaintiff's "common law claims against the United States for negligent hiring, training and supervision are barred by the 'discretionary function' exception of the FTCA," and collecting cases for the proposition that "[p]ersonnel decisions of the United States generally fall within the discretionary function exception to the FTCA"). Cohen's negligent hiring, retention, training, and supervision claim therefore cannot proceed.

As to the first of this challenged conduct—the negligent operation and management of FCI Otisville—however, it is a closer call. The Second Circuit has held that certain negligence claims related to prison management are not subject to the discretionary function exception. *See Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000). In *Coulthurst*, the plaintiff, who was a federal prisoner, was lifting weights in the prison exercise room and suffered an injury when a cable on a lateral pull down machine snapped. *Id.* at 107. He brought claims against the prison for "'negligence and carelessness' in that the defendant 'failed to diligently and periodically inspect the weight equipment, and the cable' and 'failed to replace the cable after undue wear and tear.'" *Id.* at 108 (citation omitted). The district court dismissed the claim as

31

barred by the discretionary function exception, and the Second Circuit vacated.  *Id.* at 108, 111.

In doing so, the Second Circuit distinguished between the type of negligence that is involved in

designing deficient procedures or decisions about how frequently to inspect the exercise

equipment, which involve "elements of judgment and choice" as well as "considerations of

public policy," *id.* at 109, and thus would be subject to the discretionary function exception, and

the type of negligence that results from an individual officer being carelessly inattentive or lazy

in not checking on things, which does not involve elements of judgment and choice or

considerations of governmental policy and would not be subject to the discretionary function

exception, *id.*  The Second Circuit found that the complaint was ambiguous as to which type of

negligence was alleged, and therefore that the district court was wrong to dismiss the claim

entirely as barred by the discretionary function exception.  *Id.* at 109–10.

Cohen's allegations in his complaint are similarly ambiguous as to what type of

negligence Cohen is alleging.  While Cohen alleges generally that his negligent failure to protect

claim is based on the United States' breach of its duty "in negligently operating and managing

FCI Otisville," Compl. ¶ 123, it is not clear whether Cohen claims that the alleged "negligence"

resulted from the policies and procedures governing FCI Otisville (which allowed for the unsafe

conditions in Cohen's cell to occur perhaps due to concerns about costs or resource allocation) or

from the carelessness of an individual guard in failing to check that the cell was well-ventilated,

air conditioned, and a safe temperature.

To clarify this issue, the Court asked Cohen's counsel at oral argument which of these

two theories (or both) he was alleging.  Oral Argument Tr. 50.  Cohen's counsel stated that he

was only alleging that the "policies and procedures in place during COVID at Otisville were

egregiously bad in that they, aside from deliberately indifferent, were just negligent in the

maintenance and upkeep." *Id.* at 50–51.  In other words, Cohen admitted that he was *not*

asserting a negligent guard theory of liability.  Unfortunately for Cohen, this concession is fatal

to his ability to assert this claim:  *Coulthurst* is clear that the designing of such policies and

procedures regarding maintenance and upkeep of prisons are subject to the discretionary function

exception and thus Cohen's claim of negligent failure to protect must be dismissed accordingly.

## CONCLUSION

The motions to dismiss are GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 38,[8] 39, 41.


SO ORDERED.


Dated: November 14, 2022
New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

[8] Defendants' request to stay discovery in this matter pending adjudication of their motions to dismiss, Dkt. No. 38 has already been addressed, Dkt. No. 66, and nonetheless should be denied as moot.

# EXHIBIT 4

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

2    ------------------------------x

3    MICHAEL D. COHEN,

4                    Petitioner,

5            v.                          20 CV 5614 (AKH)

6    WILLIAM BARR, in his official
     capacity as Attorney General

7    of the United States, *et al.*,

8                    Respondents.              Hearing

9    ------------------------------x

                                         New York, N.Y.
10                                       July 23, 2020
                                         11:00 a.m.

11
     Before:
12
                        HON. ALVIN K. HELLERSTEIN,
13
                                         District Judge
14

15                         APPEARANCES

16   PERRY GUHA LLP
            Attorneys for Petitioner
17   BY:  E. DANYA PERRY
            SAMIDH GUHA
18          GEORGE M. BARCHINI
            -and-
19   VERA EIDELMAN
     BRIAN HAUSS
20   ARIANNA DEMA

21   AUDREY STRAUSS
            Acting United States Attorney for the
22          Southern District of New York
     ALLISON ROVNER
23   THOMAS McKAY
            Assistant United States Attorneys

24

25

1          (Case called)

2          THE COURT:  This is Judge Hellerstein.  The case is

3    Cohen v. Barr, 20 CV 5614.

4          Ms. Perry, are you on?

5          MS. PERRY:  Yes, your Honor.  Good morning.  This is

6    Danya Perry from Perry Guha.

7          THE COURT:  Are there any different appearances from

8    your side, from the plaintiff's side?

9          MS. PERRY:  Yes, your Honor.  I am joined by my

10   partner, Samidh Guha, and my colleague, George Barchini.  We

11   are also joined by cocounsel from the ACLU, and I will let them

12   make their own appearance.

13         THE COURT:  Thank you.

14         Ms. Rovner, are you on the line?

15         MS. ROVNER:  Yes, your Honor.  I also have another

16   AUSA, Thomas McKay on the line.  He handled Mr. Cohen's

17   criminal case.  He could perhaps answer any questions that your

18   Honor has that I cannot answer.

19         THE COURT:  Thank you, Mr. McKay.

20         MS. EIDELMAN:  Your Honor, this is Vera Eidelman, also

21   on behalf of petitioner, from the ACLU, joined by my

22   colleagues, Brian Hauss and Arianna Demas.

23         THE COURT:  Thank you, all.

24         Let me caution people on this line.  There are a

25   hundred people on the line.  They all must mute their phones.

1  These are not easy circumstances.  And if there is any noise in

2  the background, we can't accomplish our purposes, so I will

3  need your cooperation.

4       This is now a resumed hearing.  I've had the benefit

5  of the government briefs and declarations and the reply brief

6  and declaration.

7       I would like to ask you, Ms. Rovner, apart from

8  condition 1, what other conditions, if any, did Mr. Levine and

9  Mr. Cohen refuse to sign?

10      MS. ROVNER:  Your Honor, Mr. Cohen also objected to --

11 let me open up the exhibit so I can tell you the condition

12 numbers.

13      He objected to condition 2, which required that his

14 employment be approved by the United States Probation Office,

15 the Bureau of Prisons.  He objected to that condition.

16      He also objected to the specific condition that he not

17 have contact with convicted felons and made a statement that he

18 wanted to communicate with people at FCI Otisville and that's

19 condition 3.

20      He objected to condition 5, which merely requires that

21 his family members do food shopping and other regular household

22 shopping errands for him.  He questioned that condition.

23      And then he found the language of condition 7 and 8

24 confusing.  7 pertains to leave requests that are not medical

25 or religious, and condition 8 pertains to meetings with his

1    attorney.

2          THE COURT:  When he questioned these, I understand

3    from the declarations that instead of negotiating further or

4    explaining what the government's conditions were and that could

5    not be changed, instead you adjourned the meeting and took it

6    up to higher authorities and never again responded to Mr. Cohen

7    or Mr. Levine.  The declarations seem to agree on that.  Am I

8    correct, Ms. Rovner?

9          MS. ROVNER:  Your Honor, I neglected to add one thing.

10   His attorney also objected to a request to electronic

11   monitoring and argued that was only for more violent prisoners.

12          (Court reporter cut off from call)

13          THE COURT:  Anything further that we missed

14   Ms. Rovner?

15          MS. ROVNER:  I think I was explaining how Adam Pakula,

16   the probation officer, said that he was being combative, and

17   then the totality of Mr. Cohen being combative, and then had

18   Mr. Cohen and his attorney wait, and went and contacted BOP.

19   It was John Gustin, the Residential Reentry Management Branch

20   administrator at BOP, who made the decision to take

21   Mr. Cohen -- to remand him back to Otisville.

22          But I think, to more directly address your Honor's

23   point, he wasn't given a chance then to agree and sign.  But

24   Mr. Cohen had already refused to sign the agreement, and I

25   don't think that BOP is necessarily required to give him a

1  chance to negotiate home confinement.  He had not been granted

2  home confinement yet.  It was contingent on him agreeing to the

3  terms and conditions of his home confinement, which he had made

4  clear that he had already refused to do at least once

5  expressly.

6      THE COURT:  I'm looking at Mr. Pakula's declaration

7  and in paragraph 15 he describes the meeting.  Paragraph 16 he

8  says Cohen was combative.  Cohen and his attorney attempted to

9  negotiate the language of nearly every provision of the

10  agreement, and Cohen stated on at least one occasion that he

11  would not sign the agreement.  Cohen makes it clear in his

12  declaration that other than go to jail, if he knew that that

13  was the last stop, he would have signed, and he was never given

14  that opportunity.

15      It seems to me that what Mr. Pakula is saying is

16  combative is an attorney's effort to negotiate an agreement,

17  which is very common.  That doesn't necessarily mean that the

18  person won't sign.  It means that the attorney is trying to get

19  the best deal possible for his client.  And Mr. Cohen was never

20  given a chance to say, if this is it, I will sign.

21      This negotiation, we have the interpretation of

22  intransigence.  I don't think it's a fair inference.

23      MS. ROVNER:  My understanding is that it is not common

24  for an inmate or his attorney to negotiate the terms and

25  conditions of home confinement.

1    I think it's also important to note that home

2    confinement means that Mr. Cohen was still in BOP's custody.

3    It was just a different location that he was within custody.

4           THE COURT:  We are not talking about locations.

5    That's a false issue.  We are talking about the issue of

6    retaliation.  He was put on furlough with no conditions other

7    than hang around your house and be in your neighborhood, the

8    only condition.  And when it came time for the furlough period

9    to end, he was allowed to stay outside, without any conditions

10   other than that.

11          All of a sudden, when the New York Post article comes

12   out and the Bureau of Prisons understands that Cohen is writing

13   a book and will likely finish before the election time, he is

14   imposed with conditions.

15          Pakula doesn't give him a form.  Pakula doesn't give

16   him the form of home confinement that typically is used by

17   probation.  Pakula says that he called a colleague somewhere

18   else and got a form that was a one-time use by the colleague

19   and gave that form.  Why couldn't something like that be a

20   subject of negotiation with an attorney?  What's an attorney

21   for if he is not going to negotiate an agreement with his

22   client?

23          Mr. Pakula dealt with attorneys.  He knew what

24   attorneys were.  He knew the negotiations occur.  Negotiations

25   occur as to how strict supervision will be and what the term of

1    the supervision will be, who can shop, and whether you can go

2    out for work or whether you can go out for religious services.

3    That's a common thing of discussion.  If you want to call

4    discussion negotiation, you can call it.

5           I can't see that there is a fair inference made that

6    because an attorney is negotiating, there is an exhibit of

7    intransigence on the part of the defendant.

8           MS. ROVNER:  Your Honor, first of all, I think it's

9    not unlawful for BOP to refuse to negotiate.  And petitioner's

10   cause of action is a First Amendment.  And BOP's refusal to

11   negotiate doesn't seem to be relevant to that and it's

12   certainly not retaliatory.

13          Your Honor noted that the agreement that was reached

14   with Mr. Cohen may not have been the same as what's typically

15   used with home confinement.  But Mr. Cohen's home confinement

16   was part of the federal location monitoring program which the

17   probation office administers rather than BOP.  The probation

18   officer who drafted the agreement had no knowledge that

19   Mr. Cohen was writing a book.

20          THE COURT:  Who is that, someone that Pakula called?

21          MS. ROVNER:  Pakula was the person who drafted the

22   federal location monitoring --

23          THE COURT:  He didn't draft it.  He took some of the

24   notes from a document.  We don't know.  Someone else wrote the

25   document and then presented it.

1          MS. ROVNER:  The person who he got the document from,

2     though, was another probation officer in another district.

3          THE COURT:  How do we know what he knew or didn't

4     know?

5          MS. ROVNER:  Your Honor, you know because the

6     declaration had been drafted.  I don't have the e-mail in front

7     of me, but I believe it was in May it was drafted for another

8     high-profile inmate by this probation officer, and it was May

9     28 that the other probation officer sent it to Pakula, and it

10    was before anyone saw Mr. Cohen out dining.

11         THE COURT:  Mr. Pakula asked for it.  What purpose

12    would there be in a paragraph 1 preventing engagement with

13    media, TV, print, film, books, prohibiting social media

14    platforms?  No posting on social media, communications with

15    friends not to do certain things about publication.

16         What purpose would that have unless Pakula was asking

17    for something like that?

18         MS. ROVNER:  Pakula is just trying -- he never drafted

19    an agreement like this.

20         THE COURT:  I have never seen such a clause.  In 21

21    years of being a judge and sentencing people and looking at the

22    terms and conditions of supervised release, I have never seen

23    such a clause.

24         Have you, Ms. Rovner, ever seen such a clause?

25         MS. ROVNER:  I have never seen a federal location

1  monitoring agreement, your Honor.

2          THE COURT:  Why would Pakula ask for something like

3  this unless there was a purpose to it, unless there was a

4  retaliatory purpose saying, you tow the line about giving up

5  your First Amendment rights or we will send you to jail.  We

6  are not going to negotiate about it because if you negotiate,

7  we are going to send you to jail and call you intransigent.

8          How can I take any other inference other than it was

9  retaliatory?

10          MS. ROVNER:  Pakula had no knowledge about Mr. Cohen's

11  book, and he got the sample from another probation officer.

12          THE COURT:  It's impossible to take that inference.

13          MR. McKAY:  Your Honor, this is Thomas McKay.  Can I

14  just jump in with a factual point on the timeline?

15          THE COURT:  Mr. McKay, is Mr. Rovner not capable of

16  answering my questions?

17          MR. McKAY:  She certainly is, your Honor.

18          THE COURT:  You will keep quiet and if Ms. Rovner

19  wants to consult you, she may.  One person speaks on a side.

20          There is no purpose that I can discern, from having

21  this paragraph 1, that I can find in any term or condition of a

22  supervised release that I have seen in 21 years of being a

23  judge.  You already know about it.  Nor is it feasible to

24  believe that Pakula wasn't asking for something like this

25  because he had some instruction about the something like this.

1          MS. ROVNER:  Your Honor, Pakula actually didn't ask

2     for it.  He just sent it and it was before he was assigned

3     Mr. Cohen's case.

4          (Court reporter cut off from call)

5          THE COURT:  If he came up with this, he had to be told

6     about the need for something or the desire for something like

7     this.  And then Ms. Rovner was answering that it was part of a

8     working group that was discussing something or other, and I

9     missed what Ms. Rovner was saying.

10         MS. ROVNER:  Mr. Pakula was part of a working group

11    with some other probation officers from other districts where,

12    among other things, they discussed better location monitoring.

13         And this e-mail, which is attached as Exhibit A to

14    Mr. Pakula's declaration, it's an e-mail to Mr. Pakula from one

15    of the probation officers in his group.

16         And it says that:  I have received a few high-profile

17    FLM, which stands for federal location monitoring, requests

18    since we last collaborated.

19         I came up with a list of additional criteria that my

20    brass and the BOP approved as having the potential FLM

21    participant agree to ahead of time, in addition to the FLM

22    conditions, and he is saying that in this particular case he

23    reviewed the FLM form with the offender and then e-mailed the

24    offender the document and had him sign it before the probation

25    office would formally agree to federal location monitoring.

```
 1              THE COURT:  I see this document.  It comes from the
 2    United States Probation Office of the Eastern District of
 3    Pennsylvania, and it gives a form letter.
 4              But this document is not vetted in the normal way in
 5    the probation office.  Mr. Fitzpatrick, the head of the office,
 6    doesn't sign off on it or see it.  It's not part of the forms
 7    typically used by the probation office.  And that will be
 8    expected if the probation office, as is said here, is delegated
 9    its function of supervision by the Bureau of Prisons.
10              I cannot believe fairly that there was not a purpose
11    in paragraph 1 of the location monitoring to stop exercise of
12    First Amendment rights, and that's my finding.
13              The instances of retaliation are laid out in the
14    papers by the plaintiff.  I don't need to go into them here.
15              But I want to ask you, Ms. Perry, if I were to give an
16    injunction, what should its terms be?
17              MS. PERRY:  Thank you, your Honor.
18              We believe that he should not be subject to any of the
19    restrictions in the prior restraint provision, which is in
20    paragraph 1 of the FLM agreement.
21              THE COURT:  Does that include a television studio?
22              MS. PERRY:  Your Honor, first of all, I think that
23    that would be constitutionally permissible and it would not
24    serve any legitimate penological objectives to deny him that.
25              THE COURT:  He can invite all the press and get a
```

SOUTHERN DISTRICT REPORTERS, P.C.•
•
•
•
(212) 805-0300

1  large apartment, 20 or so people will come in, and give a

2  publicity release and tout his book.  You think that's part of

3  his constitutional rights?

4        MS. PERRY:  I believe that the Bureau of Prisons has

5  an obligation to work with Mr. Cohen, which is exactly what he

6  was trying to do, to figure out the appropriate contours of

7  what he can and can't do.

8        THE COURT:  Tell me what the appropriate contours is.

9  Mr. Cohen is a prisoner.  He may be confined in his own home,

10  if I grant this injunction against retaliation, but he remains

11  a prisoner in his home.  And just as you wouldn't have a press

12  conference from a jail cell, you shouldn't be allowed to have a

13  press conference from your home.  You can communicate.  You can

14  discuss.  You can post on social media.  You can do all those

15  sorts of things.  But you can't make a confinement into a free

16  person.  You can't make a person confined in jail or at home

17  into a totally free person.  There has got to be a limit.

18        MS. PERRY:  Your Honor, we agree with that.  He wants

19  to be able to edit and publish his book.  He would like to be

20  able to work, subject to approval by the Bureau of Prisons, and

21  that approval has to be within the bounds of what would serve

22  an appropriate penological interest.

23        THE COURT:  What would the penological interest be?

24  Is there a proper penological inference that a person considers

25  himself as if in jail, even though he is confined to home, and

1    act accordingly?

2         MS. PERRY:  Your Honor, I think he should be permitted

3    to post on social media and to speak his mind.  He obviously

4    has something to say of great public interest.  Just like any

5    prisoner, he can't incite riot.  He had some restraints on him

6    while he was in Otisville, and we think those would remain

7    appropriate.

8         I do think this is an area where we can work with the

9    Bureau of Prisons and find out exactly what their objective is

10   because their stated objective of not glamorizing the condition

11   of home confinement obviously is pretextual.  I think the

12   burden is on them to state what the objective is, and then

13   Mr. Cohen will be happy to work with them and to appropriately,

14   under appropriately tailored conditions, to absolutely abide by

15   them.  I don't know what the Bureau of Prisons is looking to

16   do.

17        THE COURT:  Condition No. 3 is a prohibition on

18   contact with any convicted felons.  Mr. Cohen says he wants to

19   contact convicted felons to interview them.  That's in

20   violation of condition 3.  Condition 3 is a normal condition.

21        Do you have any problem with it?

22        MS. PERRY:  We don't, your Honor.  I would say there

23   is an oddity of condition 3, which says that he also can't

24   contact anyone currently under investigation by the U.S.

25   Attorney's Office, but it also appears to have been custom made

SOUTHERN DISTRICT REPORTERS, P.C.•
•
•
•
(212) 805-0300

1    for Mr. Cohen because --

2            THE COURT:  It's a normal term, I believe.

3            MS. PERRY:  Anyone that he knows to be under

4    investigation, of course, is appropriate, and he would abide by

5    that.  He agreed to that at the meeting, and he will agree to

6    that today.

7            THE COURT:  How about the condition of agreeing to any

8    employment?  The probation officer said to agree to employment.

9            MS. PERRY:  Your Honor, he agrees to each of those

10   other conditions.  He -- and, as you said, it was appropriately

11   so -- and his attorney were trying to understand the contours

12   of what he was and was not allowed to do so that he would not

13   be in violation.

14           THE COURT:  He said that, but you can read this and

15   understand what it is.

16           MS. PERRY:  Your Honor, he wasn't confused by the

17   condition.  He wanted some meat filled in on the bone.  If he

18   needs prior approval for attendance at a religious service, how

19   much prior approval.  Is it a week, is it a day?  Does a bris

20   count or can he visit his rabbi?  What is meant?  And maybe he

21   was being overly lawyerly.  But he did really want to, just as

22   he did before he left Otisville, he did want to understand very

23   clearly the parameters of his conditions of release so that he

24   wouldn't violate them.

25           He agrees to each of these conditions 2 through 8.  To

1  be very clear, it would certainly be helpful to have some

2  guidelines to what exactly is meant because he does not want to

3  be back in the same position where he is ambushed with some

4  sort of violation because he didn't quite understand the terms.

5          THE COURT:  We have the terms here.  Are any of these,

6  besides No. 1, objectionable?

7          MS. PERRY:  No, your Honor.

8          THE COURT:  We have Mr. Cohen then agreeing to

9  conditions 2 through 7.

10          MS. PERRY:  Yes, your Honor.

11          THE COURT:  What do you think --

12          MS. PERRY:  And 8 as well, your Honor.

13          THE COURT:  Pardon?

14          MS. PERRY:  There is a condition 8 that he also agrees

15  to.

16          THE COURT:  I only saw seven.

17          MS. PERRY:  It's on the following page, your Honor.

18  It's approval for him to meet with his attorney, at the

19  attorney's request, in advance.

20          THE COURT:  Yes.

21          How should No. 1 be modified?  The purpose is to avoid

22  glamorizing or bringing publicity to your status as a sentenced

23  inmate serving a custodial term in the community.

24          MS. PERRY:  Yes, your Honor, we agree with that.

25          THE COURT:  Ms. Rovner, if I were to give an

1   injunction, I would ask the two of you to negotiate condition 1

2   so that it's consistent with a First Amendment, but yet serve

3   the purposes of confinement.  Would you be able to do it?

4           MS. ROVNER:  I think so, your Honor.  I was actually

5   going to ask that we have a couple of days to attempt to

6   negotiate the conditions.  Counsel agrees to 2 through 8, but I

7   would like time to confer internally with BOP and with counsel

8   about this, if your Honor is inclined --

9           THE COURT:  How long should Mr. Cohen be in jail?  If

10  I find that this has been retaliatory, shouldn't he be restored

11  to the condition he was?

12          MS. ROVNER:  One thing, your Honor, which I don't

13  totally know the answer to, is we know that he's in quarantine

14  right now.  I'm not sure of the answer to this.  If before --

15          THE COURT:  At the direction of the jail.  If he is

16  going back to his home, which is what I would contemplate, we

17  only have to worry if his wife objects.  I don't believe she is

18  objecting.

19          MS. PERRY:  Your Honor, she is not objecting.  I have

20  discussed this with her.  He will be picked up from the Bureau

21  of Prisons, from Otisville, by his son, who also would be in

22  quarantine with Mr. Cohen and Mrs. Cohen.

23          And we would agree, should he be released -- we do ask

24  your Honor to release Mr. Cohen immediately.  And we would

25  agree to the imposition of condition 1, pending this discussion

1   and negotiation with the U.S. Attorney's Office over the next

2   few days, or however long it takes them, so that he doesn't

3   have to wait while we are negotiating.

4            THE COURT:  I think, Ms. Rovner, that's reasonable.

5   He continue his quarantine at home.  We would keep him here for

6   one more day, until he gets tested, and he gets released

7   tomorrow.  And the test results would then be communicated to

8   the probation officer and to Mr. Cohen.

9            MS. ROVNER:  Your Honor, I think that's reasonable and

10  acceptable, if your Honor is inclined to grant the injunction.

11           THE COURT:  Who is speaking?

12           MS. ROVNER:  This is AUSA Allison Rovner.

13           MS. PERRY:  Your Honor, one quick note.  He has been

14  in solitary confinement since July 9.

15           THE COURT:  I'm told he was, and you were told that he

16  was moved out from solitary confinement to the quarantine unit,

17  unit E.

18           MS. PERRY:  Your Honor, maybe it's a question of word

19  play.  He has been quarantined in what they call solitary

20  confinement.  He is by himself all day every day.  So he has

21  not had contact with another human.

22           THE COURT:  He could stand one more day.

23           MS. PERRY:  Yes, your Honor.

24           THE COURT:  Let him be tested tomorrow morning,

25  Ms. Rovner, and he should be released by 2 p.m. to his son.

1          Ms. Perry, tell me, who is going to be the custodian?

2     Is his wife be a custodian?

3          MS. PERRY:  Yes, your Honor.

4          THE COURT:  Does she need to sign anything

5     satisfactory to the probation office?

6          MS. PERRY:  I don't believe so, your Honor.  Under the

7     conditions that were to have been imposed, I don't believe she

8     was, but she certainly is more than willing to.

9          THE COURT:  And she will be taking care of shopping

10    and everything else.  Mr. Cohen will be confined to his home

11    except subject to conditions stated in the agreement.

12          MS. PERRY:  Yes, your Honor.

13          THE COURT:  I think we have it.

14          I make the finding that the purpose of the

15    transferring Mr. Cohen from furlough and home confinement to

16    jail is retaliatory and it's retaliatory because of his desire

17    to exercise his First Amendment rights to publish a book and to

18    discuss anything about the book or anything else he wants on

19    social media and with others.

20          Counsel for Mr. Cohen agrees to the eight conditions

21    set out in the federal location monitoring program participant

22    agreement tended to him by Mr. Pakula, subject to renegotiation

23    of the first term.  And with respect to that, the last sentence

24    of that first paragraph will be retained and there can be

25    further negotiation if that has to be defined, but in a way

1  that's consistent both with the First Amendment and penological

2  purposes.

3           That's my essential finding and the injunction is

4  against continuing retaliation against Mr. Cohen by keeping him

5  in jail when he should be confined, as he was before the

6  retaliation, at home.

7           I will issue a written decision further explaining my

8  reasoning, but this decision is a final decision.

9           Does counsel wish to give me terms of an injunction or

10  should I craft one myself?

11           MS. PERRY:  Your Honor, I suppose that the permanent

12  injunction would be subject to --

13           THE COURT:  Why don't I do it myself now and it's

14  subject to being replaced by a consent agreement given to me by

15  counsel.

16           MS. PERRY:  Perfect, your Honor.

17           THE COURT:  How much time shall I give you to

18  negotiate?

19           MS. PERRY:  I think we can do it immediately, but I

20  leave it to AUSA Rovner.

21           THE COURT:  Let's say a week.

22           MS. ROVNER:  Your Honor, did you say a week?

23           THE COURT:  I was thinking a week for the discussion.

24           MS. ROVNER:  I think that's feasible.

25           THE COURT:  Let's say a week.  If you need more time,

1   you'll ask for it.

2        In the meantime, condition 1, as it is stated in the

3   agreement, stands for that period of time.  I will continue to

4   maintain jurisdiction so that if there is no agreement within

5   the week, Ms. Perry can ask me to hear you again.

6        Have I missed anything, Ms. Rovner, that I should be

7   touching upon?

8        MS. ROVNER:  I don't think so, your Honor.

9        THE COURT:  Ms. Perry.

10       MS. PERRY:  No, your Honor.

11       THE COURT:  This matter is closed.  Thank you very

12  much.

13       (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25

## ADDENDUM B

**A list of the issues proposed to be raised on appeal, as well as the applicable appellate standard of review for each proposed issue**

1.  **Issue:** Whether the district court erred in dismissing as a matter of law Plaintiff's claim against Defendants Trump, Barr, Carvajal, Gustin, McFarland, Petrucci, Febus, Pakula, and John and Jane Does 1-10 under the U.S. Constitution. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

   **Standard of Review:** This Court reviews the district court's decision *de novo*, "accepting the allegations in the complaint as true and drawing all reasonable inferences in favor of the non-moving party." *Gonzalez v. Hasty*, 802 F.3d 212, 219 (2d Cir. 2015) (reviewing dismissal of *Bivens* claims pursuant to Fed. R. Civ. P. 12(b)(6)).

2.  **Issue:** Whether the district court erred in dismissing as a matter of law Plaintiff's claims against Defendant United States under the Federal Tort Claims Act ("FTCA").

   **Standard of Review:** This Court reviews the district court's "factual findings for clear error and legal conclusions de novo, accepting all material facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012) (reviewing dismissal of FTCA claims pursuant to Fed. R. Civ. P. 12(b)(1)).