# 23-0035-cv

## United States Court of Appeals

*for the*

### Second Circuit

MICHAEL D. COHEN,

*Plaintiff-Appellant,*

– v. –

UNITED STATES OF AMERICA, DONALD J. TRUMP, Former President of the United States, WILLIAM P. BARR, Former Attorney General of the United States, MICHAEL D. CARVAJAL, Director of the Bureau of Prisons, JON GUSTIN, Administrator of the Residential Reentry Management Branch of the Bureau of Prisons, PATRICK MCFARLAND, Residential Reentry Manager of the Federal Bureau of Prisons, JAMES PETRUCCI, Warden of FCI Otisville, ENID FEBUS, Supervisory Probation Officer of the United States Probation and Pretrial Services, ADAM PAKULA, Probation Officer of the United States Probation and Pretrial Services,

*Defendants-Appellees.*

───────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX

E. DANYA PERRY
PERRY GUHA LLP
1740 Broadway, 15th Floor
New York, New York 10019
(212) 399-8330

KAMI E. QUINN
JON-MICHAEL DOUGHERTY
SARAH SRADERS
GILBERT LLP
700 Pennsylvania Avenue, SE, Suite 400
Washington, DC 20003
(202) 772-2200

*Attorneys for Plaintiff-Appellant*

*(For Continuation of Appearances See Inside Cover)*

ALINA HABBA
MICHAEL T. MADAIO
HABBA MADAIO & ASSOCIATES LLP
1430 U.S. Highway 206
Bedminster, New Jersey 07921
(908) 869-1188

*Attorneys for Defendant-Appellee*
 *Donald J. Trump*

ALYSSA O'GALLAGHER
 *Assistant U.S. Attorney*
ALLISON ROVNER
BENJAMIN H. TORRANCE
UNITED STATES ATTORNEY'S OFFICE,
 SOUTHERN DISTRICT OF NEW YORK
86 Chambers Street
New York, New York 10007
(917) 754-4386

*Attorneys for Defendants-Appellees*
 *United States of America, William*
 *P. Barr, Michael D. Carvajal,*
 *Jon Gustin, Patrick McFarland,*
 *James Petrucci, Enid Febus and*
 *Adam Pakula*

# TABLE OF CONTENTS

**Page**

Clerk's Certified Docket Sheet in *Cohen v. United States*, No. 1:21-cv-10774 (LJL) (S.D.N.Y.) ............................................................ A-1

Complaint (S.D.N.Y. ECF No. 3, Dec. 17, 2021)...... A-11

Order Granting Preliminary Injunction in *Cohen v. Barr*, No. 1:20-cv-5614 (AKH) (S.D.N.Y. ECF No. 60-1, May 27, 2022) .............. A-42

Transcript of Proceedings held before the Honorable Lewis J. Liman, dated August 2, 2022. A-44

Opinion and Order (S.D.N.Y. ECF No. 76, Nov. 15, 2022) ....................................................... A-101

Clerk's Judgment (S.D.N.Y. ECF No. 77, Nov. 15, 2022) ....................................................... A-134

Notice of Appeal (S.D.N.Y. ECF No. 79, Jan. 10, 2023)........................................................... A-135

**A-1**

CLOSED,APPEAL,ECF

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:21−cv−10774−LJL

| | |
|---|---|
| Cohen v. United States of America et al | Date Filed: 12/16/2021 |
| Assigned to: Judge Lewis J. Liman | Date Terminated: 11/15/2022 |
| Cause: 28:1331tt Fed. Question: Tort Action | Jury Demand: Plaintiff |
| | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Michael D. Cohen**              represented by **E. Danya Perry**
Perry Guha LLP
1740 Broadway, 15th Floor
New York, NY 10019
212−399−8340
Fax: 212−399−8331
Email: dperry@perryguha.com
*ATTORNEY TO BE NOTICED*

**Jeffrey K. Levine**
Law Offices of Jeffrey K. Levine
340 West 57th Street
Suite 11e
New York, NY 10019
212−721−9600
Email: jl@nyadvocate.com
*ATTORNEY TO BE NOTICED*

**Andrew C. Laufer**
Law Office of Andrew C. Laufer, PLLC
264 West 40th Street
Suite 604
New York, NY 10018
212−422−1020
Email: alaufer@lauferlawgroup.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States of America**              represented by **Allison Rovner**
United States Attorney's Office SDNY
86 Chambers St.
New York, NY 10007
(212)−637−2691
Fax: (212)−637−2750
Email: Allison.Rovner@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
DOJ−USAO
86 Chambers St
New York, NY 10007
917−754−4386
Email: alyssa.o'gallagher@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

A-2

**Donald J. Trump**
*former President of the United States*

represented by **Alina Habba**
Habba Madaio & Associates LLP
1430 US Highway 206
Suite 240
Bedminster, NJ 07921
908−869−1188
Email: ahabba@habbalaw.com
*ATTORNEY TO BE NOTICED*

**Michael T Madaio**
Habba Madaio & Associates LLP
1430 US Highway 206
Suite 240
Bedminster, NJ 07921
908−869−1188
Email: mmadaio@habbalaw.com
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**William Barr**
*former Attorney General of the United States*

represented by **Allison Rovner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Michael Carvajal**
*Director of the Bureau of Prisons*

represented by **Allison Rovner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Jon Gustin**
*Administrator of the Residential Reentry Management Branch of the Bureau of Prisons*

represented by **Allison Rovner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Patrick Mcfarland**
*Residential Reentry Manager of the Federal Bureau of Prisons*

represented by **Allison Rovner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**James Petrucci**
*Warden of FCI Otisville*

represented by **Allison Rovner**
(See above for address)
*LEAD ATTORNEY*

A-3

*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Enid Febus**
*Supervisory Probation Officer of the United States Probation and Pretrial Services*

represented by **Allison Rovner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Adam Pakula**
*Probation Officer of the United States Probation and Pretrial Services*

represented by **Allison Rovner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa O'Gallagher**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/16/2021 | 1 | **FILING ERROR − DEFICIENT PLEADING − FILED AGAINST PARTY ERROR −** COMPLAINT against All Defendants. (Filing Fee $ 402.00, Receipt Number ANYSDC−25479126)Document filed by Michael D. Cohen..(Laufer, Andrew) Modified on 12/17/2021 (jgo). (Entered: 12/16/2021) |
| 12/16/2021 | 2 | NOTICE OF APPEARANCE by Jeffrey K. Levine on behalf of Michael D. Cohen..(Levine, Jeffrey) (Entered: 12/16/2021) |
| 12/17/2021 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Andrew C. Laufer to RE−FILE Document No. 1 Complaint,. The filing is deficient for the following reason(s): all of the parties listed on the pleading were not entered on CM/ECF; add party Jane Doe 1−10 with party text 'agents, servants, and employees of the United States; the All Defendant radio button was selected;. Re−file the pleading using the event type Complaint found under the event list Complaints and Other Initiating Documents − attach the correct signed PDF − select the individually named filer/filers − select the individually named party/parties the pleading is against. (jgo)** Modified on 12/17/2021 (jgo). (Entered: 12/17/2021) |
| 12/17/2021 | | **\*\*\*NOTICE TO ATTORNEY TO ELECTRONICALLY FILE CIVIL COVER SHEET. Notice to Attorney Andrew C. Laufer. Attorney must electronically file the Civil Cover Sheet. Use the event type Civil Cover Sheet found under the event list Other Documents. (jgo)** (Entered: 12/17/2021) |
| 12/17/2021 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Andrew C. Laufer. The party information for the following party/parties has been modified: all defendants. The information for the party/parties has been modified for the following reason/reasons: party name was entered in all caps; party text was omitted;. (jgo)** (Entered: 12/17/2021) |
| 12/17/2021 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above−entitled action is assigned to Judge Lewis J. Liman. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district−judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at |

| | | |
|---|---|---|
| | | https://nysd.uscourts.gov/rules/ecf−related−instructions..(jgo) (Entered: 12/17/2021) |
| 12/17/2021 | | Magistrate Judge Gabriel W. Gorenstein is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018−06/AO−3.pdf. (jgo) (Entered: 12/17/2021) |
| 12/17/2021 | | Case Designated ECF. (jgo) (Entered: 12/17/2021) |
| 12/17/2021 | 3 | COMPLAINT against William Barr, Michael Carvajal, Enid Febus, John Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, Donald J. Trump, United States of America. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 4 | **FILING ERROR − PDF ERROR −** CIVIL COVER SHEET filed..(Laufer, Andrew) Modified on 12/17/2021 (gp). (Entered: 12/17/2021) |
| 12/17/2021 | 5 | REQUEST FOR ISSUANCE OF SUMMONS as to United States of America, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 6 | REQUEST FOR ISSUANCE OF SUMMONS as to Donald J. Trump, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 7 | REQUEST FOR ISSUANCE OF SUMMONS as to William Barr, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 8 | REQUEST FOR ISSUANCE OF SUMMONS as to Michael Carvajal, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 9 | REQUEST FOR ISSUANCE OF SUMMONS as to Jon Gustin, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 10 | REQUEST FOR ISSUANCE OF SUMMONS as to Patrick McFarland, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 11 | REQUEST FOR ISSUANCE OF SUMMONS as to James Petrucci, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 12 | REQUEST FOR ISSUANCE OF SUMMONS as to Enid Febus, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | 13 | REQUEST FOR ISSUANCE OF SUMMONS as to Adam Pakula, re: 3 Complaint. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 12/17/2021) |
| 12/17/2021 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Andrew Laufer. The party information for the following party/parties has been modified: John Gustin. The information for the party/parties has been modified for the following reason/reasons: party name contained a typographical error;. (gp)** (Entered: 12/17/2021) |
| 12/17/2021 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT CIVIL COVER SHEET. Notice to attorney Andrew Laufer to RE−FILE Document No. 4 Civil Cover Sheet. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the civil cover sheet is not correct (NATURE OF SUIT INFORMATION IS MISSING). Re−file the document using the event type Civil Cover Sheet found under the event list Other Documents and attach the correct PDF. Use civil cover sheet issued by S.D.N.Y. dated October 1, 2020. The S.D.N.Y. Civil Cover Sheet dated October 1, 2020 is located at http://nysd.uscourts.gov/file/forms/civil−cover−sheet. (gp)** (Entered: 12/17/2021) |
| 12/17/2021 | 14 | ELECTRONIC SUMMONS ISSUED as to United States of America..(gp) (Entered: 12/17/2021) |

| 12/17/2021 | 15 | ELECTRONIC SUMMONS ISSUED as to Donald J. Trump..(gp) (Entered: 12/17/2021) |
|---|---|---|
| 12/17/2021 | 16 | ELECTRONIC SUMMONS ISSUED as to William Barr..(gp) (Entered: 12/17/2021) |
| 12/17/2021 | 17 | ELECTRONIC SUMMONS ISSUED as to Michael Carvajal..(gp) (Entered: 12/17/2021) |
| 12/17/2021 | 18 | ELECTRONIC SUMMONS ISSUED as to Jon Gustin..(gp) (Entered: 12/17/2021) |
| 12/17/2021 | 19 | ELECTRONIC SUMMONS ISSUED as to Patrick Mcfarland..(gp) (Entered: 12/17/2021) |
| 12/17/2021 | 20 | ELECTRONIC SUMMONS ISSUED as to James Petrucci..(gp) (Entered: 12/17/2021) |
| 12/17/2021 | 21 | ELECTRONIC SUMMONS ISSUED as to Enid Febus..(gp) (Entered: 12/17/2021) |
| 12/17/2021 | 22 | ELECTRONIC SUMMONS ISSUED as to Adam Pakula..(gp) (Entered: 12/17/2021) |
| 12/20/2021 | 23 | CIVIL COVER SHEET filed..(Laufer, Andrew) (Entered: 12/20/2021) |
| 01/07/2022 | 24 | NOTICE OF INITIAL PRETRIAL CONFERENCE: Initial Conference set for 3/2/2022 at 11:00 AM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (Signed by Judge Lewis J. Liman on 1/7/2022) (va) (Entered: 01/07/2022) |
| 01/18/2022 | 25 | AFFIDAVIT OF SERVICE. United States of America served on 1/7/2022, answer due 1/28/2022. Service was accepted by Ostrich Gordon. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 01/18/2022) |
| 01/18/2022 | 26 | AFFIDAVIT OF SERVICE. Donald J. Trump served on 1/5/2022, answer due 1/26/2022. Service was accepted by Doorman − "John Doe". Service was made by MAIL. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 01/18/2022) |
| 01/18/2022 | 27 | AFFIDAVIT OF SERVICE. William Barr served on 12/30/2021, answer due 1/20/2022. Service was accepted by William Barr. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 01/18/2022) |
| 02/07/2022 | 28 | AFFIDAVIT OF SERVICE. Michael Carvajal served on 2/2/2022, answer due 2/23/2022. Service was accepted by Corinne Nastro. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 02/07/2022) |
| 02/07/2022 | 29 | AFFIDAVIT OF SERVICE. Jon Gustin served on 2/2/2022, answer due 2/23/2022. Service was accepted by Corinne Nastro. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 02/07/2022) |
| 02/07/2022 | 30 | AFFIDAVIT OF SERVICE. Patrick Mcfarland served on 2/2/2022, answer due 2/23/2022. Service was accepted by Corinne Nastro. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 02/07/2022) |
| 02/07/2022 | 31 | AFFIDAVIT OF SERVICE. James Petrucci served on 2/2/2022, answer due 2/23/2022. Service was accepted by Corinne Nastro. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 02/07/2022) |
| 02/07/2022 | 32 | AFFIDAVIT OF SERVICE. Enid Febus served on 1/17/2022, answer due 2/7/2022. Service was accepted by Enid Febus. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 02/07/2022) |
| 02/07/2022 | 33 | AFFIDAVIT OF SERVICE. Adam Pakula served on 2/3/2022, answer due 2/24/2022. Service was made by 20 Heron Drive, Marlboro, NJ 07746. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 02/07/2022) |
| 02/21/2022 | 34 | LETTER MOTION for Extension of Time *for defendants to respond to complaint and adjournment of initial conference with corresponding extension of time for pre−conference submission* addressed to Judge Lewis J. Liman from AUSA Allison Rovner dated February 21, 2022. Document filed by United States of America..(Rovner, Allison) (Entered: 02/21/2022) |
| 02/22/2022 | 35 | ORDER granting 34 Letter Motion for Extension of Time. The initial pretrial conference is adjourned to April 7, 2022 at 2:00P.M. in Courtroom 15C, 500 Pearl |

| | | |
|---|---|---|
| | | Street, New York, NY 10007 before Judge Lewis J. Liman. (HEREBY ORDERED by Judge Lewis J. Liman)(Text Only Order) (ra) (Entered: 02/22/2022) |
| 02/22/2022 | | Set/Reset Hearings: Initial Conference set for 4/7/2022 at 02:00 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 02/23/2022) |
| 03/29/2022 | 36 | NOTICE OF APPEARANCE by Alina Habba on behalf of Donald J. Trump..(Habba, Alina) (Entered: 03/29/2022) |
| 03/31/2022 | 37 | LETTER addressed to Judge Lewis J. Liman from Andrew C. Laufer dated 3/31/22 re: Discovery. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 03/31/2022) |
| 03/31/2022 | 38 | LETTER MOTION to Stay *Discovery* addressed to Judge Lewis J. Liman from AUSA Allison Rovner dated March 31, 2022. Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 03/31/2022) |
| 04/04/2022 | 39 | MOTION to Dismiss . Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 04/04/2022) |
| 04/04/2022 | 40 | MEMORANDUM OF LAW in Support re: 39 MOTION to Dismiss . . Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 04/04/2022) |
| 04/04/2022 | 41 | MOTION to Dismiss . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 04/04/2022) |
| 04/04/2022 | 42 | MEMORANDUM OF LAW in Support re: 41 MOTION to Dismiss . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 04/04/2022) |
| 04/04/2022 | 43 | DECLARATION of Alina Habba in Support re: 41 MOTION to Dismiss .. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit Complaint in the Matter of Robert S. Trump v. Mary L. Trump, et al, # 2 Exhibit Cease and Desist Letter).(Habba, Alina) (Entered: 04/04/2022) |
| 04/06/2022 | | ORDER: The Initial Pretrial Conference scheduled for April 7, 2022 at 2:00P.M. will be held in Courtroom 24B at the 500 Pearl Street Courthouse, and will no longer be held in Courtroom 15C. Instead, Courtroom 15C will be used as an overflow room if needed. (HEREBY ORDERED by Judge Lewis J. Liman) (Text Only Order) (mf) (Entered: 04/06/2022) |
| 04/06/2022 | 44 | NOTICE OF APPEARANCE by Alyssa O'Gallagher on behalf of William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(O'Gallagher, Alyssa) (Entered: 04/06/2022) |
| 04/07/2022 | 45 | NOTICE OF APPEARANCE by Michael T Madaio on behalf of Donald J. Trump..(Madaio, Michael) (Entered: 04/07/2022) |
| 04/07/2022 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Initial Pretrial Conference held on 4/7/2022. Jeffrey Levine (present by telephone) and Andrew Laufer present for Plaintiff. Allison Rovner and Alyssa O'Gallagher present for Defendants. Alina Habba and Michael Madaio present for Defendant, Donald J. Trump. Court reporter present. The Court ordered the exchange of initial disclosures by April 18, 2022. Plaintiff is permitted to serve interrogatories and document requests by May 12. 2022. Plaintiff's opposition briefs to motion to dismiss is due by May 27, 2022. Defendants' reply briefs due by June 17, 2022. (mf) (Entered: 04/18/2022) |
| 04/08/2022 | 46 | SUPPLEMENTAL LETTER addressed to Judge Lewis J. Liman from Jeffrey K. Levine dated 04/08/2022 re: Supplement to 04/07/22 Conference. Document filed by Michael D. Cohen..(Levine, Jeffrey) (Entered: 04/08/2022) |
| 04/09/2022 | 47 | SUPPLEMENTAL LETTER addressed to Judge Lewis J. Liman from Alina Habba, Esq. dated April 9, 2022 re: Response to Plaintiff's Supplemental Letter dated April 8, 2022. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 04/09/2022) |

| 04/22/2022 | 48 | NOTICE of Request for Admission. Document filed by Michael D. Cohen. (Attachments: # 1 Exhibit Order − July 23, 2020 [ECF 30], # 2 Exhibit Stipulation and Order − July 30, 2020 [[ECF 36]).(Levine, Jeffrey) (Entered: 04/22/2022) |
| 04/26/2022 | 49 | TRANSCRIPT of Proceedings re: CONFERENCE held on 4/7/2022 before Judge Lewis J. Liman. Court Reporter/Transcriber: Andrew Walker, (212) 805−0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/17/2022. Redacted Transcript Deadline set for 5/27/2022. Release of Transcript Restriction set for 7/25/2022..(Moya, Goretti) (Entered: 04/26/2022) |
| 04/26/2022 | 50 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 4/7/22 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 04/26/2022) |
| 05/12/2022 | 51 | FIRST MOTION to Stay *Discovery*. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 05/12/2022) |
| 05/12/2022 | 52 | MEMORANDUM OF LAW in Support re: 51 FIRST MOTION to Stay *Discovery*. . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 05/12/2022) |
| 05/18/2022 | 53 | FIRST MOTION to Compel Donald J. Trump to produce discovery . Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 05/18/2022) |
| 05/18/2022 | 54 | MEMORANDUM OF LAW in Support re: 53 FIRST MOTION to Compel Donald J. Trump to produce discovery . . Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 05/18/2022) |
| 05/18/2022 | 55 | DECLARATION of Andrew C. Laufer in Support re: 53 FIRST MOTION to Compel Donald J. Trump to produce discovery .. Document filed by Michael D. Cohen. (Attachments: # 1 Exhibit Donald J. Trump's Initial Disclosures, # 2 Exhibit Order Granting Preliminary Injunction).(Laufer, Andrew) (Entered: 05/18/2022) |
| 05/23/2022 | 56 | MOTION to Stay *Discovery*. Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 05/23/2022) |
| 05/23/2022 | 57 | MEMORANDUM OF LAW in Support re: 56 MOTION to Stay *Discovery*. . Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America. (Attachments: # 1 Exhibit A (April 7, 2022 conference transcript), # 2 Exhibit B (Discovery Requests)).(Rovner, Allison) (Entered: 05/23/2022) |
| 05/25/2022 | 58 | MEMORANDUM OF LAW in Opposition re: 53 FIRST MOTION to Compel Donald J. Trump to produce discovery . . Document filed by Donald J. Trump. (Attachments: # 1 Affidavit Declaration of Michael Madaio).(Habba, Alina) (Entered: 05/25/2022) |
| 05/27/2022 | 59 | AFFIDAVIT of Andrew C. Laufer in Opposition re: 39 MOTION to Dismiss .. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 05/27/2022) |
| 05/27/2022 | 60 | DECLARATION of Andrew C. Laufer in Opposition re: 39 MOTION to Dismiss .. Document filed by Michael D. Cohen. (Attachments: # 1 Exhibit Decision of the Hon. Alvin K. Hellerstein, # 2 Exhibit United States Government Memorandum).(Laufer, Andrew) (Entered: 05/27/2022) |
| 05/27/2022 | 61 | AFFIRMATION of Andrew C. Laufer in Opposition re: 41 MOTION to Dismiss .. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 05/27/2022) |
| 05/27/2022 | 62 | DECLARATION of Andrew C. Laufer in Opposition re: 41 MOTION to Dismiss .. Document filed by Michael D. Cohen. (Attachments: # 1 Exhibit Decision of Hon. Alvin K. Hellerstein).(Laufer, Andrew) (Entered: 05/27/2022) |
| 05/31/2022 | 63 | AFFIRMATION of Andrew C. Laufer in Opposition re: 56 MOTION to Stay *Discovery*.. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: |

A-8

|  |  | 05/31/2022) |
|---|---|---|
| 06/02/2022 | 64 | REPLY AFFIRMATION of Andrew C. Laufer in Support re: 53 FIRST MOTION to Compel Donald J. Trump to produce discovery .. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 06/02/2022) |
| 06/02/2022 | 65 | REPLY MEMORANDUM OF LAW in Support re: 56 MOTION to Stay *Discovery*. . Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 06/02/2022) |
| 06/16/2022 | 66 | MEMORANDUM AND ORDER granting 51 Motion to Stay re: 51 FIRST MOTION to Stay *Discovery*., 53 FIRST MOTION to Compel Donald J. Trump to produce discovery ., 56 MOTION to Stay *Discovery*. ; denying 53 Motion to Compel; granting 56 Motion to Stay re: 51 FIRST MOTION to Stay *Discovery*., 53 FIRST MOTION to Compel Donald J. Trump to produce discovery ., 56 MOTION to Stay *Discovery*. The motion to compel a response to discovery is DENIED. The motions for a stay of discovery pending a decision on the motions to dismiss are GRANTED. The Court will set a discovery schedule if the complaint survives the motions in whole or in part. The Clerk of Court is respectfully directed to close Dkt. Nos. 51, 53, 56. (Signed by Judge Lewis J. Liman on 6/16/2022) (rro) (Entered: 06/16/2022) |
| 06/17/2022 | 67 | REPLY MEMORANDUM OF LAW in Support re: 39 MOTION to Dismiss . . Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 06/17/2022) |
| 06/17/2022 | 68 | REPLY MEMORANDUM OF LAW in Support re: 41 MOTION to Dismiss . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 06/17/2022) |
| 06/21/2022 | 69 | LETTER addressed to Judge Lewis J. Liman from Andrew C. Laufer dated 06/21/2022 re: Cohen v. United States of America, et al 21 cv 10774 (LJL) (GWG). Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 06/21/2022) |
| 06/24/2022 |  | ORDER: The Court will hear oral argument on the pending motions to dismiss on July 7, 2022 at 4:00PM. The hearing will be held in–person and parties are to appear in Courtroom 15C at the 500 Pearl Street Courthouse. (HEREBY ORDERED by Judge Lewis J. Liman) (Text Only Order) (mf) (Entered: 06/24/2022) |
| 06/24/2022 |  | Set/Reset Hearings: Oral Argument set for 7/7/2022 at 04:00 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 06/24/2022) |
| 06/24/2022 | 70 | MEMO ENDORSEMENT on re: 69 Letter filed by Michael D. Cohen. ENDORSEMENT: The Court will receive the letter as a supplement to the opposition to the motion to dismiss. No further briefing may be filed absent leave of the Court. SO ORDERED. (Signed by Judge Lewis J. Liman on 6/24/2022) (vfr) (Entered: 06/24/2022) |
| 06/27/2022 |  | ORDER: The Oral Argument on the pending motions to dismiss previously set for July 7, 2022 is RESCHEDULED to July 6, 2022 at 4:00PM in Courtroom 15C at the 500 Pearl Street Courthouse. (HEREBY ORDERED by Judge Lewis J. Liman) (Text Only Order) (mf) (Entered: 06/27/2022) |
| 06/27/2022 |  | Set/Reset Hearings: Oral Argument set for 7/6/2022 at 04:00 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 06/27/2022) |
| 06/27/2022 | 71 | LETTER addressed to Judge Lewis J. Liman from Andrew C. Laufer dated 6/27/2022 re: Adjournment. Document filed by Michael D. Cohen..(Laufer, Andrew) (Entered: 06/27/2022) |
| 06/28/2022 | 72 | ORDER granting 71 Letter from Andrew C. Laufer dated 6/27/2022 re: Adjournment filed by Michael D. Cohen. The Oral Argument on the pending motions to dismiss is RESCHEDULED to July 11, 2022 at 2:30PM in Courtroom 15C at the 500 Pearl Street Courthouse. (HEREBY ORDERED by Judge Lewis J. Liman) (Text Only Order) (mf) (Entered: 06/28/2022) |

A-9

| | | |
|---|---|---|
| 06/28/2022 | | Set/Reset Hearings: Oral Argument set for 7/11/2022 at 02:30 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 06/28/2022) |
| 07/01/2022 | 73 | LETTER addressed to Judge Lewis J. Liman from AUSA Allison Rovner dated July 1, 2022 re: request to divide oral argument between AUSAs representing Moving Defendants. Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 07/01/2022) |
| 07/08/2022 | | ORDER: Due to a scheduling conflict, the Oral Argument previously set for July 11, 2022 is RESCHEDULED to July 18, 2022 at 4:30PM in Courtroom 15C at the 500 Pearl Street Courthouse. (HEREBY ORDERED by Judge Lewis J. Liman) (Text Only Order) (mf) (Entered: 07/08/2022) |
| 07/08/2022 | | Set/Reset Hearings: Oral Argument set for 7/18/2022 at 04:30 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman. (mf) (Entered: 07/08/2022) |
| 07/11/2022 | 74 | LETTER MOTION to Adjourn Conference *(oral argument on pending motions to dismiss)* addressed to Judge Lewis J. Liman from AUSA Allison Rovner dated July 11, 2022. Document filed by William Barr, Michael Carvajal, Enid Febus, Jon Gustin, Patrick Mcfarland, Adam Pakula, James Petrucci, United States of America..(Rovner, Allison) (Entered: 07/11/2022) |
| 07/14/2022 | 75 | ORDER granting 74 Letter Motion to Adjourn Conference. The Oral Argument on the pending motions to dismiss is RESCHEDULED to August 2, 2022 at 4:30PM in Courtroom 15C at the 500 Pearl Street Courthouse. (Oral Argument set for 8/2/2022 at 04:30 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007 before Judge Lewis J. Liman.) (HEREBY ORDERED by Judge Lewis J. Liman)(Text Only Order) (mf) (Entered: 07/14/2022) |
| 08/02/2022 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Oral Argument held on 8/2/2022 re: 39 MOTION to Dismiss filed by William Barr, James Petrucci, Enid Febus, Michael Carvajal, Patrick Mcfarland, Jon Gustin, United States of America, Adam Pakula, and 41 MOTION to Dismiss filed by Donald J. Trump. Jeffrey Levine and Andrew Laufer present for Plaintiff. Allison Rovner and Alyssa O'Gallagher present for Defendants. Alina Habba and Michael Madaio present for Defendant, Donald J. Trump. Court reporter present. The Court heard argument from all parties regarding Defendants' pending motions to dismiss. The Court takes the matter under advisement, decision reserved by the Court. Defendants' directed to order a copy of the transcript on an expedited basis and to split cost between Defendants. (mf) (Entered: 08/11/2022) |
| 11/14/2022 | 76 | OPINION AND ORDER re: 39 MOTION to Dismiss . filed by William Barr, James Petrucci, Enid Febus, Michael Carvajal, Patrick Mcfarland, Jon Gustin, United States of America, Adam Pakula, 38 LETTER MOTION to Stay *Discovery* addressed to Judge Lewis J. Liman from AUSA Allison Rovner dated March 31, 2022. filed by William Barr, James Petrucci, Enid Febus, Michael Carvajal, Patrick Mcfarland, Jon Gustin, United States of America, Adam Pakula, 41 MOTION to Dismiss . filed by Donald J. Trump. The motions to dismiss are GRANTED. The Clerk of Court is respectfully directed to close Dkt. Nos. 38, 39, 41. SO ORDERED. (Signed by Judge Lewis J. Liman on 11/14/2022) (tg) Transmission to Orders and Judgments Clerk for processing. (Entered: 11/14/2022) |
| 11/15/2022 | 77 | CLERK'S JUDGMENT re: 76 Opinion & Order. in favor of United States of America, Adam Pakula, Donald J. Trump, Enid Febus, James Petrucci, Jon Gustin, Michael Carvajal, Patrick Mcfarland, William Barr against Michael D. Cohen. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion & Order dated November 14, 2022, Defendants' motions to dismiss are GRANTED; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 11/15/2022) (nd) (Entered: 11/15/2022) |
| 01/10/2023 | 78 | NOTICE OF APPEARANCE by E. Danya Perry on behalf of Michael D. Cohen..(Perry, E. Danya) (Entered: 01/10/2023) |

A-10

| 01/10/2023 | 79 | NOTICE OF APPEAL from 77 Clerk's Judgment,, 76 Memorandum & Opinion,,,. Document filed by Michael D. Cohen. Filing fee $ 505.00, receipt number BNYSDC−27181891. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Perry, E. Danya) Modified on 1/10/2023 (nd). (Entered: 01/10/2023) |
|---|---|---|
| 01/10/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 79 Notice of Appeal,..(nd) (Entered: 01/10/2023) |
| 01/10/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 79 Notice of Appeal, filed by Michael D. Cohen were transmitted to the U.S. Court of Appeals..(nd) (Entered: 01/10/2023) |

A-11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X        Case No.: 21 CV 10774
MICHAEL D. COHEN,

                       Plaintiff,        **COMPLAINT AND DEMAND**
         -against-        **FOR A JURY TRIAL**

UNITED STATES OF AMERICA,
DONALD J. TRUMP, former President of
the United States, WILLIAM BARR, former
Attorney General of the United States, MICHAEL
CARVAJAL, Director of the Bureau of Prisons,
JON GUSTIN, Administrator of the Residential
Reentry Management Branch of the Bureau of Prisons,
PATRICK McFARLAND, Residential Reentry
Manager of the Federal Bureau of Prisons,
JAMES PETRUCCI, Warden of FCI Otisville,
ENID FEBUS, Supervisory Probation Officer
of the United States Probation and Pretrial Services
ADAM PAKULA, Probation Officer of the
United States Probation and Pretrial Services,
and JOHN and JANE DOE (1-10) agents, servants,
and employees of the United States,
                           Defendants,
----------------------------------------------------------------X

      Plaintiff MICHAEL D. COHEN, by his attorneys, Andrew C. Laufer of the Law Office of

Andrew C. Laufer, PLLC and Jeffrey K. Levine of the Law Office of Jeffrey K. Levine as and

for his complaint against the defendants alleges as follows:

**<u>PRELIMINARY STATEMENT</u>**

1.    This civil rights action seeks redress under the Federal Tort Claims Act and *Bivens v. Six*

      *Unknown Named Agents of Federal Bureau of Narcotics* for injuries plaintiff suffered

      from the unconstitutional and unlawful conduct of defendants, UNITED STATES OF

      AMERICA ("United States"), DONALD J. TRUMP, former President of the United

      States, WILLIAM BARR, former Attorney General of the United States, MICHAEL

CARVAJAL, Director of the Federal Bureau of Prisons, JON GUSTIN, Administrator of the Residential Reentry Management Branch of the Federal Bureau of Prisons, PATRICK McFARLAND, Residential Reentry Manager of the Federal Bureau of Prisons, JAMES PETRUCCI, Warden of FCI Otisville, ENID FEBUS, Supervisory Probation Officer of the United States Probation and Pretrial Services ADAM PAKULA, Probation Officer of the United States Probation and Pretrial Services, and JOHN and JANE DOE (1-10) agents, servants, and employees of the United States.

2.   Plaintiff, Michael D. Cohen, was retaliated against by the defendants for the lawful exercise of his First Amendment right to free speech, in relation to his public comments and upcoming publication of a book shortly before the 2020 election, critical of the former President of the United States, Donald J. Trump.

3.   Specifically, Mr. Cohen sought to inform the public about the former President's private and public life involving both the presidency and business dealings.

4.   After pleading guilty to various crimes, including lying to Congress and campaign finance violations, committed in coordination with and at the direction of defendant Trump, Mr. Cohen was sentenced and held at FCI Otisville between May 2019 and May 2020.

5.   On or about April 2020, the Federal Bureau of Prisons ("FBOP") determined that Mr. Cohen was at high risk for serious illness and death related to the COVID-19 pandemic and was later placed on furlough status and returned to his residence in New York County.

6.    At the end of his furlough period, it was determined that Mr. Cohen would transition to home confinement in order to serve the remaining portion of his sentence.

7.    During the furlough time-period, Mr. Cohen made various public statements demonstrating his intent to publish a tell-all book about President Trump in short order.

8.    One of these statements was made via the social media platform, Twitter. On June 26, 2020 he tweeted #WillSpeakSoon. On July 2, 2020, Mr. Cohen tweeted that he has almost completed his book about his experiences with President Trump.

9.    On or about July 7, 2020 Mr. Cohen was contacted by an entity known as GEO — a third-party contractor who acted on behalf of the FBOP.

10.   GEO's role was to transition Mr. Cohen from furlough status to home confinement status at his New York County residence and would then supervise Mr. Cohen's residential reentry, attach and monitor plaintiff with an ankle location monitoring system and enforce other rules.

11.   GEO scheduled Mr. Cohen's transition for July 9, 2020 at his residence.

12.   Mr. Cohen understood and agreed to comply with GEO.

13.   At the last minute, Mr. Cohen was contacted by defendant Adam Pakula on July 8, 2020 to advise that GEO was being discharged and the United States Probation and Pretrial Services would assume GEO's role over Mr. Cohen.

14.   Defendant McFarland authorized defendant Pakula to direct Mr. Cohen leave his upper east side residence and travel downtown on the following day, July 9, 2020, to appear at the United States Probation and Pretrial Services office located in lower Manhattan within the United States Southern District Courthouse at 500 Pearl Street.

3

15.     Defendant Pakula explained Mr. Cohen needed to review some home confinement transition paperwork at the Courthouse office. Thereafter, defendant Pakula and various United States officers would travel uptown to Mr. Cohen's residence where the transition meeting would continue and fit plaintiff with an ankle location monitoring system.

16.     As with GEO, Mr. Cohen had no objection, understood what was expected of him and looked forward to home confinement status.

17.     On July 9, 2020, merely one week after the plaintiff's July 2nd tweet, Mr. Cohen was presented with a Federal Location Monitoring Program Participant Agreement (hereinafter FLM), in order to transition to home confinement, and which agreement required his signature.

18.     The very first condition within the agreement specifically forbade Mr. Cohen from speaking to or through all media, including publishing his tell-all book about then President Trump.

19.     The FML condition read as follows:

> "No engagement of any kind with of the media, including print, tv, film, books, or any other form of media/news. Prohibition from all social media platforms. No posting on social media and a requirement that you communicate with friends and family to exercise discretion in not posting on your behalf or posting any information about you. The purpose is to avoid glamorizing or bringing publicity to your status as a sentenced inmate serving a custodial term in the community."

20.     This "condition," completely uncharacteristic for an FLM, was a *prima facie* violation of Mr. Cohen's constitutional rights under the First Amendment as well as in retaliation for his public comments and proposed publication of his tell-all book critical of President Trump.

21.     Mr. Cohen sought clarification and possible revision of the proposed limitations within his home confinement FLM agreement.

22.     Defendants stated they had to confer with their superiors to determine whether they could further clarify or revise the media contact limitations and directed Mr. Cohen to remain in their waiting room.

23.     During the supposed "conferring", Mr. Cohen waited for approximately 1½ hours   in their waiting room.

24.     Rather than reengage with Mr. Cohen about clarification and possible revision defendants instead remanded plaintiff to FCI Otisville to serve the rest of his sentence.

25.     Due to the COVID-19 pandemic, this remand placed Mr. Cohen's life in danger.

26.     Defendants were readily aware, yet unconcerned with the risk of serious illness and death remanding Mr. Cohen could cause and which would unilaterally alter plaintiff's sentence imposed by the Court.

27.     Upon plaintiff's arrival at FCI Otisville, defendant Petrucci placed and/or was jointly responsible for placing Mr. Cohen in solitary confinement where he remained for approximately sixteen (16) days.

28.     On July 23, 2020 the Honorable Alvin K. Hellerstein, USDJ issued an Order granting a preliminary injunction directing defendants to immediately release Mr. Cohen to home confinement. The Court further held that defendants " . . . purpose in transferring Cohen from release on furlough and home confinement back to custody was retaliatory in response to Cohen desiring to exercise his First Amendment rights to publish a book

critical of the President and to discuss the book on social media." (See Exhibit A – Order of the Hon. Alvin K. Hellerstein, USDJ attached hereto.)

29.    Plaintiff seeks redress for the extreme physical and emotional harm he suffered as a result of the conduct of all defendants, and for the pain and suffering he continues to experience.

## JURISDICTION AND VENUE

30.    This Court has jurisdiction over the subject matter of this complaint under 28 U.S.C. §§ 1331, 1346(b), 28 U.S.C. §2671, *et. seq.*, Federal Tort Claims Act, and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1972).

31.    On or about June 15, 2021, plaintiff filed a claim under the Federal Tort Claims Act demanding damages of a set sum and has satisfied the jurisdictional prerequisites.

32.    To date, neither plaintiff nor his counsel received a response to the aforementioned claim and more than 6 months has passed since its filing.

33.    Venue is properly within the Southern District of New York under 28 U.S.C. §1402(b) and 28 U.S.C. §1391(b)(2) as the acts and omissions that are the subject of this complaint occurred within this district.

## JURY TRIAL DEMAND

34.    Plaintiff demands a trial by jury on all issues in this action which are so triable.

## PARTIES

35.    At all times relevant herein plaintiff, Michael D. Cohen, is a resident of the county, city, and state of New York.

36.　At all times relevant herein plaintiff was formally under the custodial, supervisory, and disciplinary authority of all defendants.

37.　At all times relevant herein, defendant Donald J. Trump was President of the United States and is being sued in his individual capacity. As President, he was head of the Executive Branch of the Federal Government. He was responsible for the oversight and enforcement of the laws of the United States. Defendant Trump issued specific directives and guidance to his co-defendants that governed the treatment of plaintiff and others who he believed were his political enemies. At his direction, plaintiff was remanded back to prison and subjected to great indignities when he was unlawfully incarcerated and held in solitary confinement.

38.　At all times relevant herein, defendant William Barr was Attorney General of the United States and is being sued in his individual capacity. As Attorney General, defendant Barr was head of the Department of Justice and chief law enforcement officer of the Federal Government. He was responsible for the oversight of the FBOP. Defendant Barr issued directives and guidance to his co-defendants which specifically governed the care, custody, and control of plaintiff. At the behest of then President Trump, and upon his own volition, defendant Barr directed his subordinates to retaliate against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

39.　At all times relevant herein, defendant Michael Carvajal was Director of the FBOP and is being sued in his individual capacity. As Director of the FBOP, defendant Carvajal

oversaw operations of all prisons and detention facilities in the United States prison system and was responsible for the oversight and management of FCI Otisville. He specifically issued directives and guidance to his co-defendants which specifically governed the care, custody, and control of plaintiff. At the behest of his superiors, Trump and Barr, and upon his own volition, defendant Carvajal directed his subordinates to retaliate against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

40.     At all times relevant herein, defendant James Petrucci was Warden of FCI Otisville. As Warden of FCI Otisville, defendant Petrucci oversaw operations of the prison and is responsible for its oversight and management. He specifically issued directives and guidance to his co-defendants which specifically governed the care, custody, and control of the plaintiff. At the behest of his superiors, and upon his own volition, defendant Petrucci directed his subordinates to retaliate against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

41.     At all times relevant herein, defendant Jon Gustin was Administrator of the Residential Reentry Management Branch of the FBOP. As administrator, he oversaw transferring of prisoners to home confinement and was responsible for the programs oversight and management. Defendant Gustin specifically issued directives and guidance to his co-defendants which specifically governed the care, custody, and control of plaintiff. At the behest of his superiors, and upon his own volition, defendant Gustin directed his

subordinates to retaliate against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

42.   At all times relevant herein, defendant Patrick McFarland was a Residential Reentry Manager of the FBOP. As manager, he oversaw the transferring of prisoners to home confinement and was responsible for the programs oversight and management. He specifically issued directives and guidance to his co-defendants which specifically governed the care, custody, and control of plaintiff. At the behest of his superiors and upon his own volition, defendant McFarland retaliated against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

43.   At all times relevant herein, defendant Enid Febus was a Supervisory Probation Officer of the United States Probation and Pretrial Services. She was responsible for the care custody and control of plaintiff in the oversight, maintenance, and control of his home confinement and post-prison sentence. Defendant Febus specifically issued directives and guidance to her co-defendants which specifically governed the care, custody, and control of plaintiff. At the behest of her superiors and upon her own volition, defendant Febus directed her subordinates to retaliate against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

44.   At all times relevant herein, Adam Pakula was a Probation Officer of the United States Probation and Pretrial Services. He was responsible for the care custody and control of

plaintiff in the oversight, maintenance, and control of his home confinement and post-prison sentence. Defendant Pakula issued directives and guidance which specifically governed the care, custody, and control of plaintiff. At the behest of his superiors and upon his own volition, defendant Pakula retaliated against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

45.    At all times relevant herein, defendants JOHN and JANE DOE (1-10) were agents, servants, and employees of the United States who were responsible for the retaliation and unlawful incarceration of plaintiff whose identities are unknown at this time.

46.    At all times relevant herein, defendant United States owned, operated, maintained and controlled the Department of Justice, Federal Bureau of Prisons, the Residential Reentry Management Office, the United States Probation and Pretrial Services, and the correctional facility FCI Otisville in the state of New York, and is the appropriate defendant under the Federal Torts Claim Act ("FTCA").

47.    At all times relevant herein, the individual defendants acted within the course and scope of their employment and under color of law. Plaintiff is suing them in their individual capacity.

## FACTUAL ALLEGATIONS

### *Mr. Cohen's Prior Involvement with the former President*

48.    Mr. Cohen was previously employed by the former President, Donald J. Trump as an attorney and personal advisor in excess of one decade.

49.   While employed at the Trump Organization, plaintiff became a surrogate of defendant Trump during his 2016 United States Presidential campaign. Thereafter, and upon becoming personal attorney to the President of the United States, he continued to counsel and advise then President Trump on legal and personal matters.

50.   Throughout his affiliation with defendant Trump, Mr. Cohen was privy to his decision-making, businesses, campaign, and governing strategies.

51.   He also witnessed, first-hand, the way defendant Trump treated and retaliated against his perceived enemies.

52.   In August and November 2018 Mr. Cohen pleaded guilty to violations of federal law undertaken in coordination with and at the direction of defendant Trump.

53.   He was sentenced to 36 months incarceration.

54.   On May 6, 2019, Mr. Cohen voluntarily surrendered for service of his sentence at FCI Otisville.

55.   During the term of his incarceration, Mr. Cohen began working on a manuscript, which would eventually be formulated into a book[1], regarding his over decade long association with defendant Trump.

56.   The publication chronicled the arc of his experiences with defendant Trump and how, upon reflection, came to the realization that his actions in furtherance of defendant Trump's agenda ultimately led to his own downfall.

57.   Mr. Cohen publicly stated that his book concerned matters of great national concern and interest. Considering his firsthand experiences with the former President, plaintiff was

---

[1] Disloyal: A Memoir: The True Story of the Former Personal Attorney to President Donald J. Trump

11

privy to years of his non-public behavior which included, but was not limited to, anti-Semitic and racist remarks regarding numerous individuals including prominent members of the public such as former President Barack Obama and former President Nelson Mandela.

58.    Mr. Cohen's book included numerous quotes and documentary evidence supporting defendant Trump's unseemly non-public behavior.

59.    Further, Mr. Cohen publicly stated that his book would be unfavorable for defendant Trump and would substantiate his descriptions elicited during his Congressional testimony that then President Trump was "a cheat, a liar, a conman, a racist," among other things.

60.    Defendant Trump was aware of Mr. Cohen being witness to many years of the aforementioned unseemly conduct which would not reflect well if made public, and even more specifically, could negatively impact his 2020 run for a second term as President of the United States.

61.    Former President Trump was aware of Mr. Cohen's Congressional testimony briefly described and quoted above.

### Mr. Cohen's Release on Furlough from FCI Otisville

62.    Mr. Cohen's initial incarceration, prior to his unlawful remand, was uneventful. The drafting of his book during this time period was in compliance with all rules and regulations applicable to FCI Otisville.

63.    Upon completion of his sentence, Mr. Cohen was to be released from Otisville on November 22, 2021.

64.     Onset of the COVID-19 pandemic altered his sentence due to the fact that it was easily spread within the close confinement of a prison.

65.     This had special significance for Mr. Cohen due to various health comorbidities that made him highly susceptible to infection, serious injury and death from SARS-CoV-2.

66.     As a result, Mr. Cohen petitioned the defendants for early release from FCI Otisville based upon Congress's passage of the CARES Act and defendant Barr's March 26 and April 3, 2020 memorandums.

67.     On March 31, 2020, Mr. Cohen submitted his request to FBOP officials for his release on furlough and then transfer to home confinement.

68.     FBOP officials, substantiated Mr. Cohen's concerns for his health, determined that he should be released on furlough and then transferred to home confinement.

69.     On April 18, 2020, Mr. Cohen was granted furlough approval by FBOP. The furlough time period was from May 1, 2020 to May 31, 2020.

70.     Fourteen (14) days prior to plaintiff's scheduled May 1, 2020 transfer to furlough Mr. Cohen was sequestered and placed into solitary confinement for what FCI Otisville officials represented would be the standard quarantine period — plaintiff complied.

71.     Defendants, however, kept Mr. Cohen in solitary confinement for approximately 35 days rather than 14 days. Thereafter Mr. Cohen was transferred to furlough.

72.     During the furlough time period, Mr. Cohen made several public statements via Twitter regarding the imminent publishing of his tell-all book about defendant Trump. A number of those tweets were accompanied by the hashtag #WillSpeakSoon. Mr. Cohen planned to release his book by late September 2020.

*Plaintiff's Retaliatory Confinement*

73.    In compliance with the directive of defendant Pakula, on July 9, 2020, Mr. Cohen, accompanied by his attorney, reported to the U.S. Probation Office in downtown Manhattan in order to transition from furlough to home confinement. They met with Probation Officer Adam Pakula and Supervisory U.S. Probation Officer Enid Febus.

74.    Defendants Pakula and Febus handed them a Federal Location Monitoring Program Participant Agreement (hereinafter FLM).

75.    The very first paragraph of the FLM read as follows:

> "No engagement of any kind with the media, including print, tv, film, books, or any other form of media/news. Prohibition from all social media platforms. No posting on social media and a requirement that you communicate with friends and family to exercise discretion in not posting on your behalf or posting an information about you. The purpose is to avoid glamorizing or bringing publicity to your status as a sentenced inmate serving a custodial term in the community."

76.    It was painfully apparent to Mr. Cohen and his counsel that the defendants were attempting to unlawfully, and in violation of his First Amendment rights under the United States Constitution, create a chilling effect and thereby silence Mr. Cohen's right to free speech based on the prior restraint set forth therein.

77.    It was obvious this prior restraint paragraph was not normally included in FLMs for those transferring from incarceration or furlough to home confinement.

78.    Further, the document itself was not in the standard form issued by the defendants. It contained numerous grammatical and typographical errors, and had no legend identifying its federal form designation.

79. Mr. Cohen and his counsel inquired why this paragraph was included within the FLM as it did not appear to be standard and that it would prevent him from the publication of his book.

80. Defendant Febus insisted the proposed FLM was the standard form used and Mr. Cohen was not being treated any differently than other prisoners.

81. Defendant Pakula agreed and did not attempt in any way to correct, modify or elaborate co-defendant Febus' statement, until defendant Pakula was under oath.

82. In a July 22, 2020 signed declaration made under the penalty of perjury and submitted to the Court in *Cohen v. Barr et al, supra*, document number 23, defendant Pakula admitted in great detail how he and defendant Febus lied to plaintiff.

83. Further, the proposed FLM restrictions placed upon plaintiff's friends and family were onerous. It was questionable, in the least, how Mr. Cohen could be held responsible for the actions of others outside of his control.

84. Inquiry was made whether it would be possible for the defendants to adjust the language or remove paragraph one from the agreement since it was overly broad, burdensome, and would unreasonably restrain Mr. Cohen's rights.

85. The parties agreed to table this issue so they could take Mr. Cohen's inquiry and "run it up the chain of command."

86. After reviewing the rest of the FLM, Mr. Cohen asked some clarifying questions which were satisfactorily answered by the defendants.

87. At no point during the meeting with defendants was Mr. Cohen asked to sign the FLM agreement.

A-26

88.    At no point did Mr. Cohen refuse to sign the FLM agreement, withhold consent to electronic monitoring, or any other condition of home confinement.

89.    Following their review of the FLM agreement, defendants Pakula and Febus directed Mr. Cohen and his counsel to remain in the waiting area while awaiting a response from their superiors regarding paragraph one, the prior restraint provision, of the FLM.

90.    After approximately 45 minutes, plaintiff's attorney inquired with defendants Pakula and Febus if everything was all right. Defendant Pakula assured him that everything was fine and they were still awaiting a response from their superiors.

91.    After a total waiting time of approximately 1½ hours three United States Marshals arrived in the waiting area, served counsel with an RRC remand ordered by defendant McFarland regarding Mr. Cohen that falsely stated Mr. Cohen had "failed to agree to the terms of Federal Location Monitoring" and was being remanded for that reason.

92.    United States Marshals, over the objection of counsel, shackled, handcuffed and remanded plaintiff to prison.

93.    Defendant McFarland's allegation was a complete fabrication.

94.    From the very start defendants had no intention of releasing Mr. Cohen to home confinement and used the onerous and unlawful "prior restraint provision" of the FLM as a predicate to remand him back to prison where they knew his life would be in danger due to his health conditions and the COVID-19 pandemic.

95.    In the presence of United States Marshals plaintiff's attorney stated to co-defendants Pakula and Febus that: they knew the meeting was not finished, Mr. Cohen and he were

16

waiting to hear back to see what, if anything, could be adjusted in the proposed FLM, the remand order claim was untrue, and his client was willing to sign the FLM "as is".

96.    Co-defendants Pakula and Febus did not deny this and instead responded that it was "out of their hands", the remand was an order from their superiors, and the proposed FLM agreement was "no longer on the table".

97.    In the presence of United States Marshals Mr. Cohen repeatedly stated to co-defendants Febus and Pakula that he would sign the FLM "as is" but those offers were rebuffed.

98.    Pursuant to the RRC remand order plaintiff was supposed to be remanded to MDC in Brooklyn and yet defendants violated their own remand order by transporting Mr. Cohen to MCC in Manhattan.

99.    Thereafter, Mr. Cohen was transported back to Otisville and initially placed within a special segregated housing unit.

100.   Plaintiff was then transferred to solitary confinement where he spent approximately 16 days.

101.   During this time period, Mr. Cohen spent 23.5 hours of his day alone within a twelve by eight-foot cell. On weekends, Mr. Cohen was only permitted to leave his cell for 30 minutes.

102.   Aside from the significantly increased risk of contracting COVID-19, the solitary confinement space where Mr. Cohen was imprisoned had poor ventilation, no air conditioning, and daily temperatures within plaintiff's solitary confinement cell exceeded one-hundred (100º) degrees. These conditions posed serious health risks for Mr. Cohen.

At times his blood pressure became dangerously high resulting in severe headaches, shortness of breath, and anxiety requiring immediate medical attention.

103.   While incarcerated, he was unable to proceed with the drafting of his book or make any public statements.

### Defendants Prior History of Retaliation Against Enemies of Defendant Trump and his Administration

104.   Defendants efforts to exercise prior restraint over Mr. Cohen's book was one instance in a long line of retaliatory measures engaged in by defendant Trump, his family and associates, and in the weaponization of his administration against his enemies, as with plaintiff.

105.   On June 16, 2020, the Civil Division of the U.S. Department of Justice, under the prior leadership of defendant Barr, brought a lawsuit against former National Security Advisor John Bolton to block the publication of his book, *The Room Where It Happened.* After instituting the suit, the Department of Justice filed an emergency motion seeking a temporary restraining order to stop the publication of his book. The Court denied this motion and refused to block the book's publication.

106.   On June 26, 2020, Mr. Trump's brother (through the same attorney who had sent a cease-and-desist letter to Mr. Cohen, Charles Harder), filed a lawsuit in New York State Supreme Court seeking to block the publication of Mary Trump's forthcoming book, *Too Much and Never Enough,* which promised to disclose, embarrassing yet truthful, details of her personal experiences and observations relating to defendant Trump, her uncle. The

Court denied the plaintiff's claims dismissing the action and allowed the publication of the book to occur on or about July 14, 2020.

107.   This was not the first attempt to prevent publication of Mr. Cohen's book by the defendants. On April 30, 2020, Trump Organization attorney Charles Harder sent a cease-and-desist letter to Mr. Cohen's attorney, claiming Mr. Cohen was barred by a Non-Disclosure Agreement ("NDA") from publishing his book. Mr. Cohen does not recall signing any such agreement, nor was a signed copy of it ever presented to him.

108.   On July 23, 2020 the Honorable Alvin K. Hellerstein, USDJ issued an Order granting a preliminary injunction directing defendants to release Mr. Cohen to home confinement. The Court further held that defendants " . . . purpose in transferring Cohen from release on furlough and home confinement back to custody was retaliatory in response to Cohen desiring to exercise his First Amendment rights to publish a book critical of the President and to discuss the book on social media."  (See Exhibit A – Order of the Hon. Alvin K. Hellerstein, USDJ attached hereto.)

109.   This Exhibit "A" ruling and Order by the Court was not appealed, timely or otherwise.

110.   This Exhibit "A" ruling and Order by Judge Hellerstein is law of the case.

## FIRST CAUSE OF ACTION
### Retaliation
### New York Common Law/ Federal Tort Claims Act
### (against the United States)

111.   Plaintiff adopts and incorporates by reference all preceding paragraphs as if said paragraphs are set forth fully herein.

112.    In the exercising of his right to free speech, the defendants did retaliate against the plaintiff by unlawfully detaining him by falsifying a violation of Federal Location Monitoring guidelines and, as a result, remanding him back to prison where he was held in solitary confinement for approximately 16 days.

113.    Plaintiff was aware of his confinement. He did not consent to it, nor was it otherwise privileged.

114.    Defendants actions were wrongful as a tort under the laws of the state of New York, and the law of the United States through the Federal Tort Claims Act, and without justification under any applicable federal statute or rule.


**SECOND CAUSE OF ACTION**
**False Arrest, False Imprisonment, Abuse of Authority and Process**
**New York Common Law/ Federal Tort Claims Act**
**(against *the United States*)**

115.    Plaintiff incorporates by reference the allegation set forth in all preceding paragraphs as if fully set forth herein.

116.    When employees of the United States detained, sanctioned, and exercised legal or quasi-legal authority and process over plaintiff and in violation of his rights, and specifically in retaliation for the lawful exercise of his First Amendment rights, they used their positions of power and authority to exercise unlawful force and control over Mr. Cohen.

117.    Employees of the United States exercised this force for the purpose of unlawfully and unnecessarily wrist and ankle shackling, arresting, and unlawfully confining plaintiff.

118. Plaintiff was aware of his arrest and confinement, did not consent to the arrest and confinement, nor were the arrest and confinement otherwise privileged.

119. The conduct of employees of the United States caused Mr. Cohen to be deprived of his physical liberty for a period of approximately 16 days.

120. The actions of employees of the United States were wrongful as a tort under the laws of the state of New York, and the law of the United States through the Federal Tort Claims Act, and without justification under any applicable federal statute or rule.

121. Plaintiff is entitled to relief against defendant United States because when employees of the United States falsely arrested, imprisoned, abused their authority and process in their unlawful detention of the plaintiff, they were acting under the color of law and as agents, servants, and employees of defendant United States, acting within the course and scope of their employment, and under the supervision of the United States.

## THIRD CAUSE OF ACTION
### Negligently Failure to Protect
### Federal Tort Claims Act
### *(against the United States)*

122. Plaintiff adopts and incorporates by reference all preceding paragraphs as if said paragraphs are set forth fully herein.

123. Defendant United States, had a legal duty to plaintiff as a prisoner in its care and custody to provide for the protection of inmates (18 U.S.C.S. § 4042), but breached that duty in negligently operating and managing FCI Otisville by the above described acts.

124.  As a result of the negligence of defendant United States, its agents, servants and employees, as aforesaid, plaintiff has suffered extreme emotional harm, physical injury, loss of enjoyment of life, and lost liberty.

## FOURTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress
### New York Common Law/ Federal Tort Claims Act
### (*against the United States*)

125.  Plaintiff adopts and incorporates by reference all preceding paragraphs as if said paragraphs are set forth fully herein.

126.  When defendants retaliated against plaintiff by remanding him back to FCI Otisville, placing him in solitary confinement for approximately 16 days, and significantly increasing his risk of contracting COVID-19, they created an unreasonable risk of causing him severe emotional distress.

127.  The type of severe emotional distress defendants caused plaintiff to suffer was foreseeable.

128.  Defendants conduct caused plaintiff to suffer severe emotional distress, bodily injury, anguish, insecurity, anxiety, embarrassment, humiliation, fear, and loss of enjoyment of life.

129.  Defendants actions were wrongful as a tort under the laws of the state of New York, and the law of the United States through the Federal Tort Claims Act, and without justification under any applicable federal statute or rule.

## FIFTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### New York Common Law/Federal Tort Claims Act
### (*against the United States*)

130.    Plaintiff adopts and incorporates by reference all preceding paragraphs as if said paragraphs are set forth fully herein.

131.    By intentionally subjecting plaintiff to retaliatory conduct by remanding him back to FCI Otisville, placing him in solitary confinement for approximately 16 days, and significantly increasing his risk of contracting COVID-19, defendants engaged in extreme and outrageous conduct.

132.    Defendants intended to inflict emotional distress, or they knew or should have known that severe emotional distress was the likely result of their conduct.

133.    As a result of defendants conduct, plaintiff suffered severe and lasting emotional distress, loss of enjoyment of life, lost liberty, and was otherwise damaged and injured.

134.    Defendants actions were wrongful as a tort under the laws of the state of New York, and the law of the United States through the Federal Tort Claims Act, and without justification under any applicable federal statute or rule.


## SIXTH CAUSE OF ACTION
### Negligent Hiring, Retention, Training, and Supervision
### New York Common Law/Federal Tort Claims Act
### (*against the United States*)

135.    Plaintiff adopts and incorporates by reference all preceding paragraphs as if said paragraphs are set forth fully herein.

136.    Defendant United States, had a legal duty to plaintiff as a prisoner in its care and custody, breached that duty in negligently operating and managing FCI Otisville by, *inter alia*:

a.    Hiring and retaining agents, servants, and employees known or should have been known to defendants to be of such poor moral character, temperament, and disposition as to be totally unfit to be hired, retained and placed in charge of plaintiff.

b.    Failing to adopt, incorporate and enforce such rules, regulations, policies and procedures for the operation and management of FCI Otisville as would reasonably protect plaintiff and others being unlawfully detained or incarcerated and being exposed to a deadly viral pathogen, predicated upon defendants abuse of authority, falsifying government documentation, and other such unlawful acts of their agents, servants, and employees, including, but not limited to, the individually named defendants.

c.    Failing to properly supervise, investigate, and review the operation and management of the Department of Justice, Federal Bureau of Prisons, the United States Probation and Pretrial Services, and the correctional facility FCI Otisville in the state of New York and the activities and performance of defendants thereat.

d.    Failing to properly investigate allegations of retaliation brought against defendants and otherwise failing to discipline the perpetrators of or institute safeguards to prevent the unlawful conduct suffered by the plaintiff and others similarly situated from occurring.

137.    The aforementioned acts committed against plaintiff by defendants were a direct result of the negligence, carelessness, and recklessness of defendant United States, its agents, servants and employees, in failing to meet its duty of care to plaintiff in its screening,

hiring, training, supervising, evaluating, managing, controlling, and retaining of defendants and other agents, servants, and employees of the United States.

138.  As a result of the negligence of defendant United States, its agents, servants and employees, as aforesaid, plaintiff has suffered extreme emotional harm, physical injury, loss of enjoyment of life, and lost liberty.

### SEVENTH CAUSE OF ACTION
**Violation of Plaintiff's Rights against Retaliation for Exercising his Right to Free Speech, Right against Unlawful Seizure of his Person, and to be Free from Cruel and Unusual Punishment First, Fourth, and Eighth Amendments,** *Bivens* **(against all *Individual Defendants*)**

139.  Plaintiff adopts and incorporates by reference all preceding paragraphs as if said paragraphs are set forth fully herein.

140.  Defendants intentionally retaliated against plaintiff for exercising his right to free speech and committed an unlawful seizure of the body of plaintiff. by unlawfully claiming a violation of Federal monitoring guidelines and remanding him back to FCI Otisville where he was placed in solitary confinement for approximately 16 days, preceded by 35 days in solitary confinement, which, in turn, posed a substantial risk of serious illness and death and caused him to suffer extreme emotional harm and physical injury in violation of his First, Fourth, and Eighth Amendment rights. Retaliatory incarceration serves no penological purpose as it is not a lawful penalty for criminal offenders in the custody of the United States Government.

141.   As a result of defendants conduct, plaintiff suffered extreme emotional harm, physical injury, and loss of enjoyment of life.

142.   The conduct of all defendants was accomplished under color of law and deprived plaintiff of rights, privileges, or immunities secured by the First, Fourth, and Eighth Amendment to the U.S. Constitution.

## REQUESTS FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

    a. Assume jurisdiction over this matter;

    b. Award compensatory damages to plaintiff;

    c. Award punitive damages to plaintiff;

    d. Convene and empanel a jury to consider the merits of this claim;

    e. Award plaintiff reasonable costs and interest; and

    f. Grant any other relief that the Court may deem appropriate and equitable.

Dated: New York, NY
       December 16, 2021

                                 Respectfully Submitted,

                               **LAW OFFICE OF**
                               **ANDREW C. LAUFER, PLLC**

                               By: Andrew C. Laufer
                               Attorney for Plaintiff
                               MICHAEL D. COHEN
                               264 West 40th Street, Suite 604
                               New York, New York 10018
                               (212) 422-1020

                               **LAW OFFICE OF**
                               **JEFFREY K. LEVINE**

                               By: Jeffrey K. Levine
                               Attorney for Plaintiff
                               MICHAEL D. COHEN
                               340 West 57th Street, Suite 11E
                               New York, NY 10019
                               (212) 721-9600
                               JL@NYadvocate.com

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
MICHAEL D. COHEN,                                              :
                                                              :
                                    Petitioner,               :        **ORDER GRANTING**
                                                              :        **PRELIMINARY INJUNCTION**
              v.                                              :
                                                              :
WILLIAM  BARR,  in  his  official  capacity  as :        20 Civ. 5614 (AKH)
Attorney General of the United States, MICHAEL :
CARVAJAL, in his official capacity as Director of :
the Bureau of Prisons, and JAMES PETRUCCI, in :
his  official  capacity  as  Warden  of  the  Federal :
Correctional Institution, Otisville,                         :
                                                              :
                                                              :
                                    Respondents.              :
-------------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Upon the findings and conclusions stated on the record at oral argument

conducted telephonically on July 23, 2020, Petitioner Michael D. Cohen's motion for injunctive

relief, *see* ECF No. 4, is granted as follows.

        The Court finds that Respondents' purpose in transferring Cohen from release on

furlough and home confinement back to custody was retaliatory in response to Cohen desiring to

exercise his First Amendment rights to publish a book critical of the President and to discuss the

book on social media.  Accordingly, Respondents are hereby enjoined from any continuing or

future retaliation against Cohen for exercising his First Amendment rights.  Respondents are

directed to provide Cohen with a COVID-19 test at his place of detention no later than tomorrow

morning, July 24, 2020, to report the results of that test to Cohen and to his Probation Officer

promptly when they become available, and to release Cohen from custody to any member of his

immediate family at the place of his detention at or before 2:00 p.m. tomorrow, July 24, 2020.

        Upon Cohen's release, the parties agree, and I so order, that Cohen will be subject

to the eight conditions of release set forth in the Federal Location Monitoring Agreement, *see*

ECF No. 7-2, provided, however, that adherence to condition one, except for the last sentence, is

A-40

Case 1:20-cv-05614-AKH   Document 30   Filed 07/23/20   Page 2 of 2

temporary, subject to the parties' renegotiation of said temporary condition.[1]  The condition shall be consistent with the First Amendment and legitimate penological limitations on conduct to which the parties mutually agree or the Court subsequently orders.  The parties shall have one week to conduct their negotiations and will, unless an extension has been granted, file a proposed order to the Court by July 31, 2020.  I reserve continuing jurisdiction to resolve any disputes in settling an order and enforcing same.

       This order, which codifies my extemporaneous ruling at argument, is intended to be final.  A written decision providing a fuller statement of my findings and conclusions will follow when ready.  The Clerk is instructed to terminate the open motion (ECF No. 4).

       SO ORDERED.

Dated:     July 23, 2020
         New York, New York

                            _____/s/_____
                              ALVIN K. HELLERSTEIN
                            United States District Judge

---

[1] Condition one provides:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No: 21CV10774

MICHAEL D. COHEN,

Plaintiff,

-against-

UNITED STATES OF AMERICA, DONALD J. TRUMP, former
President of the United States, WILLIAM BARR, former Attorney
General of the United States, MICHAEL CARVAJAL, Director of the
Bureau of Prisons, JON GUSTIN, Administrator of the Residential Reentry
Management Branch of the Bureau of Prisons, PATRICK McFARLAND,
Residential Reentry Manager of the Federal Bureau of Prisons, JAMES
PETRUCCI, Warden of FCI Otisville, ENID FEBUS, Supervisory Probation
Officer of the United States Probation and Pretrial Services, ADAM PAKULA,
Probation Officer of the United States Probation and Pretrial Services, and JOHN
and JANE DOE (1-10) agents, servants, and employees of the United States,

Defendants,

**COMPLAINT AND DEMAND FOR A JURY TRIAL**

LAW OFFICE OF ANDREW C. LAUFER

**Attorney(s) for Plaintiff**

Office and Post Office Address
264 W. 40th Street, Suite 604
New York, NY 10018

Tel: (212) 422 1020
Fax: (212) 422 1069

To:

Signature (Rule 130-1.1-a)

Print name beneath

Service of a copy of the within is hereby admitted.

Dated:

Attorney(s) for:

PLEASE TAKE NOTICE:

☐ NOTICE OF ENTRY
that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court on

☐ NOTICE OF SETTLEMENT
that an order of which the within is a true copy
will be presented for settlement to the HON one of the judges of the
within named Court at
on            at            M.
Dated,

Yours, etc.

Law Office of Andrew C. Laufer

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
MICHAEL D. COHEN,                                     :
                                                      :
                                  Petitioner,         :         **ORDER GRANTING**
                                                      :         **PRELIMINARY INJUNCTION**
              v.                                      :
                                                      :         20 Civ. 5614 (AKH)
WILLIAM BARR, in his official capacity as             :
Attorney General of the United States, MICHAEL        :
CARVAJAL, in his official capacity as Director of     :
the Bureau of Prisons, and JAMES PETRUCCI, in         :
his official capacity as Warden of the Federal        :
Correctional Institution, Otisville,                  :
                                                      :
                                                      :
                                  Respondents.        :
-------------------------------------------------------------- X
ALVIN K. HELLERSTEIN, U.S.D.J.:

        Upon the findings and conclusions stated on the record at oral argument

conducted telephonically on July 23, 2020, Petitioner Michael D. Cohen's motion for injunctive

relief, *see* ECF No. 4, is granted as follows.

        The Court finds that Respondents' purpose in transferring Cohen from release on

furlough and home confinement back to custody was retaliatory in response to Cohen desiring to

exercise his First Amendment rights to publish a book critical of the President and to discuss the

book on social media.  Accordingly, Respondents are hereby enjoined from any continuing or

future retaliation against Cohen for exercising his First Amendment rights.  Respondents are

directed to provide Cohen with a COVID-19 test at his place of detention no later than tomorrow

morning, July 24, 2020, to report the results of that test to Cohen and to his Probation Officer

promptly when they become available, and to release Cohen from custody to any member of his

immediate family at the place of his detention at or before 2:00 p.m. tomorrow, July 24, 2020.

        Upon Cohen's release, the parties agree, and I so order, that Cohen will be subject

to the eight conditions of release set forth in the Federal Location Monitoring Agreement, *see*

ECF No. 7-2, provided, however, that adherence to condition one, except for the last sentence, is

Case 1:20-cv-05614-AKH    Document 30    Filed 07/23/20    Page 2 of 2

temporary, subject to the parties' renegotiation of said temporary condition.[1]  The condition shall be consistent with the First Amendment and legitimate penological limitations on conduct to which the parties mutually agree or the Court subsequently orders.  The parties shall have one week to conduct their negotiations and will, unless an extension has been granted, file a proposed order to the Court by July 31, 2020.  I reserve continuing jurisdiction to resolve any disputes in settling an order and enforcing same.

   This order, which codifies my extemporaneous ruling at argument, is intended to be final.  A written decision providing a fuller statement of my findings and conclusions will follow when ready.  The Clerk is instructed to terminate the open motion (ECF No. 4).

   SO ORDERED.

Dated:  July 23, 2020      _____/s/_____
    New York, New York    ALVIN K. HELLERSTEIN
              United States District Judge

---

[1] Condition one provides:

2

A-44

```
M82YCOHC                                                        1
```

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MICHAEL D. COHEN,

 4                    Plaintiff,

 5            v.                          21 Civ. 10774 (LJL)

 6   UNITED STATES OF AMERICA, *et*
     *al.*,
 7
                     Defendants.
 8
     ------------------------------x
 9                                       New York, N.Y.
                                         August 2, 2022
10                                       4:30 p.m.

11   Before:

12                      HON. LEWIS J. LIMAN,

13                                       District Judge

14                          APPEARANCES

15   LAW OFFICE OF ANDREW C. LAUFER
     BY:  ANDREW C. LAUFER
16        -AND-
     LAW OFFICES OF JEFFREY K. LEVINE
17   BY:  JEFFREY K. LEVINE
          Attorneys for Plaintiff
18
     UNITED STATES ATTORNEY'S OFFICE, SDNY
19        Attorneys for all defendants excluding Defendant Trump
     BY:  ALLISON ROVNER
20        ALYSSA O'GALLAGHER

21   HABBA MADAIO & ASSOCIATES LLP
          Attorneys for Defendant Trump
22   BY:  ALINA HABBA
          MICHAEL T. MADAIO
23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

M82YCOHC                                                          2

1           (Case called)

2           THE DEPUTY CLERK:  Starting with counsel for

3    plaintiff, please state your appearance for the record.

4           MR. LAUFER:  Andrew Laufer for the plaintiff, Michael

5    Cohen.  Good afternoon, your Honor.

6           THE COURT:  Good afternoon, Mr. Laufer.

7           MR. LEVINE:  Good afternoon, your Honor.  My name is

8    Jeffrey Levine, also for Michael Cohen.

9           THE COURT:  Good afternoon, Mr. Cohen.

10          MS. ROVER:  Allison Rovner for all defendants except

11   for the former president.

12          MS. O'GALLAGHER:  AUSA Alyssa O'Gallagher for all of

13   the defendants except the former president.

14          MS. HABBA:  Good afternoon, your Honor.  Alina Habba

15   for former President Donald Trump.

16          THE COURT:  Good afternoon, Ms. Habba.

17          MR. MADAIO:  Good afternoon, your Honor.  Michael

18   Madaio for former President Donald Trump.

19          THE COURT:  I'll hear first from the defendants in

20   support of the motion, first from the attorneys for the

21   government and then for the attorneys for Mr. Trump.  And then

22   I will hear from the plaintiffs.  And then, if the government

23   wants a little bit of time for rebuttal at the end, I'll hear

24   from the government.

25          I understand, Ms. Rovner, that you and your colleague

1   wish to split your time.

2            Is my recollection correct?

3            MS. ROVNER:  Yes, your Honor.  If acceptable to the

4   Court, I will first address the FTCA, and then my colleague

5   will address *Bivens*.

6            THE COURT:  That's acceptable to the Court.  You each

7   may address the Court from the podium and take your mask off.

8   I think that will be easier for the court reporter and easier

9   for me.

10            Before we get started, let me mention two things:

11   First of all, I would ask each counsel to try to speak slowly.

12   I will give you sufficient time to argue this case.  I don't

13   have anything scheduled for later today, and it will be easier

14   for me and for the court reporter if you do speak slowly.

15            The second is that I'm going to ask the defendants to

16   stick around afterwards and to pay for the cost of the

17   transcript on an expedited basis with the government and the

18   attorneys for Mr. Trump splitting that cost on a 50/50 basis.

19            Ms. Rovner, I'll hear from you first.

20            MS. ROVNER:  Okay.  For argument or whether

21   your Honor's request is okay?

22            THE COURT:  For argument.  There's no question with

23   respect to ordering the transcript.  That's a directive.

24   You're going to order a copy of the transcript, and you're

25   going to try to speak slowly.

M82YCOHC                                                          4

1              MS. ROVNER:  Okay.

2              MS. HABBA:  Your Honor, before we do start, if I may,

3    I just want to state that I will be handling argument for the

4    former president, but I do have my co-counsel here as well who

5    is well-versed.  So I would just ask for permission, if there

6    is something he wants to add, that he have time to speak.

7              THE COURT:  So what is he going to address that you're

8    not going to address?  Because I generally don't like to

9    have --

10             MS. HABBA:  Okay.  I have it then.

11             THE COURT:  All right.  Ms. Habba, you will be the

12   sole attorney speaking for Mr. Trump.

13             MS. HABBA:  No problem.

14             MS. ROVNER:  May it please the Court.  The Court

15   should dismiss Mr. Cohen's FTCA claims.  First, the Court

16   should dismiss Mr. Cohen's claim for First Amendment

17   retaliation.

18             This is because a claim for a constitutional violation

19   cannot be brought under the FTCA.  The FTCA waives sovereign

20   immunity for a claim for money damages under circumstances in

21   which the United States -- if a private individual would be

22   liable in accordance with the law of the place where the act or

23   omission occurred.

24             The Supreme Court --

25             THE COURT:  Slow down, Ms. Rovner.

1          MS. ROVNER:  The Supreme Court in *FDIC v. Meyer* stated

2     that "Law of the place means law of the state."  And the Court

3     also stated that because federal law provides the source of

4     liability for a violation of constitutional rights, a

5     constitutional claim cannot be brought under the FTCA.

6          In *Hernandez v. United States*, the Second Circuit also

7     stated that the FTCA does not waive sovereign immunity for

8     claims against government officials for constitutional torts.

9          Mr. Cohen does nothing to address this controlling

10     precedent.  He also does not cite any case in any jurisdiction

11     supporting that a claim for a constitutional tort can be

12     brought under the FTCA.  For this reason, the Court should

13     dismiss Mr. Cohen's claim for First Amendment retaliation.

14          Second, the Court should dismiss Mr. Cohen's claims

15     for false arrest, false imprisonment, abuse of process, and

16     related emotional distress claims.  With respect to Mr. Cohen's

17     claim for false arrest and imprisonment, Mr. Cohen has not

18     alleged that his arrest and imprisonment are not otherwise

19     privileged.

20          Arrest and imprisonment are otherwise privileged if

21     proper under the law, meaning that it is a lawful arrest

22     supported by probable cause.  A claim --

23          THE COURT:  Don't you end up with this argument

24     basically saying to Mr. Cohen, damned if you do and damned if

25     you don't?  He can't pursue the false imprisonment or false

1   arrest claims because they were pursuant to process, but he

2   can't pursue an abuse of process claim because the wrong that

3   he's complaining of was not in the obtaining of process but was

4   in the execution of process.

5           Isn't that kind of a perverse outcome?

6           MS. ROVNER:  Well, I mean, both sets of claims, the

7   false arrest and false imprisonment and abuse of process, he

8   can't essentially bring either of those because he was within

9   the custody of BOP already pursuant to the sentence that

10  Judge Pauley entered.

11          THE COURT:  Pursuant to process presumably.  Correct?

12  The sentence is the process.

13          MS. ROVNER:  That was the process.  The sentence that

14  Judge Pauley entered, the criminal sentence, back in

15  December 2018.  And that sentence was to run from May 2019

16  until November 2021.

17          So in July 2020, when Mr. Cohen was on furlough and

18  the events alleged in the complaint occurred, Mr. Cohen was

19  already lawfully arrested and imprisoned pursuant to

20  Judge Pauley's criminal sentence.

21          And under regulation during that time period, that

22  means he was within the custody of the attorney general in

23  service of a term of imprisonment, and that's the furlough

24  regulation referenced in the moving defendant's brief.

25          And although Mr. Cohen was not yet on home

M82YCOHC                                                    7

1   confinement, he had not yet been placed on home confinement, if

2   he was on home confinement, he would also be in the custody of

3   the Bureau of Prisons pursuant to statute.

4          And Mr. Cohen's only response to that with respect to

5   the false arrest and false imprisonment claims is that home

6   confinement, he argues, is not official custody.

7          THE COURT:  No.  I understand that.  He relies upon

8   the Bail Reform Act.  And your position is that those cases are

9   distinguishable because when somebody is released on pretrial

10  release, they're not in the custody of the Bureau of Prisons by

11  definition.

12         Am I understanding the position correctly?

13         MS. ROVNER:  That's correct.  I would go even further

14  to say that the only controlling case that Mr. Cohen cites,

15  *Reno v. Koray*, the Supreme Court case.  In that case, the

16  Supreme Court made the distinction between the individuals who

17  a judge released on bail to a community treatment center prior

18  to trial or sentencing and sentenced individuals who BOP

19  transferred to community treatment center.

20         The ones that the judge, prior to trial or sentencing

21  release, could not receive credit for time served; while those

22  in BOP's custody, after sentencing transferred to community

23  treatment center, could receive credit for time served.  And

24  the Court stated that the critical distinction was this latter

25  group of sentenced individuals were completely within BOP's

M82YCOHC                                                              8

1  custody and control.

2          So *Koray*, the Supreme Court case that Mr. Cohen cites

3  in his brief, actually supports the government's position.

4          THE COURT:  Okay.  Now can you address the abuse of

5  process claim.

6          MS. ROVNER:  Yes, your Honor.  The abuse of process

7  claim, Mr. Cohen has failed to state an abuse of process claim

8  because there was no legal process involved in BOP's decision

9  to remand him to FCI Otisville.  And once again --

10         THE COURT:  Because the process was the process that

11 had been obtained previously by the conviction in

12 Judge Pauley's sentence.

13         MS. ROVNER:  Yes.  That's correct, your Honor.  So

14 that was the process, and then BOP was exercising its sole

15 discretion over Mr. Cohen's place of confinement when it

16 decided to remand him to FCI Otisville.

17         THE COURT:  But if you were to take those words,

18 "abuse of process," literally, isn't what happened here exactly

19 abuse of process?

20         That is, if I take the allegations of the complaint as

21 true, the Bureau of Prisons and Mr. Trump abused the process

22 that was in place and abused it to achieve political purposes

23 and to retaliate against First Amendment speech.  It abused

24 process.

25         MS. ROVNER:  The allegations in Mr. Cohen's complaint

1   have to be taken as true, that he is alleging retaliation and

2   that BOP, he's alleging, did something it shouldn't have done.

3   But from a legal standpoint, we have to look at whether

4   Mr. Cohen can state a claim as a matter of law.

5           THE COURT:  No.  I understand that.  But taking those

6   allegations, don't the allegations support that the defendants

7   in this case abused process that was in place?

8           And isn't that enough to constitute an abuse of

9   process claim?

10          MS. ROVNER:  It is not enough to constitute an abuse

11  of process claim because all the case law I've seen says that

12  it needs to be abuse of a legal process.  And Mr. Cohen did not

13  cite any cases.  And in my own research, I did not see any

14  cases that are even analogous in supporting that the

15  allegations that he alleged in his complaint constitute abuse

16  of process as that claim is understood under New York law.

17          THE COURT:  Okay.  Continue.

18          MS. ROVNER:  And Mr. Cohen, he does reference –- he

19  attaches to his opposition a BOP remand document, and that's a

20  document from BOP to the United States Marshal Service asking

21  to remand Mr. Cohen from his furlough back into secured

22  custody.

23          And, again, it said that he was a sentenced federal

24  prisoner, and he was not being rearrested or reimprisoned.  He

25  was being remanded.  It was an internal government document

M82YCOHC                                                    10

1   remanding him back into secure custody from the furlough

2   custody that he was already in.

3          So under similar circumstances, I don't think there is

4   case law supporting that the allegations Mr. Cohen has stated

5   support an abuse of process claim under the law.

6          THE COURT:  Okay.

7          MS. ROVNER:  And then quickly with respect to the

8   emotional distress claims, Mr. Cohen does not even address the

9   government's argument that he has not stated cognizable claims

10  for intentional infliction of emotional distress or negligent

11  infliction of emotional distress.  So the Court should dismiss

12  those claims.

13         And then, even if the Court were to reject the

14  arguments that I've just made regarding false arrest, false

15  imprisonment, abuse of process, or emotional distress, those

16  claims should also be dismissed because of a lack of a private

17  analogue because there's no private analogue here, as necessary

18  for waiver of sovereign immunity, under the FTCA.

19         This is because a private person would not be held

20  responsible for similar alleged conduct under the law of the

21  state where the actor of the emotion occurred because a private

22  person would not transfer individuals between different places

23  of confinement.

24         And there is a Second Circuit case that's very on

25  point on this issue, *McGowan v. United States*.  In that case,

M82YCOHC                                                        11

1    under similar circumstances, the Second Circuit held that there

2    was no private analogue where an individual alleged that he was

3    transferred from a halfway house back to prison in violation of

4    his First Amendment rights.

5          He had alleged he was retaliated against for

6    publishing an article with his byline.  So *McGowan v.*

7    *United States* is very strong authority supporting the

8    government's argument that these claims should be dismissed due

9    to a lack of private analogue.

10         THE COURT:  Okay.  Thank you.

11         MS. ROVNER:  And then finally, the discretionary

12   function exception to the FTCA bars Mr. Cohen's claims for

13   failure to protect, negligent infliction of emotional distress,

14   and negligent hiring retention training and supervision.

15         THE COURT:  Let me ask you about that.  The claim with

16   respect to failure to protect has to do with his confinement in

17   a cell by himself where the heat went to 100 degrees or over

18   100 degrees with some serious health impacts for him.

19         Why do you say that that falls within the

20   discretionary function exception?

21         MS. ROVNER:  First of all, because BOP's decisions

22   regarding prison management and operations involved elements of

23   judgment not compelled by statute or regulations.  The statutes

24   and regulations cited in moving defendant's brief contain very

25   broad language about the housing, placement, treatment,

M82YCOHC                                                          12

1    classification of prisoners.

2            THE COURT:  What if they permitted the heat to go up

3    to 120 degrees?  Would you say that that fell within a

4    discretionary function exception?

5            MS. ROVNER:  Well, the discretionary function

6    exception doesn't look so much at the actual conduct.  It looks

7    at whether the overall choices and decisions that the

8    government is making are discretionary.

9            THE COURT:  Right.  But if you look at it the way

10   Judge Leval did for the Second Circuit, he drew a distinction

11   between the same actions could both fall within the

12   discretionary function exemption or not fall within the

13   discretionary function exemption, depending upon whether there

14   was some sort of a policy reason for the action.

15           Why isn't it appropriate to read the complaint here to

16   assume that this was just a case of pure negligence with no

17   policy reason behind it whatsoever?

18           MS. ROVNER:  I think in areas of prison management and

19   operations, most courts have held that those are areas that

20   involve policy, the second factor that involve policy

21   considerations, and are susceptible to policy analysis.

22           Prison management operations quintessentially involve

23   considerations of public policy because of the need to preserve

24   discipline and order and maintain institutional security.

25           THE COURT:  Are you saying just as a blanket matter,

M82YCOHC                                                          13

1   nobody could ever have an FTCA claim based upon being put in a

2   cell that went up to 130 degrees let's call it?

3          I mean, what's your limiting principle?

4          MS. ROVNER:  Again, I don't think it's looking at the

5   alleged conduct.  I think most of the law --

6          THE COURT:  Yes, but the conduct does bear a little

7   bit upon whether one can infer that there is some kind of

8   discretionary decision being made.

9          MS. ROVNER:  I mean, I think in the circumstance of

10  100 degrees or 130 degrees, I mean, first of all, I think the

11  allegations are a bit vague.  I think he talked about whether

12  his cell was well-ventilated, and he does say that the

13  temperatures rose in excess of 100 degrees.

14         But I think, if you look at the regulations

15  involving -- like, for example, 28 C.F.R. 541.31 discusses that

16  a cell should be well-ventilated, adequately lighted,

17  appropriately heated, and maintained in a sanitary condition.

18  And this leaves prison officials with the discretion, since it

19  doesn't specify, for example, how many degrees or what range a

20  cell must be within.

21         THE COURT:  Don't people who work for the Postal

22  Service and drive postal cars also have discretion in terms of

23  how fast they drive the car and how they drive it on the

24  highway?

25         MS. ROVNER:  Well, I mean, I think the law is there

M82YCOHC                                                          14

1   that specifies speed limits.  So I think that would be

2   mandatory.

3           THE COURT:  So your difference between the reason why

4   your argument doesn't cut out every postal case is because in

5   those cases, the driver is always violating the law.  They're

6   not being negligent.  They're just violating the law.

7           MS. ROVNER:  Yes.  And with the discretion function

8   exception, there are two factors that come into play.  One is

9   whether it involves an element of detriment or choice or is

10  compelled by statute or regulation.  That's the first factor.

11  And in your Honor's example, I would think the speed limit is

12  something that's mandatory.

13          THE COURT:  Right.  But under your argument, there

14  could never be negligence in the absence of a violation of a

15  traffic law.

16          MS. ROVNER:  In the absence?  Well, it depends on what

17  we're talking about.  If we're going back to Mr. Cohen's

18  case --

19          THE COURT:  I'm just trying to understand how you read

20  the discretionary function exemption.

21          MS. ROVNER:  Well, I wouldn't agree that there could

22  never be negligence in violation of a traffic law.  I mean, if

23  we're talking about the speeding example --

24          THE COURT:  You know, the law that he's invoking is

25  the law that's invoked all the time here by people who are

M82YCOHC                                                    15

1    injured by government employees acting negligently.

2            You seem to be making an argument that in the

3    management of a prison, we're talking about prisoners as being

4    sort of the sole U.S. citizens who don't get the protection of

5    the FTCA, and I'm not sure I understand the argument.

6            MS. ROVNER:  I mean, if there are mandatory

7    regulations, then the discretionary function exception would

8    not bar the conduct.

9            THE COURT:  Okay.  I'll look more closely at this.

10           MS. ROVNER:  Okay.  And I would also point out that

11   Mr. Cohen, his only argument in response to the discretionary

12   function exception, is that it does not apply to constitutional

13   violations.

14           He doesn't address the government's assertion of the

15   discretionary function exception with respect to negligent

16   conduct, which is the only conduct with respect to which the

17   government's asserting the discretionary function exception.

18           THE COURT:  As I recall, *Colbertson* involved the

19   prison gym.  And the problem was that the weight system fell

20   down on the prisoner.  Right?

21           Is that what the *Colbertson* case was?  That is what

22   the *Colbertson* case is.  Just trust me on that one.

23           So are you saying the reason why the Second Circuit

24   reversed in that case and sent it back to the district court

25   was because the guards violated a rule?  I'll look back at it.

M82YCOHC                                                        16

1          MS. ROVNER:  I'm sorry.

2          THE COURT:  I'll look back at it.

3          All right.  Let me hear from your colleague on *Bivens*.

4          MS. O'GALLAGHER:  Thank you, your Honor.  May it

5    please the Court.

6          The Court should also dismiss Mr. Cohen's *Bivens*

7    claims for violations of the First, Fourth, and Eighth

8    Amendments for two reasons:  First, a *Bivens* remedy does not

9    exist for any of the alleged constitutional violations.  And

10   second, even if the Court were to determine that a *Bivens*

11   remedy does exist, the individual moving defendants would be

12   entitled to qualified immunity.

13         To take Cohen's First Amendment *Bivens* claim first,

14   the Supreme Court's recent decision in *Egbert v. Boule*

15   unequivocally foreclosures Mr. Cohen's First Amendment *Bivens*

16   claim.

17         In that case, the Supreme Court held:  "There is no

18   *Bivens* action for First Amendment retaliation."  And for that

19   reason, the Court should dismiss Mr. Cohen's First Amendment

20   *Bivens* claim.

21         With respect to Mr. Cohen's Fourth and Eighth

22   Amendment *Bivens* claims, recent Supreme Court precedent also

23   foreclosures any *Bivens* relief.  The Supreme Court has stated

24   on several occasions that expanding the *Bivens* remedy is "a

25   disfavored judicial activity."

M82YCOHC                                                        17

1          The Supreme Court has so stated in recognition of the

2     very important separation of powers concerns that come into

3     play when a Court implies a damages remedy.  Creating a cause

4     of action is an essentially legislative endeavor and one that

5     Congress is far better suited than courts to undertake.

6          THE COURT:  Let me press you on that one.  I've read

7     the Supreme Court opinions the same as you have, and I've also

8     paid attention to who's being sued in those cases and the

9     underlying facts.

10         This case is different from those cases in that if you

11    were to credit the allegations, there was an effort led by the

12    then person holding the office of the presidency of the

13    United States to squash the political commentary of somebody

14    who was threatening his reelection efforts.  None of those

15    cases involved somebody who is at the head of Article II.

16         Correct?

17         MS. O'GALLAGHER:  As far as I'm aware -- and I take

18    your Honor's word for it.  I think the most important question

19    and the animating question that the Court should be considering

20    is who should decide whether or not there should be a damages

21    remedy.

22         THE COURT:  Right.  And if you're thinking about that

23    question and you're thinking about constitutional structure,

24    you've got two branches of government that constitute elected

25    officials and sometimes elected officials who are elected by

1   members of the same party and who have an interest, one would

2   assume, in maintaining power, if they are members of the same

3   party.

4          Wouldn't you, if you thought about things from a

5   regional principal's perspective, think that the one branch of

6   government that would be necessary to protect democracy would

7   be those folks in black robes who enjoy life tenure and, once

8   they get this job, are not beholden to any political party?

9          Isn't that what the logic of our constitutional

10  structure suggests?

11         MS. O'GALLAGHER:  Yes.  I understand your Honor's

12  point, and I would argue that the folks in the black robes that

13  you're referencing have already provided Mr. Cohen with a

14  remedy in this case.  And a very important consideration that

15  courts should look to in deciding whether to apply a damages

16  remedy is whether there are alternative remedial structures

17  available.

18         In this case, there are at least two.  In fact,

19  Mr. Cohen successfully availed himself of one of those

20  alternative remedial structures, which is he filed a habeas

21  action in this court, and he was ultimately granted transfer

22  from furlough -- excuse me -- from FCI Otisville to home

23  confinement.

24         So in that instance, there is the availability --

25  there was the availability -- of an alternative remedial

M82YCOHC                                                      19

1   structure that involved the Article III courts, and Mr. Cohen's

2   interest was vindicated through that habeas action.

3          The question that we're considering here is whether

4   Mr. Cohen is also entitled to a damages remedy.  And I think

5   that the Supreme Court has been pretty unequivocal in stating

6   that if there's even a single reason for courts to defer to

7   Congress on that question, that the courts should not apply a

8   *Bivens* remedy.

9          And in the most recent Supreme Court case in *Egbert v.*

10  *Boule*, the Supreme Court urged courts not to look at too low a

11  level of granularity when considering that question.  And I

12  think if the Court looks at this case, there are several sound

13  reasons for the Court to defer to Congress and not imply a

14  *Bivens* remedy here.

15         Those reasons include the fact, as I mentioned, there

16  were multiple alternative remedial structures available to

17  Mr. Cohen.  In addition to the habeas action, he could also

18  have filed a grievance through the BOP's administrative remedy

19  program.

20         And that program, courts in this district, in this

21  Circuit, and outside, have recognized that that's an

22  alternative remedial structure that can preclude *Bivens* relief.

23         As I mentioned, in the Supreme Court's *Egbert v. Boule*

24  case, the Supreme Court made very clear that the existence of

25  alternative remedial structures alone is a sufficient reason to

1   decline to apply *Bivens* relief.

2          And there are other special factors here, so-called

3   "special factors" that counsel hesitation in the absence of

4   affirmative action by Congress.  Congress has extensively

5   legislated in the arena of prison administration, most recently

6   in the PLRA.

7          In the PLRA, Congress did not provide for a standalone

8   damages remedy against federal jailers.  Congress has never

9   provided for a standalone remedy against federal jailers.  And

10  several courts have found, in that silence, an indication that

11  the court should stay its hand and decline itself to apply a

12  damages remedy where Congress has not seen fit to do so.

13         In the PLRA, Congress also included an administrative

14  exhaustion requirement.  And the inclusion of that

15  administrative process evinces Congress' general preference for

16  the resolution of inmate grievances to take place through the

17  administrative process, not through the courts implying damages

18  remedies.

19         THE COURT:  That administrative process that you say

20  is available, was available to Mr. Cohen, would not have

21  provided any damages.  Correct?

22         So we're not talking about the question of whether a

23  federal court could provide damages.  If I accept your

24  argument, nobody -- no administrative agency, no state court,

25  no federal court -- there would be no organ of government that

1    would provide relief to Mr. Cohen for the 16 days that he spent

2    in solitary confinement because of his political speech.

3         MS. O'GALLAGHER:  I believe that's correct, your

4    Honor, though the Supreme Court has made it clear on several

5    occasions that where, as here, there are alternative remedial

6    structures available, the Court shouldn't imply a *Bivens*

7    remedy.

8         And it has made very clear that the remedy that's

9    available through alternative remedial structures need not

10   provide complete relief.  Complete relief could, perhaps, be

11   damages in certain cases.

12        But the alternative remedial structure that is

13   sufficient for a court to decline to imply **a** *Bivens* remedy need

14   not provide such complete relief.  It simply needs to provide

15   enough deterrence.  And the Court should in fact defer to

16   Congress' estimation of what the appropriate amount of

17   deterrence is where there are alternative remedial structures.

18        THE COURT:  I understand the argument that Congress is

19   particularly well-suited to understanding the value of

20   deterrence versus the chilling impact that a damages remedy can

21   have.

22        When you're talking about low-level or even mid-level

23   members of an administration or the executive branch, it's hard

24   for me to understand why you would think or the Court would

25   think that Congress is more competent than the judiciary in

M82YCOHC                                                                22

1    balancing those factors when it comes to a remedy against the

2    president of the United States.

3              MS. O'GALLAGHER:  I think I understand your Honor's

4    point.  And my response would be the same response I offered

5    previously, which is the Article III courts have already

6    provided an adequate measure of deterrence via Mr. Cohen's

7    habeas action.

8              And that was a habeas action pursuant to federal

9    statute, which was Congress' own estimation of what the

10   appropriate level of deterrence would be where there is the

11   availability of that alternative remedial structure.

12             And Mr. Cohen has already successfully availed himself

13   of filing a habeas action and having his habeas petition

14   granted and receiving transfer from FCI Otisville to home

15   confinement.

16             THE COURT:  Your point essentially is this is what the

17   Supreme Court has said.  And, Judge, that's what the

18   Supreme Court said.  Whether it is the way in which things

19   might be designed appropriately, considering constitutional

20   structure, the Supreme Court is the leading court in this

21   country.

22             MS. O'GALLAGHER:  Yes.  I think that is essentially my

23   argument, that this Court is bound by recent Supreme Court

24   precedent, which has made clear that only in the most unusual

25   of circumstances should a court find a *Bivens* remedy available.

1    And the Supreme Court has declined to do so in the last 40

2    years since the most recent case in which it applied a *Bivens*

3    remedy.

4          THE COURT:  I think I've got your argument.  You can

5    go on more if you want.  I think I understand the argument.

6          MS. O'GALLAGHER:  Thank you, your Honor.

7          I would just finish with in the event that the Court

8    does find that a *Bivens* remedy is available here to Mr. Cohen,

9    the individual moving defendants would still be entitled to

10   qualified immunity.

11         Mr. Cohen does not dispute in his papers that the

12   individual moving defendants are entitled to qualified immunity

13   with respect to his Fourth and Eighth Amendment claims.  He

14   limits his argument to his First Amendment claim.  And as I

15   mentioned earlier in my argument, pursuant to *Egbert v. Boule*,

16   there is no First Amendment retaliation claim under *Bivens*.

17         With that, I would rest on the papers with respect to

18   my other arguments and ask the Court to dismiss Mr. Cohen's

19   complaint in full with respect to the moving defendants that

20   the government represents.

21         THE COURT:  I have your argument.  Thank you.

22         MS. O'GALLAGHER:  Thank you, your Honor.

23         THE COURT:  Let me hear from Ms. Habba.

24         MS. HABBA:  Good afternoon, your Honor, or early

25   evening I should say.

M82YCOHC                                                              24

1          THE COURT:  It's still afternoon.  The sun is still

2     shining.

3          MS. HABBA:  The sun is still shining.

4          May it please the Court, your Honor.  I represent

5     Donald J. Trump.  As it relates to my client, Donald Trump, the

6     complaint is improperly pled and defective on its face, and for

7     numerous reasons I'll discuss, it must be dismissed for my

8     client outright from this action.

9          The gravamen of plaintiff's complaint against my

10    client is that he issued specific directives and guidance to

11    his codefendants concerning the handling of plaintiff's

12    incarceration and potential furlough.

13         The codefendants referred to are represented by the

14    Department of Justice are all former and current employees of

15    the Department of Justice and the Federal Bureau of Prisons,

16    both of which are part of the executive branch.

17         As the head of the executive branch, issuing

18    directives to his subordinates, particularly those regarding

19    the day-to-day operations of a federal agency, would clearly be

20    within the scope of his official duties.

21         The single cause of action which the plaintiff asserts

22    against my client which is a *Bivens* claim is wholly barred by

23    the doctrine of presidential immunity.  And while my co-counsel

24    and my colleague here argued *Bivens*, it's different for a

25    president because they have presidential immunity which is

M82YCOHC                                                      25

1   automatically --

2          THE COURT:  Let me try to understand the limiting

3   principle of your argument.  I understand this case may be a

4   little bit different in that Mr. Cohen was, at the time he was

5   put back in prison, still subject to a criminal justice

6   sentence that had not yet run.

7          But let's change the facts a little bit.  Let's assume

8   that he had not been convicted.  He was just a citizen walking

9   on the street.  And let's assume that your client ordered

10  somebody he had hired into the executive office of the

11  presidency to kidnap Mr. Cohen and just keep him silent for two

12  weeks.  I think we've seen that picture play out in other

13  countries.

14         Is it your position that the president has the

15  absolute immunity to do that in this country?

16         MS. HABBA:  Absolutely not, your Honor.  My position

17  is that when he's acting in his official rights, within his

18  official acts under the scope of his official duties, he can do

19  so and he would, frankly, in this situation that's

20  distinguishable from what you're saying because he was

21  imprisoned and it was part of the executive branch's ability to

22  decide.

23         THE COURT:  So, just to come up with the limiting

24  principles, he could not have ordered his valet, let's call it,

25  to kidnap Mr. Cohen.  That would not be covered by the doctrine

M82YCOHC                                                    26

1    of presidential immunity.

2            MS. HABBA:  Your Honor, I think that's what *Nixon v.*

3    *Fitzgerald* is on point discussing here.

4            THE COURT:  Just tell me what you think the answer is

5    to that question.

6            Could he order his valet, in the two weeks leading up

7    to a presidential election, to kidnap a political opponent?

8            MS. HABBA:  No.

9            THE COURT:  Okay.  What about the Secret Service?

10   Could he order the Secret Service, in the two weeks leading up

11   to a political election, to kidnap his political opponent?

12           MS. HABBA:  No.

13           THE COURT:  So where do you draw the difference?

14           What falls within the president's powers and what

15   doesn't for the purposes of presidential immunity?

16           MS. HABBA:  I think that the courts are really clear

17   that the conduct of the president has to be under the color of

18   law.  Here, the executive branch is in charge of -- and I have

19   to say for the record, your Honor -- I haven't gotten to it,

20   but obviously we have press in the room.

21           My client vehemently denies the allegations that

22   Mr. Cohen has brought in this complaint which are frankly

23   baseless.  He has no proof of the same, and he just claims that

24   he believes the president has ordered this treatment by other

25   members.  So I must state that for the record.

M82YCOHC                                                      27

1          THE COURT:  Okay.  You've made your statement for the

2   press.

3          MS. HABBA:  I had to state that.

4          THE COURT:  I have to take the complaint and

5   allegations as pled.  So speak to me.

6          MS. HABBA:  Sure.  I think, your Honor, at all

7   relevant times, Donald Trump was the president here.  And the

8   First Amendment claims, as my colleague mentioned, in *Egbert*,

9   were -- *Bivens* doesn't apply.

10          And it's very simple.  He has one count against the

11   president here.  The count he has against the president is a

12   *Bivens* claim for the First, the Fourth, and the Eighth

13   Amendment violations that he claims happened as a result of

14   something the president did.

15          THE COURT:  Okay.  But let's get back to your doctrine

16   of presidential immunity because you argue that is an

17   independent basis in this case.  And you've told me that it

18   would not be covered by presidential immunity if the president

19   ordered the Secret Service to kidnap Mr. Cohen.

20          MS. HABBA:  Yes.

21          THE COURT:  He would not have immunity in that case.

22          MS. HABBA:  No, because that's not under his authority

23   as the president of the United States.

24          THE COURT:  And let's say he told the Secret Service,

25   this guy presents -- actually, why isn't that within his

M82YCOHC                                                        28

1   authority under your argument?

2          Doesn't the Secret Service have some power to protect

3   the president?

4          MS. HABBA:  Actually, the Secret Service reports to

5   the government, and they have their own discretion and their

6   own policies.  But, no.  The president cannot order crimes that

7   are not within the purview of his role as president.

8          THE COURT:  So how is it within his purview to issue

9   an order to the folks who are administering the

10  Bureau of Prisons to incarcerate Mr. Cohen to silence him?

11         MS. HABBA:  First of all, the president didn't do

12  that.  But if your argument was what if he did, I would say

13  that the claim on this complaint of *Bivens* fails, also they're

14  covered under absolute immunity.  The public policy, your

15  Honor, is that as long as --

16         THE COURT:  What's the difference between the two

17  hypotheticals?  The one where he orders the Secret Service to

18  pick up the guy off of the street and the one where he just

19  jumps ahead of everybody else and orders the folks at the

20  Bureau of Prisons to put him back in?

21         MS. HABBA:  Both of them are under the executive

22  branch.  What you're saying is to take a person off of the

23  street who is not under the control -- Mr. Cohen, let's

24  remember, had committed crimes.  We're forgetting that.  He

25  committed crimes.  He was under the authority of the

1    government.  They were making decisions, the Bureau of Prisons.

2            THE COURT:  You're quarreling now with both the

3    hypothetical and with the allegations of the complaint.

4            MS. HABBA:  Not really, your Honor.  I think we're

5    forgetting that Mr. Cohen wasn't put in prison because he

6    didn't do anything.

7            THE COURT:  No.  But the fact that he was put in

8    prison, I don't understand how that ties into your presidential

9    immunity argument.  So what you're saying is that the limits of

10   presidential immunity are that you can do it to somebody who's

11   imprisoned but you can't do it to a citizen on the street.

12           MS. HABBA:  I think the president's argument of

13   absolute immunity, regardless of who the person is, for a very

14   important public policy reason, which has been brought into

15   every case, which is that presidents have to be able to do

16   their job without sitting here in court incurring legal fees.

17   That does not mean that they have the right to go willy-nilly

18   and commit crimes.

19           In fact, your Honor is aware of in court and other

20   issues that have to do with other claims against a president,

21   and those are right now on appeal.  I think that speaking in

22   hypotheticals, your Honor, quite honestly is irrelevant here.

23   This is a very clean-cut case where absolute immunity does

24   apply.

25           THE COURT:  Well, hypotheticals actually are very

1   helpful in teasing out legal rules and understanding the limits

2   of argument.  That's the reason why I'm asking these questions.

3          As I understand your argument, it is even if the

4   Congress of the United States said that we're going to provide

5   for a damages remedy against anybody who retaliates against a

6   political opponent in the one week before the election, your

7   client alone, among everybody else in the United States, your

8   client would be immune from that damages remedy.  Congress

9   couldn't do a damn thing about it.  That's your argument.

10         MS. HABBA:  He's part of the executive branch.  And as

11  president of the United States, they are granted privileges

12  that other people do not have, your Honor.

13         THE COURT:  Right.  And that's the reason why I'm

14  asking about the extent of your argument, because the extent of

15  your argument is really not about the power of the courts.

16  You're really talking about the power of Congress.

17         So where does that power of Congress end?  You've said

18  to me Congress can provide a damages remedy if the president

19  ordered the Secret Service to pick up somebody off the street.

20         But why not if the president ordered somebody from the

21  Bureau of Prisons to take a person who was on home detention,

22  no violations, on home detention, and just yank him out of the

23  home and put him in?

24         Why can't Congress do that?  Why can't Congress

25  provide a remedy for that?

A-74

M82YCOHC                                                             31

1          MS. HABBA:  I think that there's already been a method

2   to expand *Bivens*, which is what you would be implying.

3          THE COURT:  I'm just talking about if Congress passed

4   a statute because you're saying there's presidential immunity

5   against Congress.

6          MS. HABBA:  Well, he's part of the executive branch,

7   and our founding fathers created different branches of

8   government for this reason.  A president has absolute immunity

9   when it comes to these things for a very good reason.

10         There has to be a person in charge, and if the

11  president sees a reason to -- we're speaking hypothetically

12  which I would like to get back to the merits of this case.

13         But if you would like me to argue for all presidents,

14  I can tell you that presidents do act within their scope.  They

15  order bombs across countries, and they have to do so without

16  the threat of someone saying that an individual was shot or

17  killed because they're the president of the United States.

18  There are certain things that come into play when you're the

19  president.

20         My client did nothing to attack Mr. Cohen, although he

21  would like to think so.  And at the end of the day, if you

22  would like to extend *Bivens* to a new context -- and First

23  Amendment is basically the crux of his argument against my

24  client, which *Egbert* completely invalidated recently, last

25  month.  The Supreme Court gave an --

M82YCOHC                                                          32

1          THE COURT:  I understand the *Bivens* argument.  I

2    understand *Egbert*.  But you're asking me to say, even if

3    there's a *Bivens* remedy, I should dismiss your client from the

4    case, leave everybody else in the case but dismiss your client.

5          MS. HABBA:  Correct, because my client has absolute

6    immunity as the president of the United States.  Correct.  And

7    if your Honor would like to expand the *Bivens* remedy, which is

8    disfavored activity as was stated in *Ziglar v. Abbasi*, then

9    there is a test to do that.  And even under that situation,

10   that's not this case.  But I'm happy to go through that, your

11   Honor, if you'd like.

12         THE COURT:  I've heard the government on *Bivens*.  If

13   you've got something to say that they didn't say, I'm happy to

14   hear from you on it.

15         MS. HABBA:  Sure.  Let me review my notes, your Honor.

16   I'll get off of *Bivens*.  But just to say on this complaint, I

17   also just believe there's just no cognizable cause of action

18   against my client.

19         Even if you were to consider this as an exception to

20   the steadfast rule of absolute immunity, plaintiff's claim

21   fails on basic level because it doesn't set forth a cognizable

22   cause of action on its face.

23         Outside of *Egbert*, which we've discussed, that only

24   leaves plaintiff's claims for Fourth and Eighth Amendment.  But

25   he fails to identify even a single act by former

M82YCOHC                                                           33

1   President Trump that could reasonably be construed as a

2   violation of plaintiff's rights under the Fourth or Eighth

3   Amendment.

4          So the entirety of plaintiff's claim is premised on

5   his vague and conclusory assertion that my client issued

6   directives to the BOP, to the DoJ.  And there are no facts of

7   that contention.  Nor does plaintiff offer a single fact in

8   support of his belief that defendant directed or guided

9   codefendants.  Notably, he fails to even articulate specific

10  directives that say that he was remanded back to prison.  He

11  just broadly asserts that fact.

12         Therefore, frankly, even viewed in the light most

13  favorable to plaintiff, there is simply no factual basis to

14  support his claim that former President Trump violated

15  plaintiff's constitutional rights.

16         For all of the reasons I have discussed, it is

17  respectfully requested that the Court grant my client's motion

18  to dismiss the complaint pursuant to (12)(b)(1) and 12(b)(6) and

19  acknowledge what has frankly been the steadfast rule, that

20  absolute immunity exists for presidents, for the decisions that

21  they make under the executive branch and that, frankly, the way

22  this was pled, if it fails under one, it fails under both.  So

23  thank you, your Honor.

24         THE COURT:  Thank you, Ms. Habba.

25         Before I hear from the plaintiff, Ms. Rovner, I

1   miscited a case to you which may have been the cause of your

2   confusion.  I meant to cite to the *Coulhurst* case.  I may have

3   said *Colbertson*.  But I meant *Coulhurst*, which you cited to me.

4   I'm not sure whether it makes a difference in terms of your

5   answer, but I wanted to correct myself.

6          MS. ROVNER:  Thank you, your Honor.  I am aware of

7   that case.

8          Would you like me to address it now?

9          THE COURT:  Certainly.  You can go to the podium.

10         MS. ROVNER:  So *Coulhurst* is the Second Circuit case I

11  believe we cited for the standard on the discretionary function

12  exception.  That case, I think the distinction it was making is

13  it depended on what the negligence was that was being asserted

14  in the complaint.

15         And your Honor was correct that it involved the

16  plaintiff being injured by equipment in the gym.  And the

17  distinction was whether the prison was careless in its

18  procedures to inspect the gym and inspect the cable.  And in

19  those circumstances, I think the court indicated the

20  discretionary function exception would apply.

21         But because the complaint could also be read to convey

22  that the person who was inspecting the gym was lazy,

23  inattentive, or careless, which I think some courts

24  interpreting *Coulhurst* -- I don't remember the exact term but

25  have called it like the lazy or inattentive actor exception or

M82YCOHC                                                                35

1    something like that.

2            So that case recognized an exception to the

3    discretionary function exception where the case could be read

4    as alleging kind of lazy, inattentive conduct that resulted in

5    negligence.

6            And I guess a vague complaint could be read many ways,

7    but I don't think Mr. Cohen's complaint is fairly read as

8    alleging a negligent or inattentive action or a lazy action by

9    the Bureau of Prisons.

10           THE COURT:  Yes.  In a way, that's what I'm struggling

11   with, just to lay it out there, because in Coulhurst, the

12   complaint also was vague, and the court recognized that and

13   said it could be read in two different ways.

14           The complaint here also is vague.  I haven't compared

15   the two complaints up against one another yet.  But I'm

16   wondering whether, if the Second Circuit thought that the

17   complaint in that case could be read to convey that there might

18   be an FTCA claim because the prison guard was careless, whether

19   the complaint here could be read in the same way and, even if I

20   were to agree with your argument on every other count, whether

21   this count would survive because it could be read that way.

22           MS. ROVNER:  I think in context, if you look at the

23   overall complaint, which is primarily alleging intentional

24   conduct, it would seem odd to infer that this was negligent

25   conduct in the sense of just being inattentive, careless, or

1   lazy.

2           The complaint, in making all of these constitutional

3   tort claims under the FTCA alleging intentional conduct and

4   alleged unlawful arrest and imprisonment and abuse of process,

5   those seem to be very intentional-type claims.  It would seem

6   somewhat illogical I think to interpret Mr. Cohen's vague

7   allegations as alleging a lazy actor by BOP when the rest of

8   the complaint is completely to the contrary.

9           THE COURT:  Okay.  Thank you.

10          MS. ROVNER:  Thank you.

11          THE COURT:  All right.  Let me hear from the

12  plaintiff.  Mr. Laufer.

13          MR. LAUFER:  Good evening, your Honor or afternoon.

14          THE COURT:  Still afternoon.

15          MR. LAUFER:  Still afternoon.

16          Your Honor, I just want to clarify a few things, I

17  guess a general comment about some of the comments that were

18  made by the defendants.  This isn't a case about absolute

19  immunity or whether or not someone is in official custody.

20  This is a case about retaliation.  The defendants retaliated

21  against my client for the lawful exercise of his First

22  Amendment rights.  There is no question about that.

23          I was wondering a number of different things watching

24  my adversaries making their statements to the Court today,

25  watching them contort themselves to avoid the elephant in the

1   room, the order of Judge Hellerstein, who has already found

2   that my client's remand back to FCI Otisville was indeed

3   retaliatory and in violation of his First Amendment rights.

4            THE COURT:  But at this stage, maybe that has some

5   significance in terms of whether you've got a well-pleaded

6   complaint, in other words, whether you've pled facts.  It

7   doesn't necessarily establish that the facts that you've pled

8   lead to a violation of law that I can address.

9            MR. LAUFER:  Well, in terms of I think your Honor

10  might be inferring the decision in *Egbert* and *Abbasi*.  Those

11  cases are completely different and distinguishable from this

12  one.  We're talking about the unlawful incarceration of my

13  client.

14           *Egbert* had to do with an individual who owned an

15  establishment called Smuggler's Inn, and it was a known hotbed

16  of criminal activity, drug smuggling and people illegally

17  crossing the border between America and Canada since this inn

18  was right on the border.

19           That is completely different than here.  My client was

20  placed back in FCI Otisville because of his First Amendment,

21  because of the statements he was making public.  He was

22  punished.  It was an abuse of power by the defendants.

23           THE COURT:  But all First Amendment retaliation claims

24  you could say are abuses of power.  When the warden puts

25  somebody in segregated housing because the prisoner has spoken

M82YCOHC                                                          38

1   out against the warden, that's an abuse of power of an

2   egregious, gross type.

3           MR. LAUFER:  Yes.

4           THE COURT:  I don't know that *Egbert* would permit a

5   *Bivens* claim under those circumstances.  That seems to be

6   squarely what the Supreme Court was talking about when it said

7   there's no *Bivens* claim for First Amendment retaliation.

8           MR. LAUFER:  Well, I think it was a little bit more

9   nuanced in *Egbert*, your Honor.  In *Egbert*, they said -- they

10  didn't outlaw expanding *Bivens* in *Egbert* or the First Amendment

11  either.  They said it's a "disfavored activity" and that the

12  court has to go through the analysis which your Honor is aware

13  of.

14          If this is not a call for an expansion of *Bivens* into

15  the First Amendment realm, I don't know what possibly could be.

16  This was a retaliatory act by the president of the

17  United States, then president of the United States, and members

18  of his administration against my client for the lawful exercise

19  of his rights.

20          He was put in jail, in solitary confinement, for 16

21  days because of it.  And only after his attorneys did a habeas

22  petition was he then released.  If you read Judge Hellerstein's

23  opinion, he's never seen anything like this before in all the

24  years he's been on the bench.  This was the ultimate abuse of

25  power.  It needs to be addressed.

1              THE COURT:  Assume that I would agree with you.

2              How do I draw a limiting principle so that your

3    argument doesn't mean that every prisoner who complains that a

4    correction officer is retaliating against him or her or every

5    warden isn't the subject of a *Bivens* lawsuit?

6              It may be that that would be a good thing.  But it

7    would be -- I think you would agree it would be an expansion of

8    the *Bivens* remedy, which the Supreme Court has held is a

9    disfavored judicial activity.

10             MR. LAUFER:  Yes, your Honor.  I agree.  I think if

11   the Court were to do something like this, it would have to be

12   narrowly tailored for some specific situation.  What we don't

13   generally have in these other types of cases -- which I agree,

14   your Honor.  I think there should be a *Bivens* First

15   Amendment -- for retaliatory transfer or anything of that

16   nature between prisons or solitary confinement.

17             But placing that aside, what we have here is a ruling

18   already from another federal judge, from one of your

19   colleagues, that stated that Bill Barr, the former attorney

20   general; that Mike Carvajal, the soon to be former head of BOP;

21   and James Petrucci, the former head of Otisville violated my

22   client's rights by having him or are responsible for his

23   incarceration at Otisville.  That's what that order says.

24             So what we have here --

25             THE COURT:  Can you define for me what the legal rule

M82YCOHC                                                        40

1    is that you're asking me to adopt.

2            MR. LAUFER:  What I'm asking you to adopt is that my

3    client was taken from home confinement, which is not official

4    custody.  We disagree.  If your Honor would like me to expand

5    on that, I will.

6            THE COURT:  I'm happy to hear.  As I told you, I don't

7    have any time limits.  So I'm happy to hear whatever you have

8    to say.  The same with your adversaries.

9            MR. LAUFER:  Right.  Home confinement is not -- we

10   Have *Reno v. Koray*.  We have all the case law that I've placed

11   in my brief which essentially says that an individual that is

12   on home confinement -- and the DoJ has argued this countless

13   times when talking about sentence crediting -- is not official

14   custody.  Those are their own words.  It is not official

15   custody.

16           Home confinement -- and they haven't made this

17   distinction -- is not any different whether it's pre or post

18   sentencing or pre or post verdict.  There is no difference.

19   There is not a separate home confinement for bail when someone

20   is out awaiting trial or at the end of their sentence.  There's

21   just nothing.  There's nothing out there.  So I don't really

22   see any kind of distinction.

23           My client could have a cocktail at night if he chose

24   to.  He wouldn't be able to do that in BOP.  My client could go

25   for a run around the perimeter of his home if he chose to.  He

M82YCOHC                                                        41

1    cannot do that at his own leisure in BOP.  He is not under the

2    complete dominion of the Federal Bureau of Prisons.

3           So it is not official custody.  They don't tell him

4    when to wake up.  They don't tell him when to eat.  They don't

5    tell him when he can go to the bathroom or shower.  None of

6    that occurs when someone is on home confinement.  So it is not

7    official custody, and the case law I've presented, your Honor,

8    reflects that.

9           In terms of how we can craft this First Amendment

10   expansion in a very limited way, I agree with your Honor, that

11   the facts -- this is very fact-specific --

12          THE COURT:  I'm asking questions.  Don't agree with me

13   or disagree with me or assume that I have one view or another.

14   I'm asking hypotheticals to tease out legal arguments.

15          MR. LAUFER:  I think in this case, we don't have to

16   get too far into the granular aspects of motive here, your

17   Honor.  Everything is plainly stated.  What occurred here is

18   that my client was remanded back to Otisville because of the

19   exercise of his lawful First Amendment rights.

20          And everything, whether it's a Fourth Amendment claim,

21   whether it's an Eighth Amendment claim, runs from that.  The

22   Fourth Amendment claim, he was taken into custody.  They put

23   cuffs on him.  They put ankle shackles on him.  They took him

24   to MDC in Brooklyn, and then they sent him up to Otisville.

25   This wasn't a transfer between prisons.  This was a remand back

M82YCOHC                                                           42

1   to prison.  Those are the words that Judge Hellerstein uses.

2                  THE COURT:  I'm not sure how you get beyond *Egbert*.

3                  Is what you want to say that there's a *Bivens* remedy

4   that applies when, for retaliatory reasons, somebody is taken

5   from home detention and put into a federal correctional

6   institution?

7                  MR. LAUFER:  If the remand back to prison is done for

8   an unlawful purpose, a lawful power used for unlawful purpose.

9   That's what this is here.  If we were to buy that he was in

10  official custody, which, again, the plaintiff does not concede.

11  He was not in official custody.

12                 But there is a unlawful power that BOP used, that the

13  former president used, that the attorney general used for an

14  unlawful purpose, to retaliate against my client for exercising

15  his First Amendment rights.

16                 THE COURT:  If I were to apply the reasons that *Egbert*

17  tells me, look at whether Congress can pass a law to address

18  this; look at whether there were alternative remedies

19  available.  There were alternative remedies.  Your client took

20  advantage of them.

21                 And if there are transfers from home detention to

22  prison for retaliatory reasons, that would seem to be almost

23  pragmatically the kind of thing that Congress would be

24  particularly well-suited at figuring out how to craft the legal

25  laws regarding the remedy.

M82YCOHC                                                              43

1          MR. LAUFER:  Well, the commentary from Congress, your

2     Honor, demonstrates to us that they meant the FTCA and *Bivens*

3     actions to work together; that one was not supposed to replace

4     the other.  So the focus with regard to *Bivens* is that there is

5     individual liability to deter unlawful constitutional behavior.

6     That is the purpose of *Bivens*.

7          FTCA, it's the United States government.  It's a tort.

8     No one is really getting disciplined for anything.  The

9     taxpayers are I guess indirectly.  But no one who engaged in

10    this unlawful behavior is answering for it, unlike *Bivens*.

11         We need to do something here, your Honor.  SCOTUS did

12    not absolutely foreclosure the expansion of *Bivens*, even though

13    it is disfavored.  This is a very unique case.  This is someone

14    that had over a decade relationship with the former president.

15    He was the private attorney to the president.  He knew all the

16    actors involved.

17         And when he did the right thing and he testified

18    before Congress and he made numerous public statements telling

19    the truth about the former president, about Defendant Trump,

20    because he is a defendant in this action and he's a defendant

21    in a number of other actions as well.  And I have a feeling

22    he's going to continue being a defendant elsewhere.

23         THE COURT:  I don't need that argument from you, just

24    as I don't need it from the lawyers for Mr. Trump.  The lawyers

25    for Mr. Trump can say that there's no evidence that he did

M82YCOHC                                                                44

1   anything wrong.

2          I have to take the allegations of the complaint as

3   true.  You can argue from the allegations of the complaint.

4   You're not going to argue about other cases.  I'm deciding this

5   case.  It's enough to decide this case.

6          MR. LAUFER:  Very good, your Honor.

7          This was retaliatory conduct that was engaged in.  We

8   already have evidence of that, credible evidence of that,

9   against my client for the lawful exercise.  All we have to

10  demonstrate under *Iqbal v. Ashcroft* is plausibility, are the

11  allegations made in the complaint plausible.  That's the

12  standard.

13         And I think, given the ruling from Judge Hellerstein

14  coupled with my client's former relationship with the former

15  president, it is plausible, given the totality of the

16  circumstances surrounding here, the facts as they are pled in

17  the case, that what occurred here will survive a motion to

18  dismiss.

19         THE COURT:  I want to make sure -- I'll hear

20  everything that you want to say about *Bivens*, but I also do

21  want to make sure you address the FTCA claims.

22         MR. LAUFER:  Yes, your Honor.  The FTCA claims, there

23  is a private analogue I've included in my brief for all the

24  claims that we've made in there.  This was an arrest.  My

25  client was not in custody.  My client can go to the store when

M82YCOHC                                                          45

1  he's under home confinement and furlough.  He's well within his

2  rights to do that, within a certain perimeter around his home.

3  He was free.

4        I'll grant that maybe Geo, which was the contractor

5  who would normally help someone moving from prison or furlough

6  to home confinement, maybe DoJ or BOP or parole have the right

7  to suddenly say, hey, forget Geo.  Come on down to the Southern

8  District.  We want to talk about the conditions that are going

9  to oversee or rule or govern your home confinement.

10        Fine.  We come down.  At that point, they didn't have

11  a good-faith basis for bringing my client down here.  It was

12  all premeditated.  They knew, as soon as they saw that first

13  paragraph, there was going to be an issue which would restrain

14  his ability to speak publicly about the former president.

15        As soon as they weren't signing the agreement or they

16  decided to sign it to avoid prison, it didn't matter anymore.

17  He was taken into custody.  U.S. Marshals came and arrested

18  him.  As far as we're concerned, that's a Fourth Amendment

19  violation.

20        My client was released under the CARES Act because of

21  his comorbidities.  They knew that, at that point when there

22  was no treatment for COVID, it would be a potential death

23  sentence for him to be remanded back to prison.

24        Otisville, as most federal prisons were, a hotbed for

25  the spread of COVID.  It would have exposed him to a potential

1   death sentence.  But they knew that because they granted him

2   furlough based upon his comorbidities and COVID, yet they still

3   sent him back.

4           THE COURT:  They had the legal authority, even without

5   any reason, to put him back in prison.  Right?

6           That would not have been reviewable if they just

7   decided they didn't want to take the risk of him being out on

8   home confinement or furlough.  They could have put him back in.

9   He was serving a criminal justice sentence.

10          MR. LAUFER:  Yes.  But under the CARES Act, they

11  already found that he qualified for it.  They already made a

12  determination.  I guess one could say arguably that we want to

13  revoke his furlough, but he wasn't on furlough anymore.  He was

14  converted to home confinement.  And the basis, even though they

15  may have a legal authority to do that, was unlawful.

16          THE COURT:  Had he been converted to home confinement?

17  Or was he still on furlough technically as of the time he was

18  put back into BOP custody?

19          MR. LAUFER:  No.  He was on home confinement at that

20  point.  And the reason why I say that is because if you look at

21  our exhibit -- I forgot the exhibit.  I think it might be B or

22  C.  We don't have many exhibits.  Maybe B -- you'll see Patrick

23  McFarland, the residential reentry management, said that I am

24  remanding Michael Cohen back to prison for violation of the

25  rules of home confinement.  So he states that.

M82YCOHC                                                          47

1          That is an admission from the defendants stating that

2     he was under home confinement at the time.  And that was the

3     predicate for them to remand him back to Otisville, because he

4     wouldn't sign a clearly unconstitutional and I would say

5     unlawful home confinement agreement which violated his rights.

6          As for the FTCA claim, your Honor, I'm not really

7     sure.

8          What specifically would you like me to address?

9          THE COURT:  Well, there are a couple of claims that

10    I'd like to hear from you on.  One is the abuse of process

11    claim.

12         MR. LAUFER:  Yes.

13         THE COURT:  The government makes I think a fairly

14    powerful argument that abuse of process, as it's been developed

15    by the courts, refers to abuse in the obtaining of process.

16    Whether the process is a subpoena that somebody obtains

17    improperly or an arrest warrant, it's the abuse of the court

18    system that takes place when process is obtained for improper

19    purposes, not the subsequent abuse that takes place in the

20    execution of process.

21         I didn't see a response from you on that.

22         MR. LAUFER:  Well, your Honor, I think that what

23    Mr. McFarland did here was an abuse of process because he has

24    to notify the court that Mr. Cohen is no longer, as part of his

25    sentence, relegated to home confinement.  He is in violation of

M82YCOHC                                                                48

1    his home confinement agreement.  And for that purpose, he has

2    now been sent back to Otisville.

3           U.S. Marshals needed to be notified to come and arrest

4    him.  So I think in that regard, there was a fraud committed

5    upon the court by using a predicate of a violation of my

6    client's rights to have him remanded back to Otisville.

7           THE COURT:  But the abuse doesn't take place in terms

8    of obtaining the process.  It's really what's done thereafter.

9           MR. LAUFER:  Well, I think that the process here --

10          THE COURT:  The process here was Judge Pauley's

11   sentence.

12          MR. LAUFER:  Correct.  The process was -- by the

13   sentencing guidelines and the rules, there was already a

14   process that was stated, and that process was abused by

15   Mr. McFarland and defendants in remanding him back to prison

16   for unlawful means.

17          I mean, they may have the authority to do something

18   like that, but they abused that authority by remanding him

19   back.  And they abused the process that was already in place by

20   the court to do so.

21          THE COURT:  Can you address the *Coulhurst* issue with

22   respect to your client's treatment after he had been

23   re-incarcerated.

24          MR. LAUFER:  Well, yes, your Honor.  I think this goes

25   more along the lines of abuse.  I think the words we're looking

1    for here with regard to once my client was re-incarcerated are

2    "deliberately indifferent."

3          They placed him in a confined area, solitary

4    confinement, for 16 days where he was dealing with conditions

5    that were clearly harmful to I think any human being, let alone

6    someone that has existing comorbidities.  And they were

7    deliberately indifferent to his health, safety, and welfare.

8          THE COURT:  You allege negligence, and the complaint

9    is very general and very vague in terms of in what respect the

10   defendants were negligent.  So maybe you can tell me now what

11   your theory is of negligence.  I assume that you're familiar

12   with *Coulhurst*.

13         MR. LAUFER:  Yes, your Honor.  Our theory of

14   negligence in that respect is that Otisville, as with most

15   federal prisons -- I know in MDC here, it's a nightmare.  MCC

16   was also a nightmare -- it is the maintenance and upkeep and

17   the habitability of these correctional facilities that we place

18   prisoners in, on of them, at the time, being my client.

19         They knew that -- I guess we could say it was

20   negligent upkeep, maintenance, and things of that nature.

21         THE COURT:  Right.  There could be negligence in the

22   form that's discussed in *Coulhurst* of we're only going to go by

23   the cell so many times to check it out because we've got, you

24   know, a limited budget.  We've got other priorities, and we're

25   making a policy-based decision about risk.  Or it could be that

M82YCOHC                                                        50

1   the person is just asleep.

2           MR. LAUFER:  The negligent guard theory.

3           THE COURT:  Your complaint is not clear which one.

4   In fact, it could be read to say, listen.  It was the time of

5   COVID, and the Bureau of Prisons had a lot of different

6   priorities, and courts shouldn't be involved in --

7           MR. LAUFER:  In the day-to-day management --

8           THE COURT:  -- the day-to-day management and where

9   they put their resources.  That's what the discretionary

10  function exception is about.

11          MR. LAUFER:  Right.  But they can't violate public

12  policy, these decisions.  And to have these prisoners in these

13  Gulag-type conditions is a violation of public policy, as

14  your Honor aptly stated earlier.

15          THE COURT:  So is your legal proposition that they

16  made a decision about how to allocate resources but they did it

17  in a way that is illegal because it resulted in him being in

18  these awful circumstances?

19          Is that how I should understand your complaint?

20          MR. LAUFER:  I think that the policies and procedures

21  in place -- we're just speaking of the negligence claim.

22          THE COURT:  Yes.  Just the negligence claim.

23          MR. LAUFER:  The policies and procedures in place

24  during COVID at Otisville were egregiously bad in that they,

25  aside from deliberately indifferent, were just negligent in the

1     maintenance and upkeep which led to further exposure of my

2     client to horrendous conditions.

3              THE COURT:  All right.  Anything further?

4              MR. LAUFER:  The qualified immunity I guess briefly,

5     your Honor.  My papers kind of address all that.  Essentially

6     retaliation -- and I have case law in there -- for the lawful

7     exercise of someone's First Amendment rights is a well-known

8     issue by law enforcement, whether they're in prison, whether

9     they're police officers, or anything of that nature.

10             So they know that you cannot imprison someone because

11    of their speech.  There is ample case law with regard to that,

12    and that's more under a 1983 claim.  But in general, that I

13    think that that is not outside the purview or the ken, so to

14    speak, of an average correction officer or member of our

15    government.

16             THE COURT:  You mean the fact that it's 1983 versus

17    *Bivens* is kind of irrelevant from your perspective.  It's the

18    Constitution.

19             MR. LAUFER:  Yes.  Exactly.  I think we're not talking

20    state and local here, but I think it's under color of federal

21    law obviously, what we're dealing with here under *Bivens*.

22             And if the Court is not inclined to expand the First

23    Amendment, the actions, the facts that are surrounding this

24    case, led to all of the other violations, whether it's the

25    FTCA violations or whether it's the Fourth Amendment and Eighth

1    Amendment violations.

2            So, yes.  There is an analogy between 1983 First

3    Amendment retaliation by state and local and, if the Court is

4    inclined to expand *Bivens* to First Amendment coverage in this

5    one particular instance, given the very unique fact pattern

6    here, yes.  You cannot retaliate against a perceived enemy by

7    placing him back in prison.

8            THE COURT:  Thank you very much.

9            I think your client may have passed you a note.  I

10   don't know if he did or not.

11           MR. LAUFER:  No.

12           THE COURT:  Anything further from the plaintiffs?

13           MR. LAUFER:  Your Honor, I don't know if the Court

14   wants to entertain.  My co-counsel knows a little bit more

15   about the comorbidities of Mr. Cohen.  I think he could maybe

16   fill in the blanks a little bit about that.

17           THE COURT:  I'm going to judge this based upon the

18   allegations in the complaint.

19           MR. LAUFER:  Very good.

20           THE COURT:  I don't need to hear more about that I

21   don't think.

22           MR. LAUFER:  Very good, your Honor.  Thank you.

23           THE COURT:  Anything further from counsel for the

24   government?

25           MS. ROVNER:  Your Honor, I'd just like to make a brief

M82YCOHC                                                             53

1    rebuttal regarding FTCA.

2              THE COURT:  That's fine.

3              MS. ROVNER:  I'd just like to address three points:

4    First regarding the abuse of legal process claim, Mr. Cohen's

5    counsel has not identified any court process.  And once again,

6    the memo he cites is an internal government memorandum between

7    BOP and the United States Marshal Service.

8              Second, regarding *Koray*, Mr. Cohen's counsel

9    referenced a couple of times how restrictive the confinement

10   was and said that home confinement isn't very restrictive

11   because Mr. Cohen could go get a cocktail or something.

12             And in *Koray*, the Supreme Court made clear that how

13   restrictive the confinement is is not the relevant distinction.

14   The relevant distinction is that before trial or sentencing, an

15   individual who is released is not within the custody or control

16   of BOP; whereas, a sentenced individual is.  And that's why --

17             THE COURT:  That's what I do when I impose sentence, I

18   commit somebody to the custody of the Bureau of Prisons.

19             That's correct?

20             MS. ROVNER:  Yes.  I just wanted to point out that

21   *Koray* rejected the analysis that some courts have been making

22   before the decision by looking at how restrictive the

23   confinement was.  So I just wanted to make that point.

24             And then finally, with respect to the discretionary

25   function exception, although the Court gave Mr. Cohen's counsel

1    a chance to clarify what he meant by the vague allegations in

2    the complaint, I think he did clarify it by saying -- he called

3    the conduct "deliberately indifferent"; that it involved

4    considerations of public policy, which is what the

5    discretionary function applies to.

6            So I don't think that his complaint could be

7    interpreted as raising the lazy or negligent guard theory.

8            THE COURT:  Ms. Rovner, was Mr. Cohen on furlough or

9    home confinement at the time that the Bureau of Prisons then

10   put him back into custody?

11           MS. ROVNER:  He was on furlough because he went -- he

12   met with the probation officers to be placed on home

13   confinement, but he had not yet been placed on home

14   confinement.  So he was on furlough during that time period.

15           But regardless, there's a regulation that applies to

16   furlough saying that he would be in the custody of the attorney

17   general if on furlough.  And if he was on home confinement,

18   which he wasn't, there's also a statute saying that he would be

19   within the custody of the Bureau of Prisons during that time.

20           THE COURT:  Okay.

21           MS. ROVNER:  Thank you.

22           THE COURT:  I'll give the plaintiffs the last word,

23   but I'm not going to do so until I ask counsel for Mr. Trump

24   whether they want a further word.

25           MS. HABBA:  Only two sentences, your Honor.  I'm happy

1   to do so right here.

2           THE COURT:  If you're going to take off your mask even

3   a little bit, you should go up to the podium.

4           MS. HABBA:  I would just like to make very brief

5   points.  Number one, Hellerstein's decision, Donald Trump was

6   not a part of that decision.  He was not at all.  That decision

7   had nothing to do with Donald Trump.  He wasn't even in it.  I

8   just wanted to go back to your question --

9           THE COURT:  I think that's actually the plaintiff's

10  point, is that they want to be able to sue your client

11  according to habeas corpus.

12          MS. HABBA:  Of course.  I understand.  I did want to,

13  just want for the record, state that in *Nixon v. Fitzgerald*,

14  they did say that a rule for absolute immunity going back to

15  your question about the kidnapping, which would be a criminal

16  activity, that the rule for absolute immunity for the president

17  would not leave the nation with a president that's not above

18  the law.

19          That's why there is impeachment and other items that

20  exist for checks and balances.  That's why the president is

21  constantly being scrutinized.  And those alternative remedies

22  and deterrence establishes that absolute immunity will not

23  place the president in that situation.  That's all I just

24  wanted to add.

25          Also briefly, he spoke a lot about intent and

1    specifically to my client.  Malicious intent is not to be

2    considered, and the case law is very well established on that.

3    Intent has nothing to do with it.

4              THE COURT:  With absolute immunity.  I understand.

5              MS. HABBA:  Thank you, your Honor.

6              THE COURT:  Mr. Laufer, you wanted the last word.  I'm

7    happy to give it to you.  But do it from the podium.

8              MR. LAUFER:  A couple of things.  Ms. Rovner is

9    incorrect.  The document that was signed by Patrick McFarland

10   was related to his home confinement saying that Mr. Cohen

11   violated his home confinement.  So I believe it's an exhibit

12   also.

13             Again, one thing about the habeas relief.  My client

14   was freed because of the habeas relief.  That stopped the

15   bleeding, your Honor.

16             But what about the 16 days of virtual torment that he

17   dealt with being unlawfully incarcerated?  He has not been made

18   whole for that.  That is something that needs to be addressed.

19             Judge Hellerstein was very specific that he was not --

20   that Mr. Cohen was not in the custody of BOP at the time during

21   the transfer to home confinement -- from furlough to home

22   confinement; that he was able to leave his home; that he wasn't

23   under any restrictions, other than his furlough agreement and

24   his home confinement agreement, which gave him much greater

25   freedom.

A-100

M82YCOHC                                                              57

 1          Again, *Reno v. Koray* and its progeny clearly draw a

 2   distinction between being incarcerated and under home

 3   confinement.  Once you're under home confinement, you're under

 4   different rules.  You're not under the same rules as you were

 5   being an incarcerated detainee.  I think that's essentially it.

 6          THE COURT:  Thank you very much.  The Court will take

 7   this under advisement.  I will try to get you an answer as soon

 8   as I can.  I appreciate the arguments from all counsel.

 9   Everybody stay safe and stay healthy.  Thank you.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
MICHAEL COHEN,                                                    :
                                                                  :
                              Plaintiff,                          :
                                                                  :
              -v-                                                 :
                                                                  :
UNITED STATES OF AMERICA, et al.,                                :
                                                                  :
                              Defendants.                         :
                                                                  :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  11/14/2022

21-cv-10774 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiff Michael Cohen's complaint centers around allegations of serious violations of

his constitutional rights by the United States government, then-President Donald J. Trump, then-

Attorney General William Barr, and various officers within the Federal Bureau of Prisons.

Cohen alleges—and another Court found with respect to certain of the defendants, *see infra*—

that the defendants remanded him to prison because he wanted to publish a book critical of the

then-President.  He seeks redress for the violations of his constitutional rights through this

damages action.

Cohen's complaint and the motions to dismiss now before this Court raise fundamental

questions about the meaning and value of constitutional rights, the relationship between a citizen

and the government, and the role of the federal courts in protecting those rights.  The ability to

publicly criticize even our most prominent politicians and leaders without fear of retaliation is a

hallmark of American democracy; political speech is core First Amendment speech.  "[I]t is a

prized American privilege to speak one's mind, although not always with perfect good taste, on

all public institutions."  *Bridges v. California*, 314 U.S. 252, 270 (1941).  And it is a further

hallmark of American democracy that, where one's rights have been violated, one may seek to

vindicate those rights in the courts.  In the oft-quoted words of Chief Justice John Marshall: "The government of the United States has been emphatically termed a government of laws, and not of men.  It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."  *Marbury v. Madison*, 1 Cranch 137, 163 (1803).  The Court today must consider the limits of these hallmark principles.

## BACKGROUND

The following facts are drawn from the complaint and are taken as true for the purposes of this motion to dismiss.

Plaintiff Michael D. Cohen ("Cohen" or "Plaintiff") was formerly employed by individual defendant Donald J. Trump ("Trump") as his attorney and personal advisor for over a decade.  Dkt. No. 3 ("Compl.") ¶ 48.  In August and November of 2018, Cohen pleaded guilty to various crimes including lying to Congress and campaign finance violations; he was sentenced to thirty-six months of incarceration.  *Id.* ¶¶ 4, 52–53.  In May of 2019, he voluntarily surrendered for service of his sentence at FCI Otisville.  *Id.* ¶ 54.

While incarcerated, Cohen began to work on a book about his association with Trump. *Id.* ¶ 55.  The book chronicles the arc of his experiences with Trump and describes how, upon reflection, he came to the realization that his actions in furtherance of Trump's agenda ultimately led to his own downfall.  *Id.* ¶ 56.  Cohen publicly spoke about his forthcoming book in ways that made it clear that the book would be critical of and perhaps damaging to Trump; he publicly stated that his book would be unfavorable to Trump and would substantiate the descriptions he gave during his congressional testimony of Trump as "a cheat, a liar, a conman, [and] a racist," among other things.  *Id.* ¶¶ 57, 59.  The complaint also alleges that Cohen was privy to years of non-public behavior by Trump, which included witnessing anti-Semitic and racist remarks by him; that the book included quotes and documentary evidence of such behavior; and that Trump

was aware that Cohen was witness to many years of such behavior that, if made public, could damage Trump's reputation and his future political goals, including, at that time, his potential run for a second term as President in 2020. *Id.* ¶¶ 57–58, 60.

Cohen's incarceration in 2019 and the beginning of 2020 was uneventful. *Id.* ¶ 62. Upon completion of his sentence, Cohen was to be released from FCI Otisville on November 21, 2021. *Id.* ¶ 63. The onset of the COVID-19 pandemic, however, altered this. *Id.* ¶ 64. COVID-19 caused significant concerns for prison populations because the virus spreads easily within the close confines of a prison; this was particularly concerning for Cohen because he has various health comorbidities that make him highly susceptible to COVID-19 risks. *Id.* ¶¶ 64–65. Cohen petitioned the defendants for early release from FCI Otisville based on Congress's passage of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, and then-Attorney General Barr's memoranda of March 26, 2020 and April 3, 2020. *Id.* ¶ 66. Cohen submitted his request to officials from the Federal Bureau of Prisons ("FBOP") on March 31, 2020; the officials determined that Cohen should be released on furlough and then transferred to home confinement. *Id.* ¶¶ 67–68. The FBOP granted Cohen furlough approval on April 18, 2020; the furlough time period was from May 1, 2020 to May 31, 2020. *Id.* ¶ 69.

During that time period, while on furlough, Cohen made several public statements via Twitter regarding the imminent publication of his book about Trump, a number of which were accompanied by the hashtag #WillSpeakSoon. *Id.* ¶ 72. Cohen planned to release his book by late September of 2020. *Id.*

On July 9, 2020, in compliance with a directive by defendant Adam Pakula, a probation officer with U.S. Probation and Pretrial Services, Cohen reported to the U.S. Probation Office in downtown Manhattan, along with his attorney, in order to transition from furlough to home

confinement. *Id.* ¶ 73. They met with Pakula as well as defendant Enid Febus, a supervisory

probation officer. *Id.* Pakula and Febus gave Cohen a Federal Location Monitoring Program

Participant Agreement ("FLM"), which set forth conditions for Cohen's home confinement. *Id.*

¶ 74. In the first paragraph, it contained a broad provision prohibiting Cohen from engaging with

the media in any form, including books, and from posting on social media:

> No engagement of any kind with the media, including print, tv, film, books, or any
> other form of media/news. Prohibition from all social media platforms. No posting
> on social media and a requirement that you communicate with friends and family
> to exercise discretion in not posting on your behalf or posting information about
> you. The purpose is to avoid glamorizing or bringing publicity to your status as a
> sentenced inmate serving a custodial term in the community.

*Id.* ¶ 75. Cohen viewed this condition as an attempt to chill and restrain his First Amendment

rights; he also suspected that this condition was not a standard one in FLMs for those transferring

to home confinement, partially because he noted that the document was not in the standard FLM

form, contained grammatical and typographical errors, and was not identified with its federal

form designation. *Id.* ¶¶ 76–78. He and his attorney inquired why the paragraph was included in

the FLM, since it did not appear to be standard and would prohibit the publication of his book.

*Id.* ¶ 79. Febus replied—and Pakula agreed—that that this was the standard form used, and that

Cohen was not being treated differently than other prisoners.[1] *Id.* ¶¶ 80–81. Cohen and/or his

---

[1] The complaint alleges that "[i]n a July 22, 2020 signed declaration made under penalty of
perjury and submitted to the Court in *Cohen v. Barr et al, supra,* document number 23, defendant
Pakula admitted in great detail how he and defendant Febus lied to plaintiff." *Id.* ¶ 82. The
declaration, however—which is referred to and relied upon by the complaint and is thus
incorporated by reference, and which the Court can take judicial notice of the contents of as a
public record pursuant to Federal Rule of Evidence 201(b), *see Rothman v. Gregor,* 220 F.3d 81,
92 (2d Cir. 2000)—does not contain such a broad admission. Rather, Pakula states that he drew
the FLM agreement presented to Cohen from an agreement sent to him by a probation officer in
another district as an example of an FLM agreement used for high-profile inmates. Declaration
of Adam Pakula, *Cohen v. Barr et al.,* 1:20-cv-05614 (S.D.N.Y. July 22, 2020), ECF No. 23.
Taking Cohen's allegations here as true—particularly, that Febus and Pakula told Cohen that this
was the standard form and that he was not being treated differently than other prisoners—
Pakula's declaration does indicate that the statements made to Cohen were not true, in that he

A-105

attorney asked whether it would be possible to adjust the language of the paragraph or remove it entirely; the parties agreed to table the question so that they could "run it up the chain of command," and continued with reviewing the rest of the FLM. *Id.* ¶¶ 84–86. Cohen was not asked at that time or at any other point in the meeting to sign the FLM agreement, nor did he refuse to sign the agreement, withhold consent to electronic monitoring, or refuse any other condition of home confinement. *Id.* ¶¶ 87–88.

After Cohen, his attorney, Pakula, and Febus finished reviewing the agreement, Pakula and Febus directed Cohen and his attorney to remain in the waiting area while they waited for a response from their supervisors about the first paragraph of the FLM. *Id.* ¶ 89. After waiting for about an hour and half—during which time Cohen's attorney checked in with Pakula and Febus to see if everything was alright, and was assured that everything was fine and that they were just waiting for a response from their supervisors—three United States marshals came to the waiting area and served Cohen's attorney with a remand ordered by defendant Patrick McFarland that stated that Cohen had failed to agree to the terms of FLM and was being remanded for that reason. *Id.* ¶¶ 90–91. Cohen was shackled, handcuffed, and remanded to prison. *Id.* ¶ 92. Cohen's attorney explained that the meeting had not concluded, that they were still waiting to hear back as to what, if anything, could be adjusted, that Cohen had not refused to agree to the terms of the FLM, and that Cohen was prepared to sign the FLM "as is." *Id.* ¶ 95. Pakula and Febus responded that it was "out of their hands," and that the proposed FLM was no longer on the table. *Id.* ¶ 96.

---

was, at least, being treated differently than lower-profile prisoners, and this was not the standard form used in such cases.

Cohen was transported to the Metropolitan Correctional Center ("MCC") in Manhattan and then transported back to FCI Otisville, where he was placed in a special segregated housing unit and then transferred to solitary confinement for sixteen days. *Id.* ¶¶ 98–100. While in solitary confinement, he spent all but thirty minutes of his day alone in a twelve by eight-foot cell with poor ventilation, no air conditioning, and temperatures frequently over one hundred degrees. *Id.* ¶¶ 101–102. These conditions caused health problems for Cohen; his blood pressure was elevated, resulting in severe headaches, shortness of breath, and anxiety, which required immediate medical attention. *Id.* ¶ 102. While incarcerated, Cohen was unable to proceed with drafting his book and was unable to make any public statements. *Id.* ¶ 103.

Cohen filed a habeas petition against Barr, Michael Carvajal, in his official capacity as Director of the FBOP, and James Petrucci, in his official capacity as Warden of FCI Otisville, challenging his incarceration on July 20, 2020, eleven days after having been remanded. On July 23, 2020, Judge Hellerstein issued an order granting Cohen's motion for a preliminary injunction directing these defendants to release Cohen to home confinement. *Id.* ¶ 108. Judge Hellerstein found that the defendants' "purpose in transferring Cohen from release on furlough and home confinement back to custody was retaliatory in response to Cohen desiring to exercise his First Amendment rights to publish a book critical of the President and to discuss the book on social media." *Cohen v. Barr*, 2020 WL 4250342, at *1 (S.D.N.Y. July 23, 2020). Cohen had spent two weeks either in the special segregated housing unit or in solitary confinement. Compl. ¶ 27.

Cohen filed the complaint in this case on December 17, 2021. *See generally id.* The complaint names as defendants: (i) the United States of America, (ii) former President Trump, (iii) former Attorney General Barr, (iv) Director of the FBOP Carvajal, (v) Administrator of the Residential Reentry Management Branch of the FBOP Jon Gustin, (vi) Residential Reentry

Manager of the FBOP McFarland, (vii) Warden of FCI Otisville Petrucci, (viii) Supervisory Probation Officer Febus, (ix) Probation Officer Pakula, and (x) John and Jane Doe (1-10) agents, servants, and employees of the United States.

The United States and the individual defendants with the exception of Trump filed a joint motion to dismiss on March 31, 2022; Trump filed a separate motion to dismiss the same day. Dkt. Nos. 39, 41. Cohen filed oppositions to the motions on May 27, 2022. Dkt. Nos. 59, 61. The defendants filed replies on June 17, 2022. Dkt. Nos. 67, 68. The Court held oral argument on the motions on August 2, 2022.

## DISCUSSION

Cohen's complaint asserts seven causes of action. Broadly, they can be grouped into two categories. First, Cohen brings claims against all the individual defendants, including Trump, for violations of his First, Fourth, and Eighth Amendment rights; the claims are brought under a *Bivens* cause of action. *See* Compl. ¶¶ 139–142. Second, Cohen brings claims against the United States for (i) retaliation; (ii) false arrest, false imprisonment, and abuse of authority and process; (iii) negligent failure to protect; (iv) negligent infliction of emotional distress; (v) intentional infliction of emotional distress; and (vi) negligent hiring, retention, training, and supervision. *See* Compl. ¶¶ 111–138. These claims are all brought under the Federal Tort Claims Act ("FTCA").

The Court turns first to the *Bivens* claims brought against all the individual defendants and then considers the FTCA claims against the United States.

## I.    Cohen's *Bivens* Claims

The seventh cause of action in the complaint—the only one brought against the individual defendants—is brought as a *Bivens* cause of action for violations of Cohen's First, Fourth, and Eight Amendment rights, and alleges that defendants intentionally retaliated against

Cohen by remanding him to prison for exercising his right to free speech, in violation of his First

Amendment rights; committed an unlawful seizure in so doing, in violation of his Fourth

Amendment rights; and placed him in dangerous solitary confinement conditions, in violation of

his Eighth Amendment rights.  Compl. ¶¶ 139–142.  All of the individual defendants move to

dismiss this count.  They do not dispute that Cohen's constitutional rights were violated and that

he suffered injury as a result.  They instead argue that the *Bivens* cause of action is not available

for Cohen's claims.  *See* Dkt. No. 40 at 20; Dkt. No. 42 at 10.

 The Supreme Court has held that whether a *Bivens* cause of action is available is an

"antecedent issue" to whether a plaintiff has alleged a violation of a clearly established

constitutional right.  *See Wood v. Moss*, 572 U.S. 744, 757 (2014); *see also Hernandez v. Mesa*,

137 S. Ct. 2003, 2006 (2017) ("The Court turns first to the *Bivens* question, which is 'antecedent'

to the other questions presented." (quoting *Wood*, 572 U.S. at 757)).  At this stage, therefore, the

question before this Court is simple:  Assuming, in the first instance, that Cohen has sufficiently

alleged that federal officials violated his constitutional rights, is there a judicial mechanism

through which he can vindicate those rights and seek to recover for the harm he suffered from

those who harmed him?  It is a question that, here, is strengthened by the fact that—with regard

to Cohen's First Amendment claim—another court in this District has already found Cohen's

constitutional rights *were* violated.  The question thus becomes whether the Constitution and the

courts afford Cohen a forum in which to seek relief for the injury he suffered as a result of that

violation.  It is a question that, in 1803—"The very essence of civil liberty certainly consists in

the right of every individual to claim the protection of the laws, whenever he receives an injury,"

*Marbury*, 1 Cranch at 163—or in 1971—"Historically, damages have been regarded as the

ordinary remedy for an invasion of personal interests in liberty," *Bivens v. Six Unknown Named*

*Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 395 (1971)—likely would have been answered in the affirmative.  His claim would have been entertained either in state or in federal court.  It is a question to which the answer seems intuitive; what, after all, is the value of a right if one has no recourse when that right is violated?  But it is also a question that the Supreme Court has unequivocally answered in the negative.  The Court is bound by that ruling.  *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents.").

In 1971, in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, the Supreme Court squarely considered this question for the first time, in the Fourth Amendment context; as it put it, the question before the Court was "merely whether petitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts."  403 U.S. at 397.  In *Bivens*, the petitioner, Webster Bivens, alleged that agents of the now-defunct Federal Bureau of Narcotics violated his Fourth Amendment rights by entering his apartment, searching it, and arresting him, all without a warrant and with unreasonable force.  *Id.* at 389.  The Court concluded that Bivens was entitled to redress his alleged constitutional injury through the mechanism of a damages suit against the federal officers.  Justice Brennan, writing for the majority, noted:  "That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition."  *Id.* at 395.  After looking to *Marbury*, the Court held that "petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment."  *Id.* at 397.

After *Bivens*, the Supreme Court twice extended the implied cause of action to other constitutional rights:  In *Davis v. Passman*, the Court expanded the *Bivens* action to sex discrimination under the due process clause of the Fifth Amendment, 442 U.S. 228 (1979), and in *Carlson v. Green*, the Court expanded the *Bivens* action to a violation of Eight Amendment rights in a federal prison, 446 U.S. 14 (1980).  In each of these cases, the Court treated the expansion of *Bivens* as the straightforward application of settled law and settled constitutional principles.

In the era after *Bivens*, *Passman*, and *Carlson*, however, the Court's jurisprudence markedly shifted.  By 2001, in *Correctional Services Corp. v. Malesko*, the Court recognized that it had "consistently refused to extend *Bivens* liability to any new context or new category of defendants."  534 U.S. 61, 68 (2001).

This shift has frequently been explained in context of the broader shift in the Court's approach towards implying damages remedies for statutory violations.  *Bivens* was decided in an era in which the Court took an expansive view of the ability of the courts to fashion a remedy to persons injured as a result of a violation of a congressional statute.  *See, e.g.*, *J. I. Case Co. v. Borak*, 377 U.S. 426 (1964) ("While this language makes no specific reference to a private right of action, among its chief purposes is 'the protection of investors,' which certainly implies the availability of judicial relief where necessary to achieve that result.").  The Court later retreated from that view, instead believing that "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress," and that "[t]he judicial task" is not to give effect to the statute's purpose but rather "to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  Indeed, this contextualization of

the Court's newfound hostility towards the *Bivens* cause of action has repeatedly been professed by the Court itself:  "*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action—decreeing them to be 'implied' by the mere existence of a statutory or constitutional provision."  *Malesko*, 534 U.S. at 75 (Scalia, J., concurring).

In *Ziglar v. Abbasi*, against the backdrop of the September 11 terrorist attacks, the Court again considered the availability—and continued force—of the *Bivens* cause of action.  137 S. Ct. 1843 (2017).  The Court emphasized that *Bivens* and its progeny were part of an "*ancien regime*" in which "the Court followed a different approach to recognizing implied causes of action than it follows now."  *Id.* at 1855.  Under the new approach, "the Court adopted a far more cautious course before finding implied causes of action," and "clarified . . . that, when deciding whether to recognize an implied cause of action, the 'determinative' question is one of statutory intent."  *Id.* at 1855–56.  The *Ziglar* Court did recognize that "[t]he decision to recognize an implied cause of action under a statute involves somewhat different considerations than when the question is whether to recognize an implied cause of action to enforce a provision of the Constitution itself."  *Id.* at 1856.  The Court failed, however, to give significant meaning to that distinction, recounting that "the Court's expressed caution as to implied causes of actions under congressional statutes led to similar caution with respect to actions in the *Bivens* context, where the action is implied to enforce the Constitution itself."  *Id.*  Noting that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity," *id.* at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)), the Court clarified the somewhat piecemeal *Bivens* jurisprudence into a cohesive—and narrow—two-step test, which first asks "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court," meaning that it presents a new context, *id.* at 1859, and then asks if there are "special factors counselling hesitation in the absence of

11

affirmative action by Congress," in which case a court should decline to extend *Bivens*, *id.* at 1857.

    *Hernandez v. Mesa*, the next significant *Bivens* case confronted by the Court, followed the reasoning and analysis of *Ziglar*.  Again distinguishing *Bivens*, *Passman*, and *Carlson* as "the products of an era when the Court routinely inferred 'causes of action' that were 'not explicit' in the text of the provision that was allegedly violated," but from which the Court has now retreated as it "came to appreciate more fully the tension between this practice and the Constitution's separation of legislative and judicial power," the Court declined to extend a *Bivens* cause of action to a lawsuit brought under the Fourth Amendment by the family of Sergio Hernandez, a fifteen-year-old Mexican citizen who was shot and killed by a U.S. border patrol agent, allegedly without provocation.  140 S. Ct. 735, 741 (2020).  The *Hernandez* Court applied the same "two-step inquiry" articulated in *Ziglar*, asking first "whether the request involves a claim that arises in a new context or involves a new category of defendants," with "new context" understood to mean any context that "is different in a meaningful way from previous *Bivens* cases decided by this Court," and then, if a claim arises in a new context, asking "whether there are any special factors that counsel hesitation about granting the extension."  *Id.* at 743 (internal quotation marks and citations omitted).

    Finally, and most recently, in *Egbert v. Boule*, the Supreme Court considered the availability of a *Bivens* cause of action for a First Amendment retaliation claim and a Fourth Amendment excessive force claim.  Rejecting both claims, the Court stated that "our cases have made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts."  142 S. Ct. 1793, 1800 (2022).  The Court provided an even narrower test than that articulated in *Ziglar* and *Hernandez*—"[w]hile our cases describe two

steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 1803.

Explaining that test, the *Egbert* Court made clear that, effectively, it operates as a bar to a *Bivens* claim in all cases except, perhaps, those involving Fourth, Fifth and Eighth Amendment claims factually indistinguishable from *Bivens*, *Passman*, or *Carlson*.  In an all-encompassing articulation of the special factors inquiry, the Court majority stated that "[e]ven in a particular case, a court likely cannot predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*.  That uncertainty alone is a special factor that forecloses relief." *Id.* at 1804.  And claims that paralleled *Bivens*, *Passman*, or *Carlson* exactly could also be foreclosed: "Even assuming the factual parallels [to *Passman*] are as close as Boule claims, *Passman* carries little weight because it predates our current approach to implied causes of action and diverges from the prevailing framework in three important ways." *Id.* at 1808.  Departing from *Ziglar*'s assurance that "this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose," 137 S. Ct. at 1856, *Egbert* held that where a case is directly parallel to *Bivens*, *Passman*, or *Carlson*, even that is insufficient, because those cases do not align with the Court's current approach to *Bivens*; "a plaintiff cannot justify a *Bivens* extension based on 'parallel circumstances' with *Bivens*, *Passman*, or *Carlson* unless he also satisfies the 'analytic framework' prescribed by the last four decades of intervening case law," 142 S. Ct. at 1809.  Concluding, the Court all but held that *no* case would ever be able to satisfy that analytic framework, because "if we were called to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution." *Id.* at 1809.

Applying those principles to the First Amendment claim before it, and in keeping with its sweeping rejection of *Bivens*, the *Egbert* Court went beyond merely holding that a damages cause of action should not be extended to the particular facts of the case before it; seemingly rejecting the fact-specific inquiry set forth in its prior *Bivens* jurisprudence, it categorically held that "there is no *Bivens* action for First Amendment retaliation." *Id.* at 1807.

That holding squarely forecloses Cohen's First Amendment retaliation claim here.  And the Court's broader *Bivens* jurisprudence forecloses his Fourth Amendment claim as well; there is no question that it is factually distinct from the Fourth Amendment claim implied in *Bivens*. The federal officers at issue in *Bivens* were members of the Federal Bureau of Narcotics, while the federal officers named as individual defendants in Cohen's complaint are members of the Bureau of Prisons, in addition to the former President and former Attorney General.  Under the Court's current jurisprudence, this distinction alone appears to be enough to create a new context because one of the oft-quoted examples of a "new context" is a case that involves a "new category of defendants."  *Malesko*, 534 U.S. at 68; *see Egbert*, 142 S. Ct. at 1803; *Ziglar*, 137 S. Ct. at 1876.  Nor were the Bureau of Prisons officers performing functions "in the common and recurrent sphere of law enforcement," as in *Bivens*, *see Ziglar*, 137 S. Ct. at 1857; rather, they were effectuating a remand of a federal prisoner who had already been sentenced to a term of incarceration.

Likewise, Cohen's Eighth Amendment claim arises in a new context.  In *Carlson*, the Eighth Amendment claim centered on grossly inadequate medical care provided to an inmate during a severe asthma attack.  446 U.S. at 16 n.1.  Cohen's Eighth Amendment claim centers on the conditions of his solitary confinement, which—although he claims "posed serious health risks"—did not result in him receiving inadequate medical care.  Compl. ¶ 102.  To the contrary,

14

the complaint states that the conditions resulted in Cohen's "blood pressure bec[oming]

dangerously high resulting in severe headaches, shortness of breath, and anxiety requiring

immediate medical attention," implying, if anything, that "immediate medical attention" was

provided to him.  *Id.*  Cohen's claim asserts a somewhat different "mechanism of injury"

(conditions of confinement as opposed to deliberate indifference to medical needs) and thus

presents a new context under the Supreme Court's precedents.  *Egbert*, 142 S. Ct. at 1805

(quoting *Ziglar*, 137 S. Ct. at 1859); *see, e.g.*, *Mammana v. Barben*, 856 F. App'x 411 (3d Cir.

2021) (mem.) (holding that Eight Amendment claim based on conditions of "confinement in a

chilled room with constant lighting, no bedding, and only paper-like clothing" bore little

resemblance to the facts in *Carlson*); *Schwarz v. Meinberg*, 761 F. App'x 732 (9th Cir. 2019)

(mem.) (holding that Eighth Amendment claim based on unsanitary cell conditions presented a

new context).  While these contexts are undoubtedly similar, the Supreme Court has counseled

that "even a modest extension [of *Bivens* liability] is still an extension."  *Ziglar*, 137 S. Ct. at

1864.

Because Cohen's claims arise in a new context, the next question is whether there are

"special factors" which the Supreme Court has stated indicate "that the Judiciary is at least

arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages

action to proceed'" and thus further prevent the Court from recognizing a *Bivens* remedy.

*Egbert*, 142 S. Ct. at 1803 (quoting *Ziglar*, 137 S. Ct. at 1858).  The Supreme Court has stated

that "[i]f there is even a single 'reason to pause before applying *Bivens* in a new context,' a court

may not recognize a *Bivens* remedy," *id.* (quoting *Hernandez*, 140 S. Ct. at 743), and where there

are "alternative remedial structures in place, 'that alone,' like any special factor, is reason

enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action,'" *id.* at 1804

(quoting *Ziglar*, 137 S. Ct. at 1858).  It does not matter if those existing remedial structures "do not provide complete relief" or are "not as effective as an individual damages remedy."  *Id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 372, 388 (1983)).

In this case, defendants point to two remedial structures that they argue preclude this Court from recognizing a *Bivens* remedy for Cohen: (i) the FBOP's Administrative Remedy Program and (ii) a writ of habeas corpus.  Dkt. No. 40 at 27–29.  Cohen does not contest that he had these remedial structures available to him; to the contrary, he admits that he availed himself of the latter option.  *See* Oral Argument Tr. at 56 ("Again, one thing about the habeas relief.  My client was freed because of the habeas relief.  That stopped the bleeding, your Honor.").

While the Supreme Court has held that the FBOP's Administrative Remedy Program is an alternative remedial structure sufficient to preclude *Bivens* liability in prior cases, *see, e.g.*, *Malesko*, 534 U.S. at 74 (declining to find *Bivens* remedy where "[i]nmates in respondent's position [] have full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief and grievances filed through the BOP's Administrative Remedy Program"), this Court is reluctant to find—assuming that Cohen's allegations are true as it must at this stage—that Cohen could have successfully remedied the alleged constitutional violations in such a forum.  Cohen alleges in his complaint that senior FBOP officials, including the Director of the FBOP and the Warden of FCI Otisville, effectively acted at the behest of President Trump in committing the various Constitutional violations alleged.  *See, e.g.*, Compl. ¶ 39.  Yet, it is precisely these senior FBOP officials who exercise control over the Administrative Remedy Program:  Complaints are made to the Warden and are appealed to the General Counsel who appears to report up to the Director of the FBOP.[2]  If Cohen's allegations are thus proved, it

---

[2] *See* Administrative Remedy Program, FBOP (Jan. 6, 2014),

is hard to imagine that the same individuals who committed the constitutional violations against Cohen would, in any meaningful sense, provide a remedy for those violations.

Defendants' argument that Cohen had an alternative remedial structure through a writ of habeas corpus is more persuasive.  *See Ziglar*, 137 S. Ct. at 1865 ("And there might have been alternative remedies available here, for example, a writ of habeas corpus."); *Rodriguez v. Easter*, 2022 WL 356478, at *6 (D. Conn. Feb. 7, 2022) ("[C]ourts that have applied the *Ziglar* analysis to a claim of First Amendment retaliation by an inmate have noted the existing alternative remedial structures, including the BOP administrative grievance process and writ of habeas corpus.").  While the Supreme Court has left open the availability of habeas relief for federal prisoners challenging the conditions of their confinement (as Cohen does here), *see Ziglar*, 137 S. Ct. at 1862–63 ("[W]e have left open the question whether they might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *Bell v. Wolfish*, 441 U.S. 520, 527 (1979) (leaving "to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself"), the Second Circuit has held that prisoners in federal custody may seek habeas relief related to the conditions of their confinement under 28 U.S.C. § 2241, *see Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) ("This court has long interpreted § 2241 as applying to challenges to the execution of a federal sentence, 'including such matters as the administration of parole, . . . prison disciplinary actions, prison transfers, type of detention and

---

https://www.bop.gov/policy/progstat/1330_018.pdf; FBOP – Administrative Remedy Program, D.C. Corrections Information Counsel, https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/BOP%20Administrative%20Remedies%2011.15.17%20REVISED.pdf (last visited Nov. 11, 2022); Experienced Leadership, FBOP, https://www.bop.gov/about/agency/leadership.jsp (last visited Nov. 11, 2022).

prison conditions.'"); *Roba v. United States*, 604 F.2d 215, 219 (2d Cir. 1979) ("At that point petitioner's challenge to his transfer while seriously ill would be a challenge to the conditions of his confinement, for which habeas corpus relief under § 2241 would be available."); *Elleby v. Smith*, 2020 WL 2611921, at *2 (S.D.N.Y. May 22, 2020) ("[T]he Second Circuit has held that both habeas petitions, at least for prisoners in federal custody . . . may address conditions of confinement and seek the remedy of transfer (*e.g.*, to a different prison population or facility)."); *Ilina v. Zickefoose*, 591 F. Supp. 2d 145, 146–49 (D. Conn. 2008) (describing § 2241 as a "broad remedy available to federal prisoners challenging the conditions of their confinement"). That Cohen could successfully avail himself of habeas relief is borne out by the fact that he was able to do so in this case.

Cohen also likely could have sought relief through the right of federal courts to enjoin unconstitutional actions by state and federal officers. "Availability of federal equitable relief to remedy constitutional violations has been presumed by the courts," *Jensen v. Farrell Lines, Inc.*, 625 F.2d 379, 383 (2d Cir. 1980), and "it is established practice . . . to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)); *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 337 (2015) (Sotomayor, J., concurring) ("That parties may call upon the federal courts to enjoin unconstitutional government action is not subject to serious dispute."); *see also* Stephen I. Vladeck, *Douglas and the Fate of* Ex Parte Young, Yale L.J. (Forum) (Apr. 30, 2012) ("Whether or not *Ex parte Young* itself articulated this rule, it is now generally understood that injunctive relief for constitutional violations does not require a freestanding statutory cause of action (and instead arises under the relevant constitutional provision)."). As the Supreme Court stated in

*Armstrong*, the "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." 575 U.S. at 327. Thus, even if habeas relief were not available, a citizen imprisoned by the President to prevent him from expressing critical views of that President on the eve of an election is not without remedy. Cohen—and if there ever are any others similarly situated—could have sought an injunction for defendants' violations of the Constitution. *See Ojo v. United States*, 364 F. Supp. 3d 163, 174 (E.D.N.Y. 2019) (finding "there were alternative channels that plaintiff could have pursued" including "injunctive or declaratory relief to challenge and seek alterations to the BOP Policy affecting the provision of dental care."); *see also Malesko*, 534 U.S. at 74 ("And unlike the *Bivens* remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.").

It is worth noting that these alternative remedial structures are hardly adequate replacements for a suit for monetary damages. These alternative remedies would not compensate Cohen for or address the harms Cohen had already suffered prior to the issuance of the injunction. While Cohen would have been able to enjoin the defendants, as he did in this case, "a prospective injunction" does not "normally provide plaintiffs with redress for harms they have already suffered." *Ziglar*, 137 S. Ct. at 1879. Moreover, those avenues for prospective relief do not eliminate the deterrent effect that imprisonment (in solitary confinement) can have on all but the most intrepid. And, while *Bivens* is "concerned solely with deterring the unconstitutional acts of individual officers," *Egbert*, 142 S. Ct. at 1806 (quoting *Malesko*, 534 U.S. at 71), the injunctive relief that Cohen was awarded in his prior case in front of Judge Hellerstein does little to deter the unconstitutional acts of the defendants. An injunction is primarily focused on

19

A-120

stopping an unconstitutional violation from occurring on an ongoing basis. It does not seek to punish someone for what they have done and thus, in turn, deter that person from committing similar wrongs in the future. *See Sec. & Exch. Comm'n v. Stubos*, 2022 WL 6776741, at *10 (S.D.N.Y. Oct. 11, 2022) ("Injunctive remedies, as discussed, are tailored to deter future violations of law by that individual; not to punish the defendant and, through that punishment, send a message to those in the community not to do similar bad acts."). Nevertheless, the Supreme Court has instructed that it does not matter whether the existing remedies provide "complete relief" or appear inadequate. *Egbert*, 142 S. Ct. at 1804 (citation omitted). These difficult issues merit, and will no doubt receive, further consideration in the future, if not in this case.

As things currently stand, however, the Supreme Court's precedents squarely and unequivocally foreclose the *Bivens* claims here. None of the claims present a direct parallel to *Bivens*, *Passman*, or *Carlson*; even if one did, the *Egbert* Court has thrown into doubt the availability of the *Bivens* cause of action for any new claim, particularly where, as here, alternative remedial structures are in place.

As such, Cohen's *Bivens* claims must be dismissed. Before doing so, however, this Court pauses to reiterate the profound violence this holding does to Cohen's constitutional rights. Cohen's complaint alleges an egregious violation of constitutional rights by the executive branch—nothing short of the use of executive power to lock up the President's political enemies for speaking critically of him. The Supreme Court's precedents ensure that there is at best a partial remedy for the abuse of power and violation of rights against the perpetrators of those wrongs. And those precedents rest on a mistaken proposition—that the Court's reluctance to imply a damages remedy for *statutorily created* rights where Congress did not explicitly intend

20

for there to be such a remedy necessarily must extend to a reluctance to find such a remedy for *constitutionally guaranteed* rights.

As Justice Harlan articulated in *Bivens*, "[I]t must also be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities." 403 U.S. at 407 (Harlan, J., concurring). The notion that, for there to be any remedy for such a right, it must be explicitly provided for by one of the very branches of government from whom the right is designed to protect the individual is particularly insidious. And it does not logically follow from the Court's decisions in the statutory realm. The parallel to a jurisprudential shift towards looking to express congressional intent[3] in deciding whether to recognize an implied cause of action for a right conferred by Congress is emphatically not looking towards congressional intent in deciding whether to recognize an implied cause of action for a right conferred by the Constitution itself. Unlike statutory rights, constitutional rights do not stem from Congress; there is no reason why the remedies for such rights must then stem from Congress, and much reason to think that they need not.[4] This is the precise distinction that the Supreme Court recognized, but failed to give

---

[3] *See* Steven I. Vladeck, Bivens *Remedies and the Myth of the "Heady Days,"* 8 U. St. Thomas L.J. 513, 521–22 (2011) ("Whatever the merits of *Sandoval*'s approach, it is worth emphasizing that the crux of the dispute between the majority and the dissenters—and between more recent and older case law—boils down to methodological disagreements over statutory interpretation. There is simply no dispute today that congressional intent is dispositive when it comes to the existence of a private cause of action to enforce a federal statute . . . .").

[4] *See* George D. Brown, *Letting Statutory Tails Wag Constitutional Dogs—Have the* Bivens *Dissenters Prevailed?*, 64 Ind. L.J. 263, 265 (1989) ("One may agree with the Court's reservations about judicial lawmaking, its concern for the doctrine of separation of powers and its general views about the superior institutional competence of Congress. These positions . . . should not be determinative in the *Bivens* context. The basic question is availability of judicial relief for constitutional violations. In the recent cases the statutory tail comes to wag the constitutional dog. That is, the Court's emphasis on the statutory component of the remedial issues tends to obscure and downgrade their constitutional dimension. It is as if the whole problem involved only the judiciary's role in an article I legislative scheme. Yet the *Bivens*

21

meaning to, in *Ziglar*:  "The decision to recognize an implied cause of action under a statute implies somewhat different considerations than when the question is whether to recognize an implied cause of action to enforce a provision of the Constitution itself."  137 S. Ct. at 1856. Rather, a proper inquiry—one parallel to that articulated in *Sandoval*, one still removed from the "heady days" where the Court looked to whether it believed a damages remedy *should* normatively be available for a particular right, and one that would honor the important distinction between rights conferred by a legislative majority and rights conferred by the Constitution—would look to whether the framers—in the language they used, the structure of the government they established, the limitations they intended to place on executive power, and the authority they gave to the federal courts—intended for there to be such a remedy.

There are powerful reasons to believe that, in many circumstances, the answer to that question will be yes,[5] reasons that are not easily brushed aside with the Supreme Court's rejection of *Marbury*'s promise—drawn from English common law, *see Marbury*, 1 Cranch at 163 (quoting Blackstone's commentaries)—that, if one's rights are violated by executive officials, the courts provide a legal remedy for that violation.

\* \* \*

---

doctrine deals with judicial enforcement of rights whose origin is outside of, and hierarchically superior to, any statute.").

[5] *See, e.g.*, Walter Dellinger, *Of Rights and Remedies: The Constitution as a Sword*, 85 Harv. L. Rev. 1532, 1542 (1972) ("Given a common law background in which courts created damage remedies as a matter of course, it is not unreasonable to presume that the judicial power would encompass such an undertaking on the part of the federal courts, unless there were some contrary indication that the judicial implementation of such a remedy was not to be a part of the article III judicial power. While with one exception prior to *Bivens*, the Court has never explicitly exercised the judicial power to create a damage remedy in a case arising under the Constitution, its power to do so would seem rather easily established.").

For the foregoing reasons, the complaint's claims against all the individual defendants, brought under the *Bivens* cause of action, are dismissed.[6]

## II.   Cohen's FTCA Claims

Cohen's remaining causes of action—all brought against the United States—are brought under the FTCA.  Cohen asserts claims for retaliation under New York common law; false arrest, false imprisonment, and abuse of authority and process under New York common law; negligent failure to protect under 18 U.S.C. § 4042; negligent infliction of emotional distress under New York common law; intentional infliction of emotional distress under New York common law; and negligent hiring, retention, training, and supervision under New York common law.  The United States moves to dismiss all of Cohen's FTCA claims.

"The United States, as sovereign, is immune from suit save as it consents to be sued, . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the

---

[6] Defendant Trump also moves to dismiss the claims against him for the independent reason that they are barred by presidential immunity.  Because the claims against Trump are dismissed along with the claims against the other individual defendants, the Court need not address his claimed immunity here.  Nonetheless, it is worth noting—and rejecting—Trump's argument that, effectively, a president may *never* be subject to a damages suit for violations of constitutional rights because "[i]t is blackletter law that a president is entitled to absolute immunity for acts taken within the scope of his official duties," Dkt. No. 42 at 1 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731 (1982)), and *Bivens* claims—if available at all—are available only for actions taken by the official "under color of his authority," *Bivens*, 403 U.S. at 389.  Trump reasons that "[s]ince a president is entitled to absolute immunity for 'acts within the outer perimeter of his official capacity,' it follows that a *Bivens* claim—which must arise from an act performed 'under color of his authority'—cannot be maintained against a [p]resident." Dkt. No 42 at 3.  But the language of these two doctrines is not the same, and there is no reason to assume that the one wholly subsumes the other.  For an official's actions to be "under color of authority," "the conduct must be 'cloaked with official power and the official must purport to be acting under color of official right.'"  *Mueller v. Gallina*, 137 F. App'x 847, 850 (6th Cir. 2005) (mem.) (internal quotation marks omitted and alterations adopted) (quoting *Browning v. Clinton*, 292 F.3d 235, 250 (D.C. Cir. 2002)).  One could imagine a situation, for example, in which the President ordered Secret Service to kidnap his political opponent a few weeks before an election—asserting, all the while, that he was doing so in an exercise of executive authority.  Such an action could be taken under *color* of authority, while at the same time not legitimately within the president's official capacity, and thus not subject to presidential immunity.

suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (internal quotation marks omitted)

(quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).  "'The FTCA, 28 U.S.C.

§§ 13469(b), 2401(b), and 2671–2680, constitutes a limited waiver by the United States of its

sovereign immunity' and allows for tort suits against the United States under specified

circumstances."  *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007) (quoting *Millares

Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998)).  "Under the FTCA, a

private citizen may sue for injuries caused by 'the negligent or wrongful act or omission of any

employee of the Government while acting within the scope of his office or employment, under

circumstances where the United States, if a private person, would be liable to the claimant in

accordance with the law of the place where the act or omission occurred.'"  *Id.* (quoting 28

U.S.C. § 1346(b)).  The FTCA waives sovereign immunity for claims that are:

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of
> property, or personal injury or death [4] caused by the negligent or wrongful act or
> omission of any employee of the Government [5] while acting within the scope of
> his office or employment, [6] under circumstances where the United States, if a
> private person, would be liable to the claimant in accordance with the law of the
> place where the act or omission occurred.

*Id.* (quoting *FDIC v. Meyer*, 510 U.S. 471, 477 (1994)).  The "source of substantive liability

under the FTCA" is "law of the State."  *FDIC*, 510 U.S. at 478.

Cohen's first FTCA claim is a claim for "retaliation," for "the exercising of his right to

free speech," which he asserts is "a tort under the laws of the state of New York."  In defending

the claim in his opposition to the United States' motion to dismiss, however, Cohen makes it

clear that the only substantive source of this claim is the First Amendment.  *See* Dkt. No. 59 at

27 (concluding that "defendants did imprison Mr. Cohen for the lawful exercise of his First

Amendment rights"); *see also id.* at 26 (first quoting *Lancaster v. Incorporated Village of

Freeport*, 1 N.E.3d 302 (N.Y. 2013) (considering a First Amendment retaliation claim); then

quoting *People v. Oeser*, 721 N.Y.S.2d 147 (3d Dep't 2001) (not considering free speech claims

at all); then quoting *People v. Bollander*, 558 N.Y.S.2d 795 (Sup. Ct. 1990) (considering whether

fear of retaliatory prosecution for challenging a conviction implicates due process rights, which

is inapposite to Cohen's claim, and not considering free speech claims at all); and then quoting

*People v. Douglas*, 704 N.Y.S.2d 438, 439 (Sup. Ct. 1999) (noting that "retaliatory" motivation

behind indictment "was particularly offensive and repugnant to the fair administration of law,"

and therefore dismissing an indictment).  That a handful of New York cases, one arising in the

First Amendment context, mention the word "retaliation" does not demonstrate a freestanding

New York common law tort claim for retaliation.  Rather, Cohen's claim is clearly predicated on

the First Amendment.  "The FTCA 'has not waived the Government's sovereign immunity with

respect to claims that its employees have committed constitutional torts' under the federal

constitution."  *Hernandez v. United States*, 939 F.3d 191, 205 (2d Cir. 2019) (alteration adopted)

(quoting *Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994)).[7]  As such, Cohen's first cause

of action against the United States for First Amendment retaliation is not cognizable under the

FTCA and must be dismissed.

  Cohen's second FTCA claim is for false arrest, false imprisonment, and abuse of

authority and process under New York common law.  "False arrest and false imprisonment

overlap; the former is a species of the latter."  *Wallace v. Kato*, 549 U.S. 384, 388 (2007).

"Under New York law, the elements of a false arrest and false imprisonment claim are: '(1) the

defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement,

(3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise

---

[7] In *Hernandez*, the Second Circuit also held that a FTCA claim could not be brought against a
federal officer on the theory that his actions violated the New York State constitution.  939 F.3d
at 205-06.

privileged.'" *Hernandez*, 939 F.3d at 199 (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016) (per curiam)).  "For purposes of the privilege element of a false arrest and false imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause."  *Id.* (internal quotation marks omitted) (quoting *De Lourdes Torres v. Jones*, 47 N.E.3d 747 (2016)).  A claim for false imprisonment will only lie where the confinement does not stem from legal process.  As the Supreme Court articulated:

> Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held *pursuant to such process*—when, for example, he is bound over by a magistrate or arraigned on charges.  Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process.

*Wallace*, 549 U.S. at 389–90.  "[T]he tort of false arrest does not permit recovery for 'confinement imposed pursuant to legal process.'"  *Coakley v. Jaffe*, 72 F. Supp. 2d 362, 363 (S.D.N.Y. 1999) (quoting *Heck v. Humphrey*, 512 U.S. 477, 483 (1994)).

Cohen's false arrest and false imprisonment claim are based on the marshals' shackling him, handcuffing him, and remanding him to MCC and then to FCI Otisville, and his confinement there for sixteen days.  The first three elements of a claim for false arrest and/or false imprisonment are not in contention; there is no doubt that defendants intended to confine Cohen, that Cohen was aware of his confinement, and that Cohen did not consent to his confinement.  The fourth element, however, is plainly absent.  The complaint alleges that Cohen was shackled, handcuffed, remanded, and confined during his thirty-six-month period of incarceration; although he was temporarily released on furlough with a planned transfer to home confinement, an inmate on furlough "[r]emains in the legal custody of the U.S. Attorney General, in service of a term of imprisonment."  28 C.F.R. § 570.38(b)(1).  "Plaintiff's confinement was uncategorically privileged because he was a convicted felon serving his sentence."  *McGowan v.*

*United States*, 94 F. Supp. 3d 382, 390 (E.D.N.Y. 2015).  Just as a prisoner serving a term of incarceration in prison would not have a claim for false imprisonment for his transfer from one cell to another, or even from standard conditions to solitary confinement, Cohen does not have a claim for false imprisonment for his remand and confinement.  Cohen's only response is that "it has already been adjudicated by the Honorable Alvin K. Hellerstein that plaintiff's incarceration was not 'privileged' and was a result of retaliatory conduct engaged in by defendants for the lawful exercise of his First Amendment rights."  Dkt. No. 59 at 28.  That argument does not hold water; Judge Hellerstein found that Cohen's remand was an unconstitutional retaliation for Cohen's exercise of his First Amendment rights, but it does not follow that the remand and his confinement—effectuated pursuant to a remand order for an inmate in federal custody—was the product of "the absence of legal process," *see Wallace*, 549 U.S. at 390.  Rather, Cohen's complaint is not about the absence of legal process but for wrongs incurred while Cohen was subject to legal process and as a result of that process for which a claim of false imprisonment does not lie.

"To prove abuse of process, plaintiff must show that the defendant '(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'"  *Hernandez*, 939 F.3d at 204 (quoting *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)).  The United States argues that this claim, too, fails "[f]or similar reasons."  Dkt. No. 40 at 12.  They argue that the FBOP exercising its authority to determine where a prisoner serves a sentence of incarceration is not exercising "legal process"; no court order is required to effectuate its decisions.  *See Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (citing *Mormon v. Baran*, 35 N.Y.S.2d 906, 909 (Sup. Ct. 1942) for the proposition

27

that "legal process means that a court issued the process, and the plaintiff will be penalized if he violates it").  In some sense, the government's argument appears troubling:  Cohen cannot pursue a false imprisonment claim for his being shackled, handcuffed, remanded to prison, and confined because it was done pursuant to valid legal process in the form of his sentence from Judge Pauley, and thus "his confinement was legally permitted during the duration of his sentence," Dkt. No. 40 at 12, but Cohen also cannot pursue an abuse of process claim for being shackled, handcuffed, remanded to prison, and confined because that was not done pursuant to any legal process, *i.e.*, a court order.  After all, as the unavailability of a false imprisonment claim reflects, Cohen's entire period of detention is pursuant to legal process; without his sentence, the Bureau of Prisons would not possess the authority to remand him to prison without a separate court order.  But—as the only case Cohen cites recognizes—the tort of abuse of process lies in "*causing process to issue* lawfully but to accomplish some unjustified purpose."  *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers' Ass'n*, 343 N.E.2d 278, 280 (N.Y. 1975).  The "abuse" referenced by the tort is that "for maliciously abusing the process of the court," *i.e.*, it addresses those cases in which the process of the court "is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail, or retribution."  *Id.* at 281, 283.  Cohen does not allege that there was an abuse in the process of obtaining the court order pursuant to which he was confined.  What he complains about is that the FBOP perverted its authority under already issued legal process, to accomplish goals for which that process was not originally intended.  In short, since Cohen alleges no misconduct in connection with causing the process to issue, he does not properly allege a claim for abuse of process and his second cause of action must be dismissed.

Third, the government argues that Cohen's emotional distress claims—for negligent infliction of emotional distress and intentional infliction of emotional distress—relate to the same conduct as his false imprisonment and abuse of process claims, and therefore must fall with those claims.  Dkt. No. 40 at 12 (first citing *Moore v. City of New York*, 219 F. Supp. 2d 335, 229 (E.D.N.Y. 2002) for the proposition that "[n]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort authority"; and then citing *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 395 n.3 (S.D.N.Y. 2008) for the proposition that "[t]o the extent a plaintiff is alleging an alternate theory of liability for false arrest, imprisonment and prosecution sounding in negligence, New York does not provide a cause of action under such a theory").  Cohen nowhere addresses this argument or defends the availability of his emotional distress claims if his false imprisonment and abuse of process claims are dismissed.  Therefore, the Court deems the claims abandoned. *See, e.g.*, *Pincover v. J.P. Morgan Chase Bank, N.A.*, 2022 WL 864246, at *11 (S.D.N.Y. Mar. 22, 2022) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (internal quotation marks omitted) (first quoting *Williams v. Mirabal*, 2013 WL 174187, at *2 (S.D.N.Y. Jan 16, 2013)); and then quoting *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004))).

Finally, the United States moves to dismiss Cohen's remaining FTCA claims—for negligent failure to protect and negligent hiring, retention, training, and supervision—as barred by the FTCA's discretionary function exception, which provides that the Government is not liable for:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such

> statute or regulation be valid, or based upon the exercise or performance or the
> failure to exercise or perform a discretionary function or duty on the part of a federal
> agency or an employee of the Government, whether or not the discretion involved
> be abused.

28 U.S.C. § 2680(a).  "The exception covers only acts that are discretionary in nature, acts that

'involve an element of judgment or choice,' and 'it is the nature of the conduct, rather than the

status of the actor that governs whether the exception applies.'"  *United States v. Gaubert*, 499

U.S. 315, 322 (1991) (citations omitted and alterations adopted) (first quoting *Berkovitz by

Berkovitz v. United States*, 486 U.S. 531, 536 (1988); and then quoting *United States v. S.A.

Empresa de Viavao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813 (1984)).  "[E]ven

'assuming the challenged conduct involves an element of judgment,' it remains to be decided

'whether that judgment is of the kind that the discretionary function exception was designed to

shield.'"  *Id.* (quoting *Berkovitz*, 486 U.S. at 536).  The exception "marks the boundary between

Congress' willingness to impose tort liability upon the United States and its desire to protect

certain governmental activities from exposure to suit by private individuals."  *Varig Airlines*, 467

U.S. at 808.

The Second Circuit has described a two-part test, termed the *Berkovitz-Gaubert* test, as

"the framework for evaluating whether particular governmental conduct falls under the"

discretionary function exception:

> According to the *Berkovitz-Gaubert* test, the [discretionary function exception] bars
> suit only if two conditions are met: (1) the acts alleged to be negligent must be
> discretionary, in that they involve "an element of judgment or choice" and are not
> compelled by statute or regulation and (2) the judgment or choice in question must
> be grounded in "considerations of public policy" or susceptible to policy analysis.

*Coulthurst v. United States*, 214 F.3d 106, 109–10 (2d Cir. 2000).

The governmental conduct challenged in the two remaining causes of action is

(1) "negligently operating and managing FCI Otisville," Compl. ¶ 123, presumably in placing

Cohen in solitary confinement in a space with poor ventilation, no air conditioning, and daily temperatures exceeding one-hundred degrees, *id.* ¶ 102; and (2) "negligence, carelessness, and recklessness . . . in failing to meet its duty of care to plaintiff in its screening, hiring, training, supervising, evaluating, managing, controlling, and retaining of defendants and other agents, servants, and employees of the United States," *id.* ¶ 137.  As to the second of these, even assuming that it is well-plead and not conclusory, it clearly falls within the discretionary function exception.  *See, e.g.*, *Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 387 (E.D.N.Y. 2009) ("[F]ederal courts have found such hiring, training, and supervision decisions generally fall within the exception."); *Li v. Aponte*, 2008 WL 4308127, at *8 (S.D.N.Y. Sept. 16, 2008) (holding that the plaintiff's "common law claims against the United States for negligent hiring, training and supervision are barred by the 'discretionary function' exception of the FTCA," and collecting cases for the proposition that "[p]ersonnel decisions of the United States generally fall within the discretionary function exception to the FTCA").  Cohen's negligent hiring, retention, training, and supervision claim therefore cannot proceed.

As to the first of this challenged conduct—the negligent operation and management of FCI Otisville—however, it is a closer call.  The Second Circuit has held that certain negligence claims related to prison management are not subject to the discretionary function exception.  *See Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000).  In *Coulthurst*, the plaintiff, who was a federal prisoner, was lifting weights in the prison exercise room and suffered an injury when a cable on a lateral pull down machine snapped.  *Id.* at 107.  He brought claims against the prison for "'negligence and carelessness' in that the defendant 'failed to diligently and periodically inspect the weight equipment, and the cable' and 'failed to replace the cable after undue wear and tear.'"  *Id.* at 108 (citation omitted).  The district court dismissed the claim as

barred by the discretionary function exception, and the Second Circuit vacated. *Id.* at 108, 111. In doing so, the Second Circuit distinguished between the type of negligence that is involved in designing deficient procedures or decisions about how frequently to inspect the exercise equipment, which involve "elements of judgment and choice" as well as "considerations of public policy," *id.* at 109, and thus would be subject to the discretionary function exception, and the type of negligence that results from an individual officer being carelessly inattentive or lazy in not checking on things, which does not involve elements of judgment and choice or considerations of governmental policy and would not be subject to the discretionary function exception, *id.* The Second Circuit found that the complaint was ambiguous as to which type of negligence was alleged, and therefore that the district court was wrong to dismiss the claim entirely as barred by the discretionary function exception. *Id.* at 109–10.

Cohen's allegations in his complaint are similarly ambiguous as to what type of negligence Cohen is alleging. While Cohen alleges generally that his negligent failure to protect claim is based on the United States' breach of its duty "in negligently operating and managing FCI Otisville," Compl. ¶ 123, it is not clear whether Cohen claims that the alleged "negligence" resulted from the policies and procedures governing FCI Otisville (which allowed for the unsafe conditions in Cohen's cell to occur perhaps due to concerns about costs or resource allocation) or from the carelessness of an individual guard in failing to check that the cell was well-ventilated, air conditioned, and a safe temperature.

To clarify this issue, the Court asked Cohen's counsel at oral argument which of these two theories (or both) he was alleging. Oral Argument Tr. 50. Cohen's counsel stated that he was only alleging that the "policies and procedures in place during COVID at Otisville were egregiously bad in that they, aside from deliberately indifferent, were just negligent in the

A-133

maintenance and upkeep." *Id.* at 50–51.  In other words, Cohen admitted that he was *not* asserting a negligent guard theory of liability.  Unfortunately for Cohen, this concession is fatal to his ability to assert this claim:  *Coulthurst* is clear that the designing of such policies and procedures regarding maintenance and upkeep of prisons are subject to the discretionary function exception and thus Cohen's claim of negligent failure to protect must be dismissed accordingly.

## CONCLUSION

The motions to dismiss are GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 38,[8] 39, 41.


SO ORDERED.


Dated: November 14, 2022
      New York, New York

                                        LEWIS J. LIMAN
                                 United States District Judge

---

[8] Defendants' request to stay discovery in this matter pending adjudication of their motions to dismiss, Dkt. No. 38 has already been addressed, Dkt. No. 66, and nonetheless should be denied as moot.

A-134

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
MICHAEL COHEN,

                              Plaintiff,

              -against-                                              21 **CIVIL** 10774 (LJL)

                                                                    **JUDGMENT**

UNITED STATES OF AMERICA, et al.,

                              Defendants.
-----------------------------------------------------------X

              It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion & Order dated November 14, 2022, Defendants' motions to dismiss

are GRANTED; accordingly, the case is closed.


**Dated:**  New York, New York

              November 15, 2022


                                                            **RUBY J. KRAJICK**

                                                    _____
                                                              **Clerk of Court**

                                          **BY:**         _____
                                                              **Deputy Clerk**

A-135

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| MICHAEL D. COHEN,<br><br>       *Plaintiff,*<br><br>  v.<br><br>UNITED STATES OF AMERICA, DONALD J. TRUMP, former President of the United States, WILLIAM BARR, former Attorney General of the United States, MICHAEL CARVAJAL, Director of the Bureau of Prisons, JON GUSTIN, Administrator of the Residential Reentry Management Branch of the Bureau of Prisons, PATRICK MCFARLAND, Residential Reentry Manager of the Federal Bureau of Prisons, JAMES PETRUCCI, Warden of FCI Otisville, ENID FEBUS, Supervisory Probation Officer of the United States Probation and Pretrial Services, ADAM PAKULA, Probation Officer of the United States Probation and Pretrial Services, and JOHN and JANE DOE (1-10) agents, servants, and employees of the United States<br><br>       *Defendants.* | Case No. 21-cv-10774 (LJL)<br><br><u>**NOTICE OF APPEAL**</u> |

---

NOTICE IS HEREBY GIVEN that Michael D. Cohen, Plaintiff in the above-titled action, hereby appeals to the United States Court of Appeals for the Second Circuit from the Judgment of the United States District Court for the Southern District of New York dismissing all counts of his Complaint entered in this action on November 14th, 2022 (ECF No. 76).

Dated: January 10, 2023
      New York, New York

Respectfully submitted,

*/s/ E. Danya Perry*
E. Danya Perry (No. 2839983)
PERRY GUHA LLP
1740 Broadway, 15th Floor
New York, New York 10019
Email: dperry@perryguha.com
Telephone: (212) 399-8340
Facsimile: (212) 399-8331

*Attorney for Plaintiff Michael D. Cohen*

A-136

**<u>CERTIFICATE OF SERVICE</u>**

     I, E. Danya Perry, certify that on January 10, 2023, I caused the foregoing Notice of Appeal

by Plaintiff Michael D. Cohen to be filed with the Clerk of the Court and served upon all counsel

of record via CM/ECF system.

Dated: January 10, 2023               Respectfully submitted,
       New York, New York

                                 */s/ E. Danya Perry*
                                 E. Danya Perry