# 23-0035-cv

## United States Court of Appeals

*for the*

## Second Circuit

MICHAEL D. COHEN,

*Plaintiff-Appellant,*

– v. –

UNITED STATES OF AMERICA, DONALD J. TRUMP, Former President of the United States, WILLIAM P. BARR, Former Attorney General of the United States, MICHAEL D. CARVAJAL, Director of the Bureau of Prisons, JON GUSTIN, Administrator of the Residential Reentry Management Branch of the Bureau of Prisons, PATRICK MCFARLAND, Residential Reentry Manager of the Federal Bureau of Prisons, JAMES PETRUCCI, Warden of FCI Otisville, ENID FEBUS, Supervisory Probation Officer of the United States Probation and Pretrial Services, ADAM PAKULA, Probation Officer of the United States Probation and Pretrial Services,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

E. DANYA PERRY
PERRY GUHA LLP
1740 Broadway, 15th Floor
New York, New York 10019
(212) 399-8340

KAMI E. QUINN
JON-MICHAEL DOUGHERTY
SARAH SRADERS
GILBERT LLP
700 Pennsylvania Avenue, SE, Suite 400
Washington, DC 20003
(202) 772-2200

*Attorneys for Plaintiff-Appellant*

## <u>Corporate Disclosure Statement</u>

No corporate disclosure statement is required under Federal Rule of

Appellate Procedure 26.1 because Plaintiff/Appellant Michael D. Cohen is not a

nongovernmental corporation.

## Table of Contents

**Page**

Corporate Disclosure Statement ............................................................i

Table of Authorities ............................................................... iii

I.      PRELIMINARY STATEMENT ....................................1

II.     JURISDICTIONAL STATEMENT ...............................2

III.    STATEMENT OF THE ISSUES ...................................3

IV.     STATEMENT OF THE CASE ......................................3

    A.      Mr. Cohen's Work for Donald Trump and His Plans
        to Write a Book Critical of Mr. Trump ...............................3

    B.      Mr. Cohen's Eligibility for Release Because of the
        COVID-19 Pandemic .................................................5

    C.      The Defendants' Revocation of Mr. Cohen's Release and
        Imprisonment of Mr. Cohen in Solitary Confinement ......................6

    D.      Mr. Cohen's Release from Prison on a Writ of Habeas Corpus .........10

    E.      The Present Lawsuit ...............................................11

V.      SUMMARY OF ARGUMENT ....................................12

VI.     STANDARD OF REVIEW ........................................13

VII.    ARGUMENT...........................................................14

    A.      The District Court Erred in Dismissing Mr. Cohen's Valid
        Fourth and Eighth Amendment Claims Under Existing
        Bivens Precedent ...................................................16

    B.      This Court Must Provide a Damages Remedy for Mr.
        Cohen's Injuries ...................................................22

VIII.   CONCLUSION.........................................................24

## <u>Table of Authorities</u>

**Page(s)**

**Cases:**

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
  403 U.S. 388 (1971) ..................................................................... *passim*

*Carlson v. Green*,
  446 U.S. 14 (1980) ................................................................. 15, 16, 17

*Cohen v. United States*,
  – F. Supp. 3d –, No. 21-cv-10774 (LJL), 2022 WL 16925984
  (S.D.N.Y. Nov. 14, 2022) .......................................................................3

*Correctional Servs. Corp. v. Malesko*,
  534 U.S. 61 (2001) ...................................................................... 14, 18

*Davis v. Passman*,
  442 U.S. 228 (1979) ..................................................................... 15, 16

*Egbert v. Boule*,
  142 S. Ct. 1793 (2022) ............................................................... *passim*

*Gonzalez v. Hasty*,
  802 F.3d 212 (2d Cir. 2015) .................................................................13

*Marbury v. Madison*,
  5 U.S. 137 (1803) ........................................................................ 14, 21

*Raines v. Byrd*,
  521 U.S. 811 (1997) ...........................................................................19

*United States v. Mendoza*,
  No. 03-CR-730-ALL, 2004 WL 1191118 (C.D. Cal. Jan. 12, 2004) .................21

*United States v. Richardson*,
  418 U.S. 166 (1974) ...........................................................................19

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) ................................................................... *passim*

**Statutes & Other Authorities:**

U.S. Const. amend. I ............................................................... 11, 19, 22

U.S. Const. amend. IV ................................................................ *passim*

U.S. Const. amend. V.............................................................................15

U.S. Const. amend. VIII.............................................................. *passim*

U.S. Const. art. III, § 2 .........................................................................24

28 U.S.C. § 1291 ....................................................................................3

28 U.S.C. § 1331 ....................................................................................2

Fed. R. App. P. 4(a)(1)(B) .....................................................................2

Fed. R. Civ. P. 12(b)(6).........................................................................13

Letter from Thomas Jefferson to James Madison (Dec. 20, 1787) ........23

The Federalist No. 78 (Alexander Hamilton) ........................................24

## I. PRELIMINARY STATEMENT

### *Ubi ius ibi remedium—*"Where there is a right, there is a remedy"

This appeal raises a fundamental question: May the President and other United States officials conspire with impunity to silence one of the President's critics by revoking without cause his approved release from prison to home confinement and instead throw him into solitary confinement, or should monetary damages be available in the face of such egregiously unconstitutional and antidemocratic conduct?

In mid-2020, Plaintiff/Appellant Michael D. Cohen, who was then in prison for crimes committed at the behest of Defendant/Appellee Donald J. Trump, promoted his plan to publish a book about Mr. Trump, who was then running for re-election. As found by one judge in the Southern District of New York and accepted by another, Mr. Trump's administration retaliated against Mr. Cohen by conditioning his release to home confinement on an agreement to refrain from engaging with the media. When Mr. Cohen did not immediately agree, Defendants/Appellees colluded to revoke Mr. Cohen's approved transition to home confinement and instead remanded him alone for weeks to a filthy, broiling cell. Only judicial intervention ended the ongoing violation of Mr. Cohen's rights.

As the guardians of individual liberties, the courts have the responsibility to remediate the harms done to Mr. Cohen by Mr. Trump and his subordinates. But

1

the District Court reluctantly held that it could not remedy the obvious violations of Mr. Cohen's rights and the resulting injuries. As the District Court acknowledged, this cannot, and must not, be the law of a land that has adhered to foundational ideals like *ubi ius ibi remedium*. Indeed, it is not—the Supreme Court's rulings in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and subsequent cases make clear that a damages remedy is available to Mr. Cohen. If not, the courts must craft a remedy for an act as repugnant to the nation's character as using the police power to silence, imprison, and abuse the President's critics. A nation of laws must recognize real consequences and accountability for such egregious conduct—it must recognize a right to recover damages against the wrongdoers.

Mr. Cohen respectfully requests that this Court reverse the District Court's reluctant dismissal of his Complaint.

## II.    JURISDICTIONAL STATEMENT

The District Court had jurisdiction of this action under 28 U.S.C. § 1331, as this action alleges violations of the Fourth and Eighth Amendments, and therefore arises under the Constitution of the United States. The District Court entered a final order dismissing this action on November 15, 2022. Appellant Michael D. Cohen appealed that order on January 10, 2023, within the time limits specified by Federal Rules of Appellate Procedure 4(a)(1)(B). This Court has jurisdiction under

2

28 U.S.C. § 1291, because this is an appeal from a final order of the District Court that disposed of all parties' claims.

## III. STATEMENT OF THE ISSUES

Whether the District Court erred in dismissing as a matter of law Plaintiff's claim against Defendants Donald J. Trump, William P. Barr, Michael D. Carvajal, Jon Gustin, Patrick McFarland, James Petrucci, Enid Febus, and Adam Pakula under the U.S. Constitution. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

## IV. STATEMENT OF THE CASE

This is an appeal from a final order of the United States District Court for the Southern District of New York dismissing Mr. Cohen's claims for damages under *Bivens*. *See Cohen v. United States*, – F. Supp. 3d –, No. 21-cv-10774 (LJL), 2022 WL 16925984 (S.D.N.Y. Nov. 14, 2022) (Liman, J.).

### A. Mr. Cohen's Work for Donald Trump and His Plans to Write a Book Critical of Mr. Trump

For more than ten years, Mr. Cohen served as an attorney and personal advisor for Mr. Trump. A-20. In August and November 2018, Mr. Cohen pled guilty to violations of federal law that he committed at the direction of, in coordination with, and for the benefit of Mr. Trump during his tenure as Mr. Trump's employee. A-21. As a result, Mr. Cohen was sentenced to 36

months incarceration, which he began serving at Federal Correctional Institution ("FCI") Otisville on May 6, 2019. A-21.

During the first year of his incarceration, Mr. Cohen began writing a book detailing his experiences with Mr. Trump over the preceding decade. A-21. The book contained allegations of unseemly behavior by Mr. Trump, including episodes in which Mr. Trump made anti-Semitic and racist comments. A-21– A-22. Many of the book's vignettes were supported by quotes and documentary evidence. A-22. Mr. Cohen's work drafting the book was consistent with all Bureau of Prisons ("BOP") and FCI Otisville rules and regulations. A-22.

Mr. Cohen made several public statements about his book. A-21–A-22. In his statements, Mr. Cohen related that his book concerned matters of great national concern and interest. A-21. Mr. Cohen was clear his book would be unfavorable to Mr. Trump. A-22. Mr. Cohen stated his book would provide additional support for his prior congressional testimony that Mr. Trump was, among other things, "a cheat, a liar, a conman, [and] a racist." A-22.

Throughout 2020, Mr. Trump was running for re-election. *See* A-22. Mr. Trump was aware that the conduct detailed in Mr. Cohen's book would reflect poorly on him and could negatively impact his presidential campaign. A-22. Mr. Trump was also aware of Mr. Cohen's negative testimony before Congress concerning Mr. Trump's behavior and character. A-22.

4

**B.    Mr. Cohen's Eligibility for Release Because of the COVID-19 Pandemic**

In March 2020, the COVID-19 pandemic caused Congress and the Department of Justice to recognize that the coronavirus could spread rapidly within the close confines of a prison. *See* A-23. Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which, among other things, authorized the director of the BOP to increase the use of home confinement for prisoners. A-23. On March 26, 2020 and April 3, 2020, Defendant/Appellee then-Attorney General William P. Barr issued memoranda prioritizing home confinement for inmates facing high risk from COVID-19. A-23.

Mr. Cohen was particularly concerned with the spread of COVID-19, as he suffered from various comorbidities that made him highly susceptible to infection, serious injury, and death from the virus. A-23. On March 31, 2020, Mr. Cohen petitioned for early release to home confinement from FCI Otisville based on the CARES Act. A-23.

BOP officials determined that Mr. Cohen was eligible to be released on furlough, then transferred to home confinement. A-23. Mr. Cohen's furlough was approved on April 18, 2020, and he was released on May 21, 2020. *See* A-23.

During his furlough, Mr. Cohen made several public statements, via Twitter, regarding his forthcoming book about Mr. Trump. A-23. On several occasions, Mr. Cohen's tweets included the hashtag "#WillSpeakSoon." A-23. On

5

July 2,2020, Mr. Cohen tweeted that he had almost completed the book.  A-13.

Mr. Cohen planned to release his book by late September 2020.  A-23.

### C. The Defendants' Revocation of Mr. Cohen's Release and Imprisonment of Mr. Cohen in Solitary Confinement

On July 7, 2020, Mr. Cohen was contacted by the GEO Group ("GEO")—a third-party contractor for the BOP—regarding his transition from furlough to home confinement.  A-13.  GEO scheduled this transition to occur on July 9, 2020.  A-13.  GEO would then supervise Mr. Cohen's residential reentry, monitor Mr. Cohen with an ankle tracking system, and enforce other customary home confinement rules.  A-13.

However, on July 8, 2020—the day before GEO was to effectuate Mr. Cohen's transition to home confinement—Mr. Cohen was contacted by Defendant/Appellee Adam Pakula, a probation officer with the United States Probation and Pretrial Services ("PTS"), and informed that PTS was taking over Mr. Cohen's case from GEO.  A-13.

Defendant/Appellee Patrick McFarland, residential re-entry manager of the BOP, instructed Mr. Pakula to direct Mr. Cohen to travel to the PTS office at the criminal courthouse in lower Manhattan on July 9, 2020.  A-13.  In explaining this requirement to Mr. Cohen, Mr. Pakula stated that Mr. Cohen had to review home confinement paperwork at PTS's offices.  A-14.  Mr. Pakula stated that, after Mr. Cohen had appeared and reviewed the required paperwork, Mr. Pakula and

other probation officers would travel to Mr. Cohen's residence, where the meeting would continue, and Mr. Cohen would be fitted with an ankle bracelet. A-14.

On July 9, 2020, Mr. Cohen and his attorney reported to the PTS office as directed. A-24. They met with Mr. Pakula and Defendant/Appellee Enid Febus, a supervisory probation officer, who gave Mr. Cohen a two-page Federal Location Monitoring Program Participant Agreement (the "FLM") to sign. A-24. The very first paragraph of the FLM sought to prohibit Mr. Cohen from engaging with the media in any way:

> [Signatory agrees that there will be] [n]o engagement of any kind with the media, including print, tv, film, books, or any other form of media/news. Prohibition from all social media platforms. No posting on social media and a requirement that you communicate with friends and family to exercise discretion in not posting on your behalf or posting an information about you. The purpose is to avoid glamorizing or bringing publicity to your status as a sentenced inmate serving a custodial term in the community.

A-24.

This paragraph restricting a prisoner's speech is not included in standard FLMs for individuals transitioning to home confinement status. A-24. The FLM itself was not in the standard form issued by the BOP, contained grammatical and typographical errors, and had no legend identifying its federal form designation. A-24. It was clear to Mr. Cohen and his counsel that Defendants were hastily attempting to unlawfully restrict his right to free speech. A-24.

7

Recognizing that these conditions would prevent him from speaking about, let alone publishing, his book, Mr. Cohen and his counsel asked why these apparently unique conditions were included in the FLM.  A-25.  Mr. Pakula and Ms. Febus insisted that this was in fact a standard form.  A-25.  They further asserted that Mr. Cohen was not being treated any differently than other individuals placed on confinement status.  A-25.

Mr. Cohen and his attorney next asked whether these conditions could be revised or removed.  A-25.  Mr. Pakula and Ms. Febus stated that they would consult with their superiors.  A-25.  In the interim, the parties continued their review of the FLM.  A-25.  Upon the parties' completion of the review, Mr. Pakula and Ms. Febus then directed Mr. Cohen and his counsel to remain in the waiting area until they received a response from their superiors regarding the speech-restricting paragraph of the FLM.  A-26.  At no point was Mr. Cohen asked to sign the FLM.  A-25.  Mr. Cohen never refused to sign the FLM.  A-26.

After complying with the directive to remain in the waiting room for about 45 minutes, Mr. Cohen's attorney asked for an update concerning Mr. Cohen's and his counsel's request that the speech-restricting conditions be revised or removed. A-26.  Mr. Pakula assured Mr. Cohen's counsel that everything was fine, and that the PTS staff was still awaiting a response.  A-26.  After another 45 minutes, without warning, three U.S. Marshals arrived in the waiting area and served

8

Mr. Cohen's counsel with a remand order from Defendant/Appellee Patrick McFarland, which stated Mr. Cohen was to be remanded to prison for the false reason that Mr. Cohen had "failed to agree to the terms of Federal Location Monitoring." A-26.

Over the objections of Mr. Cohen's counsel, the U.S. Marshals shackled and handcuffed Mr. Cohen. A-26. As the Marshals prepared to take Mr. Cohen away, Mr. Cohen's attorney told Mr. Pakula and Ms. Febus that the meeting was not finished; that he and Mr. Cohen were waiting to learn what, if anything, could be adjusted in the FLM; that the claim in the remand order was not true; and that Mr. Cohen was willing to sign the FLM "as-is." A-26–A-27. As he was being detained by the Marshals, Mr. Cohen repeatedly stated that he would sign the FLM. A-27. Mr. Pakula and Ms. Febus responded that the situation was "out of [their] hands," and that the FLM was no longer on the table. A-27.

The U.S. Marshals transported Mr. Cohen to the Metropolitan Correctional Center in Manhattan. A-27. Hours later, Mr. Cohen was turned over to FCI Otisville correctional officers, who brought him back to prison. A-27. Defendant/Appellant James Petrucci, the warden of FCI Otisville, placed Mr. Cohen in solitary confinement. A-15, A-27. There he remained for sixteen days. A-15, A-27.

In solitary confinement, Mr. Cohen spent approximately 23.5 of every 24 hours alone in an eight-by-twelve-foot cell. A-27. The cell had poor ventilation and no air conditioning. A-27. In the July heat, daytime temperatures within Mr. Cohen's cell exceeded one hundred degrees. A-27. At times, his blood pressure became dangerously high, resulting in severe headaches, shortness of breath, and anxiety. A-28. While in solitary confinement, Mr. Cohen's ability to communicate with the outside world was severely curtailed, and he was not able to continue drafting his book or make any public statements. A-28.

### D. Mr. Cohen's Release from Prison on a Writ of Habeas Corpus

On July 20, 2020, Mr. Cohen filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of New York. *See* A-15; *Cohen v. Barr*, No. 1:20-cv-5614 (AKH) (S.D.N.Y.). Three days later, the Honorable Alvin K. Hellerstein held a hearing on Mr. Cohen's request for a preliminary injunction and issued an order that Mr. Cohen be released from custody. *See* A-39. The District Court found the "**purpose in transferring Cohen from release on furlough and home confinement back to custody *was retaliatory* in response to Cohen desiring to exercise his First Amendment rights** to publish a book critical of the President and to discuss the book on social media." A-39 (emphases added). On July 24, 2020, after sixteen days of solitary

10

confinement under deplorable conditions, Mr. Cohen was released to home

confinement through GEO at its Bronx location.  *See* A-39.

### E.    The Present Lawsuit

On December 16, 2021, Mr. Cohen filed the complaint in this matter in the

United States District Court for the Southern District of New York.  *See* A-11,

A-37.  Mr. Cohen asserted claims for damages under *Bivens* for the egregious

violations of his constitutional rights under the First, Fourth, and Eighth

Amendments and his statutory rights under the Federal Tort Claims Act.  A-29–

A-36.  The Defendants moved to dismiss the complaint.  Judge Liman held a

hearing on August 20, 2022.

Judge Liman was clearly troubled by the "profound violence" a dismissal

would do to Mr. Cohen's constitutional rights.  A-120.  As his opinion stated,

> Cohen's complaint alleges an egregious violation of constitutional
> rights by the executive branch—nothing short of the use of executive
> power to lock up the President's political enemies for speaking
> critically of him.  The Supreme Court's precedents ensure that there is
> at best a partial remedy for the abuse of power and violation of rights
> against the perpetrators of those wrongs.  And those precedents rest on
> a mistaken proposition—that the Court's reluctance to imply a damages
> remedy for *statutorily created* rights where Congress did not explicitly
> intend for there to be such a remedy necessarily must extend to a
> reluctance to find such a remedy for *constitutionally guaranteed* rights.
>
> . . .
>
> . . . [A] proper inquiry . . . would look to whether the framers—in the
> language they used, the structure of the government they established,
> the limitations they intended to place on executive power, and the

11

authority they gave to the federal courts—intended for there to be such a remedy.

There are powerful reasons to believe that, in many circumstances, the answer to that question will be yes, . . . if one's rights are violated by executive officials, the courts provide a legal remedy for that violation.

A-120–A-122. Nevertheless, on November 14, 2022, Judge Liman granted Defendants' motions and dismissed Mr. Cohen's complaint. A-133. Judge Liman held that a cause of action seeking damages for violations of Mr. Cohen's constitutional rights was not available under Supreme Court jurisprudence. A-120. The District Court also dismissed all of Mr. Cohen's FTCA claims. A-123–A-133.

Mr. Cohen timely filed this appeal on January 10, 2023.

## V.    SUMMARY OF ARGUMENT

The President of the United States, months before facing re-election, attempted to silence one of his most vocal critics by throwing him into prison and holding him in deplorable conditions, taxing his mental and physical health. Despite these flagrant violations of Mr. Cohen's constitutional rights, the District Court dismissed his claims for relief pursuant to *Bivens*. The District Court's decision must be reversed.

The District Court erred in finding that a damages remedy was unavailable to Mr. Cohen under the Supreme Court's jurisprudence first set forth in *Bivens*, and later refined by subsequent decisions. Under the Supreme Court's test in *Ziglar v. Abbasi*, 582 U.S. 120 (2017), Mr. Cohen has stated a claim for damages for

12

violations of his Fourth and Eighth Amendment rights.  Mr. Cohen's claims are not

"'meaningful[ly]' different" from prior cases in which the Supreme Court has

recognized damages action.  *Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022)

(alteration in original) (citation omitted).  Even if they were, there are no "special

factors" here indicating that Congress is better equipped than the judiciary to

provide a damages remedy.  *Id.* (citation omitted).  Mr. Cohen's claims should be

allowed to proceed.

Even if, however, this Court finds that Mr. Cohen's claims do not squarely

match with the circumstances in *Bivens*, it should find that, in *these* circumstances,

providing no remedy would so uniquely and fundamentally upend the rule of law

and basic premises of constitutional rights, that Mr. Cohen must be permitted to

bring a suit for damages.

The District Court's decision must be reversed.

## VI.  STANDARD OF REVIEW

This Court reviews the District Court's decision *de novo*, "accepting the

allegations in the complaint as true and drawing all reasonable inferences in favor

of the non-moving party."  *Gonzalez v. Hasty*, 802 F.3d 212, 219 (2d Cir. 2015)

(reviewing dismissal of *Bivens* claims under Fed. R. Civ. P. 12(b)(6)).

## VII.  ARGUMENT

The Bill of Rights memorializes certain fundamental, inviolable rights of United States citizens.  The Bill of Rights *defends* the people from governmental efforts to limit or deny the people their fundamental freedoms.

The Fourth Amendment recognizes that every person is to be free from unreasonable seizure.  The Eighth Amendment codifies every person's right to be free from cruel and unusual punishment.  These guarantees are worthless unless there is a mechanism for redressing their violations.  As the Supreme Court long ago stated, "[t]he Government of the United States has been emphatically termed a government of laws, and not of men.  It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right." *Marbury v. Madison*, 5 U.S. 137, 163 (1803).  "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Bivens*, 403 U.S. at 397 (quoting *Marbury*, 5 U.S. at 163).  "[D]amages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Id.* at 395.

Thus, the Supreme Court has repeatedly recognized "an *implied* private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (emphasis added).  In *Bivens*, the Supreme Court recognized an implied

14

damages remedy under the Fourth Amendment. 403 U.S. 388. In the following

decade, the Court held similarly with respect to the Due Process Clause of the Fifth

Amendment, *Davis v. Passman*, 442 U.S. 228 (1979), and the Cruel and Unusual

Punishments Clause of the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14

(1980).

     *Bivens* remains good law. *Egbert*, 142 S. Ct. at 1809 (declining to

reconsider *Bivens*); *id.* at 1823 (Sotomayor, J., concurring in part and dissenting in

part) ("[L]ower courts should not read [*Egbert*] to render *Bivens* a dead letter.").

To be sure, the Supreme Court has declined to extend *Bivens* and, indeed, has said

that it should be limited to "the most unusual circumstances." *Id.* at 1800. But

what could be more "unusual" than the present circumstances? A prisoner who is

about to be released to home confinement publicizes his intention to write a book

critical of the President. The President and his subordinates circumvent the usual

release procedures, lure the President's critic to the federal courthouse, abruptly

condition his release upon his waiver of his fundamental right to free speech,

revoke the approved release when the critic questions this condition, and ultimately

throw the critic into solitary confinement. These circumstances would not be

unusual in fascist or authoritarian regimes. Surely, they are unusual here. Indeed,

they are anathema to the American system of justice. Here, the District Court

erred in failing to recognize that Mr. Cohen's claims involve those "unusual

15

circumstances" that present ample reason to believe the judiciary, and not Congress, is best suited to craft a damages remedy for constitutional violations of the kind Mr. Cohen suffered. *Id.* at 1800.

That the present circumstances are "most unusual" is confirmed by application of the test announced in *Ziglar*, for determining whether a *Bivens* claim exists. Under that test, a court first asks whether the plaintiff's claim is "'meaningful[ly]' different" from the claims recognized in *Bivens*, *Passman*, and *Carlson*. *Egbert*, 142 S. Ct. at 1803 (alteration in original) (quoting *Ziglar*, 582 U.S. at 139). If so, the Court then asks whether there are "special factors" counselling hesitation to recognize a private right of action where Congress has not done so. *Id.* at 1803 (quoting *Ziglar*, 582 U.S. at 136).

### A. The District Court Erred in Dismissing Mr. Cohen's Valid Fourth and Eighth Amendment Claims Under Existing *Bivens* Precedent

Mr. Cohen seeks damages against Defendants/Appellees for violating his Fourth Amendment right against unreasonable seizure of his person and his Eighth Amendment right against cruel and unusual punishment. A-35–A-36. His claims do not "differ in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Ziglar*, 582 U.S. at 139–40.

In *Bivens*, the Supreme Court found a damages remedy where the plaintiff suffered an unconstitutional arrest in violation of the Fourth Amendment. 403 U.S.

16

at 389. Mr. Cohen has asserted that the Defendants engaged in remarkably similar conduct—an unreasonable seizure of his person.[1]

Mr. Cohen has also stated a claim for damages under the Eighth Amendment. In *Carlson*, the Supreme Court recognized a claim for damages premised on a violation of the Eighth Amendment where the plaintiff was held in grossly inadequate conditions and the defendants were deliberately indifferent to his serious medical needs. *See* 446 U.S. at 16 n.1, 18. Mr. Cohen similarly alleges that he was held in harmful conditions with deliberate indifference to the emotional harm and physical injury that he suffered.[2]

---

[1] Moments before he was to be released to home confinement, Mr. Cohen was literally seized by U.S. Marshals and led away from his attorney in shackles. There is also little doubt that the seizure was unreasonable; the release that the BOP had approved for Mr. Cohen—and that Defendant/Appellee Barr's memoranda said was appropriate for similarly situated prisoners—was suddenly withdrawn, in response to Mr. Cohen and his counsel daring to ask a question concerning the requirement that Mr. Cohen agree to a bespoke speech restriction. Judge Hellerstein's decision on Mr. Cohen's petition for habeas corpus puts to rest any doubt that Mr. Cohen's reincarceration was a "retaliatory" act in violation of the Fourth Amendment. *See* A-39.

[2] Defendants/Appellees may argue that Mr. Cohen's case "differ[s] in a meaningful way because of," among other reasons, "the rank of the officers involved." *Ziglar*, 582 U.S. at 139–40. But the quoted language from *Ziglar* is dicta, and the Supreme Court's use of the term "might" makes clear that the ranks of the Defendants here do not necessarily make this case meaningfully different from *Bivens* and *Carlson*. *See id.* Further, the fact that some of the officials involved are of higher rank makes this a more compelling case for damages, not a less compelling one. In any event, Mr. Cohen should at least have a right to damages from the lower-ranking officials named in the complaint.

17

Mr. Cohen likewise satisfies the second prong of the two-part test. The unlawful conduct of Mr. Trump and those working at his direction is far beyond any constitutional violation previously contemplated by the courts—"nothing short of the use of executive power to lock up the President's political enemies for speaking critically of him." A-120. It presents a unique and unusual circumstance where prescribing a cause of action is the responsibility of the courts, not Congress. *Egbert*, 142 S. Ct. at 1800. Quite simply, there are *no* "special factors" indicating that the judiciary is less equipped than Congress to weigh the costs and benefits of allowing Mr. Cohen's claims to proceed. *See id.* at 1803 (citation omitted).

Mr. Cohen's claims do not "call into question the formulation and implementation of a general policy," a claim disfavored in *Ziglar*. 582 U.S. at 140–41 (denying a *Bivens* remedy where plaintiffs "challenge the confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack on American soil"). Instead, Mr. Cohen seeks to hold individuals responsible for their individual acts that resulted in constitutional violations committed against one person. *See Malesko*, 534 U.S. at 70 ("The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations."). Further, unlike other cases where the Supreme Court has denied a *Bivens* remedy, this case does not involve a realm of

18

law best left to one of the other branches of government, such as the national

security or military concerns present in *Ziglar* and *Egbert*.[3]  Instead, it involves the

heart of the courts' guardianship—protection of individual liberties.  *See Raines v.*

*Byrd*, 521 U.S. 811, 829 (1997) ("The irreplaceable value of the power [of Article

III courts] . . . lies in the protection it has afforded the constitutional rights and

liberties of individual citizens and minority groups against oppressive or

discriminatory government action.") (quoting *United States v. Richardson*,

418 U.S. 166, 192 (1974) (Powell, J., concurring).

Additionally, there are no "alternative remedial structures in place" that

would limit the judiciary's ability to recognize a damages cause of action for

Mr. Cohen.  *Egbert*, 142 S. Ct. at 1804.  The District Court correctly found that

Mr. Cohen could not have relied on the BOP's Administrative Remedy Program,

as "it is hard to imagine that the same individuals who committed the constitutional

violations against Cohen would, in any meaningful sense, provide a remedy for

those violations."  A-116–A-117.  The District Court also recognized, correctly,

that a writ of habeas corpus and injunctive relief "are hardly adequate replacements

for a suit for monetary damages.  These alternative remedies would not

---

[3] The Defendants in this case have not claimed that Mr. Cohen's remand to prison
was in service of some important objective or interest of the government.  Instead,
all that the record reflects concerning the reasons for Mr. Cohen's remand is
Judge Hellerstein's conclusion that it was "retaliation" for Mr. Cohen's exercise of
his First Amendment rights.  *See* A–39.

compensate Cohen for or address the harms Cohen had already suffered prior to the issuance of the injunction"; nor do they "eliminate the deterrent effect that imprisonment (in solitary confinement) can have on all but the most intrepid." A-119. The District Court further noted that "the injunctive [habeas] relief that Cohen was awarded in his prior case in front of Judge Hellerstein does little to deter the unconstitutional acts of the defendants." A-119.

Despite recognizing the inadequacy of habeas and injunctive relief for Mr. Cohen's past injuries, the District Court nonetheless held that these remedies were available alternatives to a *Bivens* action. In so holding, the District Court erred. Although a granted habeas petition stops constitutional violations from *continuing*, it neither makes an injured person whole nor deters future wrongdoing. As the District Court conceded, "'a prospective injunction' does not 'normally provide plaintiffs with redress for harms they have already suffered.'" A-119 (citation omitted). Nor does it accomplish an important constitutional goal articulated in *Bivens*—"deterring the unconstitutional acts of individual officers." *Egbert*, 142 S. Ct. at 1806 (citation omitted). Thus, the District Court should have recognized that for Mr. Cohen—who "challenge[s] individual instances of discrimination . . . which due to their very nature are difficult to address except by way of damages actions after the fact,"—"'it is damages or nothing.'" *Ziglar*, 582 U.S. at 144 (quoting *Bivens*, 403 U.S. at 410).

20

In the absence of a suitable remedy, the sole consideration, then, is whether Congress or the judiciary is the better source of one. There is ample reason to think that the judiciary is better suited than Congress to craft a meaningful remedy for the violations Mr. Cohen alleges. Congress, a political body, is unlikely to consider, let alone approve, legislation that would authorize citizens to seek damages from executive branch officials when the President is a member of the same party that controls Congress. And a President of the opposite party would veto such legislation.

The judiciary, on the other hand, is insulated from politicization, and can therefore act to protect citizens from the government's violations of their constitutional rights. *See United States v. Mendoza*, No. 03-CR-730-ALL, 2004 WL 1191118, at *3 (C.D. Cal. Jan. 12, 2004) ("[T]he Founders intended that the Judiciary would operate independent of political agendas and programs, insulated from pressures and interests of an oft-impulsive electorate . . . ."). It is for this reason that the courts' traditional role includes the prevention and remediation of unconstitutional actions by the other branches of government. *See Marbury*, 5 U.S. 137.

Thus, there is *no* reason to think that Congress might be better equipped to create a damages remedy in this instance. The District Court erred in dismissing Mr. Cohen's Fourth and Eighth Amendment claims.[4]

### B. This Court Must Provide a Damages Remedy for Mr. Cohen's Injuries

If this Court finds that the existing framework articulated by the Supreme Court for plaintiffs seeking damages as redress for constitutional violations does not allow Mr. Cohen to recover for his injuries, it should find that this case presents a unique context outside of *Bivens* that enables Mr. Cohen to bring a suit for damages. This case presents a singular example of the distinction between the many cases for which it is appropriate for the courts to require a statutory framework for a damages remedy and those thankfully rare cases in which there can be no remedy if it is not found in the courts.

This case presents a unique challenge to the rule of law. It asks the courts to consider an illegal act by a President of the United States that targets, silences, and punishes one of his most public and vociferous critics. In a nation of laws and a society premised on notions of individual liberty, this type of violation is so fundamentally undemocratic that there *must be* a cause of action in the courts to remedy and deter it. The Court must not turn a blind eye to the type of misconduct

---

[4] In light of the Supreme Court's holding in *Egbert*, 142 S. Ct. at 1807, Mr. Cohen has not appealed the District Court's dismissal of his First Amendment claim.

Mr. Cohen alleges here because it is insufficiently analogous to earlier cases involving misconduct by line law enforcement officers, or because there is a metaphysical chance that some Congress some time in what is likely a distant future will provide a suitable remedy. To do so would render a nullity the concepts of a people endowed with certain inalienable rights, of an executive with limited powers, and of a judiciary empowered to check and deter the abuses of a rogue executive.

"[A] bill of rights is what the people are entitled to *against* every government on earth, general or particular, and what no just government should refuse . . . . " Letter from Thomas Jefferson to James Madison (Dec. 20, 1787), https://founders.archives.gov/documents/Jefferson/01-12-02-0454 (emphasis added). When the government *has* unjustly refused its citizens these rights, the judiciary cannot simply leave the defense of the citizenry, the enforceability of rights, and the consequences of their denial to a political branch, here Congress, to remedy these wrongs. As the District Court noted, "[u]nlike statutory rights, constitutional rights do not stem from Congress; there is no reason why the remedies for such rights must then stem from Congress, and much reason to think that they need not." A-121.

Here, the head of the executive branch wielded his immense power to have one of his critics silenced, thrown back into prison, and kept in conditions

dangerous to his health. Only an act of the judiciary stopped the abuse. The Constitution grants the federal courts jurisdiction over cases arising under the Constitution. U.S. Const. art. III, § 2. ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution . . . . "). If the courts' existing *Bivens* jurisprudence does not afford Mr. Cohen a remedy, the Court must find that this case falls outside the traditional realm of *Bivens* claims. *Bivens*, at its essence, reflects a discussion of the courts' authority to remedy constitutional violations; *Bivens* is not the authority *itself*. It "has been the rule *from the beginning* that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bivens*, 403 U.S. at 392 (emphasis added) (citation omitted); *see* The Federalist No. 78 (Alexander Hamilton) ("A constitution is, in fact, and must be regarded by the judges, as a fundamental law. It therefore belongs to them to ascertain its meaning . . . . "). The Second Circuit should not close its eyes to the lawlessness the District Courts have recognized. Instead, the Court should recognize that, where such a grievous injury is done to a citizen's rights and to the nation's rule of law, there must be a remedy. The District Court's order dismissing Mr. Cohen's Complaint should be reversed.

## VIII. CONCLUSION

This Court should reverse the District Court's order of dismissal and remand to the District Court for further proceedings.

24

Dated: April 24, 2023 /s/ Jon-Michael Dougherty
Kami E. Quinn
Jon-Michael Dougherty
Sarah Sraders
GILBERT LLP
700 Pennsylvania Avenue, SE, Suite 400
Washington, DC 20003
(202) 772-2200

-and-

E. Danya Perry
PERRY GUHA LLP
1740 Broadway, 15th Floor
New York, New York 10019
(212) 399-8340
*Attorneys for Plaintiff-Appellant*