# 23-35

## United States Court of Appeals
## for the Second Circuit



MICHAEL D. COHEN,

*Plaintiff-Appellant,*

-v-

UNITED STATES OF AMERICA, DONALD J. TRUMP, FORMER PRESIDENT OF THE UNITED STATES, WILLIAM P. BARR, FORMER ATTORNEY GENERAL OF THE UNITED STATES, MICHAEL D. CARVAJAL, DIRECTOR OF THE BUREAU OF PRISONS, JON GUSTIN, ADMINISTRATOR OF THE RESIDENTIAL REENTRY MANAGEMENT BRANCH OF THE BUREAU OF PRISONS, PATRICK MCFARLAND, RESIDENTIAL REENTRY MANAGER OF THE FEDERAL BUREAU OF PRISONS, JAMES PETRUCCI, WARDEN OF FCI OTISVILLE, ENID FEBUS, SUPERVISORY PROBATION OFFICER OF THE UNITED STATES PROBATION AND PRETRIAL SERVICES, ADAM PAKULA, PROBATION OFFICER OF THE UNITED STATES PROBATION AND PRETRIAL SERVICES,

*Defendant-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE
## DONALD J. TRUMP

HABBA MADAIO & ASSOCIATES LLP
*Attorneys for Defendant-Appellee*
Donald J. Trump, Former President of the United States
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
(908) 869-1188
*ahabba@habbalaw.com*

# **TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES .................................................................... *iii*

STATEMENT OF THE CASE ................................................................ 1

ISSUES PRESENTED FOR REVIEW ................................................... 5

SUMMARY OF ARGUMENT ............................................................... 5

ARGUMENT ......................................................................................... 7

I.    THE DISTRICT COURT PROPERLY HELD THAT
APPELLANT'S BIVENS CLAIM IS PRECLUDED ................................... 7

    A. Expanding the Bivens Doctrine is Highly Disfavored Judicial
       Activity. ...................................................................................... 8

    B. Appellant Seeks to Extend Bivens to a New Context. ............... 13

    C. There Are Special Factors Counselling Hesitation Against
       Implying a New Bivens Remedy................................................. 18

    D. The District Court Correctly Found That Appellant Could Avail
       Himself of Alternative Remedies, Thereby Precluding a Bivens
       Claim. ......................................................................................... 23

II.   APPELLANT'S CLAIMS ARE BARRED BY PRESIDENTIAL
IMMUNITY .......................................................................................... 27

    A. The Complaint Affirmatively Pleads That Appellee Was Acting
       Within the Scope of His Presidential Duties ............................. 29

    B. A Bivens Claim Inherently Fails Against a President.................. 33

III.  THE COMPLAINT FAILS TO PUT FORTH A COGNIZABLE
CAUSE OF ACTION AGAINST APPELLEE.............................................. 35

IV.   THIS COURT SHOULD NOT INVENT A NEW CAUSE OF
      ACTION THAT CIRCUMVENTS EXISTING CASE LAW......................38

CONCLUSION .......................................................................................40

CERTIFICATION PURSUANT TO Fed. R. App. P. 32(a)(7)(B) and (C) ...........41

# TABLE OF AUTHORITIES

***Cases***                                                                                     ***Page(s)***

_Allen v Biden_,
 CV-21-01150-PHX-JAT, 2021 WL 3472740,
 at *1 (D. Ariz., Aug. 6, 2021) ...............................................................................33

_Arar v. Ashcroft_,
 585 F.3d 559, 573 (2d Cir. 2009) .....................................................18, 19, 37, 38

_Ashcroft v. Iqbal_,
 556 U.S. 662 (2009).........................................................................................5, 7

_Barr v. Matteo_,
 360 U.S. 564, 575 (1959)....................................................................................32

_Barret v. Harrington_,
 130 F.3d 246, 254-55 (6th Cir. 1997).............................................................28, 32

_Beattie v. Boeing Co_.,
 43 F.3d 559, 563 (10th Cir.1994) .......................................................................19

_Bell Atlantic Corp. v. Twombly_.,
 550 U.S. 544, 555 (2007)....................................................................................35

_Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics_,
 403 U.S. 388 (1971).....................................................................................*passim*

_Brown v Obama_,
 10-CIV-6426-LBS, 2011 WL 2207569, at *2 (S.D.N.Y., May 31, 2011).........33

_Bush v. Lucas_,
 462 U.S. 367 (1983)............................................................................................10

_Butz v. Economou_,
 438 U.S. 478, 501 (1978).......................................................................................7

_Callahan v. Fed. Bureau of Prisons_,
 965 F.3d 520, 524 (6th Cir. 2020) ......................................................................25

*Cannenier v. Skipper-Scott*,
    No. 18 Civ. 2383, 2019 WL 764795, at *5 (S.D.N.Y. Feb. 20, 2019)...............24

*Carlson v. Green*,
    446 U.S. 14 (1980)....................................................................9, 13, 18

*Chappell v. Wallace*,
    462 U.S. 296 (1983)...........................................................................10

*Chastain v. Sundquist*,
    833 F.2d 311, 315 (D.C. Cir. 1987)....................................................29

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398, 408, 133 S. Ct. 1138, 1146 (2013) .............................20

*Clinton v. Jones*,
    520 U.S. at 700..........................................................17, 22, 28, 29, 34

*Cohen v. Barr*,
    20 Civ 5614 (AKH) ............................................................................3

*Cohen v. United States*,
    No. 1:21-cv-10774 (LJL) (S.D.N.Y.) ECF No. 41 ...............................4

*Conard v. The Atlantic Insurance Co.*,
    1 Pet. 386, 441 (1828).....................................................................38

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61, 68 (2001).......................................................8, 9, 10, 15

*Davis v. Passman,*
    442 U.S. 228 (1979)........................................................................9, 13

*Doe v. Hagenbeck*,
    870 F.3d 36, 43 (2d Cir. 2017) ...........................................................9

*Dotson v. Griesa*,
    398 F.3d 156 (2d Cir. 2005) ..............................................................19

*Edwards v. Gizzi*,
  No. 20-CV-7371 (KMK), 2022 U.S. Dist.
  LEXIS 20100, 2022 WL 309393, at *7 (S.D.N.Y. Feb. 2, 2022) ...................15

*Egbert v. Boule*,
  142 S. Ct. 1793, 1800 (2022).......................................................*passim*

*FDIC v. Meyer*,
  510 U.S. 471 (1994)...................................................................10

*Ferri v. Ackerman*,
  444 U.S. 193, 203, 100 S. Ct. 402, 408, 62 L.Ed.2d 355 (1979) ......................27

*Gonzalez v. Hasty*,
  269 F. Supp. 3d 45, 60 ...............................................................26

*Hernández v. Mesa*,
  140 S. Ct. 735, 743 (2020)...............................................9, 10, 11, 13

*Hoffman v. Preston*,
  2022 WL 6685254, at *1 (9th Cir. 2022) ...........................................39

*Hui v. Castaneda*,
  559 U.S. 799 (2010)...................................................................9, 10

*I.N.S. v. Pangilinan*,
  486 U.S. 875, 883, 108 S. Ct. 2210, 100 L.Ed.2d 882 (1988) ..........................38

*Jackson v Bush*,
  448 F.Supp 2d 198, 201-02 (D.D.C. 2006) .........................................34

*Kendall v. United States*,
  12 Pet. 524, 610, 9 L.Ed. 1181 (1838).........................................20, 21

*Klayman v. Obama*,
  125 F.Supp.3d 67, 86 (D.D.C. 2015).............................................28, 32

*Loving v. United States*,
  517 U.S. 748, 756–757 (1996)...................................................17, 22

*Martinez v. D'Agata*,
    No. 16-CV-44 (VB), 2019 U.S. Dist.
    LEXIS 218107, 2019 WL 6895436, at *7 (S.D.N.Y. Dec. 18, 2019)..........15, 16

*McKune v. Lile*,
    536 U.S. 24, 39 ...................................................................................37

*Minneci v. Pollard*,
    565 U.S. 118 (2012)..............................................................................9

*Mississippi v. Johnson*,
    4 Wall. 475, 501, 18 L.Ed. 437 (1866) ...............................................20

*Myers v. United States*,
    272 U.S. 52, 122 (1926)......................................................................31

*Nixon v. Fitzgerald*,
    457 U.S. 731, 749 (1982).............................................................*passim*

*Ostrer v. Aronwald*,
    567 F.2d 551, 553 (2d Cir. 1977.........................................................37

*Pierson v. Ray*,
    386 U.S., at 554, 87 S. Ct., at 1218. ............................................27, 28

*Rodriguez v. Easter*,
    No. 20 Civ. 1872, 2022 WL 356478, at *6-7 (D. Conn. Feb. 7, 2022)........24, 26

*Rouse v. Trump*,
    20-CV-12308, 2020 WL 6701899, at *4 (E.D. Mich., Nov. 13, 2020) .............33

*Sabir v. Williams*,
    No. 20 Civ. 0008, 2020 WL 3489522, at *4 (D. Conn. June 26, 2020).............24

*Sanford v. Bruno*,
    2018 U.S. Dist. LEXIS 80897, 2018 WL 2198759,
    at *7 (E.D.N.Y. May 14, 2018) .........................................................25

*Schweiker v. Chilicky*,
    487 U.S. 412 (1988)............................................................................10

*Screws v. United States*,
    325 U.S. 91, 111 (1945)..................................................................................34

*Sommer v. Dixon*,
    709 F.2d 173, 175 (2d Cir. 1983) ...............................................................37

*Trump v. Vance*,
    140 S. Ct. 2412, 2425 (2020).............................................................14, 28

*United States v. City of Philadelphia*,
    644 F.2d 187, 200 (3d Cir.1980) ................................................................19

*United States v. Cohen*,
    18 Cr. 850 (WHP), ECF No. 16.....................................................................1

*United States v. Curtiss–Wright Exp. Corp.*,
    299 U.S. 304 (1936).........................................................................................20

*United States v. Nixon*,
    418 U.S. 683, 703-713, 94 S. Ct. 3090, 3105-3110 (1974)..............................21

*United States v. Stanley*,
    483 U.S. 669 (1987)..............................................................................10, 19

*United States v. Verdugo–Urquidez*,
    494 U.S. 259, 274 (1990).............................................................................19

*Warren v. Fischl*,
    33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) ..........................................37

*Webb v. Goord*,
    340 F.3d 105, 110 (2d Cir.2003) ......................................................37

*Widi v. Hudson*,
    No. 16 Civ. 1042, 2019 WL 3491250, at *4 (N.D.N.Y. Aug. 1, 2019) ............24

*Wiley v. Fernandez*,
    No. 19 Civ. 652, 2021 WL 6550821, at *5. .......................................26

*Wilkie v. Robbins*,
    551 U.S. 537, 550 (2007).................................................................8, 9, 10, 26

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579, 72 S. Ct. 863 (1952)......................................................................21

*Ziglar v. Abbasi*,
    137 S. Ct. 1843, 1857 (2017).........................................................................*passim*

### ***Statutes/Regulations/Miscellaneous***

18 U.S.C. § 3621(b) ........................................................................................37

18 U.S.C. § 4041 ...........................................................................................31

28 C.F.R. § 542.10 .........................................................................................24

28 U.S.C. § 501 .............................................................................................31

Coronavirus Aid, Relief, and Economic Security ("Cares") Act, Pub. L. No.
    116-136, 134 Stat. 281 (Mar. 27, 2020).............................................................1, 2

FRCP 8(a)(2) .................................................................................................35

U.S. Const. Art. II, § 3 ....................................................................................31

U.S. Const. Art. II, 7 § 1 .................................................................................31

## STATEMENT OF THE CASE

This appeal arises from a complaint filed by Appellant, Michael D. Cohen ("Appellant") on December 16, 2021 (the "Complaint") against the United States, seven individual defendants who are past/current government employees (the "Government Appellees"), and Donald J. Trump, the former President of the United States ("Appellee") (collectively "Appellees"). A-11. In total, the Complaint puts forth seven causes of action against the Appellees. *Id*. With respect to Appellee, Appellant asserts a single cause of action against him – a *Bivens* claim.

The allegations in the Complaint revolve around certain events which Appellant claims occurred in connection with his detention at The Federal Correctional Institution, Otisville (FCI Otisville). Specifically, Appellant alleges that he began serving a 36-month sentence at FCI Otisville on May 6, 2019 as a result of his nine felony convictions relating to tax evasion, false statements, and campaign finance crimes. *See United States v. Cohen*, 18 Cr. 602 (WHP), ECF No. 29; *United States v. Cohen*, 18 Cr. 850 (WHP), ECF No. 16; A-21.

Appellant alleges that during his incarceration, he began to draft a manuscript regarding the period of time in which he was employed by Appellee. A-21. Thereafter, Appellant alleges that he submitted a request on March 31, 2020 to the Bureau of Prisons (BOP) under the Coronavirus Aid, Relief, and Economic Security ("Cares") Act, Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27,

2020) requesting early release on furlough, and then transfer to home confinement. A-23. Thereafter, Appellant claims he was placed on furlough in May of 2020. A-23. Appellant alleges that during his furlough period, he made several public statement implying that he intended to publish a tell-all book concerning his experience working for Appellee, which he planned to release in late September 2020. *Id*.

On July 9, 2020, Appellant alleges that he and his counsel met with co-Appellees, Probation Officers Adam Pakula ("Pakula") and Enid Febus ("Febus"), along with other federal officers, at the U.S. District Courthouse to review Appellant's paperwork for transitioning to home confinement. A-24. Appellant asserts that during the meeting, Pakula and Febus presented him with a Federal Location Monitoring Program Participant Agreement ("FLM") that he was required to sign in order to transition to home confinement. *Id*. According to Appellant, the first condition of the agreement contained a clause that prohibited him from engaging with the media, including publishing his book. *Id*. Appellant alleges that he sought clarification and potential revision of the clause, to which Pakula and Febus responded that they had to "confer with their superiors to determine further clarify or revise the media contact limitations and directed [Appellant] to remain in their waiting room." A-25.

Appellant then alleges that after waiting for approximately 1.5 hours while the officers conferred, three U.S. Marshals served Appellant's counsel with a remand order issued by appellee, Patrick McFarland. A-26. The remand order stated that Appellant would be remanded because he failed to agree to the terms of the FLM agreement. *Id*.

Thereafter, Appellant claims that the BOP remanded him to FCI Otisville to serve the balance of his sentence, where he was allegedly placed in a "special segregated housing unit" before being transferred to "solitary confinement" where he spent 16 days. A-27. Appellant further alleges that the conditions of his confinement posed "serious health risks" for him. *Id*.

On July 20, 2020, Appellant filed a petition for habeas corpus, seeking a release from FCI Otisville on the basis that the Government remanded him in violation of his First Amendment rights. *See Cohen v. Barr*, 20 Civ. 5614 (AKH). On July 23, 2020, U.S. District Judge Alvin K. Hellerstein preliminarily granted Cohen's motion for injunctive relief and ordered his transfer from FCI Otisville to home confinement. A-29. Appellee was not a party to the *Cohen v. Barr* matter, and Judge Hellerstein's July 23, 2020 Order does not identify, refer, or relate to Appellee in any way.

In the Complaint, Appellant's sole allegation against Appellee is his contention that Appellee "issued specific directives and guidance to his co-

defendants that governed the treatment of [Appellant]." A-7. Notably, Appellant also alleges that Appellee (along with his co-Appellees), "[a]t all relevant times . . . acted within the course and scope of [his] employment and under the color of law." A-10.

On April 4, 2022, Appellee filed a motion to dismiss the Complaint, arguing that Appellant's *Bivens* claim was improper; that it was barred by the doctrine of presidential immunity; and that Appellant otherwise failed to state a cognizable cause of action against Appellant. *See generally*, *Cohen v. United States*, No. 1:21-cv-10774 (LJL) (S.D.N.Y.) ECF No. 41. The United States and the Government Appellees filed a joint motion to dismiss the Complaint on the same day. *See generally, Id*., ECF No. 39. The parties appeared before Hon. Lewis J. Liman of the Southern District of New York for oral argument on August 2, 2022. A-44-100.

Thereafter, on November 14, 2022, the District Court issued an Opinion and Order (the "Order") dismissing the action in its entirety. A-101. Specifically as it relates to Appellant's *Bivens* claim, the District Court found that (1) under Supreme Court precedent, there is no implied private right of action for damages for First Amendment retaliation; (2) Appellant's Fourth and Eighth Amendment claims arose in a new context; and (3) the availability of alternative remedial structures for Appellant constituted special factors that argued against extending a *Bivens* remedy to his claims based on the Fourth and Eighth Amendments. *See generally*, A-101-133.

On January 10, 2023, Appellant filed the instant notice of appeal. A-135.

## ISSUES PRESENTED FOR REVIEW

1. Did the District Court properly find that Appellant's claim is precluded under the *Bivens* doctrine?

2. Is the President immune from civil liability under the presidential immunity doctrine when the complaint specifically alleges that he was acting within the scope of his employment?

3. Did Appellant assert a cognizable cause of action against Appellee?

## SUMMARY OF ARGUMENT

The District Court correctly dismissed the underlying action since Appellant's theory of liability is fundamentally flawed and fails as a matter of law. This is especially true with respect to the single cause of action asserted against Appellee—a *Bivens* claim—which is improperly pled, defective on its face, and inconsistent with Supreme Court precedent.

In declining to imply a new cause of action for Appellant, the District Court recognized that expanding the *Bivens* doctrine to a new context is a "disfavored judicial activity" which the Supreme Court has become increasingly wary of. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Indeed, the Supreme Court recently emphasized that "in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the

courts." *Egbert v. Boule*, 142 S. Ct. 1793, 1800 (2022). In fact, the Court recently went so far as to question the viability of *Bivens* altogether, declaring "if we were called to decide *Bivens* today, we would decline to discovery *any* implied action in the Constitution." *Id.* at 1809. Given the unique circumstances of this case—which involves a claim against a then-sitting President for his purported official acts—and the significant separation of powers concerns that implicated, there is simply no question that a *Bivens* remedy would be improper.

Moreover, even if a *Bivens* claim were theoretically plausible in this scenario, Appellant's claim would nonetheless be barred by the doctrine of presidential immunity. Appellant has affirmatively pleaded that Appellee was acting "within the course and scope of [his] employment and under the color of law" with respect to the conduct alleged in the Complaint. A-20. Thus, it is indisputable that Appellant's *Bivens* claim is "predicated on [Appellee's] official acts" as President and, therefore, subject to presidential immunity. *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982).

Finally, Appellant's claim fails on a more basic level since it does not set forth a cognizable cause of action against Appellee. Indeed, the entirety of Appellant's claim is premised upon his vague and conclusory assertion that Appellee "issued specific directives and guidance to his co-defendants that governed the treatment of [Appellant]." A-17. Yet, there are simply no facts alleged in the Complaint to support this threadbare conclusion, nor does Appellant identify any act taken by

Appellee that could possibly be construed as a violation of his constitutional rights. Therefore, even viewed in a light most favorable to Appellant, the facts alleged in the Complaint fail to put forth a valid *Bivens* claim.

Therefore, for the reasons set forth herein, this Court should affirm the District Court's dismissal of Appellant's *Bivens* claim.

**ARGUMENT**

## I. THE DISTRICT COURT PROPERLY HELD THAT APPELLANT'S *BIVENS* CLAIM IS PRECLUDED

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, the Supreme Court authorized an implied cause of action for constitutional violations committed by a federal official. *See generally,* 403 U.S. 388 (1971). In doing so, the Court established the standard for maintaining a *Bivens* claim – a plaintiff must show that a federal official was "acting under color of his authority" when he violated the plaintiff's constitutional rights. *Id.* at 389; *Butz v. Economou*, 438 U.S. 478, 501 (1978) ("It mandated that any person who, under color of state [or federal] law, subjected another to the deprivation of his constitutional right would be liable to the injured party in an action at law.").

Since its holding in *Bivens*, however, there has been a "notable change in the Court's approach to recognizing implied causes of action . . . [and the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar*, 137 S. Ct. at 1857 (quoting *Iqbal*, 556 U.S. at 662). Indeed, the Court has

consistently cautioned that *Bivens* provides an extraordinary remedy that should rarely if ever be applied in "new contexts." *Id*. at 69; *see also Wilkie v. Robbins,* 551 U.S. 537, 550 (2007) ("[I]n most instances we have found a *Bivens* remedy unjustified."); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) ("[W]e have consistently refused to extend *Bivens* liability to any new context or new category of defendants."). It has also identified several "special factors counselling hesitation in the absence of affirmative action by Congress" which will render a *Bivens* remedy improper. *Id.* at 1857 (internal quotations omitted).

Here, both inquiries weigh heavily against implying a new *Bivens* remedy for Appellant. The instant action certainly involves a novel factual scenario since Appellant seeks to assert a claim against a former President for acts he allegedly took while in office. As such, it also implicates serious concerns under the separation of powers doctrines — which the Supreme Court been recognized as the most prominent "special factor[] counselling hesitation in the absence of affirmative action by Congress" *Id.* Therefore, the District Court correctly determined that the "disfavored judicial activity" of expanding the *Bivens* doctrine was not justified in the instant scenario. *Id.*

### A.   Expanding the Bivens Doctrine is Highly Disfavored Judicial Activity.

The Supreme Court has recognized an implied cause of action for damages against a federal official alleged to have violated the Constitution in only three

circumstances. First, in *Bivens*, the Court held that federal law-enforcement officers may face personal monetary liability for participating in a search or seizure that violates the Fourth Amendment. 403 U.S. at 388. Next, in *Davis v. Passman*, the Court extended *Bivens* to permit a damages suit against a congressman for gender discrimination in violation of the Due Process Clause of the Fifth Amendment. 442 U.S. 228 (1979). Finally, in *Carlson v. Green*, the Court permitted a *Bivens* claim to proceed against individual federal prison officials for an alleged violation of the Eighth Amendment's Cruel and Unusual Punishment Clause. 446 U.S. 14 (1980).

Aside from these narrow contexts, the Supreme Court has "otherwise consistently declined to broaden *Bivens* to permit new claims." *Doe v. Hagenbeck*, 870 F.3d 36, 43 (2d Cir. 2017); *see also Wilkie,* 551 U.S. 537, 550 (2007) ("[I]n most instances we have found a *Bivens* remedy unjustified."); *Malesko,* 534 U.S. at 68, 122 S. Ct. 515 ("[W]e have consistently refused to extend *Bivens* liability to any new context or new category of defendants."). Indeed, in the four decades since *Carlson*, the Supreme Court has "consistently rebuffed requests to add to the claims allowed under *Bivens*" and declined to extend the doctrine to a single new factual scenario. *Hernández v. Mesa*, 140 S. Ct. 735, 743 (2020) (listing cases). In particular, the twelve cases in which the Supreme Court has refused to extend *Bivens* liability include: *Egbert*, 142 S. Ct. at 1804; *Hernandez,* 140 S. Ct. 735 (2020); *Ziglar*, 137 S. Ct. 1843 (2017); *Minneci v. Pollard*, 565 U.S. 118 (2012); *Hui v. Castaneda*, 559

U.S. 799 (2010); *Wilkie*, 551 U.S. 537 (2007); *Malesko*, 534 U.S. 61 (2001); *FDIC v. Meyer*, 510 U.S. 471 (1994); *Schweiker v. Chilicky*, 487 U.S. 412 (1988); *United States v. Stanley*, 483 U.S. 669 (1987); *Bush v. Lucas*, 462 U.S. 367 (1983); and *Chappell v. Wallace*, 462 U.S. 296 (1983). The Court shifted its approach as it began to "'appreciate more fully the tension between' judicially created causes of action and 'the Constitution's separation of legislative and judicial power.'" *Egbert*, 142 S. Ct. at 1802 (quoting *Hernández*, 140 S. Ct. at 741).

The Supreme Court has generally "framed the [ Bivens] inquiry as proceeding in two steps." *Egbert*, 142 S. Ct. at 1803. The Court first asks "whether the request involves a claim that arises in a new context or involves a new category of defendants." *Hernández*, 140 S. Ct. at 743 (citation and internal quotation marks omitted). If the claim arises in a new context, the Court proceeds "to the second step," asking "whether there are any 'special factors that counsel hesitation' about granting the extension." *Id*. (brackets, citations, and internal quotation marks omitted). But as the Court recently explained, "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 142 S. Ct. at 1803; *see id*. at 1805 ("A court faces only one question: whether there is any rational reason (even one) to think that Congress is better suited to 'weigh the costs and benefits of allowing a damages

action to proceed.'"). And the answer to that question "in most every case" is that "no Bivens action may lie." *Id*. at 1800.

Recently, in *Egbert v. Boule*, the Supreme Court signaled its intent to rescind the *Bivens* doctrine altogether. 142 S. Ct. 1793 (2022). The plaintiff in *Egbert* was a U.S. citizen who owned an inn along the U.S.-Canada border that was frequently used for cross-border smuggling. *Id*. The plaintiff informed the defendant, a U.S. Border Patrol agent, that a Turkish national would be arriving at the inn; when he arrived, the agent followed his vehicle into the driveway to check on his immigration status. *Id.* at 1801. A physical altercation between the plaintiff and the agent ensued on the plaintiff's property. *Id.* The plaintiff later brought a Fourth Amendment excessive-force claim for damages under *Bivens*. *Id*. at 1801-1802.

The Supreme Court held that the claim could not proceed under *Bivens* "for two independent reasons." *Egbert*, 142 S. Ct. at 1804. First, it found that implying a new *Bivens* remedy in this context was improper because "Congress is better positioned to create remedies in the border-security context." *Id*. In doing so, the Court rejected the plaintiff's argument that a *Bivens* remedy should be available because the case involved "a more 'conventional' excessive-force claim" than the cross-border shooting claim in *Hernández*; because the plaintiff was "'a United States citizen, complaining of harm suffered on his own property in the United States'"; and because the Turkish national "already had cleared customs." *Id*. at 1805

(citation omitted). The Court explained that "a court should not inquire whether *Bivens* relief is appropriate in light of the balance of circumstances in the 'particular case,'" but instead "must ask 'more broadly' if there is any reason to think that 'judicial intrusion' into a given field might be 'harmful' or 'inappropriate.'" *Id*. (brackets and citations omitted).

The Court also found that a second independent reason barred the extension of *Bivens*: "the Government already has provided alternative remedies that protect plaintiffs"—including a U.S. Border Patrol grievance process. *Id*. at 1804. The Court emphasized that, "a court may not fashion a *Bivens* remedy if Congress has already provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" *Id*. at 1804. In its conclusion, the Court essentially declared *Bivens* a dead letter, stating that "if we were called to decide *Bivens* today, we would decline to discover *any* implied causes of action in the Constitution. *Id*. at 1809.

Justice Neil Gorsuch issued a concurring opinion which stands as a harsh critique of the *Bivens* doctrine. In his opinion, Justice Gorsuch posited that *Bivens* crossed a line by "impl[ying] a new set of private rights and liabilities Congress never ordained." *Id*. And in answering the new standard set forth in *Egbert*, he contended that such a balancing test has "no place in federal courts charged with deciding cases and controversies under existing law." *Id.* at 1810. While Justice Gorsuch questioned the Court's conclusion that the instant factual pattern differed

12

from *Bivens* itself, he found that there will never be a scenario wherein a court is better equipped than Congress to weigh the value of a new cause of action. *Id*. Justice Gorsuch then signaled a warning that "[i]n fairness to future litigants and our lower court colleagues, we should not hold out that kind of false hope, and in the process invite still more "protracted litigation destined to yield nothing" thereby essentially expressly abrogating *Bivens* in its entirety. *Id.* at 1810.

**B.    Appellant Seeks to Extend Bivens to a New Context.**

As discussed, "for almost 40 years" the Supreme Court has "consistently rebuffed requests" to extend the *Bivens* doctrine. *Hernández*, 140 S. Ct. at 743. Given the Supreme Court's hesitation to create additional *Bivens* remedies, before delving into the substantive analysis on a *Bivens* claim, "the first question a court must ask [is] whether the claim arises in a new *Bivens* context." *Ziglar*, 137 S. Ct. at 1864; *accord id.* at 1860.

A case presents a new context when it differs "in a meaningful way" from the three "previous *Bivens* cases" in which the Supreme Court created a damages remedy (*Bivens*, *Davis*, and *Carlson*). *Id.* at 1859. Specifically, in considering whether a factual scenario presents a "new context," courts will consider:

> "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the

13

> Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider."

*Id*. at 1860.

Applying this analysis, the District Court correctly determined that both Appellant's Fourth Amendment and Eighth Amendment claims arise in a new context. A-114. Indeed, Appellant's argument that the factual predicate here does not differ from prior *Bivens* cases is simply mistaken.

*First*, the "rank of the officer[] involved," on its own, conclusively establishes that the factual circumstances in the instant action are unique and stand apart from prior *Bivens* precedent. The allegations in the Complaint are squarely directed at Appellee during the time in which he was the sitting President of the United States. The President is the highest ranking officer in the nation — he is vested with the entirety of the "executive power" of the United States government, U.S. Const. Art. II § 1; he is the Commander in Chief of the Army and Navy of the United States," *id.*; and he is responsible for, among other things, "preserv[ing], protect[ing], and defend[ing] the Constitution," *id.*, taking "[c]are that the Laws be faithfully executed[.]" *id.* at § 3, and "enforc[ing] . . . federal law," "conduct[ing] . . . foreign affairs," and "manag[ing] . . . the Executive Branch," *Nixon*, 457 U.S. at 750. In other words, the President's duties are "of unrivaled gravity and breadth." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020). For this reason, the Supreme Court has acknowledged that "the President's unique status under the Constitution

distinguishes him from other executive officials." *Nixon*, 457 U.S. at 750. Given the absence of any successful *Bivens* claim against a President, there is no need for this Court's analysis to proceed any further. Thus, there is no question that this case "involves a new category of defendants," *Egbert*, 142 S. Ct. at 1803 (q*uoting Malesko*, 534 U.S. at 68), based upon the differences in "the rank of officers involved." *Ziglar*, 137 S. Ct. at 1860.

*Second*, as succinctly stated by the District Court, there is "no question" that Appellant's claims are factually distinct from those present in prior *Bivens* cases. A-114. In this case, Appellant alleges that the sitting President of the United States directed Bureau of Prisons officers to remand Appellant back to prison where he was held in solitary confinement. Unlike *Bivens*, Appellees here are Bureau of Prison officers, not federal narcotics agents. *See Egbert*, 142 S. Ct. at 1804 (accepting court of appeals' conclusion that Fourth Amendment excessive-force claim against Customs and Border Patrol agent "presented a new context for *Bivens* purposes."); *see also, e.g., Edwards v. Gizzi*, No. 20-CV-7371 (KMK), 2022 U.S. Dist. LEXIS 20100, 2022 WL 309393, at *7 (S.D.N.Y. Feb. 2, 2022) (lawsuit against Deputy U.S. Marshals presented new context because "the officers involved in Bivens were federal narcotics agents" and therefore part of "an investigatory and enforcement force," rather than members of the U.S. Marshals Service); *Martinez v. D'Agata*, No. 16-CV-44 (VB), 2019 U.S. Dist. LEXIS 218107, 2019 WL 6895436, at *7

(S.D.N.Y. Dec. 18, 2019) (finding a "meaningful difference" between *Bivens* and the case at issue because "the type of officers involved in Bivens were DEA agents, whereas here the officers were appointed members of a federal task force."). Furthermore, neither *Bivens* nor its progeny involved claims alleging that constitutional violations were conducted at the direction of a sitting President of the United States. As such, it is indisputable that Appellant's *Bivens* claim presents a unique factual scenario.

Additionally, the BOP officers here acted under a different "legal mandate" than the narcotics officers in *Bivens*. *Ziglar*, 137 S. Ct. at 1860 (listing "the statutory or other legal mandate under which the officer was operating" among non-exhaustive list of differences meaningful enough to render context new.). Whereas *Bivens* involved narcotics agents sued "for handcuffing a man in his own home without a warrant" while investigating drug violations, *id*., the BOP defendants in this case were involved in the process of returning a federal prisoner who had already been sentenced to imprisonment. As such, not only is the "legal mandate" different, but so too is the "extent of judicial guidance" governing the relevant conduct. *See Ziglar*, 137 S. Ct. at 1859-60 (listing "extent of judicial guidance as to how an officer should respond" as relevant difference that presents a new context.).

*Third*, the "risk of disruptive intrusion by the Judiciary into the functioning of other branches" is at its apex here, where Appellant is asking the judiciary to exert

control over the official conduct of the head of the Executive Branch. *Id.* at 1849. "Courts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint." *Nixon*, 457 U.S. at 753. Indeed, the Supreme Court explicitly cautioned against the judiciary exercising precisely this type of authority over a President's decision-making process in *Nixon v. Fitzgerald*, when the Court first established the doctrine of presidential immunity. The *Nixon* Court stressed that it was vital for the President to maintain autonomy in his official action, without interference from the judiciary, noting that "[b]ecause of the singular importance of the President's duties, diversion of his energies with concern with private lawsuits would raise *unique risks to the effective functioning of government*." *Nixon* 457 U.S. at 751 (emphasis added); *see also Clinton*, 520 U.S. at 700 ("Concern of encroachment and aggrandizement . . . has animated our separation-of-powers jurisprudence") (quoting *Loving v. United States,* 517 U.S. 748, 756–757 (1996). Expanding the *Bivens* doctrine to permit civil claims against a sitting President for his official conduct would run headlong into this very concern.

Based on the foregoing, the District Court correctly found that Appellant's claim presents a new *Bivens* context that does not justify the creation of a new remedy.

### C. There Are Special Factors Counselling Hesitation Against Implying a New Bivens Remedy.

"A *Bivens* remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Ziglar*, 137 S. Ct. at 1857 (quoting *Carlson*, 446 U.S. 14 (1980)); *see also Arar*, 585 F.3d at 573 ("When the *Bivens* cause of action was created in 1971, the Supreme Court explained that such a remedy could be afforded because that "case involve[d] no special factors counselling hesitation in the absence of affirmative action by Congress'") (citing *Bivens*, 403 U.S. at 396).

In determining whether special factors counselling hesitation are present, a court's inquiry "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Ziglar*, 137 S. Ct. at 1857-58. If it is not, a 'special factor' is present and dismissal of the complaint is warranted. *Id.*

In this context, a court's threshold for declining to imply a *Bivens* remedy is "remarkably low." *Arar*, F.3d at 574. As the Supreme Court explained in *Egbert*, "a court should not inquire whether *Bivens* relief is appropriate in light of the balance of circumstances in the 'particular case,'" but instead "must ask 'more broadly' if there is any reason to think that 'judicial intrusion' into a given field might be 'harmful' or 'inappropriate.'" *Id*. at 1805. The test is indeed so stringent that "if there

is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy." *Id*. at 1803 (quoting *Hernandez*, 140 S. Ct. at 743.).

Among the "special factors" that have "counsel[ed] hesitation" and thereby foreclosed a *Bivens* remedy are: military concerns, *United States v. Stanley,* 483 U.S. 669 (1987); separation of powers, *United States v. City of Philadelphia,* 644 F.2d 187, 200 (3d Cir.1980); the comprehensiveness of available statutory schemes, *Dotson v. Griesa,* 398 F.3d 156 (2d Cir. 2005); national security concerns, *Beattie v. Boeing Co.,* 43 F.3d 559, 563 (10th Cir.1994); and foreign policy considerations, *United States v. Verdugo–Urquidez,* 494 U.S. 259, 274 (1990); *see also Arar v. Ashcroft*, 585 F.3d 559, 573 (2d Cir. 2009).

In the case at bar, there are significant "special factors" that indicate that this Court is "at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 142 S. Ct. at 1798.  The most prominent consideration is that implying a *Bivens* remedy in the instant action would implicate serious separation of powers concerns. The Supreme Court has emphasized that the "central" consideration with respect to the 'special factors' inquiry is whether an action would run afoul of the "separation-of-powers principles." *Ziglar,* 137 S. Ct.  at 1857; *see also Hernandez*, 140 S. Ct. at 739 ("when a party seeks to assert an implied cause of action under a federal statute, separation-of-powers principles are or should be central to the analysis."); *Ziglar* 137 S. Ct. at

1857 ("the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide."); *Egbert*, 142 S. Ct. at 1806 n.3 (recognizing that a *Bivens* claim "is an extraordinary act that places great stress on the separation of powers.").

Permitting a *Bivens* claim to proceed against a President—the head of the Executive Branch—would undoubtedly raise grave separation-of-powers concerns. S*ee United States v. Curtiss–Wright Exp. Corp.,* 299 U.S. 304 (1936) (noting the "plenary and exclusive power of the President as the sole organ of the federal government" and discussing the difficulties presented by congressional—let alone judicial—involvement in such affairs.); *Mississippi v. Johnson*, 4 Wall. 475, 501, 18 L.Ed. 437 (1866) ("[W]e are fully satisfied that this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties; and that no such bill out to be received by us."); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S. Ct. 1138, 1146 (2013*)* ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."). Indeed, it is axiomatic that "[t]he executive power is vested in [the] President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power." *Nixon*, 457 U.S. at 754, 102 S. Ct. at 2703 (citing *Kendall v. United States*, 12 Pet. 524, 610,

9 L.Ed. 1181 (1838)). As the *Nixon* Court explained, the separation of powers

doctrine precludes the judiciary from exercising jurisdiction over a President for the

type of civil action that Appellant has sought to bring:

> [O]ur cases [] have established that a court, before exercising
> jurisdiction, must balance the constitutional weight of the interest to be
> served against the dangers of intrusion on the authority and functions
> of the Executive Branch. When judicial action is needed to serve broad
> public interests—as when the Court acts, not in derogation of the
> separation of powers, but to maintain their proper balance . . . or to
> vindicate the public interest in an ongoing criminal prosecution . . . the
> exercise of jurisdiction has been held warranted. ***In the case of [a]
> merely private suit for damages based on a President's official acts,
> we hold it is not.***

*Id.* at 754, 2703 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72

S. Ct. 863 (1952); *United States v. Nixon*, 418 U.S. 683, 703-713, 94 S. Ct. 3090,

3105-3110 (1974)) (emphasis added).

The *Nixon* decision—wherein the Supreme Court held that a President is

entitled to absolute immunity for his official acts—centered around the Court's

concerns that the judiciary's intrusion into the President's official conduct would

violate the separation of powers doctrine. The Supreme Court determined that

presidential immunity was "a functionally mandated incident of the President's

unique office" which is "rooted in the constitutional tradition of the separation of

powers." *Nixon*, 457 U.S. at 749. The *Nixon* Court also highlighted the President's

"management of the Executive Branch" as one of the reasons why absolute

immunity is warranted, stating that it is "a task for which 'imperative reasons

require[e] an unrestricted power [in the President] to remove the most important of his subordinates in their most important duties." *Id.* at 750.

Thereafter, in *Clinton v. Jones*, the Supreme Court confirmed that the "dominant concern" in *Nixon* was not that a sitting President might be "distracted by the need to participate in litigation during the pendency of his office" but that his "decisionmaking process" may be distorted due to "needless worry as to the possibility of damages actions stemming from any particular official decision." *Clinton*, 520 U.S. at 694 n.19. While the *Clinton* court ultimately concluded that the judiciary had jurisdiction to oversee a particular civil action against President Clinton, the Court's decision was premised upon its finding that the conduct at issue had taken place *before* President Clinton was in office; therefore, the Court reasoned, "[w]hatever the outcome of this case, there is ***no possibility*** that the decision will curtail the scope of the official powers of the Executive Branch." *Clinton*, 520 U.S. at 682, 117 S. Ct. at 1638 (emphasis added); *see also Loving v. United States*, 517 U.S. 748, 757 (1996) (stating "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties" (citations omitted)). That is simply not the case here, as Appellant seeks judicial review of acts that occurred during Appellee's time in office. *See* A-07 ("At all times relevant herein, defendant Donald J. Trump was President of the United States[.]").

It is therefore imperative for this Court to decline expanding the *Bivens* doctrine in this manner. Permitting a claim to proceed against a former President—who is alleged to have been acting within the scope of presidential duties at the time the allegations in the complaint arose—would implicate serious separation-of-powers concerns that would upend the balance of power between the Executive Branch and the judiciary.

### D. The District Court Correctly Found That Appellant Could Avail Himself of Alternative Remedies, Thereby Precluding a *Bivens* Claim.

The Supreme Court has explicitly stated that courts "may not fashion a Bivens remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure." *Egbert*, 142 S. Ct. at 1798; *Ziglar*, 137 S. Ct. at 1863 ("[W]hen alternative methods of relief are available, a *Bivens* remedy usually is not."). Indeed, the existence of alternative remedies alone should prompt this Court "to think Congress might doubt the efficacy or necessity of a damages remedy in a suit like this one." *Ziglar*, 137 S. Ct. at 1865 (internal quotation marks omitted). "If there are alternative remedial structures in place, 'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.'" *Egbert*, 142 S. Ct. at 1804.

Importantly, the Supreme Court has instructed that the adequacy—or inadequacy, particularly in terms of its provision of damages—of an alternative

structure should have no bearing on a court's consideration of whether the structure evinces Congress' doubts about the necessity of a *Bivens* remedy. *See id*. at 1807 ("[T]he question whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts."). The Supreme Court did not mince words when it stated that "[s]o long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Id*.

Here, Appellant had a number of alternative remedies available to him, namely the BOP's Administrative Remedy Program. Under the Administrative Remedy Program, which is the result of congressional action, inmates can file grievances "relating to any aspect of his/her own confinement." 28 C.F.R. § 542.10. Numerous courts have already found that the Administrative Remedy Program is an alternative remedial structure which precludes the assertion of a *Bivens* remedy. *See, e.g., Rodriguez v. Easter*, No. 20 Civ. 1872, 2022 WL 356478, at *6-7 (D. Conn. Feb. 7, 2022); *Sabir v. Williams*, No. 20 Civ. 0008, 2020 WL 3489522, at *4 (D. Conn. June 26, 2020); *Widi v. Hudson*, No. 16 Civ. 1042, 2019 WL 3491250, at *4 (N.D.N.Y. Aug. 1, 2019); *Cannenier v. Skipper-Scott*, No. 18 Civ 2383, 2019 WL 764795, at *5 (S.D.N.Y. Feb. 20, 2019).

In arguing to the contrary, Appellant points to certain statements made *in dicta* in the District Court's opinion, wherein the District Court was reluctant to find that Appellant "could have successfully remedied the alleged constitutional violations in such a forum." A-116. The Supreme Court in *Ziglar*, however, has already determined that "Congress has created any alternative, existing process for protecting the [injured party's] interest . . . may amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." 137 S. Ct. at 1858 (punctuation omitted); *see also*, *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 524 (6th Cir. 2020) (identifying BOP administrative remedies as an alternative method of relief that weighed against extending *Bivens*).

While Appellant, and possibly even the District Court, may be dissatisfied with the relief provided by the Administrative Remedy Program, the mere availability of an alternative remedy is not nullified by the fact that it did not produce a favorable result for a particular individual. *See Sanford v. Bruno*, 2018 U.S. Dist. LEXIS 80897, 2018 WL 2198759, at *7 (E.D.N.Y. May 14, 2018) ("The overlapping administrative and judicial remedies that already exist to address plaintiff's situation here are thus adequate for purposes of determining whether to imply a *Bivens* remedy — even though those remedies did not work in this instance."). Further, it is of no moment that damages are not recoverable through the

Administrative Remedy Program, as an alternative process need only provide a "means to be heard" and "some procedure to defendant and make good on [the inmate's] position" to counsel hesitation; it need not provide complete relief. *See Wilkie*, 551 U.S. at 552.

More importantly, Appellant has already pursued an alternative remedy by petitioning for a writ of habeas corpus. Indeed, Appellant's counsel candidly admitted that Appellant relied on this remedy with success. *See* A-99, ("Again, one thing about the habeas relief. My client was freed because of the habeas relief. That stopped the bleeding, your Honor."). Further, relevant case law dictates where, as in the matter *sub judice*, the writ is available, a *Bivens* remedy should not be implied. *See e.g.*, *Ziglar,* 137 S. Ct. at 1863 (The "habeas remedy" may "provide [ ] a faster and more direct route to relief than a suit for money damages."); *Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 60 (same); *Rodriguez*, 2022 WL 356478, at *6-7 (noting that the existence of the petition for writ of habeas corpus counseled against extending *Bivens* to plaintiff's First Amendment retaliation and Eighth Amendment non-medical conditions of confinement claims); *Wiley v. Fernandez*, No. 19 Civ. 652, 2021 WL 6550821, at *5.

As such, the existence of alternative remedies serves as an independent basis to preclude the creation of a new *Bivens* remedy here.

## II.    APPELLANT'S CLAIMS ARE BARRED BY PRESIDENTIAL IMMUNITY

Assuming *arguendo* that this Court were to find that a *Bivens* could theoretically be maintained in the instant scenario, Appellant's claim fails all the same since it is independently foreclosed by the doctrine of presidential immunity.

It is blackletter law that a President is "entitled to absolute immunity from damages liability predicated on his official acts." *Nixon*, 457 U.S. at 749. This precedent was established in the seminal case of *Nixon*, wherein the Supreme Court held that this wide-spanning, unqualified immunity is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id*. at 749. The Supreme Court emphasized the indispensable nature of this protection, noting that, without it, a President's ability to effectively serve his country would be severely hindered. In particular, the Supreme Court reasoned:

> Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government. As is the case with prosecutors and judges—for whom absolute immunity now is established—a President must concern himself with matters likely to "arouse the most intense feelings." *Pierson v. Ray*, 386 U.S., at 554, 87 S. Ct., at 1218. Yet, as our decisions have recognized, it is in precisely such cases that there exists the greatest public interest in providing an official "the maximum ability to deal fearlessly and impartially with" the duties of his office. *Ferri v. Ackerman*, 444 U.S. 193, 203, 100 S. Ct. 402, 408, 62 L.Ed.2d 355 (1979). This concern is compelling where the officeholder must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system. Nor

> can the sheer prominence of the President's office be ignored. In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages. Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve.

*Id.* at 752-753. *see also Pierson v. Ray*, 386 U.S. 547, 554 (1967) (explaining that immunity serves the public interest in preserving the independence and decisiveness necessary of government officials); *Vance*, 140 S. Ct. 2412, 2425 (noting that the President's duties "are of unrivaled gravity and breadth.").

The test for determining whether presidential immunity applies is an objective one — it focused on the nature of the act in question, not the motive underlying it. *Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of 'functional' theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive."); *Clinton*, 520 U.S. at 693 (Noting that "immunities are grounded in 'the nature of the function performed," rather than in the lawful or unlawful motivations of the person performing them."). Indeed, presidential immunity is "not overcome by 'allegations of bad faith or malice.'" *Klayman v. Obama*, 125 F.Supp.3d 67, 86 (D.D.C. 2015) (quoting *Barret v. Harrington*, 130 F.3d 246, 254-55 (6th Cir. 1997)); even "alleged wrongful acts . . . lay well within the outer perimeter" of the President's authority." *Nixon*, 457 U.S.

at 757 (emphasis added). Thus, inquiry into the subjective motive or intent underlying the President's alleged conduct is simply improper.

In the present scenario, it cannot be reasonably disputed that Appellant's theory of liability is premised upon "acts within the 'outer perimeter' of [Appellee's] official capacity" as President. *Nixon*, 457 U.S. at 755. Therefore, for the reasons outlined below, it cannot be reasonably dispute that Appellee is immune from suit under the doctrine of presidential immunity.

## A. The Complaint Affirmatively Pleads That Appellee Was Acting Within the Scope of His Presidential Duties

As established in *Nixon*, in determining whether conduct falls within the purview of presidential immunity, the relevant inquiry is whether a plaintiff's allegations are "predicated on [the President's] official acts." *Nixon*, 457 U.S. at 749. This "sphere of protected action" is interpreted broadly and extends to conduct within the "outer perimeter of his official responsibilities." *Id*. at 756; *see also Chastain v. Sundquist*, 833 F.2d 311, 315 (D.C. Cir. 1987) (holding that presidential immunity "is absolute . . . subject only to the requirement that [his] actions fall within the outer perimeter of [his] official duties"); *Clinton*, 520 U.S. at 696 ("With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages.").

Here, Appellant outright concedes that the conduct alleged in the Complaint falls squarely within the protected sphere of Appellee's presidential duties. Indeed,

in the Complaint, Appellant expressly alleged that "***at all relevant times herein, [Appellee] acted within the course and scope of [his] employment and under the color of law***." A-20 (emphasis added). In addition, Appellant identified Appellee in the caption of the Complaint as "DONALD J. TRUMP, former *President of the United States*." A-11 (emphasis added). Likewise, in the "Parties" section, Appellant states that "[a]t all relevant times herein, defendant Donald J. Trump was President of the United States . . . was head of the Executive Branch of the Federal Government . . . [and] was responsible for the oversight and enforcement of the laws of the United States." A-17.

Thus, to state it plainly, Appellant has incontrovertibly placed his claim within the purview of the presidential immunity doctrine. By alleging that Appellee was "acting within the course and scope of his employment," Appellant has acknowledged that his claim is "predicated on [Appellee's] official acts" as President. *Nixon*, 457 U.S. at 749. Accordingly, by Appellant's own admission, presidential immunity applies as a matter of course.

Furthermore, even beyond Appellant's affirmative acknowledgment, examination of the facts alleged in the Complaint reveals that Appellant's claim is based on conduct that falls within the scope of Co-Appellee's official duties. Indeed, Appellant's entire theory of liability against Appellant is predicated on his assertion that Appellant "issued specific directives and guidance to his co-defendants"

concerning the handling of [Appellant's] incarceration and potential furlough. A-17. The "co-defendants" in the mentioned context can be readily recognized as present and/or past federal personnel affiliated with the Department of Justice (DOJ) and the Bureau of Prisons (BOP). Both of these entities fall under the purview of the Executive Branch. *See* 28 U.S.C. § 501 ("The Department of Justice is an executive department of the United States at the seat of Government."); *see generally* 18 U.S.C. § 4041 et seq. (setting forth the organization and structure of the BOP). Appellee's ability to oversee, guide, or exercise influence over the DOJ and the BOP is solely derived from his position as President. *See* U.S. Const. Art. II, 7 § 1 ("The executive Power shall be vested in a President of the United States of America."); *Nixon*, 457 U.S. 731 at 750 (noting that Art. II, § 1 "establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity."). Thus, any "specific directives" issued by Appellee to his codefendants would have been well within his official responsibilities as chief of the Executive Branch. This authority also arises from a President's overarching duty to "preserve, protect, and defend the Constitution," U.S. Const. Art. II, § 1, and to take "[c]are that the Laws be faithfully executed[.]" U.S. Const. Art. II, § 3; *see also Myers v. United States*, 272 U.S. 52, 122 (1926) (describing the take care clause as "sweeping words" which are to be broadly interpreted.).

To the extent Appellant alleges that Appellee's alleged conduct was motivated by malicious intent, thereby exceeding his official authority, this argument fails since it is well established that presidential immunity is "not overcome by 'allegations of bad faith or malice.'" *Obama*, 125 F.Supp.3d at 86 (quoting *Harrington*, 130 F.3d at 254-55). For the purposes of determining whether absolute immunity applies, a court's inquiry must focus on the objective nature of the conduct in question (i.e., whether the act itself is within the scope of a president's official duties); inquiry into the subjective motive or intent underlying the alleged conduct is prohibited. *See Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of 'functional' theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive."); *Barr v. Matteo*, 360 U.S. 564, 575 (1959) ("[T]he claim of an unworthy purpose does not defeat the privilege [of absolute immunity]."). Even "alleged wrongful acts . . . lay well within the outer perimeter" of the President's authority." *Nixon*, 457 U.S. at 757. Therefore, Appellant's motive argument is nothing more than a red herring.

Therefore, in view of the substance of the allegations contained in the Complaint—including Appellant's admission that Appellee's alleged conduct was done "within the course and scope of [his] employment and under the color of law"—it is indisputable that Appellant's claim is "predicated on [Appellant's]

official acts" as President. *Nixon*, 457 U.S. at 749. As such, it cannot be reasonably disputed that his claim is barred by the doctrine of presidential immunity.

### B. A *Bivens* Claim Inherently Fails Against a President

Even if Appellants' Complaint did not affirmatively plead that Appellee's conduct is immune from suit, the Complaint would fail all the same since it is well settled that the doctrine of presidential immunity precludes a *Bivens* claim from being maintained against a current or former President for acts taken while in office. *See generally Nixon*, 457 U.S. at 749 (1982) ("[A] former President of the United States[] is entitled to absolute immunity from damages liability predicated on his official acts."); *see also id.* at 770 (White, J., dissenting) ("[I]t is difficult to read the [majority's] opinion coherently as standing for any narrower proposition: Attempts to subject the President to liability . . . through a *Bivens* proceeding would violate the separation of powers."); *Rouse v. Trump*, 20-CV-12308, 2020 WL 6701899, at *4 (E.D. Mich., Nov. 13, 2020) ("[T]o the extent plaintiffs seek money damages from the President pursuant to *Bivens[]*, the President "is entitled to absolute immunity from damages liability predicated on his official acts."); *Allen v Biden*, CV-21-01150-PHX-JAT, 2021 WL 3472740, at *1 (D. Ariz., Aug. 6, 2021) ("The Supreme Court has also held that the President of United States is entitled to absolute immunity from *Bivens* actions) (citing *Nixon*, 457 U.S. at 758); *Brown v Obama*, 10-CIV-6426-LBS, 2011 WL 2207569, at *2 (S.D.N.Y., May 31, 2011) ("Were

Plaintiff to bring this [*Bivens*] action . . . against the President in his individual capacity, it would likewise be dismissed, as the President 'is entitled to absolute immunity from damages liability predicated on his official acts.'") (citing *Nixon*, 457 U.S. at 749); *Jackson v Bush*, 448 F.Supp 2d 198, 201-02 (D.D.C. 2006) ("Since plaintiff brings this suit against President Bush for actions he allegedly took 'within the scope of his lawful authority,' the President has absolute immunity from this lawsuit in his individual capacity.") (citing *Nixon* 457 U.S. at 756).

Any other outcome would simply defy logic. If Appellee's alleged conduct fell outside the "outer perimeter of his official responsibility" as President, then his actions could not possibly have been carried out "under [the] color of his authority" as is required under *Bivens*. *See generally Bivens,* 403 U.S. 388 (1971). Indeed, even if Appellee's alleged conduct could be construed as being "purely private" in nature—despite the Complaint alleging the exact opposite—such a finding would necessarily curtail Appellant's ability to maintain a *Bivens* claim against Appellee. *See Clinton*, 520 U.S. at 696 ("With respect to acts taken in in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages. But he is otherwise subject to the laws for his purely private acts."); *compare to Screws v. United States*, 325 U.S. 91, 111 (1945) (noting that "acts of officers in the ambit of their personal pursuits" do not qualify as acts committed "under the color of law."). In other words, either

presidential immunity applies, or *Bivens* does not. In either scenario, Appellant's claim fails.

Therefore, Appellant's *Bivens* claim is squarely foreclosed by the doctrine of presidential immunity.

## III. THE COMPLAINT FAILS TO PUT FORTH A COGNIZABLE CAUSE OF ACTION AGAINST APPELLEE

Assuming *arguendo* that Appellant's claim survives under *Bivens*, and Appellee is not shielded under the doctrine of presidential immunity, Appellant's claim still fails because he has failed to put forth a cognizable cause of action against Appellee.

Under FRCP 8(a)(2), a pleading must contain a "short a plain statement of the claim showing the pleading is entitled to relief." FRCP 8(a)(2). The pleading standard of FRCP 8(a)(2) requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Bell Atlantic Corp. v. Twombly.*, 550 U.S. 544, 555 (2007). A pleading that offers "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id*. Nor will a complaint that provides mere "naked assertion[s]" devoid of "further factual enhancement." *Id*. at 557. Further, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged. *Id.,* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.,* at 557.

Here, Appellant fails to identify a single act purportedly taken by Appellee that could sufficiently be construed as a violation of his constitutional rights. The full extent of Appellant's allegations against Appellee are that he "issued specific directives and guidance to his co-defendants that governed the treatment of [Appellant]" and that "at [Appellee's] direction, [Appellant] was remanded back to prison and subject to great indignities when he was unlawfully incarcerated and held in solitary confinement." A-17. Yet, Appellant fails to provide any facts to support this vague and conclusory claim. Critically, Appellee is not mentioned once in the recitation of facts when it comes to the alleged deprivation of constitutional rights – only the actions of the co-Appellees are described. Nor does Appellant offer a single fact in support of his unsubstantiated belief that Appellee directed or guided the actions of any of the co-Appellees. Notably, Appellant fails to even articulate the "specific directives" that Appellee purportedly gave to the co-Appellees – he merely broadly asserts that he ordered that Appellant be "remanded back to prison," which, in and of itself, is well within the BOP's discretionary authority and not a tortious

36

act. *See* 18 U.S.C. § 3621(b) (conferring sole authority and discretion in the BOP to "designate the place of [a] prisoner's imprisonment," a determination which is "not reviewable by any court."); *see also McKune v. Lile*, 536 U.S. 24, 39 ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise.").

Moreover, although not plead in such a manner, the vague and conclusory allegations contained in the Complaint fail to adequately allege that Appellee entered into an agreement or had a meeting of the minds with the other co-Defendants to sufficiently maintain a conspiracy claim under *Bivens*. *See Ashcroft*, 585 F.3d at 569 ("Broad allegations of conspiracy are insufficient; the plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." (citing *Webb v. Goord,* 340 F.3d 105, 110 (2d Cir.2003)); *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977) ("Diffuse and expansive allegations ... will not suffice to sustain a claim of governmental conspiracy to deprive appellants of their constitutional rights."); *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights" will not survive dismissal.") *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) ("A plaintiff must make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to

demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end.").

Finally, Appellant's *Bivens* claim—set forth in the Complaint's Seventh Cause of Action—is so overbroad and ambiguous that it fails to even differentiate between any of the Appellees and merely groups them all together as "Defendants" without attempting to distinguishing any specific acts committed by any of one of them. *See Arar*, 585 F.3d 559 (finding that plaintiff failed to state a cognizable *Bivens* claim when the complaint grouped together "undifferentiated" defendants and "fail[ed] to specify any culpable action taken by any single defendant.").

As such, the Complaint is facially defective as it relates to Appellee and, therefore, was properly dismissed with prejudice.

## IV. THIS COURT SHOULD NOT INVENT A NEW CAUSE OF ACTION THAT CIRCUMVENTS EXISTING CASE LAW.

Seemingly recognizing that he is not entitled to any relief under existing law, Appellant instead pleads with this Court to conjure up a new remedy out of whole cloth. It is beyond dispute, however, that "equity follows the law." *Conard v. The Atlantic Insurance Co.*, 1 Pet. 386, 441 (1828). "'Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law.'" *I.N.S. v. Pangilinan*, 486 U.S. 875, 883, 108 S. Ct. 2210, 100 L.Ed.2d 882 (1988) (internal quotations omitted.)

Indeed, as discussed at length *supra*, it is not enough for Appellant to be dissatisfied with the remedies that are already available to him. *Hoffman v. Preston*, 2022 WL 6685254, at *1 (9th Cir. 2022) ("Congress has not authorized a damages remedy in this context, and there are 'rational reason[s],' why it might not, for example, the existence of the Bureau of Prisons' formal review process for inmate complaints.") (citation omitted and brackets in original). As the Supreme Court has already made clear, "in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." *Egbert*, 142 S. Ct. at 1800. Appellant has made no meaningful showing that this case presents unusual circumstances that would permit this Court to go against that maxim. Further, as detailed above, there are important and compelling reasons why *Bivens* should not be extended to the new context that Appellant has proposed; why Appellee is absolutely immune from suit; and why Appellant's claim is prohibited under the separation of powers doctrine. As such, the creation of an entirely new remedy would be wholly inappropriate and contravene decades of Supreme Court precedent.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should affirm the District Court's dismissal of Appellant's *Bivens* claim and dismiss Appellant's Complaint with prejudice.

Dated: July 24, 2022
     New York, New York

                                Respectfully submitted,

                                *s/Alina Habba*
                                Alina Habba, Esq.
                                Michael T. Madaio, Esq.
                                HABBA MADAIO & ASSOCIATES LLP
                                1430 U.S. Highway 206, Suite 240
                                Bedminster, New Jersey 07921
                                -and-
                                112 West 34th Street, 17th & 18th Floors
                                New York, New York 10120
                                Telephone: (908) 869-1188
                                Facsimile: (908) 450-1881
                                E-mail: ahabba@habbalaw.com
                                         mmadaio@habbalaw.com
                                *Attorneys for Defendant-Appellee,*
                                *Donald J. Trump*

## CERTIFICATION PURSUANT TO
## Fed. R. App. P. 32(a)(7)(B) and (C)

The undersigned hereby certifies that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and (C) because the brief contains 9,569 words of text.

The brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word 2003, Times New Roman, Size 14.

Dated: July 24, 2022
    New York, New York

                                *s/Alina Habba*

*DB*